RON BENDER (SBN 143364)
BETH ANN R. YOUNG (SBN 143945)
MICHAEL G. D'ALBA (State Bar No. 264403)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, CA 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyg.com; bry@lnbyg.com; mgd@lnbyg.com

Attorneys for Defendants Life Capital Group, LLC and
Jonathan Polter

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>LESLIE KLEIN,<br><br>                    Debtor. | Case No. 2:23-bk-10990-NB<br><br>Chapter 11<br><br>Adv. Case No.: 2:25-ap-01020-NB |
| BRADLEY D. SHARP, Chapter 11 Trustee,<br><br>                    Plaintiff,<br><br>v.<br><br>LIFE CAPITAL GROUP, LLC, a limited liability company, SHLOMO Y. RECHNITZ, individually and as a member of LIFE CAPITAL GROUP, LLC, YISROEL ZEV RECHNITZ, an individual, CHAIM MANELA, an individual, JONATHAN POLTER, an individual and as a manager of LIFE CAPITAL GROUP, and SECURITY LIFE OF DENVER LIFE INSURANCE COMPANY,<br><br>                    Defendants. | **DEFENDANTS LIFE CAPITAL GROUP, LLC AND JONATHAN POLTER'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION BEFORE THE RABBINICAL COUNCIL OF CALIFORNIA AND FOR A STAY; DECLARATION OF JONATHAN POLTER, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF**<br><br>Date:      May 6, 2025<br>Time:     1:00 p.m.<br>Place:    Courtroom 1545<br>              255 E. Temple Street<br>              Los Angeles, CA 90012 |

1

1

# <u>TABLE OF CONTENTS</u>

2

3

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 4

4

I. SUMMARY OF ARGUMENT ......................................................................... 4

5

II. STATEMENT OF FACTS ............................................................................ 5

6

    A.    The Parties .................................................................................. 5

7

    B.    The LLC Agreement Mandates Arbitration of Disputes ............................ 6

8

    C.    In 2022, Debtor Filed Suit in the State Court Against LCG and Rechnitz
Alleging Breach of the LLC Agreement and That Action Was Compelled

9

            to Arbitration With the RCC .......................................................... 6

10

    D.    The Parties Settled the Claims in the Prior State Court Action ................. 7

11

    E.    The Debtor Files a Chapter 11 Bankruptcy Petition and The Trustee Files

12

            the Instant Adversary Proceeding .................................................... 7

13

III. ARGUMENT ........................................................................................... 8

14

    A.    The FAA Applies and Requires Arbitration ........................................ 8

15

    B.    The Court Should Compel Arbitration Because A Valid Arbitration
Agreement Exists and The Scope of the Agreement Encompasses the

16

            Claims At Issue ......................................................................... 10

17

            1.    The Parties' Arbitration Agreements Are Valid and Enforceable 12

18

            2.    The Arbitration Agreements Cover the Dispute ......................... 15

19

    C.    Use Of Rabbinical Courts To Resolve Disputes Is Widely Recognized.. 21

20

    D.    The Court Should Order a Stay Pending Arbitration .............................. 22

21

IV. CONCLUSION ...................................................................................... 23

22

DECLARATION OF JONATHAN POLTER ........................................................ 24

23

REQUEST FOR JUDICIAL NOTICE ............................................................... 26

24

25

26

27

28

i

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Federal Cases**

4

*Allied-Bruce Terminix Cos., Inc. v. Dobson,*
5      513 U.S. 265 (1995) ............................................................................. 9

6      *AT&T Mobility LLC v. Concepcion,*
7      563 U.S. 333 (2011) ...................................................................... 8, 9, 12

8      *Balen v. Holland Am. Line Inc.,*
       583 F.3d 647 (9th Cir. 2009) ............................................................. 2
9

10     *In re Celsius Network LLC,*
       658 B.R. 643 (Bankr. S.D.N.Y. 2024) ....................................... 9, 20

11
       *Chiron Corp. v. Ortho Diagnostic Sys.,*
12     207 F.3d 1126 (9th Cir. 2000) .......................................................... 11

13     *Cibro Petroleum Products, Inc. v. City of Albany,*
       270 B.R. 108 (S.D.N.Y. 2001) ......................................................... 21
14

15     *Circuit City Stores, Inc. v. Najd,*
       294 F.3d 1104 (9th Cir. 2002) .......................................................... 13
16

17     *Collins v. D.R. Horton, Inc.,*
       505 F.3d 874 (9th Cir. 2007) ............................................................ 11

18
       *Cordas v. Uber Techs., Inc.,*
19     228 F. Supp. 3d 985 (N.D. Cal. 2017) ............................................. 13

20     *Cox v. Ocean View Hotel Corp.,*
21     533 F.3d 1114 (9th Cir. 2008) . Bankruptcy .............................. 8, 10

22     *Davis v. Nordstrom, Inc.,*
       755 F.3d 1089 (9th Cir. 2014).......................................................... 12
23

24     *In re Eber,*
       687 F.3d 1123 (9th Cir. 2012) .......................................................... 19

25     *First Options of Chi., Inc. v. Kaplan,*
26     514 U.S. 938 (1995) ......................................................................... 12

27     *Fli-Lo Falcon, LLC v. Amazon.com,*
       97 F.4th 1190 (9th Cir. 2024) .......................................................... 11
28

*Franklin v. Community Regional Medical Center*,
    998 F.3d 867 (9th Cir. 2021) .......................................................................... 14

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) ................................................................................. 19, 21

*In re Gurga*,
    176 B.R. 196 (B.A.P. 9th Cir. 1994) ............................................................ 16, 17

*Hardin Invs., Ltd v. Globex Kosher Foods*,
    2016 U.S. Dist. LEXIS 9618 (E.D.N.Y. Jan. 27, 2016) ....................................... 22

*Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    885 F.2d 1149 (3rd Cir. 1989) ..................................................................... 14, 16

*Herrera v. Cathay Pacific Airways, Ltd.*,
    104 F.4th 702 (9th Cir. 2022) ........................................................................ 14

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002) ................................................................................. 10, 11

*In re J.E.L. Site Dev., Inc.*,
    646 B.R. 338 (M.D. Fla. 2022) ...................................................................... 16

*Johnson v. Walmart Inc.*,
    57 F.4th 677 (9th Cir. 2023) ........................................................................ 11

*Knutson v. Sirius XM Radio, Inc.*,
    771 F.3d 559 (9th Cir. 2014) ........................................................................ 13

*Lamps Plus, Inc. v. Varela*,
    587 U.S. 176 (2019) ................................................................................... 17

*Marselian v. Wells Fargo & Co.*,
    514 F. Supp. 3d 1166 (N.D. Cal. 2021) ........................................................... 14

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ................................................................................... 10

*In re Mor-Ben Ins. Markets Corp.*,
    73 B.R. 644 (9th Cir. BAP 1987) ................................................................... 16

*In re Morgan*,
    28 B.R. 3 (B.A.P. 9th Cir. 1983) ................................................................. 18, 19

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ...................................................................................... 11

*Mundi v. Union Sec. Life Ins. Co.*,
    555 F.3d 1042 (9th Cir. 2009).................................................................. 12

*Ortiz v. Hobby Lobby Stores, Inc.*,
    52 F. Supp. 3d 1070 (E.D. Cal. 2014)...................................................... 12

*Perry v. Thomas*,
    482 U.S. 483 (1987).................................................................................... 9

*Quackenbush v. Allstate Ins. Co.*,
    121 F.3d 1372 (9th Cir. 1997).................................................................. 10

*Republic of Nicaragua v. Standard Fruit Co.*,
    937 F.2d 469 (9th Cir. 1991).................................................................... 11

*Ruderman v. Rolls Royce Motor Cars, LLC*,
    511 F. Supp. 3d 1055 (C.D. Cal. 2021) ..................................................... 8

*Schaffer Family Investors, LLC v. Sonnier*,
    120 F. Supp. 3d 1028 (C.D. Cal. 2015) ................................................... 15

*Shearson/Am. Express, Inc. v. McMahon*,
    482 U.S. 220 (1987).................................................................................. 18

*Simula, Inc. v. Autoliv, Inc.*,
    175 F.3d 716 (9th Cir. 1999).................................................................... 11

*In re Thorpe Insulation Co.*,
    671 F.3d 1011 (9th Cir. 2012).............................................................15, 18

*Todd Shipyards Corp. v. Marine Vessel Leasing Corp.*,
    456 F. Supp. 1384 (C.D. Cal. 1978) ........................................................ 11

*In re Touchstone Home Health LLC*,
    572 B.R. 255 (Bankr. D. Colo. 2017) ...................................................... 20

*Wagner v. Stratton Oakmont, Inc.*,
    83 F.3d 1046 (9th Cir. 1996).................................................................... 12

*Wailua Assoc. v. Aetna Cas. and Sur. Co.*,
    904 F. Supp. 1142 (D. Haw. 1995) ("The United States Supreme Court
    has long recognized that the word 'commerce' as used in the
    Commerce Clause includes insurance") ................................................... 10

*Zeiler v. Deitsch*,
    500 F.3d 157 (2d Cir. 2007)..................................................................... 22

**California Cases**

*Dial 800 v. Fesbinder*,
    118 Cal.App.4th 32 (2004) ........................................................................ 22

*Garcia v. Pexco, LLC*,
    11 Cal.App.5th 782 (2017) ....................................................................... 14

*Stewart v. Preston Pipeline Inc.*,
    134 Cal. App. 4th 1565 (2005) ................................................................ 13

*Strotz v. Dean Witter Reynolds*,
    223 Cal. App. 3d 208 (1990), overruled on other grounds by *Rosenthal*
    *v. Great W. Fin. Secs. Corp.*, 14 Cal. 4th 394 (1996) ................................ 13

**Other State Cases**

*Meshel v. Ohev Sholom Talmud Torah*,
    869 A.2d 343 (D.C. 2005).......................................................................... 22

*Muller v. Wertzberger*,
    972 N.Y.S.2d 144, 2013 WL 2460358 (N.Y. Sup. Ct. 2013)..................... 22

*Wieder v. Wieder*,
    105 A.D.3d 948 (N.Y. App. Div. 2013)..................................................... 22

**Federal Statutes**

9 U.S.C.
    § 2 .............................................................................................................. 8
    § 3 ......................................................................................................... 2, 22
    § 4 .............................................................................................................. 9

11 U.S.C.
    § 541(a)(1)................................................................................................ 17
    §§ 544, 548, and 550 ............................................................................... 17

28 U.S.C.
    § 157(b)(2) and (c)(1)............................................................................... 15
    §§ 1334(b), 157(a), 157(c)(1) ................................................................... 2

Federal Arbitration Act, 9 U.S.C.
    §§ 1, et seq................................................................................................. 2

1

**California Statutes**

2

3

Cal. Civ. Code
    § 1556................................................................................................12

4

California Civil Code
    § 3439.04(a)(2), § 3439.05 and § 3439.07................................................21

5

6

**Other Authorities**

7

Federal Rule of Evidence 201 ................................................................26

8

Local Bankruptcy Rule 9013-1(f).............................................................3

9

Local Bankruptcy Rule 9013-1(h).............................................................3

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    TO THE HONORABLE NEIL W. BASON, UNITED STATES BANKRUPTCY

2    JUDGE AND PLAINTIFF BRADLEY D. SHARP, CHAPTER 11 TRUSTEE:

3         PLEASE TAKE NOTICE that, on May 6, 2025, at 1:00 p.m., before the Honorable Neil

4    W. Bason, United States Bankruptcy Judge for the Central District of California, Los Angeles

5    Division, in Courtroom 1545, located at 255 E. Temple Street, Los Angeles, California 90012,

6    Defendants Life Capital Group, LLC ("LCG") and Jonathan Polter ("Polter" and with LCG,

7

8    "Defendants"), will, and hereby do bring this motion (the "Motion") for the following Court

9    orders: (a) an order compelling arbitration of all claims alleged in the Trustee's Adversary

10   Proceeding (defined below) against Defendants to the Rabbinical Council of California pursuant

11   to Section 12.1 of the LCG Operating Agreement and Section 3 of the Mutual Release of All

12   Claims and Settlement Agreement by and between Leslie Klein dated December 5, 2022 (the

13   "Settlement Agreement"); and (b) an order staying this Adversary Proceeding brought by

14   Plaintiff Bradley D. Sharp, Chapter 11 Trustee (the "Trustee"), pending completion of the

15

16   arbitration proceedings.  A true and correct copy of the LCG Operating Agreement is attached

17   hereto as Exhibit 1.  A true and correct copy of certain pertinent pages from the Settlement

18   Agreement, in a redacted form, is attached hereto as Exhibit 3.

19        This Motion is brought pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq.,

20   and 28 U.S.C. §§ 1334(b), 157(a), 157(c)(1), and is based upon these moving papers, the

21

22   attached Memorandum of Points and Authorities, Declaration of Jonathan Polter, and Request

23   for Judicial Notice; all pleadings, records and files in the above-entitled Trustee's Adversary

24   Proceeding and the above-entitled bankruptcy case; and, such additional arguments and

25   evidence that may be presented to this Court.

26        Motions to compel arbitration are properly regarded as motions under Rule 12 in

27   response to a complaint.  *See, e.g., Balen v. Holland Am. Line Inc., 583 F.3d 647* (9th Cir. 2009)

28

1   (affirming district court's grant of a motion to compel arbitration that was brought as a Rule

2   12(b)(3) motion).

3       PLEASE TAKE FURTHER NOTICE that, pursuant to <u>a separately filed stipulation</u>

4   <u>between the Trustee and Defendants, the date for the Trustee to file any opposition to the</u>

5   <u>Motion is on or before April 8, 2025</u>.  Pursuant to Local Bankruptcy Rule 9013-1(f), any

6   opposition to the Motion must be filed with the clerk of the Court and served upon the Office of

7   the United States Trustee, as well as counsel to the moving parties, whose contact information

8   appears in the top left corner of the first page of this Notice.

9

10      PLEASE TAKE FURTHER NOTICE that pursuant to Local Bankruptcy Rule 9013-

11  1(h), the failure to timely file an opposition to the Motion may be deemed by the Court to be

12  consent to the granting of the relief requested in the Motion.

13  DATED:  March 10, 2025                    LEVENE, NEALE, BENDER, YOO &
14                                            GOLUBCHIK L.L.P

15

16                                            By:    _/s/ Michael G. D'Alba_____
                                                    RON BENDER
17                                                  BETH ANN R. YOUNG
                                                    MICHAEL G. D'ALBA
18                                                  Attorneys for Defendants Life Capital
                                                    Group, LLC and Jonathan Polter

19

20

21

22

23

24

25

26

27

28

3

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**SUMMARY OF ARGUMENT**

**Since its formation in 2011,** Defendant Life Capital Group, LLC ("LCG") purchased life insurance policies.  By its members, LCG has paid millions of dollars in premiums over 15 years to keep these policies in force.  The debtor, Leslie Klein ("Debtor"), and Defendant Shlomo Rechnitz ("Rechnitz") are LCG's members.  Jonathan Polter ("Polter") serves as LCG's sole manager.

In 2022 Klein filed litigation over the distribution of LCG policy proceeds.  Defendants LCG, Polter, and Rechnitz moved for, and the Los Angeles Superior Court compelled, arbitration pursuant to the Rabbinical Council of California ("RCC")'s procedures over the Debtor's objections.  A settlement was subsequently reached, and the Debtor dismissed his lawsuit with prejudice.  By filing the instant Complaint, the Trustee of the Debtor's bankruptcy estate purports to (selectively) resurrect the prior lawsuit, without justification.

The Debtor, Rechnitz, Polter, and LCG are parties to two agreements, each of which contain pre-dispute arbitration provisions mandating arbitration before the RCC.  First, Debtor and Rechnitz are parties to the LCG Operating Agreement (the "LLC Agreement") entered into in April 2011, which **mandates binding arbitration, in accordance with** the RCC's procedures, of disputes between the members of LCG, Debtor and Rechnitz.  Second, Debtor, Polter, LCG, and Rechnitz are parties to a settlement agreement entered in December 2022 ("Settlement Agreement"), which **mandates binding arbitration** before the RCC of disputes concerning the Settlement Agreement, LCG, or LCG's assets.

By filing the instant Complaint, the Trustee's Adversary Proceeding[1] seeks to re-open and re-litigate the ***same*** breach of contract claim and accounting disputes brought by Debtor in June 2022 in state court (the "<u>Prior State Court Action</u>"), which were compelled to arbitration and settled following the commencement of arbitration with the RCC, which occurred months before Debtor's bankruptcy petition was filed.

The Trustee, standing in the shoes of the Debtor, is bound by the arbitration provisions in both the LLC Agreement and the Settlement Agreement, each mandating that the claims against Defendants be compelled to arbitration before the RCC.  The Court should reject the Trustee's attempt to un-do the Settlement Agreement and re-litigate disputes regarding implementation of the LLC Agreement that were the subject of the Prior State Court Action and RCC arbitration, and that were settled.  Accordingly, Defendants LCG and Polter respectfully request the Court enter an order compelling arbitration before the RCC of all claims alleged by the Trustee against LCG and Polter in the Trustee's Adversary Proceeding, and stay these proceedings until such arbitration is completed.

## II.

## <u>STATEMENT OF FACTS</u>

### A.    <u>The Parties</u>

Defendant LCG is a California limited liability company, formed on April 8, 2011, whose members include Leslie Klein (the "<u>Debtor</u>") and Defendant Shlomo Y. Rechnitz ("<u>Rechnitz</u>"), each of whom owns a 50% membership interest in LCG.  Polter Decl., ¶ 4 and Ex.

---

[1] The term "Trustee's Adversary Proceeding" refers to the Complaint filed by the Trustee on January 23, 2025 against LCG, Rechnitz, Polter, Yisroel Zev Rechnitz ("<u>Yisroel</u>"), Chaim Manela ("<u>Manela</u>"), and Security Life of Denver Life Insurance Company, commencing adversary proceeding no. 2:25-ap-01020-SK.

1 (Sections 2.1 and 6.2, Sch. A); Compl., ¶¶ 20-30.  Defendant Jonathan Polter ("Polter") is

LCG's manager and has served in that capacity since approximately 2011.  Polter Decl., ¶ 4.

LCG invests in insurance policies, and upon their maturation, LCG distributes policy

proceeds to the Debtor and Rechnitz based on the waterfall set forth in LCG's Operating

Agreement ("LLC Agreement"). Polter Decl., ¶ 4, Ex. 1; Compl. ¶¶ 31-33, 37.  At the inception

of LCG, Debtor contributed 22 life insurance policies that were then in-force, and since that

time, Rechnitz has paid all of the premiums to maintain those life insurance policies as well as

the other costs incident to the operations of LCG.  Compl. ¶¶ 31, 35-36.  Debtor has paid

nothing.

**B.      The LLC Agreement Mandates Arbitration of Disputes**

The LLC Agreement, in a section conspicuously entitled "DISPUTE RESOLUTION,"

expressly provides for the arbitration of any disputes, as follows:

> Section 12.1    Rabbinical Council. If any dispute arises between
> the Members regarding this Agreement or any provision hereof,
> that dispute shall be resolved through a *binding arbitration*
> proceeding to be conducted in the State of California in
> accordance with the commercial arbitration rules of the
> Rabbinical Council of California.

Polter Decl., Ex. 1 at Section 12.1 (emphasis added).

**C.      In 2022, Debtor Filed Suit in the State Court Against LCG and Rechnitz
Alleging Breach of the LLC Agreement and That Action Was Compelled to Arbitration
With the RCC**

Almost one year prior to the Petition Date, on June 7, 2022, the Debtor commenced a

state court action against LCG, Polter, Rechnitz, and Security Life of Denver Insurance

Company (the "Prior State Court Action").  Request for Judicial Notice ("RJN"), Ex. 2.  In that

action, the Debtor's verified complaint alleged a breach of contract cause of action, among

others, against LCG and Rechnitz seeking to recover an unspecified sum of insurance policy

proceeds from an insurer that had issued two insurance policies that matured.  Polter Decl., Ex. 6 (Verified Complaint).

On October 25, 2022, 2022, the Los Angeles Superior Court compelled arbitration under the Rabbinical Council of California's procedures over the Debtor's objections.  *See* RJN, Ex. 4. The parties subsequently commenced arbitration before the RCC.    Polter Decl., ¶ 6.

**D.    <u>The Parties Settled the Claims in the Prior State Court Action</u>**

On December 5, 2022, the Debtor, Rechnitz, LCG, and Polter reached a settlement of all of the claims asserted in the Prior State Court Action and executed a confidential Settlement Agreement.  Polter Decl., ¶ 7; Compl. ¶ 2.  The Prior State Court Action was dismissed in its entirety with prejudice on December 28, 2022.  RJN, Ex. 5.

Like the LLC Agreement, the Settlement Agreement also provides for, *inter alia,* the arbitration of any disputes before the Rabbinical Council of California, as follows:

> The Parties affirm that ***any further dispute concerning this Settlement Agreement or the matters it encompasses, or any other matters arising out or relating to LCG or its assets*** shall be arbitrated by binding arbitration before the RCC in Los Angeles, pursuant to the RCC's procedures, including its procedures whereby the RCC selects three rabbinical arbitrators to hear any dispute.

Ex. 3 (Redacted Settlement Agreement) to Polter Decl. (emphasis added).

**E.    <u>The Debtor Files a Chapter 11 Bankruptcy Petition and The Trustee Files the Instant Adversary Proceeding</u>**

On February 22, 2023, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code.  Nearly two years later, on January 23, 2025, the Trustee filed the Trustee's Adversary Proceeding against LCG, Rechnitz, Polter, Yisroel Zev Rechnitz, Manela, and Security Life of Denver Life Insurance Company.

In the Adversary Proceeding, the Trustee mirrors Klein's 2022 claims in the Prior State Court Action and alleges similar claims for breach of contract of the LLC Agreement and accounting of the same policy death benefit proceeds.  The Trustee uses these same allegations to assert the alleged fraudulent transfer of Klein's rights to distributions from the same insurance policy proceeds and challenges the release by the Debtor provided in the Settlement Agreement, even though the distributions to be made from insurance policy proceeds are governed by the LLC Agreement that was the subject of the Prior State Court Action (which was settled while arbitration was pending).  Compl. ¶¶ 4-5.  Aside from these bare bone allegations, the Complaint fails to identify the nature of or grounds for any dispute.

## III.

## **ARGUMENT**

### A.    **The FAA Applies and Requires Arbitration**

The Federal Arbitration Act ("FAA" or "the Act") governs arbitration agreements in any contract affecting interstate commerce. 9 U.S.C. § 2. The Act provides as follows:

> [a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4 [as to arbitration of disputes involving sexual assault and sexual harassment]."

9 U.S.C. § 2.  "Commerce" includes "commerce among the several States . . . ." *Id.* § 1. The FAA reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345-46 (2011) ("*Concepcion*"); *see Ruderman v. Rolls Royce Motor Cars, LLC*, 511 F. Supp. 3d 1055, 1057 (C.D. Cal. 2021) ("The FAA establishes a general policy favoring arbitration agreements."); *see also Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) ("Section 2 of the FAA creates a policy favoring enforcement of agreements to

arbitrate"). Bankruptcy courts apply the same level of favor toward enforcing arbitration agreements as do district courts. *See In re Celsius Network LLC*, 658 B.R. 643, 658-59 (Bankr. S.D.N.Y. 2024).

As the Supreme Court recognized, the FAA's principal purpose is to "ensure that private arbitration agreements are enforced according to their terms." *Concepcion*, 563 U.S. at 347, n.6. Indeed, "arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations." *Id.* at 351. Under the FAA, a party to an arbitration agreement may petition to compel arbitration and "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court ***shall*** make an order directing the parties to proceed with arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4 (emphasis added).

The FAA "embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce or is revocable 'upon such grounds as exist at law or in equity for the revocation of any contract.'" *Perry v. Thomas*, 482 U.S. 483, 489 (1987) (quoting 9 U.S.C. § 2). The phrase "interstate commerce" is interpreted broadly and the transaction need only involve interstate commerce, "even if the parties did not contemplate an interstate commerce connection." *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 281-82 (1995). Here, there is no dispute that the FAA applies because the contracts evidencing the arbitration agreements involve transactions in interstate commerce. First, the parties to the Settlement Agreement are citizens of multiple states, namely, **California** and **Michigan**. Compl. ¶¶ 15-17, 20; Polter Decl., ¶ 1; *see Allied-Bruce Terminix Cos., Inc.*, 513 U.S. at 281-82 (holding transaction involved interstate commerce given "the multistate nature" of the parties and materials used by one of the parties came from out of state). Also, the Settlement Agreement determined the accounting and allocation of proceeds of insurance

policies issued by an out-of-state insurance company, namely, Security Life of Denver

Insurance Company, a **Colorado** entity.  Ex. 3 (signature page only) to Polter Decl. at p. 1;

Compl. ¶ 21.

Additionally, the LLC Agreement, containing an arbitration provision, evidences a

transaction involving interstate commerce because the LLC Agreement governs the distribution

of proceeds of life insurance policies, which are issued by insurers in multiple states. Polter

Decl., ¶ 4.  It is well-established that transactions involving insurance contracts involve

interstate commerce.  *See Quackenbush v. Allstate Ins. Co.*, 121 F.3d 1372, 1381 (9th Cir. 1997)

(holding FAA applied to interstate insurance policy); *Wailua Assoc. v. Aetna Cas. and Sur. Co.*,

904 F. Supp. 1142, 1147 n.2 (D. Haw. 1995) ("The United States Supreme Court has long

recognized that the word 'commerce' as used in the Commerce Clause includes insurance")

(quoting *U.S. v. South-Eastern Underwriters Assn.*, 322 U.S. 533, 552 (1941)).  Thus, the Court

should find that the arbitration provisions in the Settlement Agreement and LLC Agreement are

governed by the FAA and are valid, irrevocable, and enforceable.

**B.**    **The Court Should Compel Arbitration Because A Valid Arbitration
Agreement Exists and The Scope of the Agreement Encompasses the Claims At Issue**

"The federal law of arbitrability under the FAA governs the allocation of authority

between the courts and arbitrators."  *Cox*, 533 F.3d at 1119.  Where, as here, the contract

containing the arbitration agreement evidences a transaction involving interstate commerce such

that the FAA applies, courts must ***limit their inquiry*** to: (1) whether there is a valid agreement

to arbitrate between the parties; and (2) whether the agreement covers the dispute. *See Howsam

v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83–85 (2002); *see also Mitsubishi Motors Corp. v.

Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (holding that first task before

compelling arbitration is to determine whether the parties agreed to arbitrate).  "If the court

10

1   answers both questions in the affirmative, it 'must 'enforce the arbitration agreement in

2   accordance with its terms.'"  *Johnson v. Walmart Inc.*, 57 F.4th 677, 680 (9th Cir. 2023)

3   (quoting *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020)).**²**  Courts **must** "move

4   the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as

5   possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983).

6

7          As the Ninth Circuit has recognized, "[i]f an agreement exists, the FAA 'leaves no place

8   for the exercise of discretion by a district court, but instead mandates that [it] *shall* direct the

9   parties to proceed to arbitration.'"  *Fli-Lo Falcon, LLC v. Amazon.com*, 97 F.4th 1190, 1193-94

10  (9th Cir. 2024) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 214 (1985))

11  (emphasis in original); *see also Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999)

12  ("[t]he standard for demonstrating arbitrability is not high."); *Republic of Nicaragua v.*

13  *Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991) ("a district court has little discretion to

14  deny an arbitration motion, since the Act is phrased in mandatory terms.").  If there is any doubt

15  as to the proper interpretation of the agreement on any issue related to arbitrability, the FAA

16  "establishes that . . . [it] should be resolved in favor of arbitration . . . ." *Moses H. Cone*

17  *Memorial Hospital*, 460 U.S. at 24–25 (affirming an order requiring enforcement of an

18  arbitration agreement, even though the arbitration would result in bifurcated proceedings).**³**

19

20

21  _____

22  ² Procedural issues and defenses to arbitrability are "presumptively not for the judge, but for an arbitrator, to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). The preclusive effect of prior litigation is arbitrable and is an issue reserved for the arbitrator. *See Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 880 (9th Cir. 2007) ("Arbitrators are not free to ignore the preclusive effect of prior judgments under the doctrines of res judicata and collateral estoppel, although they generally are entitled to determine in the first instance whether to give the prior judicial determination preclusive effect."); *see also Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1128 (9th Cir. 2000) (holding that res judicata defense is an issue for the arbitrator to decide, which is "consistent with the strong federal policy favoring arbitration").

23

24

25

26

27  ³ The Order compelling arbitration before the RCC in the Prior State Court Action of these *same* claims asserted in the Trustee's Adversary Proceeding must be given full faith and credit by this Court. *See Todd Shipyards Corp. v. Marine Vessel Leasing Corp.*, 456 F. Supp. 1384,

28

1.     **The Parties' Arbitration Agreements Are Valid and Enforceable**

"[A]rbitration is a matter of contract . . . ." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960).  In determining whether a valid arbitration agreement exists, federal courts apply state law principles of contract formation.  *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (holding state law principles governing formation of contracts determine whether parties agreed to arbitrate); *see also Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092-93 (9th Cir. 2014); *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009) (courts apply ordinary state law principles governing contract formation "while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration.").  Courts cannot apply state contract law that disfavors or interferes with arbitration.  *See Concepcion*, 563 U.S. at 341, 346; *see also Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996) (courts must give "due regard to the federal policy in favor of arbitration" in applying state law principles).

"Under California law, a valid contract requires (1) parties capable of contracting; (2) mutual consent; (3) a lawful object; and (4) sufficient cause or consideration." *Ortiz v. Hobby Lobby Stores, Inc.*, 52 F. Supp. 3d 1070, 1077 (E.D. Cal. 2014) (citing Cal. Civ. Code § 1550). The arbitration agreements meet all of these requirements.

<u>First</u>, there is no dispute that the parties had legal capacity to enter into the arbitration agreements set forth in the two contracts at issue. Cal. Civ. Code § 1556 ("All persons are capable of contracting, except minors, persons of unsound mind, and persons deprived of civil rights.").

---

1389 (C.D. Cal. 1978) (citations omitted) (order of New York state court compelling arbitration of claims under construction contract entitled to full faith and credit in subsequent district court action in California between same parties).

Second, there is no dispute that the arbitration provisions set forth in the two agreements are valid and have a lawful purpose, i.e., the prompt and efficient resolution of disputes through mutual arbitration. *See Stewart v. Preston Pipeline Inc.*, 134 Cal. App. 4th 1565, 1586 (2005) (holding that "resolving litigation" is a "lawful object" for a contract); *see also Epic Sys.*, 138 S. Ct. at 1621 (by enacting the FAA, "Congress directed courts to . . . treat arbitration agreements as 'valid, irrevocable, and enforceable'") (quoting 9 U.S.C. § 2).

Third, the arbitration provisions set forth in the two agreements are supported by valid and sufficient consideration. A "promise to submit to arbitration and to forego the option of a judicial forum for a specified class of claims constitutes sufficient consideration." *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002) (upholding arbitration agreement and holding a party's "promise to be bound by the arbitration process itself serves as adequate consideration"); *see also Strotz v. Dean Witter Reynolds*, 223 Cal. App. 3d 208, 216 (1990) ("Where an agreement to arbitrate exists, the parties' mutual promises to forego a judicial determination and to arbitrate their disputes provide consideration for each other."), overruled on other grounds by *Rosenthal v. Great W. Fin. Secs. Corp.*, 14 Cal. 4th 394 (1996).

Fourth, all parties consented to the terms of the arbitration agreements by signing the contracts in which they appear. "Under California law, '[c]ourts must determine whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement." *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citing *Meyer v. Benko*, 55 Cal. App. 3d 937 (1976)). Mutual consent "may be manifested by written or spoken words, or by conduct." *Id.* "Under California law, mutual assent is the key to contract formation. *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 988 (N.D. Cal. 2017) (citing *Binder v. Aetna Life Ins. Co.*, 75 App. 4th 832, 850 (1999). "[O]rdinarily one who signs an instrument which on its face is a contract is deemed to assent to

1   all its terms . . . ."  *Marselian v. Wells Fargo & Co.*, 514 F. Supp. 3d 1166, 1173 (N.D. Cal.

2   2021) (applying California law).  Here, as confirmed by Exhibits 1 and 3 attached to the

3   Declaration of Jonathan Polter and filed concurrently herewith, the parties all signed the

4   arbitration agreements, assenting to their terms.  The Trustee stands in the shoes of the Debtor as

5   to the arbitration provisions in the LLC Agreement and the Settlement Agreement and "is bound

6   by the clause[s] to the same extent as would the debtor."  *Hays and Co. v. Merrill Lynch, Pierce,*

7   *Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3rd Cir. 1989) ("*Hays*").[4]

8

9        In *Hays*, the Chapter 11 trustee alleged non-bankruptcy claims as well as Bankruptcy

10  Code fraudulent conveyance claims under Section 544(b).  At issue was whether "the trustee is

11  bound by the debtor's pre-petition arbitration agreement."  *Id.* at 1150.  The general rule is that a

12  trustee is bound by the debtor's non-executory contracts, and the Third Circuit saw no reason to

13  except agreements to arbitrate from the rule.  Accordingly, as was held by the Court in *Hays*,

14  here too the Trustee is bound by the LLC Agreement and Settlement Agreement and the

15  arbitration provisions therein and cannot circumvent their terms, which expressly require the

16

17  submission of any disputes to binding arbitration before the Rabbinical Council of California.[5]

18

---

19  [4] Even if the Trustee had not stepped into Klein's "shoes" by virtue of his trusteeship, his

20  complaint remains subject to arbitration under principles of equitable estoppel.  Under these
principles, a defendant may compel arbitration where: (1) the plaintiff is equitably estopped

21  from escaping the contract, and, (2) the claims fall within the scope of the contract's arbitration
clause. *Franklin v. Community Regional Medical Center,* 998 F.3d 867, 872 (9th Cir. 2021)

22  (allowing non-signatory defendant to compel plaintiff's claims to arbitration).  The first element
is satisfied where  "the causes of action against the nonsignatory are 'intimately founded in and

23  intertwined with' the underlying contract obligations." *Garcia v. Pexco, LLC,* 11 Cal.App.5th
782, 786 (2017) (quoting *Boucher v. Alliance Title Co., Inc.,* 127 Cal.App.4th 262, 271

24  (2005).  Not  "every allegation in the complaint [need] be intertwined with the contract
containing the arbitration clause for equitable estoppel to apply." *Herrera v. Cathay Pacific*

25  *Airways, Ltd.*, 104 F.4th 702, 710 (9th Cir. 2022). Here, as detailed above, the Trustee's claims

26  arise out of the LLC Agreement and the Settlement Agreement, each of which contains an
enforceable arbitration agreement.  Further, as detailed above, the claims in question fall within

27  the scope of these provisions.  Accordingly, equitable estoppel forms an additional basis for

28  compelling arbitration.

## 2.    The Arbitration Agreements Cover the Dispute

Here, the Trustee has commenced a Bankruptcy Court adversary proceeding.  Disputes in bankruptcy are defined as "core" or "not core."  28 U.S.C. § 157(b)(2) and (c)(1) (seeking to allocate scope of bankruptcy court authority based upon "core proceeding" or "not a core proceeding" status).  As a matter of law, and as discussed in greater detail below, a bankruptcy court must compel arbitration of core proceedings.  A bankruptcy court must also compel arbitration of non-core proceedings, unless arbitration would conflict with the policy of the Bankruptcy Code.

### i.    The Claims for Which Defendants Seek to Compel Arbitration Are Non-Core Proceedings and Arbitration of these Claims is Mandatory

In addressing whether arbitration provisions may be enforced in bankruptcy courts, the Ninth Circuit acknowledges the "'liberal federal policy favoring arbitration agreements.'" *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1020 (9th Cir. 2012) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24). "Neither the text nor the legislative history of the Bankruptcy Code reflects a congressional intent to preclude arbitration in the bankruptcy setting." *Id.* at 1029 (citations omitted).  The Ninth Circuit recognizes that the distinction between core and non-core proceedings is a guide in deciding whether to order arbitration. *Id.* at 1020.  Generally, a bankruptcy court must enforce a valid pre-petition arbitration agreement as to a non-core proceeding. *Id.* at 1021 (citations omitted).

Indeed, bankruptcy courts generally lack discretion to decline to enforce arbitration of non-core proceedings. *Id.* at 1021 ("In non-core proceedings, the bankruptcy court generally does not have discretion to deny enforcement of a valid prepetition arbitration agreement.").  It

---

[5] Although the Trustee purports to assert a claim for accounting (Compl. ¶¶ 70, 75), accounting is a remedy, and not a separate cause of action. *See Schaffer Family Investors, LLC v. Sonnier*, 120 F. Supp. 3d 1028, 1049 (C.D. Cal. 2015) (dismissing accounting claim and holding "accounting is a remedy and not a cause of action").

is well-established that "[b]reach of contract actions are noncore claims." *In re Gurga*, 176 B.R. 196, 199 (B.A.P. 9th Cir. 1994) (citing 28 U.S.C. § 157).  Similarly, claims that relate broadly to or rest on breach of contract issues also are non-core claims subject to arbitration.  *Id.* (holding bankruptcy court erred in refusing to enforce the arbitration clause contained in the prepetition agreement where non-core breach of contract claims were at issue and that plaintiff's labeling of such claims as "turnover proceedings" was unavailing because turnover involves the return of undisputed funds while breach of contract claims involve disputed funds)); *In re Mor-Ben Ins. Markets Corp.*, 73 B.R. 644, 648 (9th Cir. BAP 1987) (affirming orders compelling arbitration and holding that the fact that issues pertaining to validity of claims or whether any party breached a contract "arise in the context of a bankruptcy does not invalidate the agreement of the parties to have the dispute heard by an arbitrator"); *Hays*, 885 F.2d at 1150 (holding that trustee is bound by the arbitration agreement to the same extent as the debtor, and that the Bankruptcy Code does not conflict with the Arbitration Act so as to permit a district court to deny enforcement of an arbitration clause in a non-core adversary proceeding brought by the trustee); *In re J.E.L. Site Dev., Inc.*, 646 B.R. 338 (M.D. Fla. 2022) (enforcing arbitration of breach of contract claim relating to non-core matters, derivative of Debtor's claims).

Here, the claims in the Trustee's Adversary Proceeding are entirely derivative of the Debtor, resting on breach of contract claims, and as such are non-core claims that must be compelled to arbitration according to the terms of the parties' arbitration agreements.  *Hays*, 885 F.2d at 1153-55 (holding Chapter 11 trustee was bound to arbitrate the claims that it had inherited from the debtor but not the claims under Section 544(b) because they were not derivative of the debtor and were instead creditor claims).  Parties may shape arbitration agreements "to their liking by specifying with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their

1   disputes" and the task of courts and arbitrators alike is "to give effect to the intent of the

2   parties." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019).  The parties to the LLC

3   Agreement and Settlement Agreement elected binding arbitration before the Rabbinical Council

4   of California to resolve their disputes, and this Court should honor the parties' expectations.

5           In the Complaint, the Trustee alleges a breach of the LLC Agreement on the basis that

6   the LLC Agreement allegedly entitled the Debtor to receive more than what the Debtor received

7   under the Settlement Agreement.  Compl. ¶ 47.  Specifically, the Trustee alleges in the Fifth

8   Claim for relief for breach of contract that LCG, Polter, and Rechnitz breached the LLC

9   Agreement by not distributing monies according to its terms.  Compl. ¶¶ 6, 9, 71-73; p. 16, ¶ 5.

10  The Trustee also seeks injunctive relief in the Sixth Claim for Relief and an order that LCG,

11  Polter, and Rechnitz "comply with the terms of the LLC Agreement."  Id. ¶¶ 74-75; p. 16, ¶ 6.

12  These are claims of the Debtor, previously compelled to arbitration by the Honorable Curtis A.

13  Kin of the Los Angeles Superior Court.  *See* RJN, Ex. 4.  The Debtor previously pursued his

14  claims in arbitration before the Rabbinical Council of California and subsequently settled these

15  same claims.  11 U.S.C. § 541(a)(1).

16

17

18          The Trustee's remaining claims – other than preferences – are avoidance and recovery

19  claims under Sections 544, 548, and 550 of the Bankruptcy Code, and all of them ultimately rest

20  on an alleged **breach of the LLC Agreement**, which is an issue that is required to be arbitrated.

21  *See In re Gurga*, 176 B.R. at 199 (citing 28 U.S.C. § 157)).  The Trustee's allegations reveal

22  that the gist of this Adversary Proceeding is the re-litigation of non-core **breach of contract**

23  **claims** pertaining to the LLC Agreement that were presented and resolved prior to bankruptcy.

24  *See* Compl. ¶¶ 59, 67.

25          Thus, the Court should grant this motion to compel arbitration and stay proceedings in

26  this Court pending completion of the arbitration proceedings.  The parties agreed to arbitration

27

28

1    of any claims arising from their pre-petition agreements and the Court should give effect to the

2    parties' intent and issue an order compelling these non-core claims to arbitration.

3            ii.   **Compelling the Core Claims To Arbitration Is Appropriate Because**

4            **It Would Not Conflict with the Underlying Purposes of the**

5            **Bankruptcy Code**

6

7            The presumption is that a bankruptcy court must also compel core proceedings to

8    arbitration.  *Thorpe* thus recognizes that "even in a core proceeding, the *McMahon* standard [set

9    forth by the Supreme Court in *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220 (1987)]

10   must be met—that is, a bankruptcy court has discretion to decline to enforce an otherwise

11   applicable arbitration provision **only if** arbitration would conflict with the underlying purposes

12   of the Bankruptcy Code."  *Thorpe*, 671 F.3d at 1021 (citing, among others, *Shearson/Am.*

13   *Express, Inc. v. McMahon*, 482 U.S. 220, 226-27 (1987)) (emphasis added).  *Thorpe* also warns

14   that "'[n]ot all core bankruptcy proceedings are premised on provisions of the Code that

15   'inherently conflict' with the Federal Arbitration Act; nor would arbitration of such proceedings

16   necessarily jeopardize the objectives of the Bankruptcy Code.'"  *Id.* (citing *In re Nat'l Gypsum*

17   *Co.*, 118 F.3d 1056, 1067 (5th Cir. 1997)).  For the Trustee's claims defined by statute as core

18   claims, the Court should exercise its discretion to enforce the arbitration provisions because, for

19   the reasons set forth below, arbitration would not conflict with the underlying purposes of the

20   Bankruptcy Code.

21

22           iii.  **No Competing Bankruptcy Goal Exists When Non-Creditors Are**

23           **Sued**

24

25           As the BAP has found, "[t]here is no competing bankruptcy policy where the trustee . . .

26   or debtor in possession brings suit against a party who has made no claim against the estate." *In*

27   *re Morgan*, 28 B.R. 3, 5 (B.A.P. 9th Cir. 1983) (holding bankruptcy court erred in not honoring

28

18

the arbitration clause contained in the contract between the debtor in possession and the

defendant, where debtor in possession was seeking damages from defendant and defendant had

not asserted claims for damages against debtor in possession).  Indeed, a debtor in possession

"is bound by the mandatory arbitration provisions contained in a contract where he makes a

claim arising out of that contract against a non-creditor." *Id.*

Compelling arbitration in such circumstances is also demanded by subsequent Supreme

Court precedent that protects the rights of alleged fraudulent transfer defendants who choose not

to participate in the bankruptcy case. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-59

(1989) (even if fraudulent transfer claims are defined as "core," a defendant on a fraudulent

transfer claim seeking money damages does not give up its right to a jury trial on such claims

unless it has submitted a claim to the bankruptcy estate, itself).

Under Supreme Court precedent, procedural rights are safeguarded when defendants

refrain from participating in a bankruptcy case.  Just like the fraudulent transfer defendants in

*Nordberg*, Defendants here never filed proofs of claim against the Debtor's bankruptcy estate.

Defendants are entitled to the benefits of that decision.  Defendants have not conceded to having

the fraudulent transfer monetary claims decided by a bankruptcy court because they have not

inserted themselves into the bankruptcy case and have instead preserved their right – as set forth

in pre-petition agreements – to have those claims compelled to arbitration.

### iv.   Compelling Arbitration Serves the Policy of the Bankruptcy Code

The purposes of the Bankruptcy Code include the "centralization of disputes concerning

a debtor's legal obligations, and protection of debtors and creditors from piecemeal litigation."

*In re Eber*, 687 F.3d 1123, 1131 (9th Cir. 2012) (citations omitted).  Rather than conflict,

arbitration would serve the objective of preventing piecemeal litigation.  The Debtor

commenced the Prior State Court Action, and the state law claims were subsequently compelled

to arbitration.  If the Court does not compel arbitration of the Trustee's Adversary Proceeding, Defendants will be forced to re-litigate the same issues in the Prior State Court Action before yet a third body, the Bankruptcy Court.  The litigation of a single matter before **three** different adjudicatory bodies constitutes piecemeal litigation.  To deny arbitration would be to promote piecemeal litigation, which is precisely what the Bankruptcy Code seeks to avoid.  Indeed, had no bankruptcy case been commenced and had the Debtor alleged a dispute regarding the Settlement Agreement and the LLC Agreement, LCG and Polter would promptly reinstitute arbitration before the Rabbinical Council of California.  Additionally, should arbitration pursuant to the Settlement Agreement confirm that the Debtor was entitled to *less than* what has been actually paid to the Debtor (and this Estate) through the Settlement Agreement, then there will be no avoidance claims to pursue.  Accordingly, the Court should compel all claims against Defendants to arbitration.

<center>v.   <b>Arbitration Is Required because the Claims Are Derivative</b></center>

The labels of "core" and "non-core" are not controlling.  Rather than apply them without qualification, courts must "focus on 'the underlying nature of the proceeding, i.e., whether the proceeding derives exclusively from provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the [Bankruptcy] Code.'"  *In re Touchstone Home Health LLC*, 572 B.R. 255, 275 (Bankr. D. Colo. 2017) (quoting *Nat'l Gypsum Co.*, 118 F.3d at 1067); *see also In re Celsius Network LLC*, 658 B.R. 643, 650 (Bankr. S.D.N.Y. 2024) (after looking at label of claim, court should inquire "'whether the underlying dispute concerns rights created under the Bankruptcy Code or non-Bankruptcy Code issues derivative of the debtor's pre-petition business activities'") (quoting *In re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181, 202 (Bankr. S.D.N.Y. 2002)).

Thus, even though the Trustee alleges fraudulent conveyance claims that are in part

statutorily core,[6] that does not end the Court's inquiry into the substance of those claims, and the

Court ought not to mechanically deny arbitration merely because the Trustee has attempted to

shoehorn his breach of contract claims into the "core" category.  The Trustee's claims seek to

avoid the Settlement Agreement on the grounds that the bargain that was reached in the

Settlement Agreement amounted to a breach of the LLC Agreement and on that basis, the

release should be avoided.  The Trustee's claims are thus derivative of the Debtor's alleged

rights and entitlements under the LLC Agreement.  *Cibro Petroleum Products, Inc. v. City of

Albany*, 270 B.R. 108, 124 n.12 (S.D.N.Y. 2001) (claim alleging contract to be voidable

fraudulent monetary transfer was "simply contractual" claim derivative of pre-petition

agreements) (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 55 (1989)).[7]

### C.    Use Of Rabbinical Courts To Resolve Disputes Is Widely Recognized

The Rabbinical Council of California is the largest body of Orthodox Rabbis in the

Western United States. It maintains a Beis Din (or Beth Din) that offers a full suite of arbitration

services, including arbitration of financial disputes such as the one presented in the Trustee's

Adversary Proceeding.   The RCC serves individuals and entities who prefer rabbinical

---

[6] The fraudulent conveyance claims in the second and third claims for relief do not derive
exclusively from provisions of the Bankruptcy Code because they are based upon not only the
Bankruptcy Code, but also state law, namely, California Civil Code §3439.04(a)(2), §3439.05
and §3439.07.

[7] The Supreme Court in *Nordberg* stated that "[t]here can be little doubt that fraudulent
conveyance actions by bankruptcy trustees . . . 'constitute no part of the proceedings in
bankruptcy but concern controversies arising out of it'— are quintessentially suits at common
law that more nearly resemble state-law contract claims brought by a bankrupt corporation to
augment the bankruptcy estate . . . ."  *Nordberg* 492 U.S. at 55 (quoting *Schoenthal v. Irving
Trust Co.*, 287 U.S. 92, 94-95 (1932), and citing Gibson, Jury Trials in Bankruptcy: Obeying the
Commands of Article III and the Seventh Amendment, 72 Minn.L.Rev. 967, 1022-25 (1988)).

arbitration over costly civil litigation.  RCC judgments are recognized and binding in the civil courts.

Many state and federal courts in California and throughout the country have both compelled arbitration to Beis Dins and thereafter confirmed their awards. *See, e.g., Hardin Invs., Ltd v. Globex Kosher Foods*, 2016 U.S. Dist. LEXIS 9618, *1-*2 (E.D.N.Y. Jan. 27, 2016) (granting motion to confirm arbitration award and recognizing in dicta that the district court granted defendants' motion to compel arbitration before Rabbinical Court pursuant to arbitration clause in the parties' agreement); *Zeiler v. Deitsch*, 500 F.3d 157, 170 (2d Cir. 2007) (holding that arbitration awards of Beth Din were confirmable after resignation of a Rabbi); *Wieder v. Wieder*, 105 A.D.3d 948 (N.Y. App. Div. 2013) (affirming order compelling arbitration before a rabbinical court and to stay proceedings); *see also Muller v. Wertzberger*, 972 N.Y.S.2d 144, 2013 WL 2460358 (N.Y. Sup. Ct. 2013) (confirming arbitration award of rabbinical court); *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343,  346-47 (D.C. 2005) (holding Beth Din provision constitutes an enforceable agreement to arbitrate the underlying dispute before Orthodox Jewish rabbis and directing trial court to compel congregation to comply with the agreement); *Dial 800 v. Fesbinder*, 118 Cal.App.4th 32, 46 (2004) (citations omitted) ("Agreements to resolve disputes before a beth din [*i.e.,* a rabbinical court] have been enforced in this country's courts").

**D.**      **The Court Should Order a Stay Pending Arbitration**

LCG and Polter further request that the Court stay the Trustee's Adversary Proceeding in its entirety until the completion of the arbitration.  *See* 9 U.S.C. § 3 ("If any suit or proceeding be brought. . . upon any issue referable to arbitration under an agreement . . . , the court . . . upon being satisfied that the issue involved in such suit or proceeding is referrable to arbitration . . . shall . . . stay the trial of the action until such arbitration has been had . . . .").

1

## IV.

## CONCLUSION

WHEREFORE, LCG and Polter respectfully requests that the Court enter an order:

(1)    granting the Motion;

(2)    compelling the arbitration of all claims against Defendants in the Trustee's

Adversary Proceeding to the RCC;

(3)    staying the Adversary Proceeding until the arbitration has been completed; and

(4)    granting such other and further relief as the Court deems just and appropriate.

DATED:  March 10, 2025                    LEVENE, NEALE, BENDER, YOO &
                                         GOLUBCHIK L.L.P


                                  By:    _/s/ Michael G. D'Alba_____
                                         RON BENDER
                                         BETH ANN R. YOUNG
                                         MICHAEL G. D'ALBA
                                         Attorneys for Defendants Life Capital
                                         Group, LLC and Jonathan Polter

## <u>DECLARATION OF JONATHAN POLTER</u>

I, Jonathan Polter, declare as follows:

1.    I am the Manager of Life Capital Group, LLC ("LCG"), which is a limited liability company organized under California law.  I reside in Southfield, Michigan.

2.    The facts set forth herein are based upon my personal knowledge, and, if called as a witness, I could and would testify competently thereto.  I make this Declaration in support of the foregoing Motion to Compel Arbitration before the Rabbinical Council of California and for a Stay (the "Motion").

3.    I have reviewed the Motion, and the matters stated in the Motion are true to the best of my knowledge, information and belief.

4.    Attached hereto as Exhibit 1 is a true and correct copy of the Limited Liability Company Agreement of LCG ("LLC Agreement").  I am LCG's manager and have served in that capacity since approximately 2011.  The business of LCG is to invest in life insurance policies and then, upon the maturation of the policies, distribute the policy proceeds to the members based on the waterfall set forth in the LLC Agreement.  The insurance companies for these policies are located in multiple states.

5.    On June 7, 2022, Leslie Klein (the "Debtor") filed a lawsuit in Los Angeles Superior Court, case no. 22STCV18787, that named LCG and me, among others, as defendants, (the "Prior State Court Action").  The Debtor's allegations in the Prior State Court Action related to the division of the insurance policy proceeds.

6.    In the Prior State Court Action, LCG and I joined in a motion brought by one of our co-defendants to compel arbitration before the Rabbinical Council of California.  The motion was granted, and an arbitration proceeding was commenced in October 2022 (the "Rabbinical Council Arbitration").

7.      While the Rabbinical Council Arbitration was pending, a settlement agreement was reached.  The terms of the settlement were put into writing on or about December 5, 2022 in a Mutual Release of All Claims and Settlement Agreement (the "Settlement Agreement").  The Settlement Agreement is confidential.  Attached hereto as Exhibit 3 is a true and correct copy of certain pages from the Settlement Agreement that have been redacted in light of the confidentiality requirements.  The Settlement Agreement resolved all of the disputed claims in the Prior State Court Action, which the Debtor subsequently dismissed.

8.      Due to the Settlement Agreement, I thought that the disputes between the Debtor and LCG over the division of policy proceeds had been resolved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on March        , 2025 at Southfield, Michigan.

JONATHAN POLTER

25

## **REQUEST FOR JUDICIAL NOTICE**

Defendants Life Capital Group, LLC ("LCG") and Jonathan Polter ("Polter" and with LCG, "Defendants") respectfully requests that the Court judicially notice certain facts, including the records, acts, and proceedings of this Court and other governmental institutions.  This request is based on Federal Rule of Evidence 201.

The Defendants' request includes, but is not limited to the following documents and acts:

1.      The complaint filed in the Los Angeles Superior Court on June 7, 2022 that commenced case no. 22STCV18787 (the "Prior State Court Action"); Exhibit 6 hereto.

2.      The docket in the Prior State Court Action; Exhibit 2 hereto.

3.      The request for dismissal filed in the Prior State Court Action; Exhibit 5 hereto.

4.      The minute order entered in the Prior State Court Action on October 25, 2022; Exhibit 4 hereto.

5.      The Motion to Compel Arbitration of Plaintiff's Claims and to Stay Proceedings filed in the Prior State Court Action on or about July 14, 2022; Exhibit 7 hereto.

6.      The Declaration of Avi Wagner in Support of Defendant Shlomo Rechnitz's Motion to Compel Arbitration of Plaintiff's Claims and to Stay Proceedings filed in the Prior State Court Action on or about July 14, 2022; Exhibit 8.

DATED:  March 10, 2025                    LEVENE, NEALE, BENDER, YOO &
                                          GOLUBCHIK L.L.P


                                          By:  _____/s/ Michael G. D'Alba_____
                                               RON BENDER
                                               BETH ANN R. YOUNG
                                               MICHAEL G. D'ALBA
                                               Attorneys for Defendants Life Capital
                                               Group, LLC and Jonathan Polter

# EXHIBIT "1"

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## LIFE CAPITAL GROUP, LLC

A California Limited Liability Company

Dated as of June 1, 2011

LCG000001                                                                    CONFIDENTIAL

# TABLE OF CONTENTS

## ARTICLE I
### FORMATION AND BUSINESS OF THE COMPANY

Section 1.1   Formation............................................................................................1
Section 1.2   Name..................................................................................................1
Section 1.3   Purpose...............................................................................................1
Section 1.4   Term...................................................................................................1
Section 1.5   Place of Business................................................................................1
Section 1.6   Registered Office and Agency.............................................................2
Section 1.7   Fiscal Year..........................................................................................2

## ARTICLE II
### MEMBERS

Section 2.1   Members.............................................................................................2
Section 2.2   Company Property; Company Interest..................................................2

## ARTICLE III
### CAPITAL CONTRIBUTIONS

Section 3.1   Initial Capital Contribution of Members, Capital Accounts..................2
Section 3.2   Additional Capital Contributions........................................................2
Section 3.3   Withdrawal and Return of Capital Contributions..................................3
Section 3.4   Interest...............................................................................................3
Section 3.5   Negative Capital Accounts..................................................................3

## ARTICLE IV
### DISTRIBUTIONS AND ALLOCATIONS

Section 4.1   Allocation of Net Income and Net Losses.............................................3
Section 4.2   Cash Available for Distribution...........................................................4
Section 4.3   Proceeds of Policies............................................................................4
Section 4.4   Constructive Trust..............................................................................4
Section 4.5   Sale of Policies...................................................................................4
Section 4.6   Lenders...............................................................................................4

## ARTICLE V
### COMPANY ACCOUNT

Section 5.1   Establishing a Reserve Account..........................................................4
Section 5.2   Distribution of Reserve Account..........................................................5

## ARTICLE VI
### MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

Section 6.1   Rights and Powers of Manager............................................................5

i

Section 6.2    Number, Tenure and Qualifications ........................................................5
Section 6.3    Officers ..............................................................................................5
Section 6.4    Reliance .............................................................................................5
Section 6.5    Indemnification of Manager, Members and Officers. ...........................6
Section 6.6    Exculpation ........................................................................................7
Section 6.7    No Duties ...........................................................................................7
Section 6.8    Protection of Insured's Private Information ........................................7
Section 6.9    Delivery of Policy Files ......................................................................7
Section 6.10   Change Forms .....................................................................................7
Section 6.11   Further Assurances .............................................................................7
Section 6.12   Indemnification of Rechnitz ................................................................8

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Section 7.1    Representations and Warranties of Klein. .............................................8
Section 7.2    Representations and Warranties of Rechnitz.......................................10

## ARTICLE VIII
## ADMISSION OF MEMBERS

Section 8.1    Admission of Members .....................................................................11
Section 8.2    Admission of Non-Payment Policy Members ......................................11

## ARTICLE IX
## MAINTENANCE OF BOOKS AND RECORDS; REPORTS TO MEMBERS; TAX RETURNS

Section 9.1    Accounting Method and Records .......................................................12
Section 9.2    Company Records.............................................................................12
Section 9.3    Company Reports .............................................................................12
Section 9.4    Designation of Tax Matters Member...................................................13
Section 9.5    Tax Treatment and Elections .............................................................13

## ARTICLE X
## TRANSFER OF INTERESTS; SPECIAL PROVISIONS

Section 10.1   Transfers and Assignments................................................................13
Section 10.2   Permitted Transfers...........................................................................13
Section 10.3   Substitute Members ..........................................................................13
Section 10.4   Right of First Refusal. ......................................................................14
Section 10.5   Tag-Along Rights and Obligations.....................................................15
Section 10.6   Miscellaneous Provisions Affecting Transfer. ....................................16

## ARTICLE XI
## DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

Section 11.1   Dissolution, etc ...............................................................................16
Section 11.2   Winding Up. ....................................................................................16

ii

Section 11.3    Final Distribution..................................................................................17
Section 11.4    Time for Liquidation, etc........................................................................17
Section 11.5    Termination .............................................................................................17
Section 11.6    Return of Contribution Nonrecourse to Other Members......................17

ARTICLE XII
DISPUTE RESOLUTION

Section 12.1    Rabbinical Counsel.................................................................................17

ARTICLE XIII
MISCELLANEOUS

Section 13.1    Entire Agreement....................................................................................17
Section 13.2    Other Ventures........................................................................................18
Section 13.3    Amendments............................................................................................18
Section 13.4    Choice of Law ........................................................................................18
Section 13.5    Successors and Assigns; Third Party Beneficiaries...............................18
Section 13.6    Interpretation .........................................................................................18
Section 13.7    Captions..................................................................................................18
Section 13.8    Severability.............................................................................................18
Section 13.9    Counterparts...........................................................................................19
Section 13.10   Non-Waiver.............................................................................................19
Section 13.11   Notices....................................................................................................19

ARTICLE XIV
DEFINITIONS

Section 14.1    Definitions. ............................................................................................19

iii

LIMITED LIABILITY COMPANY AGREEMENT of LIFE CAPITAL GROUP, LLC (this "**Agreement**"), a California limited liability company (the "**Company**"), dated as of June 1, 2011, among Shlomo Rechnitz, an individual residing in the State of California ("**Rechnitz**"), Leslie Klein, an individual residing in the State of California ("**Klein**"), and the Persons that become Members from time to time after the date hereof in accordance with the terms hereof.

## W I T N E S S E T H :

WHEREAS, the Members desire to operate the Company as a limited liability company under Title 2.5 of the California Corporations Code, as amended from time to time (the "**Act**"), in order to accomplish certain lawful business objectives;

WHEREAS, the Certificate of Formation of Life Capital Group, LLC was filed with the Secretary of State of the State of California on April 8, 2011, in accordance with the provisions of the Act; and

WHEREAS the Members desire to set forth herein the manner in which the Company shall be governed and operated.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

## ARTICLE I
## FORMATION AND BUSINESS OF THE COMPANY

Section 1.1    Formation.  The Company was formed on April 8, 2011 by the filing of a Certificate of Formation (the "**Certificate**") with the Secretary of State of California.  The Members hereby agree to operate the Company as a limited liability company pursuant to the provisions of the Act and upon and subject to the terms and conditions set forth in this Agreement.  Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

Section 1.2    Name.  The name of the Company shall be Life Capital Group, LLC, under which name all business and affairs of the Company shall be conducted.

Section 1.3    Purpose.  The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act.

Section 1.4    Term.  The term of the Company shall continue until terminated in accordance with the provisions of Article XI of this Agreement or otherwise dissolved and wound up pursuant to the Act.

Section 1.5    Place of Business.  The Company shall have its principal place or places of business at such place or places as the Manager may, from time to time, select.

CONFIDENTIAL

Section 1.6    Registered Office and Agency.  The address of the registered office of the Company in the State of California is 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.  The name and address of the registered agent for service of process on the Company in the State of California is Shlomo Rechnitz, 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.

Section 1.7    Fiscal Year.  The term **"Fiscal Year"** shall mean, subject to the provisions of Section 706 of the Code, each of (a) the period commencing on the date of formation of the Company and ending on December 31, 2011, (b) any subsequent 12-month period commencing on January 1 and ending on December 31 and (c) the period commencing on January 1 and ending on the Dissolution Date.

<div align="center">

ARTICLE II
MEMBERS

</div>

Section 2.1    Members.  The Company shall consist of the Members executing this Agreement and any substitute or additional Members admitted to the Company in accordance with the terms hereof.  Each initial Member shall be deemed admitted as a Member of the Company at such time as such Member has made its Initial Capital Contribution to the Company.

Section 2.2    Company Property; Company Interest.  No property of the Company shall be deemed to be owned by any Member individually, but all of such property shall be owned by, and title thereto shall be vested solely in, the Company.

<div align="center">

ARTICLE III
CAPITAL CONTRIBUTIONS

</div>

Section 3.1    Initial Capital Contribution of Members, Capital Accounts.  Each Member has contributed to the capital of the Company, as such Member's Initial Capital Contribution, the amount of cash, or property with a value, set forth on Schedule A.  The Company shall maintain a record of:  (a) the number of Interests held by each Member and (b) the respective Percentage Interest of each Member.  The Manager shall update such Schedule A from time to time to reflect changes in such information.  The Members agree that Klein's Initial Capital Contribution associated with each Policy shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement.  The Members agree that Rechnitz's Initial Capital Contribution associated with the Policies (in the order of each Policy that first generates proceeds) shall be deemed to be $3,800,000. The Company will establish and maintain a Capital Account for each Member throughout the full term of the Company.

Section 3.2    Additional Capital Contributions.    Other than the Initial Capital Contributions made by the Members upon admission to the Company in accordance with Section 3.1 and Article VIII, the Members shall not be required to make any additional contributions to the Company; except that Rechnitz shall be obligated to contribute to the Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the Policies which are not Non-Payment Policies after the date of this Agreement and each Non-Payment Policy Member shall be obligated to contribute to the

<div align="center">2</div>

CONFIDENTIAL

Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the applicable Non-Payment Policy after the date such Non-Payment Policy Member was admitted to the Company as a Member.

Section 3.3    <u>Withdrawal and Return of Capital Contributions</u>.

(a)    No Member shall be entitled to demand a return of such Member's Capital Contribution (including any earnings thereon) or to withdraw any portion of such Member's Capital Account except as expressly provided in this Agreement. Except as expressly provided herein, no Member shall have the right to demand a distribution of property other than cash for its Interest. Each Member hereby waives any right such Member may otherwise have to cause any asset of the Company to be partitioned or to file a complaint or institute any proceeding at law or in equity seeking the partition of any such asset. Except as otherwise provided herein, no Member shall have priority over any other Member, either as to a return of such Member's Capital Contribution or as to Net Income, Net Losses, any other item of Company income, gain, loss or deduction, or Company distributions.

(b)    No Member shall be personally liable for the return of the Capital Contributions of any other Member or any portion thereof, it being expressly understood that any such return shall be made solely from available Company assets, if any.

Section 3.4    <u>Interest</u>.    Interest, if any, earned on funds contributed or held by the Company shall inure to the benefit of the Company. The Members shall not be entitled to receive interest or any other payments from the Company with respect to their Capital Contributions or Capital Accounts, except as otherwise provided for herein.

Section 3.5    <u>Negative Capital Accounts</u>.    Except as may be required by the provisions of the Act or in respect of any negative balance resulting from a withdrawal of capital or distribution in contravention of this Agreement, at no time shall any Member with a negative Capital Account balance have any obligation to the Company or the other Members to restore such negative balance, and such negative balance shall not be treated as an asset of the Company.

## ARTICLE IV
## DISTRIBUTIONS AND ALLOCATIONS

Section 4.1    <u>Allocation of Net Income and Net Losses</u>.

(a)    Net Income with respect to a Policy for any Fiscal Year shall be allocated (i) first, to Rechnitz to the extent of Rechnitz's Priority Return with respect to such Policy; (ii) second, to Rechnitz until $3,800,000 of Net Income has been allocated to Rechnitz in the aggregate (without regard to allocations of Net Income under subclause (i)); (iii) third, to Klein, to the extent of Klein's Priority Return with respect to such Policy; and (iv) thereafter, to Klein and Rechnitz in proportion to their Percentage Interests.

(b)    Net Losses with respect to a Policy for any Fiscal Year shall be allocated to Klein and Rechnitz in proportion to their Capital Contributions associated with such Policy.

50028620.3

LCG000007    CONFIDENTIAL

Section 4.2    Cash Available for Distribution. Subject to Article XI, the Company shall distribute Available Cash to the Members at such times and in such amounts as determined by Rechnitz in accordance with this Agreement.

Section 4.3    Proceeds of Policies. If at any time the Company receives any proceeds from any Policy that is not a Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a)    first, to Rechnitz by wire transfer into an account designated by Rechnitz, in an amount up to the Rechnitz Amount for such Policy;

(b)    second, (A) first, to each of the Lenders, pro-rata, based on the outstanding principal balance owed to such Lender as set forth on Schedule C, until such outstanding principal balance is equal to zero, in an aggregate amount up to the Klein Amount for such Policy and (B) second, any remaining Klein Amount with respect to such Policy to Klein by wire transfer into an account designated by Klein;

(c)    third, (i) 50% to Rechnitz by wire transfer into an account designated by Rechnitz and (ii) 50% to Klein by wire transfer into an account designated by Klein, provided, however, that if the balance of the Reserve Account is less than $2,500,000, then proceeds distributable to Klein under clause (ii) above shall be deposited in the Reserve Account until such balance is equal to $2,500,000.

Section 4.4    Constructive Trust. If any Member receives any proceeds in respect of any Policy (following the death of an Insured or otherwise), such Member shall hold such proceeds in a constructive trust for the Company and shall within one (1) Business Day inform the other Members and the Manager and deposit such proceeds in the Reserve Account.

Section 4.5    Sale of Policies. The Company shall be entitled to sell any Policy to any Person with the prior written consent of each of the Members. Notwithstanding the immediately preceding sentence, upon Klein's written consent, Rechnitz or his designee shall be entitled to purchase any Policy that is not a Non-Payment Policy from the Company by transferring an amount equal to the Klein Amount for such Policy to the Company, which for administrative convenience shall be subsequently distributed to an account designated by Klein.

Section 4.6    Lenders. The Members agree that (i) the Company may pay amounts pursuant to Section 4.3(b) directly to the Lenders, and in such event, the payments will be treated as distributions by the Company to Klein and subsequently transferred by Klein to the Lenders, (ii) nothing herein is intended to grant to the Lenders an equity interest in the Company, and (iii) nothing herein is intended to imply that the Company is assuming the obligations owed to the Lenders.

ARTICLE V
RESERVE ACCOUNT

Section 5.1    Establishing a Reserve Account. As soon as practicable the Company shall establish the Reserve Account with the Account Bank in the name of Company.

50028620.3

LCG000008                                                                                                          CONFIDENTIAL

Section 5.2   Distribution of Reserve Account. Amounts in the Reserve Account shall be distributed to certain Members in certain specified amounts under the following circumstances: (a) if the amount of Net Income allocated to Klein with respect to a Policy under Section 4.1 for a Fiscal Year exceeds the amount of proceeds distributed to Klein with respect to such Policy pursuant to Section 4.3; then 40% of such excess shall be distributed to Klein from the Reserve Account; (b) if upon a disposition of a Policy or the receipt of proceeds from such policy, the Rechnitz Amount with respect to the Policy exceeds the amount of proceeds distributed to Rechnitz with respect to such Policy pursuant to Section 4.3, then the amount of such excess shall be distributed to Rechnitz from the Reserve Account; and (c) if agreed upon by the Members, then the amount agreed upon by the Members shall be distributed to Klein from the Reserve Account.

ARTICLE VI
MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

Section 6.1   Rights and Powers of Manager. The business and affairs of the Company shall be managed by the Manager. The Manager shall direct, manage, and control the business of the Company to the best of the Manager's ability. Except for situations in which the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all acts or activities customary or incident to the management of the Company's business. Nothing contained in this Agreement shall require any person to inquire into the authority of the Manager to execute and deliver any document on behalf of the Company or to bind the Company pursuant to such document.

Section 6.2   Number, Tenure and Qualifications. The Company shall have one Manager, which initially shall be Jonathon Polter ("**Polter**"), an individual residing at 2000 Town Center, Suite 1490, Southfield, Michigan 48075. Polter shall remain as the Manager unless he resigns from such position, is relieved of his duties by (i) if there are two Members or less, a unanimous vote of the Members and (ii) otherwise, an affirmative vote of Members holding a majority of the Interests. Subsequent Managers shall be elected by the affirmative vote of Members holding a majority of the Interests. Managers need not be residents of the State of California.

Section 6.3   Officers. The Manager may delegate the management of the Company's day-to-day business affairs to a Chief Executive Officer and other officers of the Company designated by the Manager and approved by an affirmative vote of Members holding a majority of the Interests and, unless otherwise decided by the Manager, all actions of the Company may be taken by the appropriate duly authorized officers.

Section 6.4   Reliance. The Manager shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any officers, employees, or committees of the Company, or by any other Person as to matters such Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including, without limitation, information, opinions, reports or

5

statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

Section 6.5    Indemnification of Manager, Members and Officers.

(a)    General.    The Company shall indemnify any Person (a "**Covered Person**") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including an action by or in the right of the Company) by reason of the fact that he is or was a Manager, Member or officer of the Company, or is or was serving at the request of the Company as a director, manager or officer of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith with no willful misconduct or gross negligence and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.    The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b)    Indemnification in Certain Cases.    To the extent that a Covered Person has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in clause (a) of this Section 6.5, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

(c)    Advances for Expenses.    Expenses (including attorneys' fees) incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be ultimately determined that he is not entitled to be indemnified by the Company as authorized in this Section 6.5.

(d)    Rights Non-Exclusive.    The indemnification and advancement of expenses provided by, or granted pursuant to, the other subparagraphs of this Section 6.5 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, agreement or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

(e)    Insurance.    The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was a Covered Person against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such,

6

whether or not the Company would have the power to indemnify him against such liability under the provisions of this Section 6.5.

(f)     Survival of Rights.  The indemnification and advancement of expenses provided by, or granted pursuant to this Section 6.5 shall continue as to a Person who has ceased to be an officer, Manager or Member and shall inure to the benefit of the heirs, executors and administrators of such Person.

Section 6.6     Exculpation.  No Member, Manager or officer of the Company shall be liable, in damages or otherwise, to the Company or its Members for any act or omission performed or omitted by such Member, Manager or officer pursuant to authority granted by this Agreement except to the extent such Person fails to meet the standard for indemnification set forth in Section 6.5(a).

Section 6.7     No Duties.  Any duties (including fiduciary duties) of a Covered Person to the Company or to any other Covered Person that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, provided, that (i) the foregoing shall not eliminate the obligation of each Member and the Manager to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied covenant of good faith and fair dealing.

Section 6.8     Protection of Insured's Private Information.  Manager and each Member acknowledge that insurance regulations and other applicable Laws are structured to provide confidentiality to policy owners and insureds with respect to Consumer Information in connection with ownership or sale of their policies, and that the Manager and each Member and all of their respective agents and representatives, are obligated to keep Consumer Information confidential in accordance with applicable Laws.  The Manager and each Member agree to comply with all applicable Laws with respect to the confidentiality of Consumer Information; provided, that (i) the Manager and each Member may disclose such information to their internal or external auditors and attorneys and as required or permitted by Law, and (ii) Klein may take all necessary and appropriate actions to transfer ownership of the Policies to the Company.

Section 6.9     Delivery of Policy Files.  Klein shall deliver each Policy File as directed by the Manager within thirty (30) Business Days of the date of this Agreement.

Section 6.10    Change Forms.  On the date of this Agreement, Klein shall execute and deliver Change Forms to the Company or at the Company's direction, changing the owner and Beneficiary of the Policy to the Company or the Company's designee.  In addition, Klein shall execute and deliver any additional instruments of transfer that the Company may reasonably request necessary to evidence the assignment of the Policy and any rights therein to the Company or its designee.

Section 6.11    Further Assurances.  From and after the date hereof, each Member shall execute and deliver such other documents and instruments, and take such further actions, as may be reasonably requested from time to time by another Member to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby.  Without limiting the foregoing, Klein shall cooperate with Rechnitz in causing the Company or its designee to be

CONFIDENTIAL

recorded as the owner and beneficiary of each Policy on the books and records of the relevant issuing insurance companies.

Section 6.12   Indemnification of Rechnitz.  Klein shall indemnify and hold harmless (which indemnification shall survive any termination of this Agreement and the dissolution of the Company) Rechnitz and his Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an **"Indemnified Person"**), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and actual expenses incurred (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person, and in connection with or arising out of (i) any breach of any representation, covenant or other obligation of Klein hereunder, (ii) the transactions contemplated hereunder, (iii) any actions or failures to act in connection therewith or (iv) and any and all reasonable legal costs and actual expenses arising out of or incurred in connection with disputes between or among Klein and Rechnitz (collectively, **"Indemnified Liabilities"**); provided, that Klein shall not be liable for any indemnification to an Indemnified Person to the extent that any such Indemnified Liability results from that Indemnified Person's gross negligence or willful misconduct; provided, further, that the aggregate amount of Klein's liability under this Section 6.12 shall be limited to the aggregate of the Rechnitz Amounts for all of the Policies.

ARTICLE VII
REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Section 7.1   Representations and Warranties of Klein.

(a)   Power and Authority.  Klein has full power, authority and right to execute and deliver this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of its obligations hereunder.

(b)   Binding Obligation.  This Agreement constitutes the legal, valid and binding obligations of Klein enforceable against Klein in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(c)   Consent of Third Parties.  No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by Klein in connection with the execution of this Agreement and the compliance by Klein with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Klein of any other action contemplated hereby.

(d)   Policies.  With respect to each Policy, to the best of Klein's knowledge:

50028620.3

LCG000012                    CONFIDENTIAL

(i)    at the issuance of such Policy, the related Insured or Original Owner thereof was not a party to any written or oral agreement or arrangement to cause the same or interests therein to be issued, assigned, sold, transferred, or otherwise disposed of in violation of applicable law or public policy;

(ii)    at the issuance of such Policy, the related Insured or Original Owner thereof had the financial capacity to pay the premiums necessary to maintain such Policy in force;

(iii)    at the issuance of such Policy the related Original Owner had an insurable interest in the life of the Insured;

(iv)    the material medical or financial information supplied by or on behalf of the Insured or Original Owner of such Policy in the application and related materials delivered to the applicable issuing insurance company in connection with the issuance of such Policy was not false, incomplete or misleading in any material respect;

(v)    Klein does not possess or control any material documentation or information related to such Policy, or the acquisition or maintenance thereof by Klein, that has not been delivered or disclosed in writing to Rechnitz or his agents;

(vi)    prior to the date of this Agreement and the consummation of the transactions contemplated by [insert transfer agreement title], Klein was trustee of the applicable Original Owner which held sole legal and beneficial title thereto;

(vii)    Klein, in his capacity as trustee of the applicable Original Owner, acquired sole legal and beneficial title thereto and had the power and authority to enter into this Agreement;

(viii)    Immediately prior to its transfer to the Company hereunder, Klein held sole legal and beneficial title thereto;

(ix)    upon the transfer of such Policy, Company or its designee, will hold good and marketable title to and ownership of such Policy free and clear of any liens, charges, rights, encumbrances or other interests;

(x)    such Policy was acquired in a manner in compliance, in all material respects, with the Laws applicable to the purchase of life insurance policies, as then in effect and as then interpreted by the relevant regulators or in case law;

(xi)    except as disclosed to Rechnitz in writing, no previous owner of such Policy has waived, amended or terminated any material provision of, or any material rights in relation to, such Policy;

(xii)    except as disclosed on Schedule 7.1(d)(xii), the premiums for such Policy have been paid such that such Policy will not be in a grace period as of the date of this Agreement and such Policy has not been cancelled as of the date of this Agreement;

9

(xiii)    Klein has disclosed or delivered to Rechnitz and the Company in writing all information received by Klein or any of his agents from the related issuing insurance company related to any change in the terms of such Policy, including with respect to an intent to increase the cost of insurance for such Policy;

(xiv)    there is no current or pending written notice that has been issued to Klein by the related issuing insurance company of such issuing insurance company's intention to cancel, contest, rescind or refuse payment under such Policy;

(xv)    all the information contained in each of the documents in the related Policy File or otherwise delivered by or on behalf of Klein to the Company and Rechnitz in connection with such Policy is true, complete and correct in all material respects;

(xvi)    the related Policy File contains the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

(xvii)    there is not any pending or threatened Proceeding challenging the validity, ownership or enforceability of such Policy or Klein's ownership rights in such Policy;

(xviii)    such Policy was not issued pursuant to or in connection with an agreement whereby the premiums required to be paid on such Policy were paid by any Person pursuant to a recourse or non-recourse premium financing program;

(xix)    Klein has not required any broker to sign an agreement offering Klein or any other Person the "right of last offer" in connection with the purchase of such Policy; and

(xx)    such Policy has been issued by the related issuing insurance company and is in force and any related contestability period and any suicide exclusion period has expired.

Section 7.2    <u>Representations and Warranties of Rechnitz</u>.  Rechnitz hereby represents and warrants that:

(i)    <u>Authority</u>.  Rechnitz has full power, authority and right to execute this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of his obligations hereunder.

(ii)    <u>Binding Obligation</u>.  This Agreement constitutes Rechnitz's legal, valid and binding obligation, enforceable against Rechnitz in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(iii)    <u>Consent of Third Parties</u>.  No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or

50028620.3

LCG000014                                                                CONFIDENTIAL

Governmental Authority is required by Rechnitz in connection with the execution of this Agreement and the compliance by Rechnitz with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Rechnitz of any other action contemplated hereby.

<div align="center">ARTICLE VIII<br>ADMISSION OF MEMBERS</div>

Section 8.1    Admission of Members.  Subject to Section 8.2, upon the approval of the Members by majority vote, one or more Persons may be admitted to the Company as Members. The Members by majority vote shall determine the number of Interests and the Percentage Interest to be offered to any such Member and the Initial Capital Contribution to be made by any such Member.  Each such Person shall be admitted as a Member at the time such Person (a) executes and delivers a copy of this Agreement to the Manager and (b) if applicable, makes its Initial Capital Contribution to the Company.  The Manager shall update Schedule A to reflect the admission of any such Members.

Section 8.2    Admission of Non-Payment Policy Members.    It is agreed and acknowledged by the Members that Rechnitz's sole obligation with respect to the Company is making Capital Contributions for the payment of premiums on the Policies and the expenses associated with the Policies, in each case after the date of this Agreement.  Rechnitz shall provide the Company and Klein with six (6) months prior written notice if Rechnitz elects to cease paying premiums in respect of any Policy (such Policy, a "**Non-Payment Policy**").  After delivery of such notice, Rechnitz or Klein shall have the right to introduce any Person to the Company as a potential Member who agrees in writing to assume Rechnitz's obligations for the payment of premiums and other costs and expenses with respect to such Non-Payment Policy, which person shall be admitted as a Member upon the approval of the Members by [majority] vote (such a Member, a "**Non-Payment Policy Member**").  With respect to any Non-Payment Policy, any payment of premiums and other costs and expenses shall be contributed to the capital of the Company by the applicable Non-Payment Policy Member.  If at any time the Company receives any proceeds from any Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a)    First, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount up to (x) the total amount of Capital Contributions made on such Policy by such Non-Payment Policy Member and (y) the Priority Return of such Non-Payment Policy Member on such Policy computed starting on the date such Non-Payment Policy Member was admitted as a Member;

(b)    Second, by wire transfer into an account designated by Rechnitz, in an amount equal to the Rechnitz Amount for such Policy;

(c)    Third, by wire transfer into an account designated by Klein, in an amount equal to the Klein Amount for such Policy;

50028620.3

LCG000015                                                                                                                CONFIDENTIAL

(d)    Fourth, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount equal to fifty percent (50%) of all remaining proceeds from such Policy;

(e)    Fifth, to Rechnitz and Klein by wire transfers into accounts respectively designated by them in proportion to the Capital Contributions made by them with respect to each such Non-Payment Member Policy; provided, however that if Klein introduced the related Non-Payment Policy Member to the Company, then 25% of the amount distributable under this clause (e) to Rechnitz shall be distributed to Klein instead.

Notwithstanding Section 4.1 hereof, Net Income associated with a Non-Payment Policy shall be allocated to each Member to the extent of any Priority Return distributed to such Member with respect to the Non-Payment Policy and to the extent of any distributions made to a Member pursuant to Section 8.2(d) or Section 8.2(e) above with respect to such Non-Payment Policy . Notwithstanding Section 4.1 hereof, Net Losses associated with a Non-Payment Policy shall be allocated to each Member in proportion to the Capital Contributions made by such Member with respect to such Non-Payment Policy.

<div align="center">

ARTICLE IX

MAINTENANCE OF BOOKS AND RECORDS;
REPORTS TO MEMBERS; TAX RETURNS

</div>

Section 9.1    Accounting Method and Records.    Rechnitz shall determine the accounting method to be used by the Company.  The Company shall maintain such accounting records as shall reflect all Company transactions and as shall be appropriate and adequate for the Company's business.

Section 9.2    Company Records.  The Company shall maintain the following records, within or outside the State of California: (a) a copy of the Company's accounting records and federal, state, local and foreign income tax or information returns and reports, if any, for the five most recent Fiscal Years; and (b) all other records and reports required by the Act or otherwise to be maintained by the Company.    Each Member, and such Member's duly authorized representatives or agents, shall, for any purpose reasonably related to his interest as a Member, have reasonable access to such books and records at such office and shall have the right to inspect and copy such books and records; provided, however, that if a Member was an officer, consultant or employee of the Company received his/her Interest pursuant to a profits interests grant agreement ceases to be an employee, consultant or officer of the Company, such Member shall only have the right to receive books and records that he/she has the right to require the Company to provide to him/her in accordance with applicable law.

Section 9.3    Company Reports.  The Company shall cause to be furnished to each Member and each other Person who was a Member during the period in question (a) such reports and financial statements as may be reasonably required for his financial reporting requirements, including, without limitation, copies of all annual, quarterly and monthly financial statements, and (b) detailed financial statements and information and documents (including Form K-1) necessary or desirable for the preparation or support of such Member's tax returns required in any jurisdiction, as soon as practicable after the end of each Fiscal Year.

<div align="center">12</div>

                                                                                    CONFIDENTIAL

Section 9.4    Designation of Tax Matters Member.  Rechnitz is designated the "**Tax Matters Member**" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

Section 9.5    Tax Treatment and Elections.  The Company shall be treated as a partnership for federal income tax purposes, the Members shall be treated as partners for federal income tax purposes, and each of the Members agrees to report consistently with such treatment. The Manager shall make all elections necessary to give effect to such treatment.

<div align="center">

ARTICLE X
TRANSFER OF INTERESTS; SPECIAL PROVISIONS

</div>

Section 10.1    Transfers and Assignments.

(a)    No Member shall be permitted to Transfer any Interest to a Person other than a Permitted Transferee, except in accordance with the provisions set forth in this Article X.

Section 10.2    Permitted Transfers.

(a)    Each Member shall notify the Manager and the other Members of any proposed Transfer to a Permitted Transferee by such Member, or by any of its Affiliates, in the case of an indirect Transfer of an Interest, which notice shall set forth the name and address of the Permitted Transferee and the nature of the relationship between such Member and such Permitted Transferee, at least ten (10) calendar days prior to the proposed date of such Transfer. Each Member shall be responsible for paying all transfer, gains or similar taxes, if any, and all reasonable costs and expenses of the Company, including reasonable attorneys' fees, arising out of any Transfer by such Member of all or a portion of its Interest (or by any of its Affiliates in the case of an indirect Transfer of an Interest) to a Permitted Transferee.  As a condition to any Transfer of all or any portion of an Interest in the Company to a Permitted Transferee shall execute and deliver to the Company a joinder agreement, in form of Exhibit A (a "**Joinder Agreement**").  All of the provisions of this Agreement, including without limitation, the provisions of this Article X, shall be applicable to and binding upon each Permitted Transferee.

(b)    The transfer by a Member of all or any portion of its Interest (including, without limitation, any transfer to a Permitted Transferee) shall not release such Member from any or all of its obligations under this Agreement arising prior to the date of such Transfer.

Section 10.3    Substitute Members.  A Permitted Transferee of the Interest of a Member or a transferee of the Interest of a Member pursuant to Sections 10.4 and 10.5 of this Agreement, or any portion thereof, shall become a substitute Member entitled to all the rights, and subject to all of the obligations and restrictions, of the transferor Member if, and only if:

(a)    the transferor assigns the transferee such right;

(b)      the transferor or transferee pays to the Company all reasonable costs and expenses incurred by the Company in connection with such substitution; and

(c)      the transferee executes and delivers a Joinder Agreement.

Section 10.4    Right of First Refusal.

(a)      Except for Transfers pursuant to or contemplated by Section 10.2, if any Member (a "**Selling Member**") receives a bona fide written offer from an independent third party (a "**Third Party**") to purchase any or all of such Selling Member's Interests for cash and such Selling Member desires to Transfer any or all of such Interests (the "**Offered Interests**") pursuant to such offer, prior to any Transfer it shall give written notice of the proposed Transfer (the "**Notice of Intention**") to the Company and the other Members (the "**Remaining Members**") specifying the number of Offered Interests which such Selling Member wishes to Transfer, the proposed transferee, the proposed purchase price for the Offered Interests (the "**Offer Price**") and the other material terms and conditions of the proposed Transfer.

(b)      For a period of thirty (30) days after receipt of the Notice of Intention (the "**Option Period**"), each of the Remaining Members shall have the irrevocable option to purchase at the Offer Price and on the other terms specified in the Notice of Intention, all of the Offered Interests pro rata based on the Percentage Interest of each Remaining Member; provided, however, that if any Remaining Member does not purchase any or all of its pro rata portion of such Offered Interests, the other Remaining Members shall have the right to purchase such portion, pro rata, until all of such Offered Interests are purchased.  The option of a Remaining Member pursuant to this Section 10.4(b) (the "**Remaining Members Option**") shall be exercisable by delivery of a notice (the "**Remaining Members Notice**") setting forth the maximum number of Offered Interests that such Remaining Member wishes to purchase, including any number which would be allocated to such Remaining Member if any other Remaining Member does not purchase all or any portion of its pro rata portion, to the Selling Member, the Company and the other Remaining Members and shall expire if the Remaining Members Notice is not delivered prior to the expiration of the Option Period.

(c)      If all notices required to be given pursuant to this Section 10.4 have been duly given, and the Remaining Members determine not to exercise their respective options to purchase all of the Offered Interests at the Offer Price and on the other terms specified in the Notice of Intention or determine, with the consent of the Selling Member, to exercise their options to purchase less than all of the Offered Interests, then the Selling Member shall have the right, for a period of ninety (90) days from the earlier of (a) the expiration of the Option Period and (b) the date on which such Selling Member receives notice from the Remaining Members that they will not exercise the option granted pursuant to this Section 10.4, to accept the bona fide offer from the Third Party and enter into an agreement to sell the Offered Interests remaining unsold under this Section 10.4 at a price not less than the Offer Price and on the same terms as set forth in the Notice of Intention; provided that prior to any such Transfer to a Third Party, such Third Party executes and delivers to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby becomes a party to this Agreement.

14

(d)    The closing of any purchase and sale of any Interests to a Remaining Member pursuant to this Section 10.4 shall take place at the offices of the Company on such date, not later than sixty (60) days after the delivery to the Selling Member of the Remaining Members Notice. At the closing of such purchase and sale, the Secretary or such other officer of the Company shall record such Transfer in the books of the Company against evidence of such Transfer, delivery of the Offer Price therefor and an executed Joinder Agreement.

(e)    If the Remaining Members Option is not exercised, and the Offered Interests are not sold pursuant to Section 10.4(c) within the ninety (90) day period referred to therein, such sale may not be carried out without complying again with the terms of this Section 10.4.

Section 10.5    Tag-Along Rights and Obligations.

(a)    In the event that after complying with the terms of Section 10.4, the Selling Member desires to sell (the "**Disposition**") the Offered Securities to a Third Person (the "**Acquirer**"), the Selling Member's right to accept such offer to purchase the Offered Securities shall be conditioned on each Remaining Member being offered the right to sell to the Acquirer its pro rata portion of the Offered Securities (based on the Percentage Interest of each Remaining Member) in such Disposition in accordance with this Section 10.5. The Selling Member shall give notice (the "**Disposition Notice**") to each Remaining Member at least thirty (30) days prior to the consummation of the Disposition specifying the number of Offered Interests which such Selling Member wishes to Transfer in the proposed Disposition, the proposed transferee, the proposed purchase price for the Offered Interests and the other material terms and conditions of the proposed Disposition.

(b)    The election to participate in the Disposition by the Remaining Members pursuant to Section 10.5(a) shall be exercised by notice to the Selling Member given within the time period specified in the Disposition Notice, which time period shall not be less than fifteen (15) days after such Disposition Notice is given. If any Remaining Member gives notice of its election to sell, it shall be obligated to sell the number of Interests specified in such Remaining Member's notice upon the terms and subject to the conditions specified in Section 10.5(a) to the Acquirer (which shall be the same for the other Remaining Members and the Selling Member), conditional upon the closing of the Disposition.

(c)    The sale or Transfer of Interests to the Acquirer by the Selling Member and by the Remaining Members electing to participate in the Disposition pursuant to this Section 10.5 shall occur simultaneously and be on the same terms and at the same price as the Interests sold by the Selling Member; provided that prior to any such Transfer to an Acquirer, such Acquirer shall execute and deliver to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby become a party to this Agreement.

(d)    If the Acquirer declines to purchase from such Remaining Members their respective proportionate number of Interests calculated in accordance with this Section 10.5, the Selling Member will not sell any Interests to the Acquirer.

15

CONFIDENTIAL

Section 10.6    <u>Miscellaneous Provisions Affecting Transfer</u>.

(a)    Upon the Transfer of all or any portion of a Member's Interests as permitted or required under this Agreement, including, without limitation, as provided in this <u>Article X</u>, (i) the income, loss, gain, deduction and credit attributable to the Interests so transferred shall be allocated between the transferor and transferee based upon the number of days during the applicable Fiscal Year that the Interests so transferred was held by each of them, without regard to the results of Company activities during the period in which each was the holder; provided that the Manager shall, at the request and expense of the transferring Member, cause an interim closing of the Company's books as of the effective date of Transfer for purposes of allocating such items between the transferor and transferee; and (ii) the transferor shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods preceding the date of Transfer, and the transferee shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods on and after the date of Transfer based upon the number of days during the applicable Fiscal Year that the Interests so transferred were held by each of them, without regard to the results of Company activities during the period in which each was the holder.

(b)    The Company shall be entitled to treat the record owner of any Interests as the absolute owner thereof, and shall incur no liability for distributions of cash or other property or allocations of income, gain, loss, deduction or credit made in good faith to such owner until such time as a written assignment of such Interests has been received, accepted and recorded on the books of the Company.

<div align="center">

ARTICLE XI
DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

</div>

Section 11.1    <u>Dissolution, etc</u>.  The Company shall be dissolved upon the occurrence of any of the following events (the date of such occurrence, the **"Dissolution Date"**):

(a)    As approved by the majority vote of the Members; or

(b)    As otherwise required by applicable law.

Section 11.2    <u>Winding Up</u>.

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company in accordance with this <u>Section 11.2</u>.

(b)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be

<div align="center">16</div>

considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(c)    The Members shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

Section 11.3    Final Distribution.    After the application or distribution of the proceeds of the liquidation of the Company's assets in one or more installments to the satisfaction of the liabilities to creditors of the Company, including to the satisfaction of the expenses of the winding-up, liquidation and dissolution of the Company (whether by payment or the making of reasonable provision for payment thereof), the remaining proceeds, if any, plus any remaining assets of the Company shall be distributed to the Members in accordance with Sections 4.3 and 8.2, as applicable.

Section 11.4    Time for Liquidation, etc.    A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Company to seek to minimize potential losses upon such liquidation.    The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of a certificate of cancellation of the certificate with the Secretary of State of the State of California.

Section 11.5    Termination.    Upon completion of the winding up of the Company, the Manager (or any duly elected liquidating trustee or other duly designated representative) shall execute, acknowledge and cause to be filed a certificate of cancellation of the Certificate with the Secretary of State of the State of California.    Upon the cancellation of the Certificate, this Agreement and the Company shall terminate.

Section 11.6    Return of Contribution Nonrecourse to Other Members.    Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution.    If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

<div align="center">

ARTICLE XII
DISPUTE RESOLUTION

</div>

Section 12.1    Rabbinical Counsel.    If any dispute arises between the Members regarding this Agreement or any provision hereof, that dispute shall be resolved through a binding arbitration proceeding to be conducted in the State of California in accordance with the commercial arbitration rules of the Rabbinical Council of California.

<div align="center">

ARTICLE XIII
MISCELLANEOUS

</div>

Section 13.1    Entire Agreement.    This Agreement, taken together with the other documents expressly referred to herein, each as amended or supplemented, constitutes the entire

agreement among the parties with respect to the subject matter herein or therein and supersedes any prior agreement or understanding among the parties hereto.

Section 13.2    <u>Other Ventures</u>.  The Manager or any Member, and any firm, corporation or association with which the Manager or any Member is in any way interested or connected, may act as attorney for, deal and contract with, and be employed by the Company, and the Manager or any Member may be, in any manner, interested in or connected with any corporation, association or business in which the Company is directly or indirectly interested, all in the same manner and with the same freedom as though not a Manager or a Member, as the case may be, and without accountability for any profit, benefit or compensation received in connection with such actions or relationships, none of which shall be void or voidable.

Section 13.3    <u>Amendments</u>.  This Agreement may be amended only with the written consent of a Majority in Interest; provided that any such amendment that materially adversely affects the rights and privileges of any Member (other than any amendment effected in connection with the making of a Capital Contribution to the Company by, and/or the issuance of additional Interests to, any Member, including, without limitation, any amendment to the rights and privileges of the Interests to reflect dilution resulting from such Capital Contributions or issuance of additional Interests) must be consented to by each of the Members so affected[; provided further, that any amendment to this Agreement shall not be effective without the consent of Rechnitz].

Section 13.4    <u>Choice of Law</u>.  This Agreement shall be construed in accordance with the laws of the State of California, without regard to the choice of laws rules thereof, and the obligations, rights and remedies of the Members hereunder shall be determined in accordance with such laws.

Section 13.5    <u>Successors and Assigns; Third Party Beneficiaries</u>.  This Agreement shall be binding upon, and, subject to <u>Article X</u>, shall inure to the benefit of, the parties and their legal representatives, heirs, administrators, executors, successors and permitted assigns.  Except as otherwise expressly provided herein, none of the provisions of this Agreement shall be for the benefit of or enforceable by any Person not a party hereto.

Section 13.6    <u>Interpretation</u>.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or neuter gender shall include the masculine, the feminine and the neuter.

Section 13.7    <u>Captions</u>.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend or otherwise affect the scope or intent of this Agreement or any provision hereof.

Section 13.8    <u>Severability</u>.  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement, or the application of such provision in jurisdictions or to Persons or circumstances other than those to which it is held invalid, illegal or unenforceable, shall not be affected thereby.

50028620.3

                    CONFIDENTIAL

Section 13.9   Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Section 13.10  Non-Waiver.  No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in a written notice given to the party claiming such waiver has occurred; provided that no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

Section 13.11  Notices.  All notices, requests, demands, claims and other communications that are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by confirmed facsimile with a copy sent by another means specified herein; the business day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five business days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

if to the Company:

c/o Shlomo Rechnitz
     5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.


with a copy to:

Leslie Klein
14245 Ventura Blvd., Sherman Oaks, CA 91423



and if to a Member, to the Member's address or facsimile number on the books records of the Company, or to such other address with respect to the Company or a Member as the Company or such Member, as applicable, notifies the Company and the other Members in writing as provided above.

ARTICLE XIV
DEFINITIONS

Section 14.1   Definitions.

References in this Agreement to an "**Exhibit**" are intended to refer, unless otherwise specified, to an Exhibit attached to this Agreement, and references in this Agreement to an "**Article**" or a "**Section**" are intended to refer, unless otherwise specified, to an Article or a Section of this Agreement.  As used in this Agreement, the following terms shall have the respective meanings set forth below:

19

"**Account Bank**" means PrivateBancorp, Inc.

"**Act**" shall have the meaning specified in the recitals to this Agreement.

"**Affiliate**" means any Person that, directly or indirectly, through one or more intermediaries, is Controlled by one or more Members. As used in this Definition, "Control" means either (a) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting stock of a corporation, or in the case of any Person which is not a corporation, the ownership, directly or indirectly, of at least fifty percent (50%) of the beneficial ownership interests in such Person, or (b) irrespective of stock ownership or other beneficial ownership, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person.

"**Agreement**" means this Limited Liability Company Agreement, as the same may be amended hereafter from time to time as provided herein.

"**Available Cash**" means, at the time of determination, cash generated from revenues from the Company's operations, after provision has been made for (a) all expenditures paid or to be paid by the Company to non-Members and (b) such amounts as the Manager, in his sole discretion, shall deem reasonable in order to provide for any anticipated, contingent or unforeseen expenditures or liabilities of the Company. Available Cash shall be determined without regard to (i) Capital Contributions and (ii) principal advanced on Company indebtedness.

"**Beneficiary**" means, with respect to the Policy, the legal person or persons designated as the recipients of the Death Benefit for such Policy.

"**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Member by crediting such Member's Capital Contributions, such Member's share of Net Income, and the amount of any Company liabilities that are assumed by such Member (other than liabilities that are secured by any Company property distributed to such Member) and by debiting the amount of cash and the gross fair market value of any Company property distributed to such Member pursuant to any provision of this Agreement (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752), such Member's share of Net Losses, and the amount of any liabilities of such Member that are assumed by the Company (other than liabilities that are secured by any property contributed by such Member to the Company).

"**Capital Contribution**" means, with respect to any Member, the amount of money and the initial gross fair market value of any property contributed (or deemed contributed) from time to time by such Member to the Company (net of any liabilities secured by such property or to which such property is otherwise subject). The initial gross fair market value of each Policy contributed by Klein shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement. Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution made

20

CONFIDENTIAL

by any predecessor of a Member. For purposes of this Agreement, a Capital Contribution shall include, without limitation, any Initial Capital Contribution.

"**Certificate**" has the meaning set forth in Section 1.1.

"**Change Forms**" means the forms changing the owner and Beneficiary of the Policy using such form as is required by each of the relevant issuing insurance companies.

"**Code**" means the Internal Revenue Code of 1986, as amended, and as the same may be amended hereafter from time to time.

"**Company**" shall have the meaning specified in the preamble hereto.

"**Consumer Information**" means medical, health, financial and personal information about an Insured, an Original Owner, a Beneficiary under a Policy or a person designated by an Insured to provide periodic information regarding the medical status of the Insured, or any spouse or other individual closely related by blood or law to any such person (each, a "**Consumer**"), including, without, limitation, a Consumer's name, street or mailing address, email address, telephone or other contact information, employer, social security or tax identification number, date of birth, driver's license number, photograph or documentation of identity or residency (whether independently disclosed or contained in any disclosed document such as a Policy, life expectancy evaluation, life insurance application or life settlement application).

"**Covered Person**" shall have the meaning specified in Section 6.5(a).

"**Death Benefit**" means the cash amount of a Policy to be paid upon the death of the applicable Insured under such Policy, which amount will be net of any policy loans made under such Policy (and accrued interest thereon).

"**Disposition**" shall have the meaning specified in Section 10.5(a).

"**Disposition Notice**" shall have the meaning specified in Section 10.5(a).

"**Dissolution Date**" shall have the meaning specified in Section 11.1.

"**Fiscal Period**" means, subject to the provisions of Section 706 of the Code, (i) any Fiscal Year and (ii) any portion of a Fiscal Year for which the Company is required to allocate Net Income, Net Losses or other items of Company income, gain, loss or deduction pursuant to Article IV.

"**Fiscal Year**" shall have the meaning specified in Section 1.7.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Indemnified Liabilities**" shall have the meaning specified in Section 6.12.

50028620.3

CONFIDENTIAL

"**Indemnified Person**" shall have the meaning specified in Section 6.12.

"**Initial Capital Contribution**" means, with respect to each Member, such Member's Initial Capital Contribution set forth on Schedule A.

"**Insured**" means, with respect to a Policy, each person whose life is insured under such Policy.

"**Interest**" means, with respect to any Member, (a) such Member's share of the profits and losses of the Company and a Member's rights to receive distributions from the Company in accordance with the provisions of this Agreement and the Act and (b) such Member's other rights and privileges in respect of the Company as herein provided.

"**Joinder Agreement**" shall have the meaning specified in Section 10.2(a).

"**Klein Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Klein related to such Policy and (y) the Priority Return for Klein on such Policy.

"**Law**" means any law, constitution, statute, ordinance, code, rule, regulation, decision, order, consent, decree, judgment, ordinance, release, license, permit, stipulation or other pronouncement having the effect of law enacted or issued by any Governmental Authority, any foreign country, or domestic or foreign state, country, city or other political subdivision, which includes binding judicial precedent and principles of common law.

"**Lender**" shall mean each lender identified on Schedule C.

"**Majority in Interest**" means Members that at the time in question together hold a Percentage Interest greater than 50% in the aggregate.

"**Manager**" means one or more persons designated as such pursuant to this Agreement.

"**Members**" means, collectively, the members signatory to this Agreement, and any other Persons admitted to the Company as members after the date hereof in accordance with the terms of this Agreement.

"**Net Income**" and "**Net Losses**" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss and each item of income, gain, expense, deduction and loss shall be allocable to the Members in accordance herewith).

"**Non-Payment Policy**" shall have the meaning as specified in Section 8.2.

"**Non-Payment Policy Member**" shall have the meaning as specified in Section 8.2.

**"Notice of Intention"** shall have the meaning as specified in Section 10.4(a).

**"Offer Price"** shall have the meaning as specified in Section 10.4(a).

**"Offered Interests"** shall have the meaning specified in Section 10.4(a).

**"Option Period"** shall have the meaning as specified in Section 10.4(b)

**"Original Owner"** means, with respect to a Policy, the Person to which the Policy was initially issued and who was listed as owner on the initial declarations page of such Policy or the policy application, as applicable.

**"Percentage Interest"** means, with respect to any Member as of any date of determination, a fraction (expressed as a percentage) having as its numerator the aggregate number of Interests held by such Member at such time, and having as its denominator the aggregate number of Interests held by all Members at such time. Each Member's Percentage Interest as of the date hereof, and as adjusted from time to time, is set forth on Schedule A.

**"Permitted Transferee"** means (a) with respect to any Member who is an individual, such member's siblings, parents, spouse (former spouse, if any), and children, and trusts solely for the benefit of any of the foregoing, and (b) with respect to any Member that is an entity, an Affiliate of such Member. [**Anyone else?**]

**"Person"** means any individual or any corporation, partnership, limited liability company, limited liability partnership, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other legal entity.

**"Policy"** means each of the life insurance policies contributed to the capital of the Company by Klein, as specified in Schedule B hereto.

**"Policy File"** means, with respect to a Policy, the file relating to such Policy which file shall include, without limitation, the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

**"Policy Illustration"** means, with respect to a Policy, a policy illustration from the related issuing insurance company.

**"Polter"** shall have the meaning set forth in Section 6.2.

**"Priority Return"** of a Member with respect to any Policy shall mean an annual rate of return of 12% on the total amount of Capital Contributions made by a Member with respect to such Policy from the date such Capital Contribution were made but computed no earlier than from the date of this Agreement. .

**"Rechnitz Amount"** shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Rechnitz related to such Policy and (y) the Priority Return for Rechnitz on such Policy.

50028620.3

LCG000027

CONFIDENTIAL

"**Remaining Members**" shall have the meaning specified in Section 10.4(a).

"**Remaining Members Notice**" shall have the meaning specified in Section 10.4(b).

"**Remaining Members Option**" shall have the meaning specified in Section 10.4(b).

"**Reserve Account**" means account number [____] established at Account Bank.

"**Selling Member**" shall have the meaning specified in Section 10.4(a).

"**Third Party**" shall have the meaning as specified in Section 10.4(a).

"**Transfer**" means, as a noun, any voluntary or involuntary, and direct or indirect, assignment, transfer, pledge, syndication, sale, hypothecation, contribution, encumbrance or other disposition or purported disposition, and, as a verb, voluntarily or involuntarily, and directly or indirectly, to assign, transfer, pledge, syndicate, sell, hypothecate, contribute, encumber or otherwise dispose of.

"**Tax Matters Member**" shall have the meaning specified in Section 9.4.

"**Treasury Regulations**" means the Income Tax Regulations promulgated under the Code, as the same may be amended hereafter from time to time.

*[Remainder of Page Intentionally Left Blank]*

50028620.3

LCG000028

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Limited Liability Company Agreement as of the date first set forth above.

SHLOMO RECHNITZ

LESLIE KLEIN

LCG000029                                                                    CONFIDENTIAL

## SCHEDULE A

| Member | Initial Capital Contributions | Interests | Initial Percentage Interest |
|---|---|---|---|
| Rechnitz | SEE SECTION 3.1 | 50% | 50% |
| Klein | SEE SECTION 3.1 | 50% | 50% |

Sch. A-1

CONFIDENTIAL

## SCHEDULE B

### POLICIES

| Insured | Owner | Issuing Insurance Company | Policy Number | Death Benefit |
|---|---|---|---|---|
|  |  |  |  |  |

Sch. B-1

LCG000034                                                                                CONFIDENTIAL

## SCHEDULE C

## LENDERS

| Lender | Outstanding Principal Balance |
|---|---|
| Sol Majer | $343,000 |
| Leah Katzsl | $100,000 |
| Ari Majer | $65,328 |
| Simcha Mann | $110,000 |
| Yisroel Rechnitz | $350,000 |
| Chaim Manella | $600,000 |
| Ben Katzsl | $245,000 |
| Shlomo Rechnitz | $500,000 |
| Hirshy Krich | $240,000 |
| | |
| **TOTAL** | **$2,553,328** |

Sch. C-1

LCG000035                                                                 CONFIDENTIAL

**<u>SCHEDULE 7.1(D)(XII)</u>**


**POLICIES IN GRACE**

Sch. 7.1(D)(XII)-1

LCG000036                                                                                            CONFIDENTIAL

# **EXHIBIT A**

## **JOINDER AGREEMENT**

[TO COME]

CONFIDENTIAL

# EXHIBIT "2"

THE SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

Español   Tiếng Việt   한국어   中文   հայերեն

Search

| Home | Online Services | Forms, Filings & Files | Self-Help | Divisions | Jury | General Info |
|---|---|---|---|---|---|---|
| | Pay Fines, Search Records... | Forms, Filing Fees... | For persons without attorneys | Civil, Criminal, Family... | Jury Duty Portal, Q&A... | Courthouses, ADA ... |

ONLINE SERVICES

# Case Access

 LANGUAGE ACCESS
[English ▾]

[PRINT]   [NEW SEARCH]

## CASE INFORMATION

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

**Case Number:** 22STCV18787
LESLIE KLEIN, INDIVIDUALLY AND AS A MEMBER OF THE EKLK FOUNDATION, AND DERIVATIVELY ON BEHALF OF LIFE CAPITAL GROUP, LLC, A VS JONATHON POLTER, ET AL.

**Filing Courthouse:** Stanley Mosk Courthouse

**Filing Date:** 06/07/2022
**Case Type:** Other Breach of Contract/Warranty (not fraud or negligence) (General Jurisdiction)
**Status:** Court-Ordered Dismissal - Other (Other) 10/25/2022

Click here to access document images for this case
If this link fails, you may go to the Case Document Images site and search using the case number displayed on this page

## FUTURE HEARINGS

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

None

## PARTY INFORMATION

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

BURNITE JOHN T. - Attorney for Defendant

KLEIN LESLIE - Plaintiff

POLTER JONATHON - Defendant

RECHNITZ SHLOMO - Defendant

SECURITY LIFE OF DENVER INSURANCE COMPANY - Defendant

SLOTT JEFFREY A. - Attorney for Plaintiff

TABIBKHOEI FARAH - Attorney for Defendant

VOYA FINANCIAL ADVISORS INC. - Defendant

WAGNER AVRAHAM - Attorney for Defendant

## DOCUMENTS FILED

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

**Documents Filed (Filing dates listed in descending order)**

**12/28/2022** Request for Dismissal
Filed by Leslie Klein (Plaintiff)

**10/25/2022** Order - Dismissal
Filed by Court

**10/25/2022** Minute Order ((Hearing on Motion to Compel Arbitration by Defendant Shlomo R...))
Filed by Clerk

**10/18/2022** Declaration (Supplemental Declaration of Avi Wagner in Support of Motion to Compel Arbitration)
Filed by Shlomo Rechnitz (Defendant)

**10/18/2022** Reply (Defendant's Reply Brief in Support of Motion to Compel Arbitration)
Filed by Shlomo Rechnitz (Defendant)

**10/18/2022** Reply (to Plaintiff's Opposition to Motion to Compel Arbitration and to Stay Proceedings)
Filed by Jonathon Polter (Defendant)

**10/12/2022** Opposition (OF PLAINTIFF TO MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS)
Filed by Leslie Klein (Plaintiff)

**10/12/2022** Opposition (BY SECURITY LIFE OF DENVER INSURANCE COMPANY TO DEFENDANTS SHLOMO RECHNITZ AND JONATHON POLTERS
MOTIONS TO COMPEL ARBITRATION)
Filed by Security Life of Denver Insurance Company (Defendant)

**10/11/2022** Declaration (OF JEFFREY A. SLOTT IN OPPOSITION TO OSC RE FILING PROOF OF SERVICE OF COMPLAINT)
Filed by Leslie Klein (Plaintiff)

**10/11/2022** Case Management Statement
Filed by Leslie Klein (Plaintiff)

**10/10/2022** Case Management Statement
Filed by Jonathon Polter (Defendant)

**10/10/2022** Proof of Service (not Summons and Complaint)
Filed by Security Life of Denver Insurance Company (Defendant)

**10/10/2022** Case Management Statement
Filed by Security Life of Denver Insurance Company (Defendant)

**10/07/2022** Case Management Statement
Filed by Shlomo Rechnitz (Defendant)

**08/24/2022** Notice (Notice of Hearing)
Filed by Shlomo Rechnitz (Defendant)

**08/24/2022** Minute Order ( (Order to Show Cause Re: Failure to File Proof of Service as t...))
Filed by Clerk

**08/17/2022** Verified Answer of Security Life of Denver Insurance Company to Plaintiff's Verified Complaint
Filed by Security Life of Denver Insurance Company (Defendant)

**08/16/2022** Amendment to Complaint (Fictitious/Incorrect Name)
Filed by Leslie Klein (Plaintiff)

**07/15/2022** Joinder to Motion (Defendant Jonathan Polter's Notice of Joinder and Joinder in Defendant Shlomo Rechnitz's Motion to Compel
Arbitration and to Stay Proceedings)
Filed by Jonathon Polter (Defendant)

**07/14/2022** Declaration (of Avi Wagner ISO Motion to Compel Arbitration)
Filed by SHLOMO RECHNITZ (Defendant)

**07/14/2022** Motion to Compel Arbitration
Filed by SHLOMO RECHNITZ (Defendant)

**07/07/2022** Notice of Case Management Conference
Filed by Clerk

**07/07/2022** Order to Show Cause Failure to File Proof of Service
Filed by Clerk

**06/16/2022** Certificate of Mailing for ((Court Order) of 06/16/2022)
Filed by Clerk

**06/16/2022** Minute Order ( (Court Order))
Filed by Clerk

**06/15/2022** Challenge To Judicial Officer - Peremptory (170.6)

Filed by Leslie Klein (Plaintiff)

**06/10/2022** Amendment to Complaint (Fictitious/Incorrect Name)
Filed by Leslie Klein (Plaintiff)

**06/07/2022** Notice of Case Assignment - Unlimited Civil Case
Filed by Clerk

**06/07/2022** Voluntary Efficient Litigation Stipulation Packet
Filed by Clerk

**06/07/2022** First Amended General Order re: Mandatory Electronic Filing
Filed by Clerk

**06/07/2022** Alternative Dispute Resolution Packet
Filed by Clerk

**06/07/2022** Civil Case Cover Sheet
Filed by Leslie Klein (Plaintiff)

**06/07/2022** Summons (on Complaint)
Filed by Leslie Klein (Plaintiff)

**06/07/2022** Complaint
Filed by Leslie Klein (Plaintiff)


## PROCEEDINGS HELD

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

### Proceedings Held (Proceeding dates listed in descending order)

**01/18/2023** at 09:30 AM in Department 72
Status Conference (ReArbitration) - **Not Held - Vacated by Court**

**10/25/2022** at 08:30 AM in Department 72
Case Management Conference - **Held**

**10/25/2022** at 08:30 AM in Department 72, Curtis A. Kin, Presiding
Hearing on Motion to Compel Arbitration (by Defendant Shlomo Rechnitz; Joinder by Defendant Jonathan Polter) - **Held**

**10/25/2022** at 08:30 AM in Department 72
Order to Show Cause Re: Failure to File Proof of Service (as to all named Defendants) - **Held**

**10/17/2022** at 09:30 AM in Department 72
Case Management Conference - **Not Held - Advanced and Continued - by Court**

**08/24/2022** at 08:30 AM in Department 72, Curtis A. Kin, Presiding
Order to Show Cause Re: Failure to File Proof of Service (as to all named Defendants) - **Held - Continued**

**06/16/2022** at 09:49 AM in Department 19, Stephanie M. Bowick, Presiding
Court Order


## REGISTER OF ACTIONS

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

**12/28/2022** Request for Dismissal; Filed by: Leslie Klein (Plaintiff); As to: Jonathon Polter (Defendant); Shlomo Rechnitz (Defendant); Voya Financial Advisors, Inc. (Defendant) et al.

**12/28/2022** On the Complaint filed by Leslie Klein on 06/07/2022, entered Request for Dismissal with prejudice filed by Leslie Klein as to the entire action

**12/28/2022** Status Conference Re: Arbitration scheduled for 01/18/2023 at 09:30 AM in Stanley Mosk Courthouse at Department 72 Not Held - Vacated by Court on 12/28/2022

**12/28/2022** The case is removed from the special status of: Stay - Binding Arbitration

**10/25/2022** Updated -- Motion to Compel Arbitration: Filed By: SHLOMO RECHNITZ (Defendant); Result: Granted; Result Date: 10/25/2022

**10/25/2022** Updated -- Joinder to Motion Defendant Jonathan Polter's Notice of Joinder and Joinder in Defendant Shlomo Rechnitz's Motion to Compel Arbitration and to Stay Proceedings: Filed By: Jonathon Polter (Defendant); Result: Granted; Result Date: 10/25/2022

**10/25/2022** On the Complaint filed by Leslie Klein on 06/07/2022, entered Order for Dismissal without prejudice as to Voya Financial Advisors, Inc.

**10/25/2022** Status Conference Re: Arbitration scheduled for 01/18/2023 at 09:30 AM in Stanley Mosk Courthouse at Department 72

**10/25/2022** Updated -- Minute Order (Hearing on Motion to Compel Arbitration by Defendant Shlomo R...): Status Date changed from 10/25/2022 to 10/25/2022 ; Name Extension changed from (Hearing on Motion to Compel Arbitration by Defendant Shlomo R...) to (Hearing on

**10/25/2022** Order - Dismissal; Filed by: Court

**10/25/2022** Minute Order (Hearing on Motion to Compel Arbitration by Defendant Shlomo R...)

**10/25/2022** The case is placed in special status of: Stay - Binding Arbitration

**10/25/2022** Hearing on Motion to Compel Arbitration by Defendant Shlomo Rechnitz; Joinder by Defendant Jonathan Polter scheduled for 10/25/2022 at 08:30 AM in Stanley Mosk Courthouse at Department 72 updated: Result Date to 10/25/2022; Result Type to Held

**10/25/2022** Order to Show Cause Re: Failure to File Proof of Service as to all named Defendants scheduled for 10/25/2022 at 08:30 AM in Stanley Mosk Courthouse at Department 72 updated: Result Date to 10/25/2022; Result Type to Held

**10/25/2022** Case Management Conference scheduled for 10/25/2022 at 08:30 AM in Stanley Mosk Courthouse at Department 72 updated: Result Date to 10/25/2022; Result Type to Held

**10/18/2022** Reply to Plaintiff's Opposition to Motion to Compel Arbitration and to Stay Proceedings; Filed by: Jonathon Polter (Defendant)

**10/18/2022** Reply Defendant's Reply Brief in Support of Motion to Compel Arbitration; Filed by: Shlomo Rechnitz (Defendant)

**10/18/2022** Declaration Supplemental Declaration of Avi Wagner in Support of Motion to Compel Arbitration; Filed by: Shlomo Rechnitz (Defendant)

**10/12/2022** Opposition BY SECURITY LIFE OF DENVER INSURANCE COMPANY TO DEFENDANTS SHLOMO RECHNITZ AND JONATHON POLTERS MOTIONS TO COMPEL ARBITRATION; Filed by: Security Life of Denver Insurance Company (Defendant)

**10/12/2022** Opposition OF PLAINTIFF TO MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS; Filed by: Leslie Klein (Plaintiff)

**10/11/2022** Case Management Statement; Filed by: Leslie Klein (Plaintiff)

**10/11/2022** Declaration OF JEFFREY A. SLOTT IN OPPOSITION TO OSC RE FILING PROOF OF SERVICE OF COMPLAINT; Filed by: Leslie Klein (Plaintiff)

**10/10/2022** Case Management Statement; Filed by: Security Life of Denver Insurance Company (Defendant)

**10/10/2022** Proof of Service (not Summons and Complaint); Filed by: Security Life of Denver Insurance Company (Defendant); As to: Leslie Klein (Plaintiff)

**10/10/2022** Case Management Statement; Filed by: Jonathon Polter (Defendant)

**10/07/2022** Case Management Statement; Filed by: Shlomo Rechnitz (Defendant)

**08/24/2022** Order to Show Cause Re: Failure to File Proof of Service as to all named Defendants scheduled for 10/25/2022 at 08:30 AM in Stanley Mosk Courthouse at Department 72

**08/24/2022** Notice Notice of Hearing; Filed by: Shlomo Rechnitz (Defendant); As to: Leslie Klein (Plaintiff); Jonathon Polter (Defendant); Shlomo Rechnitz (Defendant) et al.

**08/24/2022** Minute Order (Order to Show Cause Re: Failure to File Proof of Service as t...)

**08/24/2022** Updated -- John T. Burnite (Attorney): First Name changed from JOHN to John; Last Name changed from BURNITE to Burnite; Organization Name changed from McDOWELL HETHERINGTON LLP to McDowell Hetherington LLP

**08/24/2022** Order to Show Cause Re: Failure to File Proof of Service as to all named Defendants scheduled for 08/24/2022 at 08:30 AM in Stanley Mosk Courthouse at Department 72 Held - Continued was rescheduled to 10/25/2022 08:30 AM

**08/24/2022** On the Court's own motion, Case Management Conference scheduled for 10/17/2022 at 09:30 AM in Stanley Mosk Courthouse at Department 72 Not Held - Advanced and Continued - by Court was rescheduled to 10/25/2022 08:30 AM

**08/17/2022** Verified Answer of Security Life of Denver Insurance Company to Plaintiff's Verified Complaint; Filed by: Security Life of Denver Insurance Company (Defendant); As to: Leslie Klein (Plaintiff)

**08/16/2022** Amendment to Complaint (Fictitious/Incorrect Name); Signed and Filed by: Leslie Klein (Plaintiff); As to: Voya Financial Advisors, Inc. (Defendant); SECURITY LIFE OF DENVER INSURANCE COMPANY (Defendant)

**08/16/2022** Updated -- Amendment to Complaint (Fictitious/Incorrect Name): Filed By: Leslie Klein (Plaintiff); Result: Granted; Result Date: 08/16/2022

**08/16/2022** Updated -- Security Life of Denver Insurance Company (Defendant): Organization Name changed from SECURITY LIFE OF DENVER INSURANCE COMPANY to Security Life of Denver Insurance Company

**07/15/2022** Joinder to Motion Defendant Jonathan Polter's Notice of Joinder and Joinder in Defendant Shlomo Rechnitz's Motion to Compel Arbitration and to Stay Proceedings; Filed by: Jonathon Polter (Defendant)

**07/15/2022** Updated -- Leslie Klein (Plaintiff): First Name: Leslie; Last Name: Klein; Organization Name: blank; Government Agency: No

**07/15/2022** Updated -- Jonathon Polter (Defendant): First Name changed from JONATHON to Jonathon; Last Name changed from POLTER to Polter

**07/15/2022** Updated -- Shlomo Rechnitz (Defendant): First Name: Shlomo; Last Name: Rechnitz; Organization Name: blank

**07/15/2022** Updated -- Voya Financial Advisors, Inc. (Defendant): Organization Name changed from VOYA FINANCIAL ADVISORS, INC. to Voya Financial Advisors, Inc.

**07/14/2022** Motion to Compel Arbitration; Filed by: SHLOMO RECHNITZ (Defendant); As to: LESLIE KLEIN, individually and as a Member of the EKLK FOUNDATION, and derivatively on behalf of LIFE CAPITAL GROUP, LLC, a limited liability company (Plaintiff)

**07/14/2022** Declaration of Avi Wagner ISO Motion to Compel Arbitration; Filed by: SHLOMO RECHNITZ (Defendant)

**07/14/2022** Hearing on Motion to Compel Arbitration scheduled for 11/02/2022 at 08:30 AM in Stanley Mosk Courthouse at Department 72

**07/07/2022** Order to Show Cause Failure to File Proof of Service; Filed by: Clerk

**07/07/2022** Order to Show Cause Re: Failure to File Proof of Service as to all named Defendants scheduled for 08/24/2022 at 08:30 AM in Stanley Mosk Courthouse at Department 72

**07/07/2022** Notice of Case Management Conference; Filed by: Clerk

**07/07/2022** Case Management Conference scheduled for 10/17/2022 at 09:30 AM in Stanley Mosk Courthouse at Department 72

**07/07/2022** Case Management Conference scheduled for 10/25/2022 at 08:30 AM in Stanley Mosk Courthouse at Department 72

**07/07/2022** Updated -- Jeffrey A. Slott (Attorney): Organization Name changed from LAW OFFICES OF JEFFREY A. SLOTT, APC to Law Offices of Jeffrey A. Slott; Middle Name changed from Alan to A.

**07/07/2022** Address for Jeffrey A. Slott (Attorney) updated

**06/16/2022** Updated -- Challenge To Judicial Officer - Peremptory (170.6): Filed By: LESLIE KLEIN, individually and as a Member of the EKLK FOUNDATION, and derivatively on behalf of LIFE CAPITAL GROUP, LLC, a limited liability company (Plaintiff); Result: Granted; Result Date: 06/16/2022; As To Parties: removed

**06/16/2022** Case reassigned to Stanley Mosk Courthouse in Department 72 - Hon. Curtis A. Kin; Reason: Challenge / Recusal, by Plaintiff

**06/16/2022** Minute Order (Court Order)

**06/16/2022** Certificate of Mailing for (Court Order) of 06/16/2022; Filed by: Clerk

**06/15/2022** Challenge To Judicial Officer - Peremptory (170.6); Filed by: LESLIE KLEIN, individually and as a Member of the EKLK FOUNDATION, and derivatively on behalf of LIFE CAPITAL GROUP, LLC, a limited liability company (Plaintiff)

**06/10/2022** Updated -- Amendment to Complaint (Fictitious/Incorrect Name): Filed By: LESLIE KLEIN, individually and as a Member of the EKLK FOUNDATION, and derivatively on behalf of LIFE CAPITAL GROUP, LLC, a limited liability company (Plaintiff); Result: Granted; Result Date: 06/10/2022

**06/10/2022** Amendment to Complaint (Fictitious/Incorrect Name); Signed and Filed by: LESLIE KLEIN, individually and as a Member of the EKLK FOUNDATION, and derivatively on behalf of LIFE CAPITAL GROUP, LLC, a limited liability company (Plaintiff); As to: VOYA FINANCIAL, INC., a corporation (Defendant)

**06/08/2022** Case assigned to Hon. Stephanie M. Bowick in Department 19 Stanley Mosk Courthouse

**06/07/2022** Complaint; Filed by: LESLIE KLEIN, individually and as a Member of the EKLK FOUNDATION, and derivatively on behalf of LIFE CAPITAL GROUP, LLC, a limited liability company (Plaintiff); As to: JONATHON POLTER (Defendant); SHLOMO RECHNITZ, individually and as a Member of the TRSR FOUNDATION, LIFE CAPITAL GROUP, LLC, a limited liability company, VOYA FINANCIAL, INC., a corporation (Defendant); SHLOMO RECHNITZ (Defendant) et al.

**06/07/2022** Summons on Complaint; Issued and Filed by: LESLIE KLEIN, individually and as a Member of the EKLK FOUNDATION, and derivatively on behalf of LIFE CAPITAL GROUP, LLC, a limited liability company (Plaintiff); As to: JONATHON POLTER (Defendant); SHLOMO RECHNITZ, individually and as a Member of the TRSR FOUNDATION, LIFE CAPITAL GROUP, LLC, a limited liability company, VOYA FINANCIAL, INC., a corporation (Defendant)

**06/07/2022** Civil Case Cover Sheet; Filed by: LESLIE KLEIN, individually and as a Member of the EKLK FOUNDATION, and derivatively on behalf of LIFE CAPITAL GROUP, LLC, a limited liability company (Plaintiff); As to: JONATHON POLTER (Defendant); SHLOMO RECHNITZ, individually and as a Member of the TRSR FOUNDATION, LIFE CAPITAL GROUP, LLC, a limited liability company, VOYA FINANCIAL, INC., a corporation (Defendant)

**06/07/2022** Alternate Dispute Resolution Packet; Filed by: Clerk

**06/07/2022** First Amended General Order re: Mandatory Electronic Filing; Filed by: Clerk

**06/07/2022** Voluntary Efficient Litigation Stipulation Packet; Filed by: Clerk

**06/07/2022** Notice of Case Assignment - Unlimited Civil Case; Filed by: Clerk

NEW SEARCH

EXHIBIT "3"

## MUTUAL RELEASE OF ALL CLAIMS AND SETTLEMENT AGREEMENT BY AND BETWEEN LESLIE KLEIN

### READ CAREFULLY

This Mutual Release of All Claims and Settlement Agreement ("Settlement Agreement") is made and entered into by and among Leslie Klein, individually and derivatively on behalf of Life Capital Group, LLC, ("Klein"), Life Capital Group, LLC ("LCG"), Jonathan Polter ("Polter"), individually and as Manager for LCG, and Shlomo Y. Rechnitz, individually and as a member of LCG ("Rechnitz" and, collectively with Klein, LCG and Polter "the Parties").

WHEREAS, Klein and Rechnitz are members and Polter is the manager of LCG;



LCG000161

CONFIDENTIAL



**3.**



The Parties affirm that any further dispute concerning this Settlement Agreement or the matters it encompasses, or any other matters arising out of or relating to LCG or its assets shall be arbitrated by binding arbitration before the RCC in Los Angeles, pursuant to the RCC's procedures, including its procedures whereby the RCC selects three rabbinical arbitrators to hear any dispute. In view of the substantial benefits afforded to Klein under this Agreement, as a condition precedent to commencing an action before the RCC or any other dispute arising out of or relating to LCG, the *Klein* Action, the Interpleader, and/or the Din Torah, Klein agrees to return five hundred thousand dollars ($500,000) of the funds remitted to him under this Settlement Agreement to LCG, which funds shall be held by LCG pending resolution of such dispute.

**THE PERSONS SIGNING THIS MUTUAL RELEASE AND SETTLEMENT AGREEMENT AND MUTUAL RELEASE REPRESENT AS FOLLOWS: THEY HAVE READ THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE, THEY UNDERSTAND THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE, THEY HAVE HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL ABOUT THE MEANING AND CONSEQUENCES OF THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE, AND THEY FREELY, KNOWINGLY AND VOLUNTARILY SIGN THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE.**

Dated: December 5, 2022

**LESLIE KLEIN**

Dated: December 5, 2022

**JONATHAN POLTER**

Dated: December 5, 2022

**LIFE CAPITAL GROUP, LLC**
By: _____
Its: _____

Dated: December 5, 2022

**SHLOMO Y. RECHNITZ**

**APPROVED AND AGREED AS TO CONTENT AND FORM:**

Dated: December 5, 2022

LAW OFFICES OF JEFFREY A. SLOTT

Jeffrey A. Slott
Attorneys for Leslie Klein

THE PERSONS SIGNING THIS MUTUAL RELEASE AND SETTLEMENT AGREEMENT AND MUTUAL RELEASE REPRESENT AS FOLLOWS:  THEY HAVE READ THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE, THEY UNDERSTAND THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE, THEY HAVE HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL ABOUT THE MEANING AND CONSEQUENCES OF THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE, AND THEY FREELY, KNOWINGLY AND VOLUNTARILY SIGN THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE.

Dated: December 5, 2022

_____
**LESLIE KLEIN**

Dated: December 5, 2022

_____
**JONATHAN POLTER**

Dated: December 5, 2022

_____
**LIFE CAPITAL GROUP, LLC**
By: _Jonathan_ Potter
Its: _Manager_

Dated: December 5, 2022

_____
**SHLOMO Y. RECHNITZ**

**APPROVED AND AGREED AS TO CONTENT AND FORM:**

Dated: December 5, 2022          LAW OFFICES OF JEFFREY A. SLOTT

_____
Jeffrey A. Slott
Attorneys for Leslie Klein

9

**THE PERSONS SIGNING THIS MUTUAL RELEASE AND SETTLEMENT AGREEMENT AND MUTUAL RELEASE REPRESENT AS FOLLOWS: THEY HAVE READ THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE, THEY UNDERSTAND THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE, THEY HAVE HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL ABOUT THE MEANING AND CONSEQUENCES OF THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE, AND THEY FREELY, KNOWINGLY AND VOLUNTARILY SIGN THE CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE.**

Dated: December 5, 2022         _____
**LESLIE KLEIN**

Dated: December 5, 2022         _____
**JONATHAN POLTER**

Dated: December 5, 2022         _____
**LIFE CAPITAL GROUP, LLC**
By: _____
Its: _____

Dated: December 5, 2022         *Shlomo Rechnitz*
DocuSigned by:
**SHLOMO Y. RECHNITZ**

**APPROVED AND AGREED AS TO CONTENT AND FORM:**

Dated: December 5, 2022         LAW OFFICES OF JEFFREY A. SLOTT

_____
Jeffrey A. Slott
Attorneys for Leslie Klein

Dated: December 5, 2022            DOMINIUM LAW, APC

_Farah Tabibkhoei_

Farah Tabibkhoei
Attorneys for Jonathan Polter and Life Capital Group, LLC

Dated: December 5, 2022            THE WAGNER FIRM

Avi Wagner
Attorney for Shlomo Y. Rechnitz

Dated: December 5, 2022          DOMINIUM LAW, APC

_____
Farah Tabibkhoei
Attorneys for Jonathan Polter and Life Capital Group, LLC

Dated: December 5, 2022          THE WAGNER FIRM

_____
Avi Wagner
Attorney for Shlomo Y. Rechnitz

# EXHIBIT "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**22STCV18787**                                                          October 25, 2022
**LESLIE KLEIN, INDIVIDUALLY AND AS A MEMBER OF**                              8:30 AM
**THE EKLK FOUNDATION, AND DERIVATIVELY ON**
**BEHALF OF  LIFE CAPITAL GROUP, LLC, A  vs**
**JONATHON POLTER, et al.**

| | |
|---|---|
| Judge: Honorable Curtis A. Kin | CSR: None |
| Judicial Assistant: M. Mort | ERM: None |
| Courtroom Assistant: M. Rodriguz | Deputy Sheriff: None |

APPEARANCES:

For Plaintiff(s): Jeffrey A. Slott via LA CourtConnect

For Defendant(s): John T. Burnite via LA CourtConnect; Farah Tabibkhoei via LA

CourtConnect; Avraham Wagner via LA CourtConnect; Charissa Morningstar via LA

CourtConnect

**NATURE OF PROCEEDINGS:** Hearing on Motion to Compel Arbitration by Defendant
Shlomo Rechnitz; Joinder by Defendant Jonathan Polter; Order to Show Cause Re: Failure to
File Proof of Service as to all named Defendants; Case Management Conference

The matter is called for hearing.

The Court, pursuant to an oral request made by counsel for plaintiff, orders Voya Financial
Advisors, Inc. in Complaint filed by Leslie Klein on 06/07/2022 dismissed without prejudice.

Order to show cause hearing is discharged.

The Court provides the following tentative ruling:

TENTATIVE RULING:

Defendants Shlomo Rechnitz's Motion to Compel Arbitration, joined by Defendant Jonathon
Polter, is GRANTED.

Pursuant to Section 12.1 of the Limited Liability Company Agreement of Life Capital Group,
LLC ("Agreement"), plaintiff is obligated to submit his claims against defendants Shlomo
Rechnitz and Jonathon Polter to arbitration. (Wagner Decl. ¶ 4 & Ex. 1 at § 12.1 ["If any dispute
arises between the Members regarding this Agreement or any provision hereof, that dispute shall
be resolved through a binding arbitration proceeding to be conducted in the State of California in

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**22STCV18787**
**LESLIE KLEIN, INDIVIDUALLY AND AS A MEMBER OF
THE EKLK FOUNDATION, AND DERIVATIVELY ON
BEHALF OF  LIFE CAPITAL GROUP, LLC, A  vs
JONATHON POLTER, et al.**

October 25, 2022
8:30 AM

| | |
|---|---|
| Judge: Honorable Curtis A. Kin | CSR: None |
| Judicial Assistant: M. Mort | ERM: None |
| Courtroom Assistant: M. Rodriguz | Deputy Sheriff: None |

accordance with the commercial arbitration rules of the Rabbinical Council of California"].)

Plaintiff's claims arise of the Agreement. (Compl. ¶¶ 13, 14, 16.)

With respect to Rechnitz, as the persons who executed the Agreement, plaintiff and Rechnitz are "Members" under the Agreement. (Wagner Decl. ¶ 4 & Ex. 1 at § 2.1 ["The Company shall consist of the Members executing this Agreement and any substitute or additional Members admitted to the Company in accordance with the terms hereof."])

With respect to Polter, plaintiff alleges that Polter is an agent of Rechnitz. (Compl. ¶ 11 [defendants are allegedly agents of each other].) "California law permits a nonsignatory defendant to compel a signatory plaintiff to arbitrate where there is a connection between the claims alleged against the nonsignatory and its agency relationship with a signatory." (Cohen v. TNP 2008 Participating Notes Program, LLC (2019) 31 Cal.App.5th 840, 863.) Plaintiff's claims against Polter are related to Polter's refusal to provide financial documents for inspection, as purportedly required under the Agreement, in his capacity as manager of Life Capital Group, LLC. (Compl. ¶¶ 5, 15, 16.)

Plaintiff does not dispute the enforcement of the arbitration provision in the Agreement by either Rechnitz or Polter. Rather, plaintiff requests that the arbitration take place using the services of the Rabbinical Council in New York. (Klein Decl. ¶ 2.)

"If the arbitration agreement provides a method of appointing an arbitrator, that method shall be followed." (CCP § 1281.6.) The Agreement provides for the arbitration to take place "in accordance with the commercial arbitration rules of the Rabbinical Council of California." (Wagner Decl. ¶ 4 & Ex. 1 at § 12.1.) The rules of the Rabbinical Council of California provide for the "Beth Din" – a Rabbinic Court – to select three rabbis to serve as arbitrators. (See Dial 800 v. Fesbinder (2004) 118 Cal.App.4th 32, 46 ["A 'beth din,'. . . is a Rabbinic Court, an authoritative forum of Jewish law"].) Because plaintiff agreed to the rules of the Rabbinical Council of California, which provide for a beth din to select the arbitrators, plaintiff's request runs contrary to his agreement to arbitrate and must be rejected.

Plaintiff also requests the Court to order the parties to engage in mediation before arbitration. (Klein Decl. ¶ 4.) Plaintiff cites no authority for the Court to issue such an order—thought he parties are free to pursue mediation of their own accord.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**22STCV18787**                                                        October 25, 2022
**LESLIE KLEIN, INDIVIDUALLY AND AS A MEMBER OF**                            8:30 AM
**THE EKLK FOUNDATION, AND DERIVATIVELY ON**
**BEHALF OF  LIFE CAPITAL GROUP, LLC, A  vs**
**JONATHON POLTER, et al.**

Judge: Honorable Curtis A. Kin              CSR: None
Judicial Assistant: M. Mort                ERM: None
Courtroom Assistant: M. Rodriguz           Deputy Sheriff: None

---

The motion is GRANTED, except as to plaintiff's claims against nonsignatory defendant
Security Life of Denver Insurance Company. Pursuant to CCP § 1281.4, this action is STAYED
pending the completion of arbitration.

---

The matter is argued and the tentative ruling becomes the order of the Court.

The Motion to Compel Arbitration filed by SHLOMO RECHNITZ on 07/14/2022 and Joinder to
Motion Defendant Jonathan Polter's Notice of Joinder and Joinder in Defendant Shlomo
Rechnitz's Motion to Compel Arbitration and to Stay Proceedings filed by Jonathon Polter on
07/15/2022 are Granted.

The case is ordered stayed pending binding arbitration as to the entire action.

Status Conference Re: Arbitration is scheduled for 01/18/2023 at 09:30 AM in Department 72 at
Stanley Mosk Courthouse.

Notice is waived.

# EXHIBIT "5"

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: **SBN 103807** | FOR COURT USE ONLY |

NAME: **Jeffrey A Slott, Esq.**
FIRM NAME: **Law Offices of Jeffrey A. Slott, APC**
STREET ADDRESS: **15760 Ventura Blvd. #700**
CITY: **Encino**    STATE: **CA**    ZIP CODE: **91436**
TELEPHONE NO.: **(818) 995-1955**    FAX NO.: **(818) 995-0955**
E-MAIL ADDRESS: **jslott@aol.com**
ATTORNEY FOR (Name): **Leslie Klein**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
STREET ADDRESS: **111 N. Hill Street**
MAILING ADDRESS: **111 N. Hill Street**
CITY AND ZIP CODE: **Los Angeles 90012-3014**
BRANCH NAME: **Stanley Mosk**

**FILED**
Superior Court of California
County of Los Angeles
**12/28/2022**
Sherri R. Carter, Executive Officer / Clerk of Court
By: _____ C. Crow _____ Deputy

Plaintiff/Petitioner: Leslie Klein, et al.

Defendant/Respondent: Shlomo Rechnitz, et al.

**REQUEST FOR DISMISSAL**

CASE NUMBER:
**22STCV18787**

A conformed copy will not be returned by the clerk unless a method of return is provided with the document.

**This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)**

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) [✔] With prejudice    (2) [ ] Without prejudice
   b. (1) [ ] Complaint    (2) [ ] Petition
      (3) [ ] Cross-complaint filed by (name):                    on (date):
      (4) [ ] Cross-complaint filed by (name):                    on (date):
      (5) [✔] Entire action of all parties and all causes of action
      (6) [ ] Other (specify):*

2. (Complete in all cases except family law cases.)
   The court [ ] did  [✔] did not  waive court fees and costs for a party in this case. (This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).

Date: **December 28, 2022**

**Jeffrey A Slott, Esq.**
(TYPE OR PRINT NAME OF [✔] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
▶ _____ (SIGNATURE)

*If dismissal requested is of specified parties only or specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner    [ ] Defendant/Respondent
[ ] Cross Complainant

3. **TO THE CLERK:** Consent to the above dismissal is hereby given.**

Date:

_____
(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
▶ _____ (SIGNATURE)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner    [ ] Defendant/Respondent
[ ] Cross Complainant

(To be completed by clerk)

4. [✔] Dismissal entered as requested on (date): **12/28/2022**

5. [ ] Dismissal entered on (date):                    as to only (name):

6. [ ] Dismissal **not entered** as requested for the following reasons (specify):

7. a. [✔] Attorney or party without attorney notified on (date): **12/28/2022**
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
        [ ] a copy to be conformed    [ ] means to return conformed copy

Date: **12/28/2022**    Clerk, by _____ C. Crow, Deputy

Sherri R. Carter, Executive Officer / Clerk of Court

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 [Rev. Jan. 1, 2013]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.; Gov. Code,
§ 68637(c); Cal. Rules of Court, rule 3.1390
www.courts.ca.gov

Electronically Received 12/28/2022 12:01 PM

# EXHIBIT "6"

Electronically FILED by Superior Court of California, County of Los Angeles on 06/07/2022 09:55 PM Sherri R. Carter, Executive Officer/Clerk of Court, by S. Ruiz,Deputy Clerk
Case 2:25-ap-01020-NB    Doc 26    Filed 03/10/25    Entered 03/10/25 15:16:17    Desc
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Stephanie Bowick
Main Document    Page 90 of 202

1   JEFFREY A. SLOTT, ESQ. (SBN 103807)
2   LAW OFFICES OF JEFFREY A. SLOTT
    A Professional Corporation
3   15760 Ventura Boulevard, Suite 1600
    Encino, California  91436
4   Telephone: (818) 995-1955
    Facsimile: (818) 995-0955
5   Email: jslott@aol.com

6   Attorney for Plaintiff LESLIE KLEIN

7

8

9               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10            **FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

11

12  LESLIE KLEIN, individually and ) CASE NO: 22STCV18787
    as a Member of the EKLK        )
13  FOUNDATION, and derivatively   )
    on behalf of LIFE CAPITAL      )
14  GROUP, LLC, a limited          )   **VERIFIED COMPLAINT OF LESLIE**
    liability company,             )   **KLEIN, INDIVIDUALLY AND AS A**
15                                 )   **MEMBER OF THE EKLK FOUNDATION,**
             Plaintiffs,           )   **AND DERIVATIVELY ON BEHALF OF**
16                                 )   **LIFE CAPITAL GROUP, LLC, A**
         vs.                       )   **LIMITED LIABILITY COMPANY FOR:**
17                                 )
    JONATHON POLTER, an            )
18  individual; SHLOMO RECHNITZ,   )   **1.  ENFORCEMENT OF RIGHT OF**
    individually and as a Member   )       **INSPECTION;**
19  of the TRSR FOUNDATION, LIFE   )   **2.  BREACH OF FIDUCIARY**
    CAPITAL GROUP, LLC, a limited  )       **DUTY;**
20  liability company, VOYA        )   **3.  ACCOUNTING;**
    FINANCIAL, INC., a corporation )   **4.  BREACH OF CONTRACT;**
21  and DOES 1-30, inclusive.      )   **5.  INJUNCTIVE RELIEF, INCLUDING**
                                   )       **APPOINTMENT OF RECEIVER;**
22           Defendants.           )   **6.  BREACH OF IMPLIED COVENANT**
                                   )       **OF GOOD FAITH AND FAIR**
23  _____    **DEALING;**
24                                     **7.  DECLARATORY RELIEF**

25
                                       **[DEMAND FOR JURY TRIAL]**
26

27  / / /

28                                1

1  Plaintiff, LESLIE KLEIN, hereby complains and alleges
2  against Defendants, and each of them, as follows:

3  COMES NOW LESLIE KLEIN, in his individual capacity
4  asserting claims on his own behalf and derivatively on behalf of
5  LIFE CAPITAL GROUP, LLC, a limited liability Company, and hereby
6  complains and alleges against Defendants, and each of them, as
7  follows:

8

9  **GENERAL ALLEGATIONS**

10  1.  At all times herein mentioned, Plaintiff was and now
11  is, an individual residing in the County of Los Angeles, State
12  of California. At all times herein mentioned, Plaintiff was and
13  now is a Member of the EKLK Foundation, on whose behalf
14
15  Plaintiff is pursuing claims against Defendants, and each of
16  them. At all times herein mentioned, Plaintiff is pursuing
17  claims derivatively on behalf of Life Capital Group, LLC, a
18  limited liability company.

19  2.  At all times herein mentioned, Defendants SCHLOMO
20  RECHNITZ and DOES 1 through 10, inclusive, and each of them,
21  (collectively "RECHNITZ") and JONATHAN POLTER and DOES 11
22
23  through 20, inclusive, and each of them (collectively "POLTER")
24  were and now are individuals. At all times herein mentioned,
25  RECHNITZ is a resident of the County of Los Angeles, State of
26  California. Plaintiff is informed and believes and based upon
27  such information and belief, alleges that at all times herein

28

2

1   mentioned, POLTER was and now is a resident of the State of

2   Michigan from which he conducts business in the State of

3   California in his own name, as an employee of various California

4   business entities, and individually utilizing the names of

5   various California business entities.  At all times herein

6   mentioned, Defendant RECHNITZ was and now is a Member of the

7   TRSR Foundation, against whom Plaintiff is seeking damages.

8
9       3.    At all times herein mentioned, LIFE CAPITAL GROUP,

10  LLC, a limited liability Company and DOES 21 through 30,

11  inclusive, and each of them (collectively "LCG"), were and now

12  are California Limited Liability Companies authorized, licensed

13  and conducting business in the State of California with their

14  principal place of business located at 7223 Beverly Boulevard,

15  Suite 205, Los Angeles, California 90356.

16
17      4.    At all times herein mentioned, Plaintiff and RECHNITZ

18  were and now are the sole members and owners of LCG, each owning

19  a 50% membership interest therein.

20      5.    At all times herein mentioned, and until approximately

21  June 14, 2021, POLTER was a manager of LCG.

22      6.    At all times herein mentioned, and effective as of

23  June 14, POLTER resigned as sole manager of LCG whereupon

24  Plaintiff and RECHNITZ became the equal managing members of LCG.

25
26      7.    At all times herein mentioned, POLTER and RECHNITZ

27  failed and refused to notify Plaintiff of POLTER's resignation

28  as sole manager of LCG, whereupon RECHNITZ, without the

3

1   knowledge, authorization or consent of Plaintiff designated

2   himself as sole managing member of LCG by filing applicable

3   forms with the California Secretary of State with such

4   unilateral and unauthorized designation.

5      8.    At all times herein mentioned, Defendant VOYA

6   FINANCIAL, INC., a corporation ("VOYA") is named as a defendant

7   herein, solely and exclusively as a nominal defendant, against

8
    whom Plaintiff seeks no damages and no affirmative relief, other
9
10  than to impose injunctive relief upon said defendant to preclude

11  it from inadvertently or intentionally jeopardizing or

12  prejudicing the rights of Plaintiff and/or LCG by making

13  distributions of large sums of life insurance proceeds to

14  RECHNITZ or LCG as hereinafter described and alleged.

15     9.    Plaintiff is informed and believes and based upon such

16  information and belief alleges that at all times herein

17
    mentioned, defendant VOYA FINANCIAL, INC was and now is a
18
19  corporation, licensed, authorized and conducting business in the

20  State of California, with its principle place of business

21  located in Atlanta, Georgia.

22     10.   At all times herein mentioned, Plaintiff requested of

23  RECHNITZ and POLTER that the claims asserted by Plaintiff herein

24  derivatively on behalf of LCG, be honored or satisfied prior to

25
    the filing of this Complaint.  The foregoing request was ignored
26
27  or overtly rejected and denied by each of said Defendants prior

28  to the filing of this Complaint.  Such request was in fact

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

futile given the hostility, fraudulent conduct and intentional disregard for the rights of Plaintiff demonstrated by Defendants RECHNITZ and POLTER. Prior to the filing of this Compliant, Plaintiff informed RECHNITZ and POLTER in writing of the ultimate facts of each cause of action asserted against each said Defendant herein. Such requests by Plaintiff directed to said Defendants included but are not limited to Plaintiff's requests that he be acknowledged as a 50% owner and member of LCG, that he be permitted to inspect the books and records of LCG, that he be included in the management, decision-making and control of money of LCG and that LCG conduct its operations and maintain its financial dealings and record-keeping separate and distinct from the individual financial dealings of RECHNITZ and POLTER. Based on the foregoing and at all times herein mentioned, the rights of LCG are therefore being derivatively pursued hereunder by Plaintiff.

19
20
21
22
23
24
25
26
27

11. At all times herein mentioned, Defendants, and each of them, with the exception of Defendant VOYA FINANCIAL, INC., were and now are the agents, servants, employees, representatives, joint tortfeasors, co-conspirators, members, officers, directors, owners and managers of each of the other Defendants named herein and in doing the things hereinafter alleged, were acting within their individual capacities and/or in such representative capacities.

28

/ / /

5

1

2

3

4

5

12.    Plaintiff is unaware of the true name and capacities of DOES 1-30, inclusive, and each of them, who therefore sues said Defendants under such fictitious names.  Plaintiff will seek leave of Court to amend this Complaint accordingly when the identities of said DOE defendants have been ascertained.

6

7

8

9

10

11

12

13

13.    On or about June 1, 2011, Plaintiff and RECHNITZ entered into an Operating Agreement concerning their joint and equal ownership in LCG.  The Operating Agreement is titled "Limited Liability Company Agreement of Life Capital Group, LLC" dated as of June 1, 2011 ("The Agreement").  A true and correct copy of the Agreement is attached hereto as Exhibit "A" and is incorporated herein by this reference.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14.    LCG is a life insurance policy holding company pursuant to which it has, for at least the past ten years, engaged in the ownership, management and maintenance of life insurance policies contributed to it by Plaintiff as prior owner of each such policy.  As prior owner of each such life insurance policy, Plaintiff paid the premiums on such policies, from approximately 2007 through approximately 2011 when the policies were then contributed to LCG by Plaintiff.  Under the terms of the Agreement, Plaintiff was and is entitled to receive interest on the premiums he paid on the aforesaid life insurance policies from 2007 through 2011.  Under the terms of the Agreement, upon contribution of the aforesaid life insurance policies to LCG, LCG was to assume and undertake payment of all life insurance

6

policy premiums from and after 2011, through the present. Under the terms of the Agreement, funding for LCG to enable it to pay the premiums on the aforesaid life insurance policies was to be contributed to LCG solely by RECHNITZ. Under the terms of the Agreement, RECHNITZ was and is entitled to receive interest at the rate of thirteen percent (13%) per annum on all of the money he contributed to LCG for payment of life insurance policy premiums. In forming LCG, it was contemplated by its members that the company would hold the life insurance policies, manage and maintain them, and pay the premiums on the life insurance policies until such time as the insureds of such life insurance policies died. Upon the death of the insureds under the aforesaid life insurance policies, LCG would profit from receipt of the life insurance proceeds from each policy, theoretically in an amount greater than the amount paid for the policies and for the premium payments. Over the years of its existence, some insureds died and LCG received the proceeds of their life insurance policies, other policies lapsed or otherwise became worthless and were replaced with other valuable life insurance policies as contributed to LCG by Plaintiff from time-to-time. One such policy involved insured Barbara Holtzman, deceased. Without the knowledge, permission or consent of Plaintiff, Defendant RECHNITZ assigned and transferred the life insurance policy of Barbara Holtzman to a charitable organization known as Torah Umesorah for the purpose of defrauding LCG and Plaintiff.

7

Upon the death of Barbara Holtzman, Torah Umesorah paid Defendant RECHNITZ all of the proceeds of her life insurance policy in the approximate sum of Eight Million Dollars ($8,000,000.00) without the knowledge, consent or participation of LCG or Plaintiff. On another life insurance policy owned by LCG, Mr. and Mrs. Bernstein passed away and their life insurance company paid LCG the sum of $1,500,000.00, all of which was taken by RECHNITZ without the knowledge or consent of Mr. Klein. Similarly, the life insurance policy of Ruth Berke was paid to LCG in the sum of $3,500,000.00 and not a dime was paid to Mr. Klein. Finally, Andrew Gardner and Yvette Gardner passed away recently, and their life insurance carrier, Voya Financial, Inc. fka Security Life of Denver Insurance Company is about to pay LCG the sum of $10,000,000.00 and Mr. Klein has no control over those proceeds as RECHNITZ and POLTER have essentially locked him out of LCG. Defendant RECHNITZ absconded with such life insurance proceeds and has never accounted for same, all of which occurred within four years last passed. Under the terms of the Agreement, upon the death of insureds under policies owned by LCG, the life insurance proceeds would be paid to LCG and its members would then split the net profits therefrom, after deducting from the gross life insurance proceeds all interest due Plaintiff and said Defendant on the premiums paid by each of them as heretofore alleged.

/ / /

8

1    15.   At all times herein mentioned, Plaintiff and RECHNITZ

2    had and continue to have equal voting rights in regard to all

3    business matters undertaken and engaged in by LCG, including the

4    appointment of managers for the company.  At some point in time

5    RECHNITZ unilaterally appointed POLTER as manager of LCG.  On or

6    about June 14, 2021, RECHNITZ appointed himself as sole member

7    and manager of LCG without the knowledge, authorization or

8    consent of Plaintiff.  Prior to and after June 14, 2021, on

9    numerous occasions, verbally and in writing, Plaintiff has

10   demanded copies of the LCG books and records, K-1 tax forms to

11   be issued to the members of LCG each year, tax returns prepared

12   and filed on behalf of LCG and a full accounting of all business

13   conducted by LCG.

14

15   16.   At all times herein mentioned, LCG was required under

16   the terms of The Agreement and California law, to prepare,

17   maintain, distribute to its members and otherwise properly

18   manage all of the LCG books and records, including without

19   limitation the above-described financial documents, banking

20   records, etc.  Despite Plaintiff's multiple demands that copies

21   of such documents be provided to Plaintiff, RECHNITZ and POLTER

22   have failed and refused and continue to fail and refuse to

23   provide same to Plaintiff.  Plaintiff is informed and believes

24   and based upon such information and belief, alleges that

25   RECHNITZ and POLTER have never prepared or filed any tax returns

26   for LCG, have never kept its books and records in a manner

27

28

9

consistent with state and federal laws, have never maintained bank accounts for the company and yet have collected in excess of Thirteen Million Dollars ($13,000,000.00) from life insurance proceeds on the death of various insureds, all to the exclusion of Plaintiff, without accounting for same.

## FIRST CAUSE OF ACTION

### (Enforcement of Right of Inspection

### [Corp. Code Sections 17701 and 17704.10]

### As Against Defendants RECHNITZ, POLTER and LCG)

17.   Plaintiff refers to the allegations set forth in Paragraphs 1 through 16 above, and incorporates same herein by this reference.

18.   Plaintiff has made multiple demands of Defendants RECHNITZ, POLTER and LCG for copies of the federal, state and local income tax returns and reports for the six most recent fiscal years. Plaintiff has made multiple demands of said Defendants for the right to inspect the books and records of LCG for the past four fiscal years.  Said Defendants, and each of them, have failed and refused and continue to fail and refuse to comply with such demands, notwithstanding Plaintiff's status as a 50% member of LCG.

19.   Under the terms of the Agreement, Plaintiff is entitled to a full accounting of all business conducted by LCG.

/ / /

/ / /

10

1
2
3

Despite Plaintiff's multiple demands for such full accounting, said Defendants, and each of them, have failed and refused to provide it.

4
5
6
7
8
9
10
11

20.   As a direct and proximate result of said Defendants' impeding Plaintiff's right to inspect the books, records, finances and financial documents, including tax returns, of LCG, Plaintiff has been damaged in a certain but unascertained amount.   Plaintiff will seek leave of court to amend this Complaint accordingly when the exact nature and extent of all such damages have been ascertained.

12
13
14
15
16
17
18
19
20

21.   As a direct and proximate result of the aforesaid wrongful conduct and violation of Plaintiff's right to inspection and to receive documents from LCG, Plaintiff is entitled to and hereby seeks an Order form the Court enforcing his right as a member of LCG to inspect its books and records and to obtain the requested documents, along with a full accounting of all financial transactions involving LCG during the past six years.

21

**SECOND CAUSE OF ACTION**

22

**(Breach of Fiduciary Duty as Against**

23

**Defendants RECHNITZ and POLTER)**

24
25
26
27

22.   Plaintiff refers to the allegations as set forth in Paragraphs 1 through 16, 18 and 19 above and incorporates same herein by this reference

28

/ / /

11

23.   At all times herein mentioned, POLTER was a manager of LCG, and RECHNITZ is and was a member manager of LCG.   As such, POLTER and RECHNITZ owed and owe fiduciary duties under the California Corporations Code and common law to Plaintiff as a member of LCG.   In addition, at all times herein mentioned, said Defendants have owed and continue to owe Plaintiff fiduciary duties under the Agreement.

24.   From in or about 2018 and continuing through the present, Defendants RECHNITZ and POLTER have breached their fiduciary duties owed to LCG and Plaintiff by, among other things, excluding Plaintiff from participation in the business of LCG, by failing and refusing to account to Plaintiff for financial transactions involving LCG, by diverting funds belonging to LCG and Plaintiff to their own personal use and benefit without the knowledge, authorization or consent of Plaintiff, by mismanaging CLG to such extent that it can no longer operate or remain solvent, and by refusing to acknowledge Plaintiff's 50% ownership in LCG, all in breach of said Defendants' fiduciary duties of good faith, undivided loyalty and disclosure owed to Plaintiff.

25.   As a direct and proximate result of said Defendants' aforesaid breaches of fiduciary duties to LCG and Plaintiff, LCG and Plaintiff have been damaged in a certain, but presently unascertained sum in excess of the minimum jurisdictional limits of this Court.   As a further direct and proximate result of the

12

aforesaid breaches of fiduciary duties by said Defendants, and each of them, Plaintiff and LCG are entitled to disgorgement of profits and an accounting. Plaintiff also seeks the appointment of a receiver to assume full control of LCG for the purpose of managing the business and eventually winding down its affairs and dissolving it.

26. The aforesaid conduct on the part of said Defendants, and each of them, was undertaken with malice, fraud and oppression, and in disregard of the rights of Plaintiff and LCG. Plaintiff is therefore entitled to and hereby seeks an award of exemplary and punitive damages in a sum to be determined according to proof.

## THIRD CAUSE OF ACTION

## (Accounting As Against Defendants RECHNITZ, POLTER and LCG)

27. Plaintiff refers to the allegations set forth in paragraphs 1 through 16, 18, 19, 23 and 24 above and incorporates same herein by this reference.

28. Plaintiff is informed and believes and thereon alleges that Defendants RECHNITZ, POLTER and LCG have maintained a pattern and practice of converting LCG assets, including life insurance proceeds to their own personal benefit and use, to the exclusion of Plaintiff. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, said Defendants have failed to maintain proper books and records of business conducted by LCG, have co-mingled their personal assets

13

with those of LCG, have failed to file tax returns for LCG from and after 2018 and continuing through the present, and at all times herein mentioned have concealed the assets and the nature and extent of business operations of LCG from Plaintiff

29.   As a direct and proximate result of the aforesaid unauthorized and wrongful actions of said Defendants, and each of them, Plaintiff seeks and is entitled to an accounting of the LCG business and financial affairs, including but not limited to a full accounting of all financial transactions involving LCG and/or the life insurance policies it owns.

## FOURTH CAUSE OF ACTION

**(Breach of Contract as Against Defendants RECHNITZ and LCG)**

30.   Plaintiff refers to the allegations set forth in paragraphs 1 through 16, 18, 19, 23 and 24 above and incorporates same herein by this reference.

31.   The Agreement provides for the payment of net income to the members of LCG, as well as distribution of life insurance proceeds to Plaintiff.   The Agreement also requires maintenance of the LCG books and records, filing of tax returns and disclosure of same to members of LCG.

32.   From at least January 1, 2018 through the present, Defendants RECHNITZ and LCG have breached the Agreement by virtue of all of their aforesaid wrongful conduct

/ / /

/ / /

14

33.   As a direct and proximate result of the aforesaid breaches of the Agreement by said Defendants, and each of them, Plaintiff has been damaged in a certain, but presently unascertained sum in excess of $40,000,000.  Plaintiff is entitled to compensatory and consequential damages as a direct and proximate result of the aforesaid wrongful conduct on the part of said Defendants, and each of them.  Plaintiff will seek leave of Court to amend this Complaint accordingly when the exact nature and extent of all such damages have been ascertained.

**FIFTH CAUSE OF ACTION**

**(Injunctive Relief and Appointment of Receiver**

**As Against All Defendants)**

34.   Plaintiff refers to the allegations set forth in paragraphs 1 through 16, 18, 19, 23, 24, 31 and 32 above and incorporates same herein by this reference.

35.   Plaintiff is informed and believes and thereon alleges that insurance policies issued by ING and Security Life of Denver Insurance Company, the successor of which is Defendant VOYA, on the lives of Andrew and Evette Gardner, Policy Nos. 1621379 and 1625579.  Andrew and Evette Gardner passed away in in or around early 2022 and VOYA will be paying the sum of $5,000,000 for each of the aforesaid insurance policies on their lives to LCG.

/ / /

15

36.   At all times herein mentioned, Defendants RECHNITZ and LCG have concealed the fact that the Gardners are deceased in an attempt to collect $10,000,000 from VOYA on the Gardners' life insurance policies to the exclusion of Plaintiff.  On or about May 10, 2022, counsel for Plaintiff wrote and delivered a letter to VOYA (directed to Security Life of Denver Insurance Company) demanding that the proceeds of the Gardner life insurance policies be withheld and not distributed to LCG or RECHNITZ.  To date, VOYA has not responded to the aforesaid written correspondence.

37.   Plaintiff is informed and believes and thereon alleges that unless restrained and enjoined, Defendants, and each of them, will wrongfully distribute and disburse the Gardner life insurance proceeds to LCG and/or to RECHNITZ, to the exclusion of Plaintiff, thereby causing great and irreparable injury to LCG and Plaintiff.  For the reasons heretofore stated, Plaintiff has no adequate legal remedy in that once the funds are distributed to LCG and/or RECHNITZ, RECHNITZ will abscond with same to the permanent exclusion of Plaintiff, notwithstanding Plaintiff's right to share in such proceeds.  In addition, RECHNITZ will undertake the same conduct and divisive action to defraud Plaintiff and LCG and abscond with other insurance proceeds if RECHNITZ is permitted to remain in sole control of LCG and is not restrained.

/ / /

16

38.   Plaintiff is therefore entitled to and hereby seeks a temporary restraining order, preliminary injunction and permanent injunction enjoining Defendants, and each of them, and their agents, servants, and employees and all persons acting under and in concert with or for them, from further managing the business of LCG, from disbursing the Gardner life insurance proceeds to LCG or RECHNITZ until such time as a receiver has been appointed to control such disbursements and funds and further to restrain said Defendants against further exclusion of Plaintiff from the business of LCG.   Plaintiff is entitled to and further seeks a mandatory injunction compelling LCG, RECHNITZ and POLTER to account for all financial transactions involving LCG since January 1, 2018 through the present.

### SIXTH CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith**

**and Fair Dealing as Against Defendants**

**RECHNITZ, POLGER and LCG)**

39.   Plaintiff refers to the allegations set forth in paragraphs 1 through 16, 18, 19, 23 and 24 above and incorporates same herein by this reference.

40.   At all times herein mentioned, there existed and exists a covenant among Plaintiff and Defendants RECHNITZ, LCG and POLTER pursuant to which each owes the other an obligation to conduct business with each other in good faith and with

/ / /

17

1    fairness to all.  Implied in the Agreement is a covenant of good

2    faith and fair dealing among Plaintiff and Defendants.

3         41.  Plaintiff is informed and believes and thereon alleges

4    that Defendants RECHNITZ, POLTER and LCG breached and/or

5    assisted in or ratified the breach of the aforesaid implied

6    covenant of good faith and fair dealing in the Agreement by

7    undertaking the foregoing wrongful conduct as against Plaintiff,

8    as heretofore alleged.

9

10        42.  As a direct and proximate result of the aforesaid

11   breaches of the implied covenant of good faith and fair dealing

12   as alleged herein, Plaintiff has been damaged in a certain but

13   presently unascertained sum.  Plaintiff will seek leave of Court

14   to amend this Complaint accordingly when the exact nature and

15   extent of all such damages has been ascertained.

16        43.  The aforesaid conduct by Defendants, and each of them,

17   was undertaken with malice, fraud, and oppression, and in

18

19   conscious disregard of the rights of Plaintiff.  Plaintiff is

20   therefore entitled to and hereby seeks an award of exemplary and

21   punitive damages in a sum to be determined according to proof.

22                     **SEVENTH CAUSE OF ACTION**

23            **(Declaratory Relief as Against All Defendants)**

24        44.  Plaintiff refers to the allegations set forth in

25   paragraphs 1 through 16, 18, 19, 23, 24, 31, 32, 35, 36 and 37

26   above and incorporates same herein by this reference.

27

28   / / /

                              18

45.   An actual controversy has arisen between Plaintiff and Defendants, and each of them, wherein Defendants RECHNITZ and POLTER, on their own individual behalf and on behalf of LCG, have excluded Plaintiff from the business of LCG, have diverted funds from the business of LCG, have failed and refused to account for financial transactions of LCG and are planning to abscond with the Gardner life insurance policy proceeds.   An actual controversy has arisen between Plaintiff and VOYA to the extent VOYA has not agreed to withhold distribution of the Gardner life insurance policy proceeds.

46.   Plaintiff accordingly seeks a declaration of the rights and duties of the parties with respect to the Agreement, management of LCG, disposition of the Gardner life insurance policy proceeds and accounting for all financial transactions involving LCG as heretofore described

WHEREFORE, Plaintiff prays for Judgment against Defendants, and each of them, as follows:

1.   For a temporary restraining order, preliminary injunction and a permanent injunction, enjoining Defendants, and each of them, and their agents, servants and employees, and all persons acting under and in concert with or for them, from disbursing or paying out the Gardner life insurance policy proceeds pending further order of the Court, refusing to permit Plaintiff to participate in the business of LCG, mandating that Defendants RECHNITZ, POLTER and LCG provide Plaintiff with a full

accounting of all financial transactions involving LCG and against interfering with the appointment of a receiver to control LCG and operate its business;

2.    For the appointment of a receiver to fully control and operate LCG to the exclusion of RECHNITZ and POLTER.

3.    For general damages according to proof;

4.    For special damages for out-of-pocket expenses incurred by Plaintiff in the pursuit of Plaintiff's rights of inspection, and copies of the books and records of LCG;

5.    For disgorgement of profits and benefits unjustly retained by LCG and/or RECHNITZ;

6.    For an accounting;

7.    For a declaration of the rights and duties with respect to the agreement and operation of the business of LCG;

8.    For pre-judgment interest as permitted by law;

9.    For attorney's fees according to proof;

10.   For costs of suit incurred herein; and

11.   For such other and further relief as the Court deems just and proper.


Dated:   June 6, 2022      LAW OFFICES OF JEFFREY A. SLOTT
                           A Professional Corporation



                           BY: _____
                              JEFFREY A. SLOTT, ESQ.
                              Attorney for Plaintiff LESLIE KLEIN,

20

**VERIFICATION**

1

2   STATE OF CALIFORNIA  )
                        )  ss.
3   COUNTY OF LOS ANGELES )

4

5   I, LESLIE KLEIN, am the Complainant in this action.  I have

6   read the allegations contained in the attached COMPLAINT and

7   know the contents thereof.  The allegations contained in the

8   Complaint are true of my own knowledge except as to those

9   matters which are stated therein on information and belief, and
10
11   as to those matters I believe them to be true.

12   I declare under penalty of perjury under the laws of the

13   State of California that the foregoing is true and correct.

14   Executed this 6th day of June, 2022, at Encino, California.

15

16

17                              LESLIE KLEIN,

18

19

20

21

22

23

24

25

26

27

28
                                21

# EXHIBIT A

LIMITED LIABILITY COMPANY AGREEMENT of LIFE CAPITAL GROUP, LLC (this "**Agreement**"), a California limited liability company (the "**Company**"), dated as of June 1, 2011, among Shlomo Rechnitz, an individual residing in the State of California ("**Rechnitz**"), Leslie Klein, an individual residing in the State of California ("**Klein**"), and the Persons that become Members from time to time after the date hereof in accordance with the terms hereof.

## WITNESSETH:

WHEREAS, the Members desire to operate the Company as a limited liability company under Title 2.5 of the California Corporations Code, as amended from time to time (the "**Act**"), in order to accomplish certain lawful business objectives;

WHEREAS, the Certificate of Formation of Life Capital Group, LLC was filed with the Secretary of State of the State of California on April 8, 2011, in accordance with the provisions of the Act; and

WHEREAS the Members desire to set forth herein the manner in which the Company shall be governed and operated.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

## ARTICLE I
## FORMATION AND BUSINESS OF THE COMPANY

Section 1.1    Formation.  The Company was formed on April 8, 2011 by the filing of a Certificate of Formation (the "**Certificate**") with the Secretary of State of California.   The Members hereby agree to operate the Company as a limited liability company pursuant to the provisions of the Act and upon and subject to the terms and conditions set forth in this Agreement. Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

Section 1.2    Name.  The name of the Company shall be Life Capital Group, LLC, under which name all business and affairs of the Company shall be conducted.

Section 1.3    Purpose.  The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act.

Section 1.4    Term.  The term of the Company shall continue until terminated in accordance with the provisions of Article XI of this Agreement or otherwise dissolved and wound up pursuant to the Act.

Section 1.5    Place of Business.  The Company shall have its principal place or places of business at such place or places as the Manager may, from time to time, select.

Section 1.6    Registered Office and Agency. The address of the registered office of the Company in the State of California is 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036. The name and address of the registered agent for service of process on the Company in the State of California is Shlomo Rechnitz, 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.

Section 1.7    Fiscal Year. The term **"Fiscal Year"** shall mean, subject to the provisions of Section 706 of the Code, each of (a) the period commencing on the date of formation of the Company and ending on December 31, 2011, (b) any subsequent 12-month period commencing on January 1 and ending on December 31 and (c) the period commencing on January 1 and ending on the Dissolution Date.

## ARTICLE II
## MEMBERS

Section 2.1    Members. The Company shall consist of the Members executing this Agreement and any substitute or additional Members admitted to the Company in accordance with the terms hereof. Each initial Member shall be deemed admitted as a Member of the Company at such time as such Member has made its Initial Capital Contribution to the Company.

Section 2.2    Company Property; Company Interest. No property of the Company shall be deemed to be owned by any Member individually, but all of such property shall be owned by, and title thereto shall be vested solely in, the Company.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

Section 3.1    Initial Capital Contribution of Members, Capital Accounts. Each Member has contributed to the capital of the Company, as such Member's Initial Capital Contribution, the amount of cash, or property with a value, set forth on Schedule A. The Company shall maintain a record of: (a) the number of Interests held by each Member and (b) the respective Percentage Interest of each Member. The Manager shall update such Schedule A from time to time to reflect changes in such information. The Members agree that Klein's Initial Capital Contribution associated with each Policy shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement. The Members agree that Rechnitz's Initial Capital Contribution associated with the Policies (in the order of each Policy that first generates proceeds) shall be deemed to be $3,800,000. The Company will establish and maintain a Capital Account for each Member throughout the full term of the Company.

Section 3.2    Additional Capital Contributions.    Other than the Initial Capital Contributions made by the Members upon admission to the Company in accordance with Section 3.1 and Article VIII, the Members shall not be required to make any additional contributions to the Company; except that Rechnitz shall be obligated to contribute to the Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the Policies which are not Non-Payment Policies after the date of this Agreement and each Non-Payment Policy Member shall be obligated to contribute to the

2

Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the applicable Non-Payment Policy after the date such Non-Payment Policy Member was admitted to the Company as a Member.

Section 3.3    Withdrawal and Return of Capital Contributions.

(a)    No Member shall be entitled to demand a return of such Member's Capital Contribution (including any earnings thereon) or to withdraw any portion of such Member's Capital Account except as expressly provided in this Agreement. Except as expressly provided herein, no Member shall have the right to demand a distribution of property other than cash for its Interest. Each Member hereby waives any right such Member may otherwise have to cause any asset of the Company to be partitioned or to file a complaint or institute any proceeding at law or in equity seeking the partition of any such asset. Except as otherwise provided herein, no Member shall have priority over any other Member, either as to a return of such Member's Capital Contribution or as to Net Income, Net Losses, any other item of Company income, gain, loss or deduction, or Company distributions.

(b)    No Member shall be personally liable for the return of the Capital Contributions of any other Member or any portion thereof, it being expressly understood that any such return shall be made solely from available Company assets, if any.

Section 3.4    Interest.    Interest, if any, earned on funds contributed or held by the Company shall inure to the benefit of the Company. The Members shall not be entitled to receive interest or any other payments from the Company with respect to their Capital Contributions or Capital Accounts, except as otherwise provided for herein.

Section 3.5    Negative Capital Accounts.    Except as may be required by the provisions of the Act or in respect of any negative balance resulting from a withdrawal of capital or distribution in contravention of this Agreement, at no time shall any Member with a negative Capital Account balance have any obligation to the Company or the other Members to restore such negative balance, and such negative balance shall not be treated as an asset of the Company.

## ARTICLE IV
## DISTRIBUTIONS AND ALLOCATIONS

Section 4.1    Allocation of Net Income and Net Losses.

(a)    Net Income with respect to a Policy for any Fiscal Year shall be allocated (i) first, to Rechnitz to the extent of Rechnitz's Priority Return with respect to such Policy; (ii) second, to Rechnitz until $3,800,000 of Net Income has been allocated to Rechnitz in the aggregate (without regard to allocations of Net Income under subclause (i)); (iii) third, to Klein, to the extent of Klein's Priority Return with respect to such Policy; and (iv) thereafter, to Klein and Rechnitz in proportion to their Percentage Interests.

(b)    Net Losses with respect to a Policy for any Fiscal Year shall be allocated to Klein and Rechnitz in proportion to their Capital Contributions associated with such Policy.

3

Section 4.2    Cash Available for Distribution. Subject to Article XI, the Company shall distribute Available Cash to the Members at such times and in such amounts as determined by Rechnitz in accordance with this Agreement.

Section 4.3    Proceeds of Policies. If at any time the Company receives any proceeds from any Policy that is not a Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a)    first, to Rechnitz by wire transfer into an account designated by Rechnitz, in an amount up to the Rechnitz Amount for such Policy;

(b)    second, (A) first, to each of the Lenders, pro-rata, based on the outstanding principal balance owed to such Lender as set forth on Schedule C, until such outstanding principal balance is equal to zero, in an aggregate amount up to the Klein Amount for such Policy and (B) second, any remaining Klein Amount with respect to such Policy to Klein by wire transfer into an account designated by Klein;

(c)    third, (i) 50% to Rechnitz by wire transfer into an account designated by Rechnitz and (ii) 50% to Klein by wire transfer into an account designated by Klein, provided, however, that if the balance of the Reserve Account is less than $2,500,000, then proceeds distributable to Klein under clause (ii) above shall be deposited in the Reserve Account until such balance is equal to $2,500,000.

Section 4.4    Constructive Trust. If any Member receives any proceeds in respect of any Policy (following the death of an Insured or otherwise), such Member shall hold such proceeds in a constructive trust for the Company and shall within one (1) Business Day inform the other Members and the Manager and deposit such proceeds in the Reserve Account.

Section 4.5    Sale of Policies. The Company shall be entitled to sell any Policy to any Person with the prior written consent of each of the Members. Notwithstanding the immediately preceding sentence, upon Klein's written consent, Rechnitz or his designee shall be entitled to purchase any Policy that is not a Non-Payment Policy from the Company by transferring an amount equal to the Klein Amount for such Policy to the Company, which for administrative convenience shall be subsequently distributed to an account designated by Klein.

Section 4.6    Lenders. The Members agree that (i) the Company may pay amounts pursuant to Section 4.3(b) directly to the Lenders, and in such event, the payments will be treated as distributions by the Company to Klein and subsequently transferred by Klein to the Lenders, (ii) nothing herein is intended to grant to the Lenders an equity interest in the Company, and (iii) nothing herein is intended to imply that the Company is assuming the obligations owed to the Lenders.

## ARTICLE V
## RESERVE ACCOUNT

Section 5.1    Establishing a Reserve Account. As soon as practicable the Company shall establish the Reserve Account with the Account Bank in the name of Company.

4

Section 5.2    Distribution of Reserve Account. Amounts in the Reserve Account shall be distributed to certain Members in certain specified amounts under the following circumstances: (a) if the amount of Net Income allocated to Klein with respect to a Policy under Section 4.1 for a Fiscal Year exceeds the amount of proceeds distributed to Klein with respect to such Policy pursuant to Section 4.3; then 40% of such excess shall be distributed to Klein from the Reserve Account; (b) if upon a disposition of a Policy or the receipt of proceeds from such policy, the Rechnitz Amount with respect to the Policy exceeds the amount of proceeds distributed to Rechnitz with respect to such Policy pursuant to Section 4.3, then the amount of such excess shall be distributed to Rechnitz from the Reserve Account; and (c) if agreed upon by the Members, then the amount agreed upon by the Members shall be distributed to Klein from the Reserve Account.

## ARTICLE VI
## MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

Section 6.1    Rights and Powers of Manager. The business and affairs of the Company shall be managed by the Manager. The Manager shall direct, manage, and control the business of the Company to the best of the Manager's ability. Except for situations in which the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all acts or activities customary or incident to the management of the Company's business. Nothing contained in this Agreement shall require any person to inquire into the authority of the Manager to execute and deliver any document on behalf of the Company or to bind the Company pursuant to such document.

Section 6.2    Number, Tenure and Qualifications. The Company shall have one Manager, which initially shall be Jonathon Polter ("**Polter**"), an individual residing at 2000 Town Center, Suite 1490, Southfield, Michigan 48075. Polter shall remain as the Manager unless he resigns from such position, is relieved of his duties by (i) if there are two Members or less, a unanimous vote of the Members and (ii) otherwise, an affirmative vote of Members holding a majority of the Interests. Subsequent Managers shall be elected by the affirmative vote of Members holding a majority of the Interests. Managers need not be residents of the State of California.

Section 6.3    Officers. The Manager may delegate the management of the Company's day-to-day business affairs to a Chief Executive Officer and other officers of the Company designated by the Manager and approved by an affirmative vote of Members holding a majority of the Interests and, unless otherwise decided by the Manager, all actions of the Company may be taken by the appropriate duly authorized officers.

Section 6.4    Reliance. The Manager shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any officers, employees, or committees of the Company, or by any other Person as to matters such Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including, without limitation, information, opinions, reports or

5

statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

Section 6.5    Indemnification of Manager, Members and Officers.

(a)    General.    The Company shall indemnify any Person (a "**Covered Person**") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including an action by or in the right of the Company) by reason of the fact that he is or was a Manager, Member or officer of the Company, or is or was serving at the request of the Company as a director, manager or officer of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith with no willful misconduct or gross negligence and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.    The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b)    Indemnification in Certain Cases.    To the extent that a Covered Person has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in clause (a) of this Section 6.5, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

(c)    Advances for Expenses.    Expenses (including attorneys' fees) incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be ultimately determined that he is not entitled to be indemnified by the Company as authorized in this Section 6.5.

(d)    Rights Non-Exclusive.    The indemnification and advancement of expenses provided by, or granted pursuant to, the other subparagraphs of this Section 6.5 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, agreement or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

(e)    Insurance.    The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was a Covered Person against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such,

6

whether or not the Company would have the power to indemnify him against such liability under the provisions of this <u>Section 6.5</u>.

(f)     <u>Survival of Rights</u>.  The indemnification and advancement of expenses provided by, or granted pursuant to this <u>Section 6.5</u> shall continue as to a Person who has ceased to be an officer, Manager or Member and shall inure to the benefit of the heirs, executors and administrators of such Person.

Section 6.6     <u>Exculpation</u>.  No Member, Manager or officer of the Company shall be liable, in damages or otherwise, to the Company or its Members for any act or omission performed or omitted by such Member, Manager or officer pursuant to authority granted by this Agreement except to the extent such Person fails to meet the standard for indemnification set forth in <u>Section 6.5(a)</u>.

Section 6.7     <u>No Duties</u>.  Any duties (including fiduciary duties) of a Covered Person to the Company or to any other Covered Person that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, <u>provided</u>, that (i) the foregoing shall not eliminate the obligation of each Member and the Manager to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied covenant of good faith and fair dealing.

Section 6.8     <u>Protection of Insured's Private Information</u>.  Manager and each Member acknowledge that insurance regulations and other applicable Laws are structured to provide confidentiality to policy owners and insureds with respect to Consumer Information in connection with ownership or sale of their policies, and that the Manager and each Member and all of their respective agents and representatives, are obligated to keep Consumer Information confidential in accordance with applicable Laws.  The Manager and each Member agree to comply with all applicable Laws with respect to the confidentiality of Consumer Information; <u>provided</u>, that (i) the Manager and each Member may disclose such information to their internal or external auditors and attorneys and as required or permitted by Law, and (ii) Klein may take all necessary and appropriate actions to transfer ownership of the Policies to the Company.

Section 6.9     <u>Delivery of Policy Files</u>.  Klein shall deliver each Policy File as directed by the Manager within thirty (30) Business Days of the date of this Agreement.

Section 6.10     <u>Change Forms</u>.  On the date of this Agreement, Klein shall execute and deliver Change Forms to the Company or at the Company's direction, changing the owner and Beneficiary of the Policy to the Company or the Company's designee.  In addition, Klein shall execute and deliver any additional instruments of transfer that the Company may reasonably request necessary to evidence the assignment of the Policy and any rights therein to the Company or its designee.

Section 6.11     <u>Further Assurances</u>.  From and after the date hereof, each Member shall execute and deliver such other documents and instruments, and take such further actions, as may be reasonably requested from time to time by another Member to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby.  Without limiting the foregoing, Klein shall cooperate with Rechnitz in causing the Company or its designee to be

7

recorded as the owner and beneficiary of each Policy on the books and records of the relevant issuing insurance companies.

Section 6.12   Indemnification of Rechnitz.   Klein shall indemnify and hold harmless (which indemnification shall survive any termination of this Agreement and the dissolution of the Company) Rechnitz and his Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an **"Indemnified Person"**), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and actual expenses incurred (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person, and in connection with or arising out of (i) any breach of any representation, covenant or other obligation of Klein hereunder, (ii) the transactions contemplated hereunder, (iii) any actions or failures to act in connection therewith or (iv) and any and all reasonable legal costs and actual expenses arising out of or incurred in connection with disputes between or among Klein and Rechnitz (collectively, **"Indemnified Liabilities"**); provided, that Klein shall not be liable for any indemnification to an Indemnified Person to the extent that any such Indemnified Liability results from that Indemnified Person's gross negligence or willful misconduct; provided, further, that the aggregate amount of Klein's liability under this Section 6.12 shall be limited to the aggregate of the Rechnitz Amounts for all of the Policies.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Section 7.1   Representations and Warranties of Klein.

(a)   Power and Authority.   Klein has full power, authority and right to execute and deliver this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of its obligations hereunder.

(b)   Binding Obligation.   This Agreement constitutes the legal, valid and binding obligations of Klein enforceable against Klein in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(c)   Consent of Third Parties.   No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by Klein in connection with the execution of this Agreement and the compliance by Klein with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Klein of any other action contemplated hereby.

(d)   Policies.   With respect to each Policy, to the best of Klein's knowledge:

8

(i)      at the issuance of such Policy, the related Insured or Original Owner thereof was not a party to any written or oral agreement or arrangement to cause the same or interests therein to be issued, assigned, sold, transferred, or otherwise disposed of in violation of applicable law or public policy;

(ii)      at the issuance of such Policy, the related Insured or Original Owner thereof had the financial capacity to pay the premiums necessary to maintain such Policy in force;

(iii)      at the issuance of such Policy the related Original Owner had an insurable interest in the life of the Insured;

(iv)      the material medical or financial information supplied by or on behalf of the Insured or Original Owner of such Policy in the application and related materials delivered to the applicable issuing insurance company in connection with the issuance of such Policy was not false, incomplete or misleading in any material respect;

(v)      Klein does not possess or control any material documentation or information related to such Policy, or the acquisition or maintenance thereof by Klein, that has not been delivered or disclosed in writing to Rechnitz or his agents;

(vi)      prior to the date of this Agreement and the consummation of the transactions contemplated by [insert transfer agreement title], Klein was trustee of the applicable Original Owner which held sole legal and beneficial title thereto;

(vii)      Klein, in his capacity as trustee of the applicable Original Owner, acquired sole legal and beneficial title thereto and had the power and authority to enter into this Agreement;

(viii)      Immediately prior to its transfer to the Company hereunder, Klein held sole legal and beneficial title thereto;

(ix)      upon the transfer of such Policy, Company or its designee, will hold good and marketable title to and ownership of such Policy free and clear of any liens, charges, rights, encumbrances or other interests;

(x)      such Policy was acquired in a manner in compliance, in all material respects, with the Laws applicable to the purchase of life insurance policies, as then in effect and as then interpreted by the relevant regulators or in case law;

(xi)      except as disclosed to Rechnitz in writing, no previous owner of such Policy has waived, amended or terminated any material provision of, or any material rights in relation to, such Policy;

(xii)      except as disclosed on Schedule 7.1(d)(xii), the premiums for such Policy have been paid such that such Policy will not be in a grace period as of the date of this Agreement and such Policy has not been cancelled as of the date of this Agreement;

9

(xiii)   Klein has disclosed or delivered to Rechnitz and the Company in writing all information received by Klein or any of his agents from the related issuing insurance company related to any change in the terms of such Policy, including with respect to an intent to increase the cost of insurance for such Policy;

(xiv)   there is no current or pending written notice that has been issued to Klein by the related issuing insurance company of such issuing insurance company's intention to cancel, contest, rescind or refuse payment under such Policy;

(xv)   all the information contained in each of the documents in the related Policy File or otherwise delivered by or on behalf of Klein to the Company and Rechnitz in connection with such Policy is true, complete and correct in all material respects;

(xvi)   the related Policy File contains the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

(xvii)   there is not any pending or threatened Proceeding challenging the validity, ownership or enforceability of such Policy or Klein's ownership rights in such Policy;

(xviii)   such Policy was not issued pursuant to or in connection with an agreement whereby the premiums required to be paid on such Policy were paid by any Person pursuant to a recourse or non-recourse premium financing program;

(xix)   Klein has not required any broker to sign an agreement offering Klein or any other Person the "right of last offer" in connection with the purchase of such Policy; and

(xx)   such Policy has been issued by the related issuing insurance company and is in force and any related contestability period and any suicide exclusion period has expired.

Section 7.2    Representations and Warranties of Rechnitz.  Rechnitz hereby represents and warrants that:

(i)    Authority.  Rechnitz has full power, authority and right to execute this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of his obligations hereunder.

(ii)    Binding Obligation.  This Agreement constitutes Rechnitz's legal, valid and binding obligation, enforceable against Rechnitz in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(iii)    Consent of Third Parties.  No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or

Governmental Authority is required by Rechnitz in connection with the execution of this Agreement and the compliance by Rechnitz with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Rechnitz of any other action contemplated hereby.

## ARTICLE VIII
## ADMISSION OF MEMBERS

Section 8.1 <u>Admission of Members</u>. Subject to <u>Section 8.2</u>, upon the approval of the Members by majority vote, one or more Persons may be admitted to the Company as Members. The Members by majority vote shall determine the number of Interests and the Percentage Interest to be offered to any such Member and the Initial Capital Contribution to be made by any such Member. Each such Person shall be admitted as a Member at the time such Person (a) executes and delivers a copy of this Agreement to the Manager and (b) if applicable, makes its Initial Capital Contribution to the Company. The Manager shall update <u>Schedule A</u> to reflect the admission of any such Members.

Section 8.2 <u>Admission of Non-Payment Policy Members</u>. It is agreed and acknowledged by the Members that Rechnitz's sole obligation with respect to the Company is making Capital Contributions for the payment of premiums on the Policies and the expenses associated with the Policies, in each case after the date of this Agreement. Rechnitz shall provide the Company and Klein with six (6) months prior written notice if Rechnitz elects to cease paying premiums in respect of any Policy (such Policy, a **"Non-Payment Policy"**). After delivery of such notice, Rechnitz or Klein shall have the right to introduce any Person to the Company as a potential Member who agrees in writing to assume Rechnitz's obligations for the payment of premiums and other costs and expenses with respect to such Non-Payment Policy, which person shall be admitted as a Member upon the approval of the Members by [majority] vote (such a Member, a **"Non-Payment Policy Member"**). With respect to any Non-Payment Policy, any payment of premiums and other costs and expenses shall be contributed to the capital of the Company by the applicable Non-Payment Policy Member. If at any time the Company receives any proceeds from any Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a) First, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount up to (x) the total amount of Capital Contributions made on such Policy by such Non-Payment Policy Member and (y) the Priority Return of such Non-Payment Policy Member on such Policy computed starting on the date such Non-Payment Policy Member was admitted as a Member;

(b) Second, by wire transfer into an account designated by Rechnitz, in an amount equal to the Rechnitz Amount for such Policy;

(c) Third, by wire transfer into an account designated by Klein, in an amount equal to the Klein Amount for such Policy;

11

(d)     Fourth, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount equal to fifty percent (50%) of all remaining proceeds from such Policy;

(e)     Fifth, to Rechnitz and Klein by wire transfers into accounts respectively designated by them in proportion to the Capital Contributions made by them with respect to each such Non-Payment Member Policy; provided, however that if Klein introduced the related Non-Payment Policy Member to the Company, then 25% of the amount distributable under this clause (e) to Rechnitz shall be distributed to Klein instead.

Notwithstanding Section 4.1 hereof, Net Income associated with a Non-Payment Policy shall be allocated to each Member to the extent of any Priority Return distributed to such Member with respect to the Non-Payment Policy and to the extent of any distributions made to a Member pursuant to Section 8.2(d) or Section 8.2(e) above with respect to such Non-Payment Policy . Notwithstanding Section 4.1 hereof, Net Losses associated with a Non-Payment Policy shall be allocated to each Member in proportion to the Capital Contributions made by such Member with respect to such Non-Payment Policy.

## ARTICLE IX
## MAINTENANCE OF BOOKS AND RECORDS;
## REPORTS TO MEMBERS; TAX RETURNS

Section 9.1     Accounting Method and Records.     Rechnitz shall determine the accounting method to be used by the Company.  The Company shall maintain such accounting records as shall reflect all Company transactions and as shall be appropriate and adequate for the Company's business.

Section 9.2     Company Records.  The Company shall maintain the following records, within or outside the State of California: (a) a copy of the Company's accounting records and federal, state, local and foreign income tax or information returns and reports, if any, for the five most recent Fiscal Years; and (b) all other records and reports required by the Act or otherwise to be maintained by the Company.     Each Member, and such Member's duly authorized representatives or agents, shall, for any purpose reasonably related to his interest as a Member, have reasonable access to such books and records at such office and shall have the right to inspect and copy such books and records; provided, however, that if a Member was an officer, consultant or employee of the Company received his/her Interest pursuant to a profits interests grant agreement ceases to be an employee, consultant or officer of the Company, such Member shall only have the right to receive books and records that he/she has the right to require the Company to provide to him/her in accordance with applicable law.

Section 9.3     Company Reports.  The Company shall cause to be furnished to each Member and each other Person who was a Member during the period in question (a) such reports and financial statements as may be reasonably required for his financial reporting requirements, including, without limitation, copies of all annual, quarterly and monthly financial statements, and (b) detailed financial statements and information and documents (including Form K-1) necessary or desirable for the preparation or support of such Member's tax returns required in any jurisdiction, as soon as practicable after the end of each Fiscal Year.

Section 9.4    Designation of Tax Matters Member.  Rechnitz is designated the "**Tax Matters Member**" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

Section 9.5    Tax Treatment and Elections.    The Company shall be treated as a partnership for federal income tax purposes, the Members shall be treated as partners for federal income tax purposes, and each of the Members agrees to report consistently with such treatment. The Manager shall make all elections necessary to give effect to such treatment.

### ARTICLE X
### TRANSFER OF INTERESTS; SPECIAL PROVISIONS

Section 10.1    Transfers and Assignments.

(a)    No Member shall be permitted to Transfer any Interest to a Person other than a Permitted Transferee, except in accordance with the provisions set forth in this Article X.

Section 10.2    Permitted Transfers.

(a)    Each Member shall notify the Manager and the other Members of any proposed Transfer to a Permitted Transferee by such Member, or by any of its Affiliates, in the case of an indirect Transfer of an Interest, which notice shall set forth the name and address of the Permitted Transferee and the nature of the relationship between such Member and such Permitted Transferee, at least ten (10) calendar days prior to the proposed date of such Transfer. Each Member shall be responsible for paying all transfer, gains or similar taxes, if any, and all reasonable costs and expenses of the Company, including reasonable attorneys' fees, arising out of any Transfer by such Member of all or a portion of its Interest (or by any of its Affiliates in the case of an indirect Transfer of an Interest) to a Permitted Transferee.  As a condition to any Transfer of all or any portion of an Interest in the Company to a Permitted Transferee shall execute and deliver to the Company a joinder agreement, in form of Exhibit A (a "**Joinder Agreement**").    All of the provisions of this Agreement, including without limitation, the provisions of this Article X, shall be applicable to and binding upon each Permitted Transferee.

(b)    The transfer by a Member of all or any portion of its Interest (including, without limitation, any transfer to a Permitted Transferee) shall not release such Member from any or all of its obligations under this Agreement arising prior to the date of such Transfer.

Section 10.3    Substitute Members.  A Permitted Transferee of the Interest of a Member or a transferee of the Interest of a Member pursuant to Sections 10.4 and 10.5 of this Agreement, or any portion thereof, shall become a substitute Member entitled to all the rights, and subject to all of the obligations and restrictions, of the transferor Member if, and only if:

(a)    the transferor assigns the transferee such right;

13

(b)     the transferor or transferee pays to the Company all reasonable costs and expenses incurred by the Company in connection with such substitution; and

(c)     the transferee executes and delivers a Joinder Agreement.

Section 10.4    Right of First Refusal.

(a)     Except for Transfers pursuant to or contemplated by Section 10.2, if any Member (a "**Selling Member**") receives a bona fide written offer from an independent third party (a "**Third Party**") to purchase any or all of such Selling Member's Interests for cash and such Selling Member desires to Transfer any or all of such Interests (the "**Offered Interests**") pursuant to such offer, prior to any Transfer it shall give written notice of the proposed Transfer (the "**Notice of Intention**") to the Company and the other Members (the "**Remaining Members**") specifying the number of Offered Interests which such Selling Member wishes to Transfer, the proposed transferee, the proposed purchase price for the Offered Interests (the "**Offer Price**") and the other material terms and conditions of the proposed Transfer.

(b)     For a period of thirty (30) days after receipt of the Notice of Intention (the "**Option Period**"), each of the Remaining Members shall have the irrevocable option to purchase at the Offer Price and on the other terms specified in the Notice of Intention, all of the Offered Interests pro rata based on the Percentage Interest of each Remaining Member; provided, however, that if any Remaining Member does not purchase any or all of its pro rata portion of such Offered Interests, the other Remaining Members shall have the right to purchase such portion, pro rata, until all of such Offered Interests are purchased. The option of a Remaining Member pursuant to this Section 10.4(b) (the "**Remaining Members Option**") shall be exercisable by delivery of a notice (the "**Remaining Members Notice**") setting forth the maximum number of Offered Interests that such Remaining Member wishes to purchase, including any number which would be allocated to such Remaining Member if any other Remaining Member does not purchase all or any portion of its pro rata portion, to the Selling Member, the Company and the other Remaining Members and shall expire if the Remaining Members Notice is not delivered prior to the expiration of the Option Period.

(c)     If all notices required to be given pursuant to this Section 10.4 have been duly given, and the Remaining Members determine not to exercise their respective options to purchase all of the Offered Interests at the Offer Price and on the other terms specified in the Notice of Intention or determine, with the consent of the Selling Member, to exercise their options to purchase less than all of the Offered Interests, then the Selling Member shall have the right, for a period of ninety (90) days from the earlier of (a) the expiration of the Option Period and (b) the date on which such Selling Member receives notice from the Remaining Members that they will not exercise the option granted pursuant to this Section 10.4, to accept the bona fide offer from the Third Party and enter into an agreement to sell the Offered Interests remaining unsold under this Section 10.4 at a price not less than the Offer Price and on the same terms as set forth in the Notice of Intention; provided that prior to any such Transfer to a Third Party, such Third Party executes and delivers to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby becomes a party to this Agreement.

14

(d)      The closing of any purchase and sale of any Interests to a Remaining Member pursuant to this Section 10.4 shall take place at the offices of the Company on such date, not later than sixty (60) days after the delivery to the Selling Member of the Remaining Members Notice.  At the closing of such purchase and sale, the Secretary or such other officer of the Company shall record such Transfer in the books of the Company against evidence of such Transfer, delivery of the Offer Price therefor and an executed Joinder Agreement.

(e)      If the Remaining Members Option is not exercised, and the Offered Interests are not sold pursuant to Section 10.4(c) within the ninety (90) day period referred to therein, such sale may not be carried out without complying again with the terms of this Section 10.4.

Section 10.5   Tag-Along Rights and Obligations.

(a)      In the event that after complying with the terms of Section 10.4, the Selling Member desires to sell (the "**Disposition**") the Offered Securities to a Third Person (the "**Acquirer**"), the Selling Member's right to accept such offer to purchase the Offered Securities shall be conditioned on each Remaining Member being offered the right to sell to the Acquirer its pro rata portion of the Offered Securities (based on the Percentage Interest of each Remaining Member) in such Disposition in accordance with this Section 10.5.  The Selling Member shall give notice (the "**Disposition Notice**") to each Remaining Member at least thirty (30) days prior to the consummation of the Disposition specifying the number of Offered Interests which such Selling Member wishes to Transfer in the proposed Disposition, the proposed transferee, the proposed purchase price for the Offered Interests and the other material terms and conditions of the proposed Disposition.

(b)      The election to participate in the Disposition by the Remaining Members pursuant to Section 10.5(a) shall be exercised by notice to the Selling Member given within the time period specified in the Disposition Notice, which time period shall not be less than fifteen (15) days after such Disposition Notice is given.  If any Remaining Member gives notice of its election to sell, it shall be obligated to sell the number of Interests specified in such Remaining Member's notice upon the terms and subject to the conditions specified in Section 10.5(a) to the Acquirer (which shall be the same for the other Remaining Members and the Selling Member), conditional upon the closing of the Disposition.

(c)      The sale or Transfer of Interests to the Acquirer by the Selling Member and by the Remaining Members electing to participate in the Disposition pursuant to this Section 10.5 shall occur simultaneously and be on the same terms and at the same price as the Interests sold by the Selling Member; provided that prior to any such Transfer to an Acquirer, such Acquirer shall execute and deliver to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby become a party to this Agreement.

(d)      If the Acquirer declines to purchase from such Remaining Members their respective proportionate number of Interests calculated in accordance with this Section 10.5, the Selling Member will not sell any Interests to the Acquirer.

15

Section 10.6    Miscellaneous Provisions Affecting Transfer.

(a)     Upon the Transfer of all or any portion of a Member's Interests as permitted or required under this Agreement, including, without limitation, as provided in this Article X, (i) the income, loss, gain, deduction and credit attributable to the Interests so transferred shall be allocated between the transferor and transferee based upon the number of days during the applicable Fiscal Year that the Interests so transferred was held by each of them, without regard to the results of Company activities during the period in which each was the holder; provided that the Manager shall, at the request and expense of the transferring Member, cause an interim closing of the Company's books as of the effective date of Transfer for purposes of allocating such items between the transferor and transferee; and (ii) the transferor shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods preceding the date of Transfer, and the transferee shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods on and after the date of Transfer based upon the number of days during the applicable Fiscal Year that the Interests so transferred were held by each of them, without regard to the results of Company activities during the period in which each was the holder.

(b)     The Company shall be entitled to treat the record owner of any Interests as the absolute owner thereof, and shall incur no liability for distributions of cash or other property or allocations of income, gain, loss, deduction or credit made in good faith to such owner until such time as a written assignment of such Interests has been received, accepted and recorded on the books of the Company.

ARTICLE XI
DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

Section 11.1    Dissolution, etc.    The Company shall be dissolved upon the occurrence of any of the following events (the date of such occurrence, the "**Dissolution Date**"):

(a)     As approved by the majority vote of the Members; or

(b)     As otherwise required by applicable law.

Section 11.2    Winding Up.

(a)     Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company in accordance with this Section 11.2.

(b)     Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be

16

considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(c)     The Members shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

Section 11.3    Final Distribution.    After the application or distribution of the proceeds of the liquidation of the Company's assets in one or more installments to the satisfaction of the liabilities to creditors of the Company, including to the satisfaction of the expenses of the winding-up, liquidation and dissolution of the Company (whether by payment or the making of reasonable provision for payment thereof), the remaining proceeds, if any, plus any remaining assets of the Company shall be distributed to the Members in accordance with Sections 4.3 and 8.2, as applicable.

Section 11.4    Time for Liquidation, etc.    A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Company to seek to minimize potential losses upon such liquidation. The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of a certificate of cancellation of the certificate with the Secretary of State of the State of California.

Section 11.5    Termination.    Upon completion of the winding up of the Company, the Manager (or any duly elected liquidating trustee or other duly designated representative) shall execute, acknowledge and cause to be filed a certificate of cancellation of the Certificate with the Secretary of State of the State of California. Upon the cancellation of the Certificate, this Agreement and the Company shall terminate.

Section 11.6    Return of Contribution Nonrecourse to Other Members.    Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

## ARTICLE XII
## DISPUTE RESOLUTION

Section 12.1    Rabbinical Counsel.    If any dispute arises between the Members regarding this Agreement or any provision hereof, that dispute shall be resolved through a binding arbitration proceeding to be conducted in the State of California in accordance with the commercial arbitration rules of the Rabbinical Council of California.

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1    Entire Agreement.    This Agreement, taken together with the other documents expressly referred to herein, each as amended or supplemented, constitutes the entire

17

agreement among the parties with respect to the subject matter herein or therein and supersedes any prior agreement or understanding among the parties hereto.

Section 13.2   Other Ventures.  The Manager or any Member, and any firm, corporation or association with which the Manager or any Member is in any way interested or connected, may act as attorney for, deal and contract with, and be employed by the Company, and the Manager or any Member may be, in any manner, interested in or connected with any corporation, association or business in which the Company is directly or indirectly interested, all in the same manner and with the same freedom as though not a Manager or a Member, as the case may be, and without accountability for any profit, benefit or compensation received in connection with such actions or relationships, none of which shall be void or voidable.

Section 13.3   Amendments.  This Agreement may be amended only with the written consent of a Majority in Interest; provided that any such amendment that materially adversely affects the rights and privileges of any Member (other than any amendment effected in connection with the making of a Capital Contribution to the Company by, and/or the issuance of additional Interests to, any Member, including, without limitation, any amendment to the rights and privileges of the Interests to reflect dilution resulting from such Capital Contributions or issuance of additional Interests) must be consented to by each of the Members so affected[; provided further, that any amendment to this Agreement shall not be effective without the consent of Rechnitz].

Section 13.4   Choice of Law.  This Agreement shall be construed in accordance with the laws of the State of California, without regard to the choice of laws rules thereof, and the obligations, rights and remedies of the Members hereunder shall be determined in accordance with such laws.

Section 13.5   Successors and Assigns; Third Party Beneficiaries.  This Agreement shall be binding upon, and, subject to Article X, shall inure to the benefit of, the parties and their legal representatives, heirs, administrators, executors, successors and permitted assigns.  Except as otherwise expressly provided herein, none of the provisions of this Agreement shall be for the benefit of or enforceable by any Person not a party hereto.

Section 13.6   Interpretation.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or neuter gender shall include the masculine, the feminine and the neuter.

Section 13.7   Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend or otherwise affect the scope or intent of this Agreement or any provision hereof.

Section 13.8   Severability.  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement, or the application of such provision in jurisdictions or to Persons or circumstances other than those to which it is held invalid, illegal or unenforceable, shall not be affected thereby.

18

Section 13.9   Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Section 13.10   Non-Waiver.  No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in a written notice given to the party claiming such waiver has occurred; provided that no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

Section 13.11   Notices. All notices, requests, demands, claims and other communications that are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by confirmed facsimile with a copy sent by another means specified herein; the business day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five business days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

> if to the Company:
>
> c/o Shlomo Rechnitz
> > 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.
>
>
> with a copy to:
>
> Leslie Klein
> 14245 Ventura Blvd., Sherman Oaks, CA 91423

and if to a Member, to the Member's address or facsimile number on the books records of the Company, or to such other address with respect to the Company or a Member as the Company or such Member, as applicable, notifies the Company and the other Members in writing as provided above.

## ARTICLE XIV
## DEFINITIONS

Section 14.1   Definitions.

References in this Agreement to an "**Exhibit**" are intended to refer, unless otherwise specified, to an Exhibit attached to this Agreement, and references in this Agreement to an "**Article**" or a "**Section**" are intended to refer, unless otherwise specified, to an Article or a Section of this Agreement.  As used in this Agreement, the following terms shall have the respective meanings set forth below:

19

"**Account Bank**" means PrivateBancorp, Inc.

"**Act**" shall have the meaning specified in the recitals to this Agreement.

"**Affiliate**" means any Person that, directly or indirectly, through one or more intermediaries, is Controlled by one or more Members. As used in this definition, "Control" means either (a) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting stock of a corporation, or in the case of any Person which is not a corporation, the ownership, directly or indirectly, of at least fifty percent (50%) of the beneficial ownership interests in such Person, or (b) irrespective of stock ownership or other beneficial ownership, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person.

"**Agreement**" means this Limited Liability Company Agreement, as the same may be amended hereafter from time to time as provided herein.

"**Available Cash**" means, at the time of determination, cash generated from revenues from the Company's operations, after provision has been made for (a) all expenditures paid or to be paid by the Company to non-Members and (b) such amounts as the Manager, in his sole discretion, shall deem reasonable in order to provide for any anticipated, contingent or unforeseen expenditures or liabilities of the Company. Available Cash shall be determined without regard to (i) Capital Contributions and (ii) principal advanced on Company indebtedness.

"**Beneficiary**" means, with respect to the Policy, the legal person or persons designated as the recipients of the Death Benefit for such Policy.

"**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Member by crediting such Member's Capital Contributions, such Member's share of Net Income, and the amount of any Company liabilities that are assumed by such Member (other than liabilities that are secured by any Company property distributed to such Member) and by debiting the amount of cash and the gross fair market value of any Company property distributed to such Member pursuant to any provision of this Agreement (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752), such Member's share of Net Losses, and the amount of any liabilities of such Member that are assumed by the Company (other than liabilities that are secured by any property contributed by such Member to the Company).

"**Capital Contribution**" means, with respect to any Member, the amount of money and the initial gross fair market value of any property contributed (or deemed contributed) from time to time by such Member to the Company (net of any liabilities secured by such property or to which such property is otherwise subject). The initial gross fair market value of each Policy contributed by Klein shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement. Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution made

20

by any predecessor of a Member.  For purposes of this Agreement, a Capital Contribution shall include, without limitation, any Initial Capital Contribution.

"**Certificate**" has the meaning set forth in <u>Section 1.1</u>.

"**Change Forms**" means the forms changing the owner and Beneficiary of the Policy using such form as is required by each of the relevant issuing insurance companies.

"**Code**" means the Internal Revenue Code of 1986, as amended, and as the same may be amended hereafter from time to time.

"**Company**" shall have the meaning specified in the preamble hereto.

"**Consumer Information**" means medical, health, financial and personal information about an Insured, an Original Owner, a Beneficiary under a Policy or a person designated by an Insured to provide periodic information regarding the medical status of the Insured, or any spouse or other individual closely related by blood or law to any such person (each, a "**Consumer**"), including, without, limitation, a Consumer's name, street or mailing address, email address, telephone or other contact information, employer, social security or tax identification number, date of birth, driver's license number, photograph or documentation of identity or residency (whether independently disclosed or contained in any disclosed document such as a Policy, life expectancy evaluation, life insurance application or life settlement application).

"**Covered Person**" shall have the meaning specified in <u>Section 6.5(a)</u>.

"**Death Benefit**" means the cash amount of a Policy to be paid upon the death of the applicable Insured under such Policy, which amount will be net of any policy loans made under such Policy (and accrued interest thereon).

"**Disposition**" shall have the meaning specified in <u>Section 10.5(a)</u>.

"**Disposition Notice**" shall have the meaning specified in <u>Section 10.5(a)</u>.

"**Dissolution Date**" shall have the meaning specified in <u>Section 11.1</u>.

"**Fiscal Period**" means, subject to the provisions of Section 706 of the Code, (i) any Fiscal Year and (ii) any portion of a Fiscal Year for which the Company is required to allocate Net Income, Net Losses or other items of Company income, gain, loss or deduction pursuant to <u>Article IV</u>.

"**Fiscal Year**" shall have the meaning specified in <u>Section 1.7</u>.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Indemnified Liabilities**" shall have the meaning specified in <u>Section 6.12</u>.

21

"**Indemnified Person**" shall have the meaning specified in <u>Section 6.12</u>.

"**Initial Capital Contribution**" means, with respect to each Member, such Member's Initial Capital Contribution set forth on <u>Schedule A</u>.

"**Insured**" means, with respect to a Policy, each person whose life is insured under such Policy.

"**Interest**" means, with respect to any Member, (a) such Member's share of the profits and losses of the Company and a Member's rights to receive distributions from the Company in accordance with the provisions of this Agreement and the Act and (b) such Member's other rights and privileges in respect of the Company as herein provided.

"**Joinder Agreement**" shall have the meaning specified in <u>Section 10.2(a)</u>.

"**Klein Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Klein related to such Policy and (y) the Priority Return for Klein on such Policy.

"**Law**" means any law, constitution, statute, ordinance, code, rule, regulation, decision, order, consent, decree, judgment, ordinance, release, license, permit, stipulation or other pronouncement having the effect of law enacted or issued by any Governmental Authority, any foreign country, or domestic or foreign state, country, city or other political subdivision, which includes binding judicial precedent and principles of common law.

"**Lender**" shall mean each lender identified on <u>Schedule C</u>.

"**Majority in Interest**" means Members that at the time in question together hold a Percentage Interest greater than 50% in the aggregate.

"**Manager**" means one or more persons designated as such pursuant to this Agreement.

"**Members**" means, collectively, the members signatory to this Agreement, and any other Persons admitted to the Company as members after the date hereof in accordance with the terms of this Agreement.

"**Net Income**" and "**Net Losses**" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss and each item of income, gain, expense, deduction and loss shall be allocable to the Members in accordance herewith).

"**Non-Payment Policy**" shall have the meaning as specified in <u>Section 8.2</u>.

"**Non-Payment Policy Member**" shall have the meaning as specified in <u>Section 8.2</u>.

22

"**Notice of Intention**" shall have the meaning as specified in <u>Section 10.4(a)</u>.

"**Offer Price**" shall have the meaning as specified in <u>Section 10.4(a)</u>.

"**Offered Interests**" shall have the meaning specified in <u>Section 10.4(a)</u>.

"**Option Period**" shall have the meaning as specified in <u>Section 10.4(b)</u>

"**Original Owner**" means, with respect to a Policy, the Person to which the Policy was initially issued and who was listed as owner on the initial declarations page of such Policy or the policy application, as applicable.

"**Percentage Interest**" means, with respect to any Member as of any date of determination, a fraction (expressed as a percentage) having as its numerator the aggregate number of Interests held by such Member at such time, and having as its denominator the aggregate number of Interests held by all Members at such time. Each Member's Percentage Interest as of the date hereof, and as adjusted from time to time, is set forth on <u>Schedule A</u>.

"**Permitted Transferee**" means (a) with respect to any Member who is an individual, such member's siblings, parents, spouse (former spouse, if any), and children, and trusts solely for the benefit of any of the foregoing, and (b) with respect to any Member that is an entity, an Affiliate of such Member. [**Anyone else?**]

"**Person**" means any individual or any corporation, partnership, limited liability company, limited liability partnership, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other legal entity.

"**Policy**" means each of the life insurance policies contributed to the capital of the Company by Klein, as specified in <u>Schedule B</u> hereto.

"**Policy File**" means, with respect to a Policy, the file relating to such Policy which file shall include, without limitation, the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

"**Policy Illustration**" means, with respect to a Policy, a policy illustration from the related issuing insurance company.

"**Polter**" shall have the meaning set forth in <u>Section 6.2</u>.

"**Priority Return**" of a Member with respect to any Policy shall mean an annual rate of return of 12% on the total amount of Capital Contributions made by a Member with respect to such Policy from the date such Capital Contribution were made but computed no earlier than from the date of this Agreement. .

"**Rechnitz Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Rechnitz related to such Policy and (y) the Priority Return for Rechnitz on such Policy.

23

"**Remaining Members**" shall have the meaning specified in <u>Section 10.4(a)</u>.

"**Remaining Members Notice**" shall have the meaning specified in <u>Section 10.4(b)</u>.

"**Remaining Members Option**" shall have the meaning specified in <u>Section 10.4(b)</u>.

"**Reserve Account**" means account number [   ] established at Account Bank.

"**Selling Member**" shall have the meaning specified in <u>Section 10.4(a)</u>.

"**Third Party**" shall have the meaning as specified in <u>Section 10.4(a)</u>.

"**Transfer**" means, as a noun, any voluntary or involuntary, and direct or indirect, assignment, transfer, pledge, syndication, sale, hypothecation, contribution, encumbrance or other disposition or purported disposition, and, as a verb, voluntarily or involuntarily, and directly or indirectly, to assign, transfer, pledge, syndicate, sell, hypothecate, contribute, encumber or otherwise dispose of.

"**Tax Matters Member**" shall have the meaning specified in <u>Section 9.4.</u>

"**Treasury Regulations**" means the Income Tax Regulations promulgated under the Code, as the same may be amended hereafter from time to time.

*[Remainder of Page Intentionally Left Blank]*

24

# EXHIBIT "7"

1  Avi Wagner, Esq. (SBN 226688)
   THE WAGNER FIRM
2  1925 Century Park East, Suite 2100
   Los Angeles, California 90067
3  Telephone: (310) 491-7949
   Facsimile:  (310) 694-3967
4  Email: avi@thewagnerfirm.com

5

6  *Attorney for Defendant Shlomo Rechnitz*

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8          **COUNTY OF LOS ANGELES, STANLEY MOSK COURTHOUSE**

9

10 | LESLIE KLEIN, individually and as a Member | CASE NO. 22STCV18787 |
11 of the EKLK FOUNDATION, and derivatively   [Assigned to the Hon. Curtis A. Kin,
   on behalf of LIFE CAPITAL GROUP, LLC, a    Department 72]
12 limited liability company

13              Plaintiffs,                   **DEFENDANT SHLOMO RECHNITZ'S
                                             NOTICE OF MOTION AND MOTION TO
14              vs.                           COMPEL ARBITRATION OF
                                             PLAINTIFF'S CLAIMS AND TO STAY
15 JONATHON POLTER, an individual;           PROCEEDINGS; MEMORANDUM OF
   SHLOMO RECHNITZ, individually and as a    POINTS AND AUTHORITIES**
16 Member of the TRSR FOUNDATION, LIFE
   CAPITAL GROUP, LLC, a limited liability
17 company, VOYA FINANCIAL, INC., a
   corporation and DOES 1 through 30, inclusive,
18                                            Reservation No.: 957829874870
                                             Date:   October 25, 2022
19              Defendants.                   Time:   8:30 a.m.
                                             Dept.:   72
20

21

22

23

24

25

26

27

28

1  TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD

2          PLEASE TAKE NOTICE THAT on October 25, 2022 in Department 72 of the Stanley

3  Mosk Courthouse at 111 N. Hill Street, Los Angeles, California, Defendant Shlomo Rechnitz

4  ("Rechnitz"), before the Hon. Curtis A. Kin, will and hereby does move the Court under the Federal

5  Arbitration Act (9 U.S.C. § 2) and Code of Civil Procedure Section 1281.2 for an order compelling

6  Plaintiff Leslie Klein ("Plaintiff") to submit his claims against Rechnitz in this action to binding

7  arbitration under Life Capital Group, LLC ("Life Capital")'s Operating Agreement (the

8  "Agreement").

9          This motion is filed on the ground that Plaintiff has entered into the Agreement, which is a

10  binding contract that includes a bilateral requirement to arbitrate all claims arising out of Life

11  Capital's operations, including claims between members of Life Capital regarding Life Capital, the

12  Agreement, or any provision thereof.

13          Additionally, under Code of Civil Procedure section 1281.4, Rechnitz will and hereby does

14  move for an order staying all proceedings in the action, other than proceedings related to the Motion,

15  pending the conclusion of the arbitration.

16          The motion is based upon this notice, and, the memorandum of points and authorities and

17  declaration of Avi Wagner, each filed concurrently herewith, the pleadings on file, and such

18  evidence and argument as may be presented in reply or at the hearing on the motion.

19

20  Dated: July 14, 2022                          THE WAGNER FIRM

21                                                By: */s/ Avi Wagner*

22                                                Avi Wagner
                                                  1925 Century Park East, Suite 2100
23                                                Los Angeles, California 90067
                                                  Telephone: (310) 491-7949
24                                                Facsimile: (310) 694-3967
                                                  Email: avi@thewagnerfirm.com
25

26                                                *Attorney for Defendant Shlomo Rechnitz*

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

In June 2022, Leslie Klein ("Plaintiff") filed a complaint (the "Complaint") in this Court alleging seven causes of action against defendant Shlomo Rechnitz ("Rechnitz") related to defendant Life Capital Group ("Life Capital")'s Operating Agreement ("Agreement"), which Plaintiff and Rechnitz entered into in 2011.[1] (*See* Exhibit A to Complaint (excerpt of Agreement); Declaration of Avi Wagner ("Wagner Dec."), Exhibit ("Ex.") 1 (a true and correct copy of the Agreement).)   The Agreement, however, explicitly requires that all disputes arising between members regarding the Agreement or any provision thereof *shall* be resolved via binding arbitration pursuant to the commercial rules of the Rabbinical Council of California ("RCC").  (Agreement, Section 12.1.)[2]

As set forth below, Rechnitz has carried his burden of establishing the existence of an agreement to arbitrate by setting out the arbitration provision verbatim and attaching the entire Agreement.  Moreover, the Agreement's arbitration provision is valid, and all of Plaintiff's claims fall within its scope.  Specifically, the Complaint's first, second, fourth, sixth, and seventh causes of action recite the Agreement as the basis of the relief sought.  The third cause of action seeks an accounting of Life Capital's books and records, a right that is governed by the Agreement's express terms.  Finally, the fifth cause of action seeks to enjoin a purportedly "wrongful" distribution of funds.  Since the Agreement governs Life Capital's distribution of funds, this claim is also subsumed by the Agreement.

---

[1] The Complaint also alleges claims against other defendants, who on information and belief will either join this motion or file similar motions of their own.

[2] The RCC is a non-profit organization that, among other things, provides arbitration and mediation services in accordance with Jewish law.  (*See* Wagner Dec., Ex. 2, 1-2.)  The RCC has thus, "adjudicate[d] a wide range of commercial disputes such as employer-employee, landlord-tenant, real property, business interference, breach of contract, breach of fiduciary duty, and unfair competition disputes." (*Id*. at 3-5 (describing RCC arbitration).)

In sum, because all of Plaintiff's causes of action against Rechnitz fall within the scope of the parties' written agreement to arbitrate claims, the Court should order these claims to arbitration, and stay this action until resolution of that arbitration.

## II.    STATEMENT OF FACTS

### A.    The Parties

In 2011, Plaintiff and Rechnitz formed defendant Life Capital, a limited liability company of which they were, and are, the sole members.  (Wagner Decl., Ex. 1, p. 22, Schedule A.) Life Capital is a limited liability company which owns and manages certain insurance assets.  Defendant Jonathon Polter has, at all relevant times, been Life Capital's manager.  (*Id*., p. 5 (Section 6.2).)

Defendant Voya Financial, Inc. ("Voya") is an insurance company or affiliate of an insurance company that issued an insurance policy which Life Capital owns and is named pursuant to such ownership.  Put another way, in naming Voya, Plaintiff seeks to adjudicate entitlements of Life Capital assets under the Agreement.

### B.    Plaintiff and Rechnitz Enter into the Agreement, Which Includes an Agreement to Resolve Disputes by Binding Arbitration

On June 1, 2011 Plaintiff and Rechnitz entered into the Agreement, which concerns their rights and responsibilities in relation to Life Capital.  According to Plaintiff:

Under the terms of the Agreement, Plaintiff was and is entitled to receive interest on the premiums he paid on the aforesaid life insurance policies from 2007 through 2011…. Under the terms of the Agreement, funding for LCG to enable it to pay the premiums on the aforesaid life insurance policies was to be contributed to LCG solely by Rechnitz. Under the terms of the Agreement, Rechnitz was and is entitled to receive interest at the rate of thirteen percent (13%) per annum on all of the money he contributed to LCG for payment of life insurance policy premiums. In forming LCG, it was contemplated by its members that the company would hold the life insurance policies, manage and maintain them, and pay the premiums on the life insurance policies until such time as the insureds of such life insurance policies died. Upon the death of the insureds under the aforesaid life insurance policies, LCG

1    would profit from receipt of the life insurance proceeds from each policy,

2    theoretically in an amount greater than the amount paid for the policies and for the

3    premium payments.

4    (Complaint ("Compl."), ¶ 14.)

5    While Plaintiff's description of the Agreement is materially inaccurate, it nonetheless

6    establishes that Plaintiff's claims arise under the Agreement.

7    The Agreement includes an arbitration provision, which provides in full:

8    Section 12.1 Rabbinical Counsel. If any dispute arises between the Members

9    regarding this Agreement or any provision hereof, that dispute shall be resolved

10    through a binding arbitration proceeding to be conducted in the State of California

11    in accordance with the commercial arbitration rules of the Rabbinical Council of

12    California.

13    (Agreement, Article XII, p. 17.)

14    The RCC conducts a wide variety of commercial arbitrations in accordance with Jewish law

15    using a panel of three arbitration judges for each dispute. (Wagner Decl., Ex. 2, pp. 1-2.) The RCC

16    has procedures governing the process for choosing arbitrators, conducting discovery and hearings,

17    and allocating costs. (*Id*. at 5 (Application for Din Torah).) It is a logical choice for the parties since

18    both Plaintiff and Rechnitz self-identify as members of the Jewish faith. (*See, also* note 4, *infra*.)

19    ## C.    Plaintiff's Claims Are Covered by the Agreement's Arbitration Provision

20    On June 7, 2022 Plaintiff filed a Complaint in this action, alleging seven causes of action

21    against Rechnitz. Four of these causes of action expressly invoke the Agreement as a basis of the

22    rights Plaintiff seeks to vindicate. (Compl., ¶¶ 19, 21 (first cause of action seeking to inspect

23    company records as a Life Capital Member pursuant to the Agreement); 23-26 (second cause of

24    action alleging a breach of fiduciary duties under the Agreement); 32-33 (fourth cause of action

25    alleging a breach of Agreement); 40-41 (sixth cause of action alleging breach of a covenant implied

26    in Agreement); 46 (seventh cause of action seeking declaration of rights and duties under

27    Agreement).)

28

1    The remaining claims also regard the Agreement, even though Plaintiff does not expressly

2    reference the Agreement in those specific claims.

3    The third cause of action seeks an accounting of Life Capital's business and financial affairs,

4    alleging that Rechnitz has, *inter alia*, failed to maintain proper books and records of business

5    conducted by Life Capital and concealed the assets and the nature and extent of Life Capital's

6    business operations from Plaintiff.  (*Id.* at ¶ 28.)  The Agreement expressly governs the maintenance

7    of Life Capital books and records. (Agreement, Sections 9.1-9.5.)

8    The fifth cause of action seeks to enjoin the "wrongful" distribution of life policy proceeds.

9    (Compl., ¶¶ 35-38.)  Though Plaintiff does not make this distinction, he is seeking to enjoin a

10    distribution that would allegedly violate the Agreement, which governs the distribution of policy

11    proceeds.   (Agreement, Section 4.1.)  Like every other cause of action alleged, this dispute also

12    regards the Agreement, and thus subject to its arbitration clause.

### III.    APPLICABLE LEGAL STANDARDS

13

14    Code of Civil Procedure section 1281.2 requires a party seeking to compel arbitration "to

15    plead and prove a prior demand for arbitration under the parties' arbitration agreement and a refusal

16    to arbitrate under the agreement." (*Mansouri v. Superior Court* (2010) 181 Cal.App.4th 633, 640-

17    41.)   Where a party to the agreement files a lawsuit rather than an arbitration demand, this

18    affirmatively establishes a refusal to arbitrate.[3] (*Hyundai Amco America, Inc. v. S3H, Inc.* (2014)

19    232 Cal.App.4th 572, 577.)

20    In deciding a motion to compel arbitration, the Court first decides whether an enforceable

21    arbitration agreement exists between the parties, and then determines whether the claims alleged fall

22    within the scope of the agreement. (*Omar v. Ralphs Grocery Co.* (2004) 118 Cal.App.4th 955, 961.

23    Since California has a strong public policy in favor of arbitration, arbitration agreements should be

24    liberally interpreted and arbitration ordered unless the agreement clearly does not apply to the

25    dispute in question. (*Gravillis v. Coldwell Banker Residential Brokerage Company* (2006) 143 Cal.

26

27

28    [3] Although Plaintiff's filing of this action extinguished Rechnitz's duty to allege a refusal to
arbitrate, Plaintiff did in fact make such a refusal prior to filing this action.  (Wagner Decl. ¶ 3.)

App. 4th 761, 771.)  Accordingly, the burden falls on the party opposing arbitration to show that an agreement cannot be interpreted to apply to the dispute.  (*Id.* at 772.)

Similarly, the Federal Arbitration Act ("FAA") provides that arbitration agreements are valid, irrevocable, and enforceable, except upon such grounds as exist at law or in equity for the revocation of any contract, (9 U.S.C. § 2), and preempt any state-law rule that stands as an obstacle to the FAA's strong public policy in favor of enforcement of arbitration agreements. (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 173 *reversed in part on other grounds in Viking River Cruises, Inc. v. Moriana* (2022) -- U.S. --, 142 S. Ct. 734.)  The FAA applies if the arbitration agreement is included in "a contract evidencing a transaction involving commerce . . . ."(9 U.S.C. § 2; *see Nixon v. AmeriHome Mortgage Co., LLC* (2021) 67 Cal. App. 5th 934, 945 *citing Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University* (1989) 489 U.S. 468, 476 (["It is undisputed that this contract falls within the coverage of the FAA, since it involves interstate commerce."]).  Here, the matters in question relate to interstate commerce in the insurance business, as evidenced by the inclusion of defendants Voya and Polter, each out of state defendants.  (*See, also* note 5, *infra.*)

Finally, a motion to compel arbitration must include the provisions of the written agreement and the paragraph that provides for arbitration. (Cal. Rules of Court, Rule 3.1330.)  "The provisions must be stated verbatim or a copy must be physically or electronically attached to the petition and incorporated by reference."  (*Id.*)

## IV.    ARGUMENT

### A.    Rechnitz Has Proven the Existence of An Agreement to Arbitrate

A party moving to compel arbitration must provide prima facie evidence of a written agreement to arbitrate the controversy.   (*Rosenthal v. Great W. Fin. Secs. Corp.* (1996) 14 Cal.4th 394, 413.)  A party may satisfy this burden by setting forth the arbitration agreement verbatim, or attaching a copy of the agreement and incorporating it by reference.  (Cal. Rules of Court, Rule 3.1330.)  The Agreement's arbitration provision is both included in the Agreement, (Ex. 1 to the Wagner Dec.) and quoted verbatim in Section II, above.  Though Plaintiff has already submitted the agreement to arbitrate to this Court, as Exhibit A to its Complaint, it did not provide the Agreement's

1   signature page.  Thus, for the avoidance of doubt Rechnitz re-submits the entire document.  (Wagner

2   Decl., Ex. 1, un-numbered page following p. 24.)   Either way, an agreement to arbitrate is

3   established by a preponderance of the evidence.[4]

4         **B.**    **The Agreement Encompasses All of Plaintiff's Claims**

5        The Complaint includes seven causes of action, all of which are based either on explicit

6   allegations that Rechnitz violated the Agreement, or which seek relief based on rights established in

7   the Agreement.  All of these claims fall within the scope of the arbitration clause, and thus must be

8   arbitrated.

9        The arbitration clause requires arbitration of "any dispute [that] arises between the Members

10  regarding this Agreement or any provision hereof."  (Agreement, Section 12.1.)

11       The first, second, fourth, sixth, and seventh causes of action explicitly seek relief pursuant to

12  the Agreement.  (Compl., ¶¶ 19 ("Under the terms of the Agreement, Plaintiff is entitled to a full

13  accounting of all business conducted by LCG"); 24 ("at all times herein mentioned, said

14  Defendants have owed and continue to owe Plaintiff fiduciary duties under the Agreement"); 32

15  ("Defendants RECHNITZ and LCG have breached the Agreement by virtue of all of their aforesaid

16  wrongful conduct"); 41 ("Implied in the Agreement is a covenant of good faith and fair dealing

17  among Plaintiff and Defendants."); 46 ("Plaintiff accordingly seeks a declaration of the rights and

18  duties of the parties with respect to the Agreement").)  These causes of action are plainly disputes

19  between Life Capital members regarding the Agreement.

20       The same is true of the third and fifth causes of action.  The third cause of action seeks an

21  accounting of Life Capital's business and financial affairs, alleging that Rechnitz has, *inter alia*,

22  failed to maintain proper books and records of business conducted by Life Capital and concealed the

23  assets and the nature and extent of Life Capital's business operations from Plaintiff.  (Compl. at ¶

24  28.)   The Agreement governs the maintenance of Life Capital books and records (Agreement,

25

26  _____

[4] Though it is not Rechnitz's burden to establish enforceability (*Rosenthal, supra* 14 Cal. 4th at 413),

27  Rechnitz notes that the fact that the clause requires arbitration pursuant to RCC rules is not a defense
to its enforceability. (*Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 46 ("Agreements to resolve

28  disputes before a beth din have been enforced in this country's courts."); *see also Blitz v. Beth Isaac
Adas Israel Congregation* (1998) 720 A.2d 912, 913, fn. 1.)

1    Sections 9.1-9.5); this claim is therefore related to the Agreement.  The fifth cause of action seeks

2    to enjoin the "wrongful" distribution of life policy proceeds.  (Compl., ¶¶ 35-38.)  Plaintiff seeks to

3    enjoin a distribution that would allegedly violate the Agreement's provision governing the

4    distribution of policy proceeds.    (Agreement, Section 4.1.)  Every cause of action constitutes a

5    dispute arising between Members and regarding the Agreement, and thus falls within the scope of

6    the arbitration clause in issue.

7    **C.    The FAA and California Law Each Favor the Enforcement of Arbitration
        Agreements**

8    

9    Enforcing the Agreement's arbitration clause aligns with California and federal law.  The

10   FAA "requires courts 'rigorously' to enforce arbitration agreements according to their terms," and

11   stands for an "emphatic" federal policy in favor of arbitration.[5] (*Epic Sys. Corp. v. Lewis*, 138 S. Ct.

12   1612, 1621 (2018) (internal quotation marks omitted).)  In evaluating a motion to compel, "courts

13   apply state contract law while giving due regard to the federal policy favoring arbitration." (*Pinnacle*

14   *Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, (2012) 55 Cal. 4th 223, 236.)  The Court's

15   role is narrow: It must direct the parties to proceed to arbitration as long as (1) a valid arbitration

16   agreement exists; and (2) the agreement encompasses the dispute at issue. (*See Cox v. Ocean View*

17   *Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008).) "Any doubts concerning the scope of arbitrable

18   issues should be resolved in favor of arbitration." (*Moses H. Cone Mem. Hosp. v. Mercury Constr.*

19   *Corp.* (1983) 460 U.S. 1, 24-25.)

20   California law similarly "favors enforcement of valid arbitration agreements." (*Armendariz*

21   *v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 87.) Under California law,

22   "arbitration agreements are valid, irrevocable, and enforceable, save upon such grounds as exist at

23   _____

24   [5] There can be no dispute that the FAA governs the Agreement. The concept of interstate commerce
     "for purposes of FAA coverage 'is to be broadly construed so as to be coextensive with

25   congressional power to regulate under the Commerce Clause.'" (*Erickson v. Aetna Health Plans of
     Cal., Inc.* (1999) 71 Cal. App. 4th 646, 651 (holding that actions such as "a health care provider's

26   treatment of Medicare patients" and "receipt of reimbursement from Medicare" establish interstate
     commerce, thereby supporting application of FAA) (citing *Summit Health, Ltd. v. Pinhas* (1991)

27   500 U.S. 322, 329). "Section 2 of the FAA mandates enforcement of arbitration provisions in any
     contract evidencing a transaction involving commerce." (*Toledo v. Kaiser Permanente Med. Grp.*,

28   987 F. Supp. 1174, 1180 (N.D. Cal. 1997) (citation and internal quotation omitted).)

law or in equity for the revocation of any contract." (*Id.* at 98.) Courts "will indulge every reasonable intendment to give effect to arbitration proceedings." (*Toal v. Tardif*, (2009) 178 Cal. App. 4th 1208, 1218; *see, also Ramos v. Superior Court* (2018) 28 Cal. App. 5th 1042, 1051 ("A heavy presumption weighs the scales in favor of arbitrability; an order directing arbitration should be granted 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'").  The Court should compel arbitration of these claims pursuant to the valid and enforceable arbitration clause.

### D.    The Proceedings Should be Stayed

Under the FAA, where, as here a dispute is subject to arbitration under the terms of a written agreement, the trial court should "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. (9 U.S.C. § 3.  *Accord* Code Civ. Proc. § 1281.4 ("the court in which such action or proceeding is pending shall, upon motion of a party to such action or proceeding, stay the action until an arbitration is had in accordance with the order to arbitrate." *See, also Franco v. Arakelian Enters., Inc.* (2015) 234 Cal. App. 4th 947, 965–66.)[6]  Accordingly, upon granting the present motion, the remaining claims against other defendants should be stayed pending the completion of arbitration.

Allowing this case to proceed would conflict with the FAA, as well as principles of orderly resolution.  As courts have observed in respect to the California Arbitration Act, where arbitration has been ordered, "the continuation of the proceedings in the trial court disrupts the arbitration proceedings and can render them ineffective." (*Heritage Provider Network, Inc. v. Superior Court* (2008) 158 Cal. App. 4th 1146, 1152 (citation omitted).)  Thus, a stay of further proceedings should be ordered.

---

[6] The Ninth Circuit has held that under the FAA courts also have the discretion to dismiss claims that are subject to an arbitration agreement. (*See Sparling v. Hoffman Const. Co., Inc.* (9th Cir. 1988) 864 F.2d 635, 638; *Loewen v. Lyft, Inc.* (N.D. Cal. 2015 129 F. Supp. 3d 945, 966 (after granting a motion to compel arbitration, the court dismissed the action).)

## V.    CONCLUSION

When they founded Life Capital Plaintiff and Rechnitz agreed to arbitrate any dispute that arises regarding the Agreement. Yet, Plaintiff inexplicably commenced litigation, not arbitration, even while including the Agreement – with its arbitration provision as Exhibit A to his Complaint. The Agreement's arbitration provision is valid, and all of the claims pleaded by Plaintiff fall squarely within it.  Therefore, Rechnitz respectfully requests that the motion to compel arbitration be granted, and that this case be stayed pending completion of arbitration proceedings.


Date:   July 14, 2022                              THE WAGNER FIRM

                                                  By: */s/ Avi Wagner*
                                                  Avi Wagner
                                                  1925 Century Park East, Suite 2100
                                                  Los Angeles, California 90067
                                                  Telephone: (310) 491-7949
                                                  Facsimile: (310) 694-3967
                                                  Email: avi@thewagnerfirm.com

                                                  *Attorney for Defendant Shlomo Rechnitz*

# EXHIBIT "8"

1 | Avi Wagner, Esq. (SBN 226688)
2 | THE WAGNER FIRM
  | 1925 Century Park East, Suite 2100
3 | Los Angeles, California 90067
  | Telephone: (310) 491-7949
4 | Facsimile:  (310) 694-3967
  | Email: avi@thewagnerfirm.com
5 |
6 | *Attorney for Defendant*

7 | ## SUPERIOR COURT OF THE STATE OF CALIFORNIA

8 | ## COUNTY OF LOS ANGELES, STANLEY MOSK COURTHOUSE

9 |

| LESLIE KLEIN, individually and as a Member of the EKLK FOUNDATION, and derivatively on behalf of LIFE CAPITAL GROUP, LLC, a limited liability company | CASE NO. 22STCV18787 [Assigned to the Hon. Curtis A. Kin, Department 72] |
|---|---|
| Plaintiffs, | **DECLARATION OF AVI WAGNER IN SUPPORT OF DEFENDANT SHLOMO RECHNITZ'S MOTION TO COMPEL ARBITRATION OF PLAINTIFF'S CLAIMS AND TO STAY PROCEEDINGS** |
| vs. | |
| JONATHON POLTER, an individual; SHLOMO RECHNITZ, individually and as a Member of the TRSR FOUNDATION, LIFE CAPITAL GROUP, LLC, a limited liability company, VOYA FINANCIAL, INC., a corporation and DOES 1 through 30, inclusive, | Reservation No.: 957829874870 Date:   October 25, 2022 Time:   8:30 a.m. Dept.:   72 |
| Defendants. | |

1   I, Avi Wagner, declare as follows:

2   1.  I am the principal of The Wagner Firm, counsel for Defendant Shlomo Rechnitz

3 ("Rechnitz") in this matter.  I have personal knowledge of the matters set forth herein and if called

4 to testify could and would truthfully testify to the following.

5   2.  I make this Declaration in support of Rechnitz's Motion to Compel Arbitration of

6 Plaintiff's Claims and Stay Proceedings.

7   3.  On June 28, 2022, I conferred with Jeffrey A. Slott, counsel for plaintiff Leslie Klein.

8 Mr. Slott did not agree to unconditionally arbitrate the causes of action alleged in his complaint.

9   4.  Attached hereto as Exhibit 1 is a true and correct copy of the Life Capital Group

10 Operating Agreement.

11   5.  Attached hereto as Exhibit 2 is a true and correct copy of publicly available

12 information provided by the Rabbinical Council of California on its website regarding the

13 organization and procedures of the commercial, or "din torah" arbitrations that it conducts.

14   I declare under penalty of perjury under the laws of California that the foregoing is true and

15 correct.

16

17 Executed on July 14, 2022 in Los Angeles, California.    _/s/ Avi Wagner_  

18                            Avi Wagner

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## LIFE CAPITAL GROUP, LLC

A California Limited Liability Company

Dated as of June 1, 2011

# TABLE OF CONTENTS

## ARTICLE I
## FORMATION AND BUSINESS OF THE COMPANY

Section 1.1    Formation..................................................................................................1
Section 1.2    Name......................................................................................................1
Section 1.3    Purpose ..................................................................................................1
Section 1.4    Term.......................................................................................................1
Section 1.5    Place of Business ....................................................................................1
Section 1.6    Registered Office and Agency..................................................................2
Section 1.7    Fiscal Year ..............................................................................................2

## ARTICLE II
## MEMBERS

Section 2.1    Members .................................................................................................2
Section 2.2    Company Property; Company Interest ......................................................2

## ARTICLE III
## CAPITAL CONTRIBUTIONS

Section 3.1    Initial Capital Contribution of Members, Capital Accounts.......................2
Section 3.2    Additional Capital Contributions..............................................................2
Section 3.3    Withdrawal and Return of Capital Contributions......................................3
Section 3.4    Interest ...................................................................................................3
Section 3.5    Negative Capital Accounts .......................................................................3

## ARTICLE IV
## DISTRIBUTIONS AND ALLOCATIONS

Section 4.1    Allocation of Net Income and Net Losses.................................................3
Section 4.2    Cash Available for Distribution.................................................................4
Section 4.3    Proceeds of Policies.................................................................................4
Section 4.4    Constructive Trust ...................................................................................4
Section 4.5    Sale of Policies .......................................................................................4
Section 4.6    Lenders ...................................................................................................4

## ARTICLE V
## COMPANY ACCOUNT

Section 5.1    Establishing a Reserve Account ...............................................................4
Section 5.2    Distribution of Reserve Account ...............................................................5

## ARTICLE VI
## MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

Section 6.1    Rights and Powers of Manager.................................................................5

Section 6.2    Number, Tenure and Qualifications ...................................................................5
Section 6.3    Officers .............................................................................................................5
Section 6.4    Reliance .............................................................................................................5
Section 6.5    Indemnification of Manager, Members and Officers. ......................................6
Section 6.6    Exculpation........................................................................................................7
Section 6.7    No Duties...........................................................................................................7
Section 6.8    Protection of Insured's Private Information ......................................................7
Section 6.9    Delivery of Policy Files.....................................................................................7
Section 6.10   Change Forms....................................................................................................7
Section 6.11   Further Assurances ............................................................................................7
Section 6.12   Indemnification of Rechnitz ..............................................................................8

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Section 7.1    Representations and Warranties of Klein. ..........................................................8
Section 7.2    Representations and Warranties of Rechnitz.....................................................10

## ARTICLE VIII
## ADMISSION OF MEMBERS

Section 8.1    Admission of Members ....................................................................................11
Section 8.2    Admission of Non-Payment Policy Members ..................................................11

## ARTICLE IX
## MAINTENANCE OF BOOKS AND RECORDS; REPORTS TO MEMBERS; TAX RETURNS

Section 9.1    Accounting Method and Records ......................................................................12
Section 9.2    Company Records.............................................................................................12
Section 9.3    Company Reports .............................................................................................12
Section 9.4    Designation of Tax Matters Member................................................................13
Section 9.5    Tax Treatment and Elections............................................................................13

## ARTICLE X
## TRANSFER OF INTERESTS; SPECIAL PROVISIONS

Section 10.1   Transfers and Assignments...............................................................................13
Section 10.2   Permitted Transfers..........................................................................................13
Section 10.3   Substitute Members .........................................................................................13
Section 10.4   Right of First Refusal. ......................................................................................14
Section 10.5   Tag-Along Rights and Obligations...................................................................15
Section 10.6   Miscellaneous Provisions Affecting Transfer. .................................................16

## ARTICLE XI
## DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

Section 11.1   Dissolution, etc ................................................................................................16
Section 11.2   Winding Up. .....................................................................................................16

ii

Section 11.3    Final Distribution...........................................................................................17
Section 11.4    Time for Liquidation, etc................................................................................17
Section 11.5    Termination .....................................................................................................17
Section 11.6    Return of Contribution Nonrecourse to Other Members.......................17

ARTICLE XII
DISPUTE RESOLUTION

Section 12.1    Rabbinical Counsel.........................................................................................17

ARTICLE XIII
MISCELLANEOUS

Section 13.1    Entire Agreement............................................................................................17
Section 13.2    Other Ventures...............................................................................................18
Section 13.3    Amendments....................................................................................................18
Section 13.4    Choice of Law .................................................................................................18
Section 13.5    Successors and Assigns; Third Party Beneficiaries...............................18
Section 13.6    Interpretation ..................................................................................................18
Section 13.7    Captions ...........................................................................................................18
Section 13.8    Severability......................................................................................................18
Section 13.9    Counterparts....................................................................................................19
Section 13.10  Non-Waiver .....................................................................................................19
Section 13.11  Notices .............................................................................................................19

ARTICLE XIV
DEFINITIONS

Section 14.1    Definitions. ......................................................................................................19

LIMITED LIABILITY COMPANY AGREEMENT of LIFE CAPITAL GROUP, LLC (this "**Agreement**"), a California limited liability company (the "**Company**"), dated as of June 1, 2011, among Shlomo Rechnitz, an individual residing in the State of California ("**Rechnitz**"), Leslie Klein, an individual residing in the State of California ("**Klein**"), and the Persons that become Members from time to time after the date hereof in accordance with the terms hereof.

## WITNESSETH:

WHEREAS, the Members desire to operate the Company as a limited liability company under Title 2.5 of the California Corporations Code, as amended from time to time (the "**Act**"), in order to accomplish certain lawful business objectives;

WHEREAS, the Certificate of Formation of Life Capital Group, LLC was filed with the Secretary of State of the State of California on April 8, 2011, in accordance with the provisions of the Act; and

WHEREAS the Members desire to set forth herein the manner in which the Company shall be governed and operated.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

## ARTICLE I
## FORMATION AND BUSINESS OF THE COMPANY

Section 1.1    Formation.  The Company was formed on April 8, 2011 by the filing of a Certificate of Formation (the "**Certificate**") with the Secretary of State of California.  The Members hereby agree to operate the Company as a limited liability company pursuant to the provisions of the Act and upon and subject to the terms and conditions set forth in this Agreement.  Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

Section 1.2    Name.  The name of the Company shall be Life Capital Group, LLC, under which name all business and affairs of the Company shall be conducted.

Section 1.3    Purpose.  The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act.

Section 1.4    Term.  The term of the Company shall continue until terminated in accordance with the provisions of Article XI of this Agreement or otherwise dissolved and wound up pursuant to the Act.

Section 1.5    Place of Business.  The Company shall have its principal place or places of business at such place or places as the Manager may, from time to time, select.

Section 1.6    Registered Office and Agency.  The address of the registered office of the Company in the State of California is 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.  The name and address of the registered agent for service of process on the Company in the State of California is Shlomo Rechnitz, 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.

Section 1.7    Fiscal Year.  The term **"Fiscal Year"** shall mean, subject to the provisions of Section 706 of the Code, each of (a) the period commencing on the date of formation of the Company and ending on December 31, 2011, (b) any subsequent 12-month period commencing on January 1 and ending on December 31 and (c) the period commencing on January 1 and ending on the Dissolution Date.

ARTICLE II
MEMBERS

Section 2.1    Members.  The Company shall consist of the Members executing this Agreement and any substitute or additional Members admitted to the Company in accordance with the terms hereof.  Each initial Member shall be deemed admitted as a Member of the Company at such time as such Member has made its Initial Capital Contribution to the Company.

Section 2.2    Company Property; Company Interest.  No property of the Company shall be deemed to be owned by any Member individually, but all of such property shall be owned by, and title thereto shall be vested solely in, the Company.

ARTICLE III
CAPITAL CONTRIBUTIONS

Section 3.1    Initial Capital Contribution of Members, Capital Accounts.  Each Member has contributed to the capital of the Company, as such Member's Initial Capital Contribution, the amount of cash, or property with a value, set forth on Schedule A.  The Company shall maintain a record of:  (a) the number of Interests held by each Member and (b) the respective Percentage Interest of each Member.  The Manager shall update such Schedule A from time to time to reflect changes in such information.  The Members agree that Klein's Initial Capital Contribution associated with each Policy shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement.  The Members agree that Rechnitz's Initial Capital Contribution associated with the Policies (in the order of each Policy that first generates proceeds) shall be deemed to be $3,800,000. The Company will establish and maintain a Capital Account for each Member throughout the full term of the Company.

Section 3.2    Additional Capital Contributions.    Other than the Initial Capital Contributions made by the Members upon admission to the Company in accordance with Section 3.1 and Article VIII, the Members shall not be required to make any additional contributions to the Company; except that Rechnitz shall be obligated to contribute to the Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the Policies which are not Non-Payment Policies after the date of this Agreement and each Non-Payment Policy Member shall be obligated to contribute to the

2

Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the applicable Non-Payment Policy after the date such Non-Payment Policy Member was admitted to the Company as a Member.

Section 3.3    <u>Withdrawal and Return of Capital Contributions</u>.

(a)    No Member shall be entitled to demand a return of such Member's Capital Contribution (including any earnings thereon) or to withdraw any portion of such Member's Capital Account except as expressly provided in this Agreement. Except as expressly provided herein, no Member shall have the right to demand a distribution of property other than cash for its Interest. Each Member hereby waives any right such Member may otherwise have to cause any asset of the Company to be partitioned or to file a complaint or institute any proceeding at law or in equity seeking the partition of any such asset. Except as otherwise provided herein, no Member shall have priority over any other Member, either as to a return of such Member's Capital Contribution or as to Net Income, Net Losses, any other item of Company income, gain, loss or deduction, or Company distributions.

(b)    No Member shall be personally liable for the return of the Capital Contributions of any other Member or any portion thereof, it being expressly understood that any such return shall be made solely from available Company assets, if any.

Section 3.4    <u>Interest</u>.    Interest, if any, earned on funds contributed or held by the Company shall inure to the benefit of the Company. The Members shall not be entitled to receive interest or any other payments from the Company with respect to their Capital Contributions or Capital Accounts, except as otherwise provided for herein.

Section 3.5    <u>Negative Capital Accounts</u>.    Except as may be required by the provisions of the Act or in respect of any negative balance resulting from a withdrawal of capital or distribution in contravention of this Agreement, at no time shall any Member with a negative Capital Account balance have any obligation to the Company or the other Members to restore such negative balance, and such negative balance shall not be treated as an asset of the Company.

ARTICLE IV
DISTRIBUTIONS AND ALLOCATIONS

Section 4.1    <u>Allocation of Net Income and Net Losses</u>.

(a)    Net Income with respect to a Policy for any Fiscal Year shall be allocated (i) first, to Rechnitz to the extent of Rechnitz's Priority Return with respect to such Policy; (ii) second, to Rechnitz until $3,800,000 of Net Income has been allocated to Rechnitz in the aggregate (without regard to allocations of Net Income under subclause (i)); (iii) third, to Klein, to the extent of Klein's Priority Return with respect to such Policy; and (iv) thereafter, to Klein and Rechnitz in proportion to their Percentage Interests.

(b)    Net Losses with respect to a Policy for any Fiscal Year shall be allocated to Klein and Rechnitz in proportion to their Capital Contributions associated with such Policy.

3

S0028620.3

Section 4.2    Cash Available for Distribution.  Subject to Article XI, the Company shall distribute Available Cash to the Members at such times and in such amounts as determined by Rechnitz in accordance with this Agreement.

Section 4.3    Proceeds of Policies.  If at any time the Company receives any proceeds from any Policy that is not a Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a)    first, to Rechnitz by wire transfer into an account designated by Rechnitz, in an amount up to the Rechnitz Amount for such Policy;

(b)    second, (A) first, to each of the Lenders, pro-rata, based on the outstanding principal balance owed to such Lender as set forth on Schedule C, until such outstanding principal balance is equal to zero, in an aggregate amount up to the Klein Amount for such Policy and (B) second, any remaining Klein Amount with respect to such Policy to Klein by wire transfer into an account designated by Klein;

(c)    third, (i) 50% to Rechnitz by wire transfer into an account designated by Rechnitz and (ii) 50% to Klein by wire transfer into an account designated by Klein, provided, however, that if the balance of the Reserve Account is less than $2,500,000, then proceeds distributable to Klein under clause (ii) above shall be deposited in the Reserve Account until such balance is equal to $2,500,000.

Section 4.4    Constructive Trust.  If any Member receives any proceeds in respect of any Policy (following the death of an Insured or otherwise), such Member shall hold such proceeds in a constructive trust for the Company and shall within one (1) Business Day inform the other Members and the Manager and deposit such proceeds in the Reserve Account.

Section 4.5    Sale of Policies.  The Company shall be entitled to sell any Policy to any Person with the prior written consent of each of the Members.  Notwithstanding the immediately preceding sentence, upon Klein's written consent, Rechnitz or his designee shall be entitled to purchase any Policy that is not a Non-Payment Policy from the Company by transferring an amount equal to the Klein Amount for such Policy to the Company, which for administrative convenience shall be subsequently distributed to an account designated by Klein.

Section 4.6    Lenders.  The Members agree that (i) the Company may pay amounts pursuant to Section 4.3(b) directly to the Lenders, and in such event, the payments will be treated as distributions by the Company to Klein and subsequently transferred by Klein to the Lenders, (ii) nothing herein is intended to grant to the Lenders an equity interest in the Company, and (iii) nothing herein is intended to imply that the Company is assuming the obligations owed to the Lenders.

<div align="center">

ARTICLE V
RESERVE ACCOUNT

</div>

Section 5.1    Establishing a Reserve Account.  As soon as practicable the Company shall establish the Reserve Account with the Account Bank in the name of Company.

<div align="center">

4

</div>

Section 5.2    Distribution of Reserve Account.  Amounts in the Reserve Account shall be distributed to certain Members in certain specified amounts under the following circumstances: (a) if the amount of Net Income allocated to Klein with respect to a Policy under Section 4.1 for a Fiscal Year exceeds the amount of proceeds distributed to Klein with respect to such Policy pursuant to Section 4.3; then 40% of such excess shall be distributed to Klein from the Reserve Account; (b) if upon a disposition of a Policy or the receipt of proceeds from such policy, the Rechnitz Amount with respect to the Policy exceeds the amount of proceeds distributed to Rechnitz with respect to such Policy pursuant to Section 4.3, then the amount of such excess shall be distributed to Rechnitz from the Reserve Account; and (c) if agreed upon by the Members, then the amount agreed upon by the Members shall be distributed to Klein from the Reserve Account.

ARTICLE VI
MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

Section 6.1    Rights and Powers of Manager.  The business and affairs of the Company shall be managed by the Manager.  The Manager shall direct, manage, and control the business of the Company to the best of the Manager's ability.  Except for situations in which the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all acts or activities customary or incident to the management of the Company's business.  Nothing contained in this Agreement shall require any person to inquire into the authority of the Manager to execute and deliver any document on behalf of the Company or to bind the Company pursuant to such document.

Section 6.2    Number, Tenure and Qualifications.   The Company shall have one Manager, which initially shall be Jonathon Polter ("**Polter**"), an individual residing at 2000 Town Center, Suite 1490, Southfield, Michigan 48075.  Polter shall remain as the Manager unless he resigns from such position, is relieved of his duties by (i) if there are two Members or less, a unanimous vote of the Members and (ii) otherwise, an affirmative vote of Members holding a majority of the Interests.  Subsequent Managers shall be elected by the affirmative vote of Members holding a majority of the Interests.  Managers need not be residents of the State of California.

Section 6.3    Officers.  The Manager may delegate the management of the Company's day-to-day business affairs to a Chief Executive Officer and other officers of the Company designated by the Manager and approved by an affirmative vote of Members holding a majority of the Interests and, unless otherwise decided by the Manager, all actions of the Company may be taken by the appropriate duly authorized officers.

Section 6.4    Reliance.  The Manager shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any officers, employees, or committees of the Company, or by any other Person as to matters such Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including, without limitation, information, opinions, reports or

5

statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

Section 6.5    Indemnification of Manager, Members and Officers.

(a)    General.    The Company shall indemnify any Person (a "**Covered Person**") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including an action by or in the right of the Company) by reason of the fact that he is or was a Manager, Member or officer of the Company, or is or was serving at the request of the Company as a director, manager or officer of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith with no willful misconduct or gross negligence and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.    The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b)    Indemnification in Certain Cases.    To the extent that a Covered Person has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in clause (a) of this Section 6.5, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

(c)    Advances for Expenses.    Expenses (including attorneys' fees) incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be ultimately determined that he is not entitled to be indemnified by the Company as authorized in this Section 6.5.

(d)    Rights Non-Exclusive.    The indemnification and advancement of expenses provided by, or granted pursuant to, the other subparagraphs of this Section 6.5 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, agreement or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

(e)    Insurance.    The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was a Covered Person against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such,

6

whether or not the Company would have the power to indemnify him against such liability under the provisions of this Section 6.5.

(f)      Survival of Rights.   The indemnification and advancement of expenses provided by, or granted pursuant to this Section 6.5 shall continue as to a Person who has ceased to be an officer, Manager or Member and shall inure to the benefit of the heirs, executors and administrators of such Person.

Section 6.6      Exculpation.   No Member, Manager or officer of the Company shall be liable, in damages or otherwise, to the Company or its Members for any act or omission performed or omitted by such Member, Manager or officer pursuant to authority granted by this Agreement except to the extent such Person fails to meet the standard for indemnification set forth in Section 6.5(a).

Section 6.7      No Duties.   Any duties (including fiduciary duties) of a Covered Person to the Company or to any other Covered Person that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, provided, that (i) the foregoing shall not eliminate the obligation of each Member and the Manager to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied covenant of good faith and fair dealing.

Section 6.8      Protection of Insured's Private Information.   Manager and each Member acknowledge that insurance regulations and other applicable Laws are structured to provide confidentiality to policy owners and insureds with respect to Consumer Information in connection with ownership or sale of their policies, and that the Manager and each Member and all of their respective agents and representatives, are obligated to keep Consumer Information confidential in accordance with applicable Laws.   The Manager and each Member agree to comply with all applicable Laws with respect to the confidentiality of Consumer Information; provided, that (i) the Manager and each Member may disclose such information to their internal or external auditors and attorneys and as required or permitted by Law, and (ii) Klein may take all necessary and appropriate actions to transfer ownership of the Policies to the Company.

Section 6.9      Delivery of Policy Files.   Klein shall deliver each Policy File as directed by the Manager within thirty (30) Business Days of the date of this Agreement.

Section 6.10    Change Forms.   On the date of this Agreement, Klein shall execute and deliver Change Forms to the Company or at the Company's direction, changing the owner and Beneficiary of the Policy to the Company or the Company's designee.   In addition, Klein shall execute and deliver any additional instruments of transfer that the Company may reasonably request necessary to evidence the assignment of the Policy and any rights therein to the Company or its designee.

Section 6.11    Further Assurances.   From and after the date hereof, each Member shall execute and deliver such other documents and instruments, and take such further actions, as may be reasonably requested from time to time by another Member to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby.   Without limiting the foregoing, Klein shall cooperate with Rechnitz in causing the Company or its designee to be

7

recorded as the owner and beneficiary of each Policy on the books and records of the relevant issuing insurance companies.

Section 6.12   Indemnification of Rechnitz.   Klein shall indemnify and hold harmless (which indemnification shall survive any termination of this Agreement and the dissolution of the Company) Rechnitz and his Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an **"Indemnified Person"**), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and actual expenses incurred (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person, and in connection with or arising out of (i) any breach of any representation, covenant or other obligation of Klein hereunder, (ii) the transactions contemplated hereunder, (iii) any actions or failures to act in connection therewith or (iv) any and all reasonable legal costs and actual expenses arising out of or incurred in connection with disputes between or among Klein and Rechnitz (collectively, **"Indemnified Liabilities"**); provided, that Klein shall not be liable for any indemnification to an Indemnified Person to the extent that any such Indemnified Liability results from that Indemnified Person's gross negligence or willful misconduct; provided, further, that the aggregate amount of Klein's liability under this Section 6.12 shall be limited to the aggregate of the Rechnitz Amounts for all of the Policies.

<div align="center">

ARTICLE VII
REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

</div>

Section 7.1   Representations and Warranties of Klein.

(a)   Power and Authority.   Klein has full power, authority and right to execute and deliver this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of its obligations hereunder.

(b)   Binding Obligation.   This Agreement constitutes the legal, valid and binding obligations of Klein enforceable against Klein in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(c)   Consent of Third Parties.   No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by Klein in connection with the execution of this Agreement and the compliance by Klein with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Klein of any other action contemplated hereby.

(d)   Policies.   With respect to each Policy, to the best of Klein's knowledge:

<div align="center">

8

</div>

(i)     at the issuance of such Policy, the related Insured or Original Owner thereof was not a party to any written or oral agreement or arrangement to cause the same or interests therein to be issued, assigned, sold, transferred, or otherwise disposed of in violation of applicable law or public policy;

(ii)     at the issuance of such Policy, the related Insured or Original Owner thereof had the financial capacity to pay the premiums necessary to maintain such Policy in force;

(iii)     at the issuance of such Policy the related Original Owner had an insurable interest in the life of the Insured;

(iv)     the material medical or financial information supplied by or on behalf of the Insured or Original Owner of such Policy in the application and related materials delivered to the applicable issuing insurance company in connection with the issuance of such Policy was not false, incomplete or misleading in any material respect;

(v)     Klein does not possess or control any material documentation or information related to such Policy, or the acquisition or maintenance thereof by Klein, that has not been delivered or disclosed in writing to Rechnitz or his agents;

(vi)     prior to the date of this Agreement and the consummation of the transactions contemplated by [insert transfer agreement title], Klein was trustee of the applicable Original Owner which held sole legal and beneficial title thereto;

(vii)     Klein, in his capacity as trustee of the applicable Original Owner, acquired sole legal and beneficial title thereto and had the power and authority to enter into this Agreement;

(viii)     Immediately prior to its transfer to the Company hereunder, Klein held sole legal and beneficial title thereto;

(ix)     upon the transfer of such Policy, Company or its designee, will hold good and marketable title to and ownership of such Policy free and clear of any liens, charges, rights, encumbrances or other interests;

(x)     such Policy was acquired in a manner in compliance, in all material respects, with the Laws applicable to the purchase of life insurance policies, as then in effect and as then interpreted by the relevant regulators or in case law;

(xi)     except as disclosed to Rechnitz in writing, no previous owner of such Policy has waived, amended or terminated any material provision of, or any material rights in relation to, such Policy;

(xii)     except as disclosed on Schedule 7.1(d)(xii), the premiums for such Policy have been paid such that such Policy will not be in a grace period as of the date of this Agreement and such Policy has not been cancelled as of the date of this Agreement;

9

(xiii)   Klein has disclosed or delivered to Rechnitz and the Company in writing all information received by Klein or any of his agents from the related issuing insurance company related to any change in the terms of such Policy, including with respect to an intent to increase the cost of insurance for such Policy;

(xiv)   there is no current or pending written notice that has been issued to Klein by the related issuing insurance company of such issuing insurance company's intention to cancel, contest, rescind or refuse payment under such Policy;

(xv)   all the information contained in each of the documents in the related Policy File or otherwise delivered by or on behalf of Klein to the Company and Rechnitz in connection with such Policy is true, complete and correct in all material respects;

(xvi)   the related Policy File contains the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

(xvii)   there is not any pending or threatened Proceeding challenging the validity, ownership or enforceability of such Policy or Klein's ownership rights in such Policy;

(xviii)   such Policy was not issued pursuant to or in connection with an agreement whereby the premiums required to be paid on such Policy were paid by any Person pursuant to a recourse or non-recourse premium financing program;

(xix)   Klein has not required any broker to sign an agreement offering Klein or any other Person the "right of last offer" in connection with the purchase of such Policy; and

(xx)   such Policy has been issued by the related issuing insurance company and is in force and any related contestability period and any suicide exclusion period has expired.

Section 7.2    Representations and Warranties of Rechnitz.  Rechnitz hereby represents and warrants that:

(i)   Authority.  Rechnitz has full power, authority and right to execute this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of his obligations hereunder.

(ii)   Binding Obligation.  This Agreement constitutes Rechnitz's legal, valid and binding obligation, enforceable against Rechnitz in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(iii)   Consent of Third Parties.  No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or

10

Governmental Authority is required by Rechnitz in connection with the execution of this Agreement and the compliance by Rechnitz with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Rechnitz of any other action contemplated hereby.

<div align="center">

ARTICLE VIII
ADMISSION OF MEMBERS

</div>

Section 8.1    Admission of Members.    Subject to Section 8.2, upon the approval of the Members by majority vote, one or more Persons may be admitted to the Company as Members. The Members by majority vote shall determine the number of Interests and the Percentage Interest to be offered to any such Member and the Initial Capital Contribution to be made by any such Member.  Each such Person shall be admitted as a Member at the time such Person (a) executes and delivers a copy of this Agreement to the Manager and (b) if applicable, makes its Initial Capital Contribution to the Company.  The Manager shall update Schedule A to reflect the admission of any such Members.

Section 8.2    Admission of Non-Payment Policy Members.    It is agreed and acknowledged by the Members that Rechnitz's sole obligation with respect to the Company is making Capital Contributions for the payment of premiums on the Policies and the expenses associated with the Policies, in each case after the date of this Agreement.  Rechnitz shall provide the Company and Klein with six (6) months prior written notice if Rechnitz elects to cease paying premiums in respect of any Policy (such Policy, a "**Non-Payment Policy**").  After delivery of such notice, Rechnitz or Klein shall have the right to introduce any Person to the Company as a potential Member who agrees in writing to assume Rechnitz's obligations for the payment of premiums and other costs and expenses with respect to such Non-Payment Policy, which person shall be admitted as a Member upon the approval of the Members by [majority] vote (such a Member, a "**Non-Payment Policy Member**").  With respect to any Non-Payment Policy, any payment of premiums and other costs and expenses shall be contributed to the capital of the Company by the applicable Non-Payment Policy Member.  If at any time the Company receives any proceeds from any Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a)    First, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount up to (x) the total amount of Capital Contributions made on such Policy by such Non-Payment Policy Member and (y) the Priority Return of such Non-Payment Policy Member on such Policy computed starting on the date such Non-Payment Policy Member was admitted as a Member;

(b)    Second, by wire transfer into an account designated by Rechnitz, in an amount equal to the Rechnitz Amount for such Policy;

(c)    Third, by wire transfer into an account designated by Klein, in an amount equal to the Klein Amount for such Policy;

<div align="center">

11

</div>

(d)     Fourth, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount equal to fifty percent (50%) of all remaining proceeds from such Policy;

(e)     Fifth, to Rechnitz and Klein by wire transfers into accounts respectively designated by them in proportion to the Capital Contributions made by them with respect to each such Non-Payment Member Policy; provided, however that if Klein introduced the related Non-Payment Policy Member to the Company, then 25% of the amount distributable under this clause (e) to Rechnitz shall be distributed to Klein instead.

Notwithstanding Section 4.1 hereof, Net Income associated with a Non-Payment Policy shall be allocated to each Member to the extent of any Priority Return distributed to such Member with respect to the Non-Payment Policy and to the extent of any distributions made to a Member pursuant to Section 8.2(d) or Section 8.2(e) above with respect to such Non-Payment Policy . Notwithstanding Section 4.1 hereof, Net Losses associated with a Non-Payment Policy shall be allocated to each Member in proportion to the Capital Contributions made by such Member with respect to such Non-Payment Policy.

ARTICLE IX
MAINTENANCE OF BOOKS AND RECORDS;
REPORTS TO MEMBERS; TAX RETURNS

Section 9.1    Accounting Method and Records.    Rechnitz shall determine the accounting method to be used by the Company.  The Company shall maintain such accounting records as shall reflect all Company transactions and as shall be appropriate and adequate for the Company's business.

Section 9.2    Company Records.  The Company shall maintain the following records, within or outside the State of California: (a) a copy of the Company's accounting records and federal, state, local and foreign income tax or information returns and reports, if any, for the five most recent Fiscal Years; and (b) all other records and reports required by the Act or otherwise to be maintained by the Company.  Each Member, and such Member's duly authorized representatives or agents, shall, for any purpose reasonably related to his interest as a Member, have reasonable access to such books and records at such office and shall have the right to inspect and copy such books and records; provided, however, that if a Member was an officer, consultant or employee of the Company received his/her Interest pursuant to a profits interests grant agreement ceases to be an employee, consultant or officer of the Company, such Member shall only have the right to receive books and records that he/she has the right to require the Company to provide to him/her in accordance with applicable law.

Section 9.3    Company Reports.  The Company shall cause to be furnished to each Member and each other Person who was a Member during the period in question (a) such reports and financial statements as may be reasonably required for his financial reporting requirements, including, without limitation, copies of all annual, quarterly and monthly financial statements, and (b) detailed financial statements and information and documents (including Form K-1) necessary or desirable for the preparation or support of such Member's tax returns required in any jurisdiction, as soon as practicable after the end of each Fiscal Year.

Section 9.4   Designation of Tax Matters Member.  Rechnitz is designated the "**Tax Matters Member**" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

Section 9.5   Tax Treatment and Elections.   The Company shall be treated as a partnership for federal income tax purposes, the Members shall be treated as partners for federal income tax purposes, and each of the Members agrees to report consistently with such treatment. The Manager shall make all elections necessary to give effect to such treatment.

ARTICLE X
TRANSFER OF INTERESTS; SPECIAL PROVISIONS

Section 10.1   Transfers and Assignments.

(a)   No Member shall be permitted to Transfer any Interest to a Person other than a Permitted Transferee, except in accordance with the provisions set forth in this Article X.

Section 10.2   Permitted Transfers.

(a)   Each Member shall notify the Manager and the other Members of any proposed Transfer to a Permitted Transferee by such Member, or by any of its Affiliates, in the case of an indirect Transfer of an Interest, which notice shall set forth the name and address of the Permitted Transferee and the nature of the relationship between such Member and such Permitted Transferee, at least ten (10) calendar days prior to the proposed date of such Transfer. Each Member shall be responsible for paying all transfer, gains or similar taxes, if any, and all reasonable costs and expenses of the Company, including reasonable attorneys' fees, arising out of any Transfer by such Member of all or a portion of its Interest (or by any of its Affiliates in the case of an indirect Transfer of an Interest) to a Permitted Transferee.  As a condition to any Transfer of all or any portion of an Interest in the Company to a Permitted Transferee shall execute and deliver to the Company a joinder agreement, in form of Exhibit A (a "**Joinder Agreement**").  All of the provisions of this Agreement, including without limitation, the provisions of this Article X, shall be applicable to and binding upon each Permitted Transferee.

(b)   The transfer by a Member of all or any portion of its Interest (including, without limitation, any transfer to a Permitted Transferee) shall not release such Member from any or all of its obligations under this Agreement arising prior to the date of such Transfer.

Section 10.3   Substitute Members.  A Permitted Transferee of the Interest of a Member or a transferee of the Interest of a Member pursuant to Sections 10.4 and 10.5 of this Agreement, or any portion thereof, shall become a substitute Member entitled to all the rights, and subject to all of the obligations and restrictions, of the transferor Member if, and only if:

(a)   the transferor assigns the transferee such right;

13

(b)     the transferor or transferee pays to the Company all reasonable costs and expenses incurred by the Company in connection with such substitution; and

(c)     the transferee executes and delivers a Joinder Agreement.

Section 10.4    Right of First Refusal.

(a)     Except for Transfers pursuant to or contemplated by Section 10.2, if any Member (a "**Selling Member**") receives a bona fide written offer from an independent third party (a "**Third Party**") to purchase any or all of such Selling Member's Interests for cash and such Selling Member desires to Transfer any or all of such Interests (the "**Offered Interests**") pursuant to such offer, prior to any Transfer it shall give written notice of the proposed Transfer (the "**Notice of Intention**") to the Company and the other Members (the "**Remaining Members**") specifying the number of Offered Interests which such Selling Member wishes to Transfer, the proposed transferee, the proposed purchase price for the Offered Interests (the "**Offer Price**") and the other material terms and conditions of the proposed Transfer.

(b)     For a period of thirty (30) days after receipt of the Notice of Intention (the "**Option Period**"), each of the Remaining Members shall have the irrevocable option to purchase at the Offer Price and on the other terms specified in the Notice of Intention, all of the Offered Interests pro rata based on the Percentage Interest of each Remaining Member; provided, however, that if any Remaining Member does not purchase any or all of its pro rata portion of such Offered Interests, the other Remaining Members shall have the right to purchase such portion, pro rata, until all of such Offered Interests are purchased. The option of a Remaining Member pursuant to this Section 10.4(b) (the "**Remaining Members Option**") shall be exercisable by delivery of a notice (the "**Remaining Members Notice**") setting forth the maximum number of Offered Interests that such Remaining Member wishes to purchase, including any number which would be allocated to such Remaining Member if any other Remaining Member does not purchase all or any portion of its pro rata portion, to the Selling Member, the Company and the other Remaining Members and shall expire if the Remaining Members Notice is not delivered prior to the expiration of the Option Period.

(c)     If all notices required to be given pursuant to this Section 10.4 have been duly given, and the Remaining Members determine not to exercise their respective options to purchase all of the Offered Interests at the Offer Price and on the other terms specified in the Notice of Intention or determine, with the consent of the Selling Member, to exercise their options to purchase less than all of the Offered Interests, then the Selling Member shall have the right, for a period of ninety (90) days from the earlier of (a) the expiration of the Option Period and (b) the date on which such Selling Member receives notice from the Remaining Members that they will not exercise the option granted pursuant to this Section 10.4, to accept the bona fide offer from the Third Party and enter into an agreement to sell the Offered Interests remaining unsold under this Section 10.4 at a price not less than the Offer Price and on the same terms as set forth in the Notice of Intention; provided that prior to any such Transfer to a Third Party, such Third Party executes and delivers to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby becomes a party to this Agreement.

14

(d)     The closing of any purchase and sale of any Interests to a Remaining Member pursuant to this Section 10.4 shall take place at the offices of the Company on such date, not later than sixty (60) days after the delivery to the Selling Member of the Remaining Members Notice. At the closing of such purchase and sale, the Secretary or such other officer of the Company shall record such Transfer in the books of the Company against evidence of such Transfer, delivery of the Offer Price therefor and an executed Joinder Agreement.

(e)     If the Remaining Members Option is not exercised, and the Offered Interests are not sold pursuant to Section 10.4(c) within the ninety (90) day period referred to therein, such sale may not be carried out without complying again with the terms of this Section 10.4.

Section 10.5    Tag-Along Rights and Obligations.

(a)     In the event that after complying with the terms of Section 10.4, the Selling Member desires to sell (the "**Disposition**") the Offered Securities to a Third Person (the "**Acquirer**"), the Selling Member's right to accept such offer to purchase the Offered Securities shall be conditioned on each Remaining Member being offered the right to sell to the Acquirer its pro rata portion of the Offered Securities (based on the Percentage Interest of each Remaining Member) in such Disposition in accordance with this Section 10.5. The Selling Member shall give notice (the "**Disposition Notice**") to each Remaining Member at least thirty (30) days prior to the consummation of the Disposition specifying the number of Offered Interests which such Selling Member wishes to Transfer in the proposed Disposition, the proposed transferee, the proposed purchase price for the Offered Interests and the other material terms and conditions of the proposed Disposition.

(b)     The election to participate in the Disposition by the Remaining Members pursuant to Section 10.5(a) shall be exercised by notice to the Selling Member given within the time period specified in the Disposition Notice, which time period shall not be less than fifteen (15) days after such Disposition Notice is given. If any Remaining Member gives notice of its election to sell, it shall be obligated to sell the number of Interests specified in such Remaining Member's notice upon the terms and subject to the conditions specified in Section 10.5(a) to the Acquirer (which shall be the same for the other Remaining Members and the Selling Member), conditional upon the closing of the Disposition.

(c)     The sale or Transfer of Interests to the Acquirer by the Selling Member and by the Remaining Members electing to participate in the Disposition pursuant to this Section 10.5 shall occur simultaneously and be on the same terms and at the same price as the Interests sold by the Selling Member; provided that prior to any such Transfer to an Acquirer, such Acquirer shall execute and deliver to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby become a party to this Agreement.

(d)     If the Acquirer declines to purchase from such Remaining Members their respective proportionate number of Interests calculated in accordance with this Section 10.5, the Selling Member will not sell any Interests to the Acquirer.

15

Section 10.6   Miscellaneous Provisions Affecting Transfer.

(a)   Upon the Transfer of all or any portion of a Member's Interests as permitted or required under this Agreement, including, without limitation, as provided in this Article X, (i) the income, loss, gain, deduction and credit attributable to the Interests so transferred shall be allocated between the transferor and transferee based upon the number of days during the applicable Fiscal Year that the Interests so transferred was held by each of them, without regard to the results of Company activities during the period in which each was the holder; provided that the Manager shall, at the request and expense of the transferring Member, cause an interim closing of the Company's books as of the effective date of Transfer for purposes of allocating such items between the transferor and transferee; and (ii) the transferor shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods preceding the date of Transfer, and the transferee shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods on and after the date of Transfer based upon the number of days during the applicable Fiscal Year that the Interests so transferred were held by each of them, without regard to the results of Company activities during the period in which each was the holder.

(b)   The Company shall be entitled to treat the record owner of any Interests as the absolute owner thereof, and shall incur no liability for distributions of cash or other property or allocations of income, gain, loss, deduction or credit made in good faith to such owner until such time as a written assignment of such Interests has been received, accepted and recorded on the books of the Company.

## ARTICLE XI
## DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

Section 11.1   Dissolution, etc.   The Company shall be dissolved upon the occurrence of any of the following events (the date of such occurrence, the "**Dissolution Date**"):

(a)   As approved by the majority vote of the Members; or

(b)   As otherwise required by applicable law.

Section 11.2   Winding Up.

(a)   Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company in accordance with this Section 11.2.

(b)   Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be

16

considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

      (c)    The Members shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

Section 11.3   Final Distribution. After the application or distribution of the proceeds of the liquidation of the Company's assets in one or more installments to the satisfaction of the liabilities to creditors of the Company, including to the satisfaction of the expenses of the winding-up, liquidation and dissolution of the Company (whether by payment or the making of reasonable provision for payment thereof), the remaining proceeds, if any, plus any remaining assets of the Company shall be distributed to the Members in accordance with Sections 4.3 and 8.2, as applicable.

Section 11.4   Time for Liquidation, etc. A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Company to seek to minimize potential losses upon such liquidation. The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of a certificate of cancellation of the certificate with the Secretary of State of the State of California.

Section 11.5   Termination. Upon completion of the winding up of the Company, the Manager (or any duly elected liquidating trustee or other duly designated representative) shall execute, acknowledge and cause to be filed a certificate of cancellation of the Certificate with the Secretary of State of the State of California. Upon the cancellation of the Certificate, this Agreement and the Company shall terminate.

Section 11.6   Return of Contribution Nonrecourse to Other Members. Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

<div align="center">

ARTICLE XII
DISPUTE RESOLUTION

</div>

Section 12.1   Rabbinical Counsel. If any dispute arises between the Members regarding this Agreement or any provision hereof, that dispute shall be resolved through a binding arbitration proceeding to be conducted in the State of California in accordance with the commercial arbitration rules of the Rabbinical Council of California.

<div align="center">

ARTICLE XIII
MISCELLANEOUS

</div>

Section 13.1   Entire Agreement. This Agreement, taken together with the other documents expressly referred to herein, each as amended or supplemented, constitutes the entire

<div align="center">

17

</div>

agreement among the parties with respect to the subject matter herein or therein and supersedes any prior agreement or understanding among the parties hereto.

Section 13.2    Other Ventures.  The Manager or any Member, and any firm, corporation or association with which the Manager or any Member is in any way interested or connected, may act as attorney for, deal and contract with, and be employed by the Company, and the Manager or any Member may be, in any manner, interested in or connected with any corporation, association or business in which the Company is directly or indirectly interested, all in the same manner and with the same freedom as though not a Manager or a Member, as the case may be, and without accountability for any profit, benefit or compensation received in connection with such actions or relationships, none of which shall be void or voidable.

Section 13.3    Amendments.  This Agreement may be amended only with the written consent of a Majority in Interest; provided that any such amendment that materially adversely affects the rights and privileges of any Member (other than any amendment effected in connection with the making of a Capital Contribution to the Company by, and/or the issuance of additional Interests to, any Member, including, without limitation, any amendment to the rights and privileges of the Interests to reflect dilution resulting from such Capital Contributions or issuance of additional Interests) must be consented to by each of the Members so affected[; provided further, that any amendment to this Agreement shall not be effective without the consent of Rechnitz].

Section 13.4    Choice of Law.  This Agreement shall be construed in accordance with the laws of the State of California, without regard to the choice of laws rules thereof, and the obligations, rights and remedies of the Members hereunder shall be determined in accordance with such laws.

Section 13.5    Successors and Assigns; Third Party Beneficiaries.  This Agreement shall be binding upon, and, subject to Article X, shall inure to the benefit of, the parties and their legal representatives, heirs, administrators, executors, successors and permitted assigns.  Except as otherwise expressly provided herein, none of the provisions of this Agreement shall be for the benefit of or enforceable by any Person not a party hereto.

Section 13.6    Interpretation.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or neuter gender shall include the masculine, the feminine and the neuter.

Section 13.7    Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend or otherwise affect the scope or intent of this Agreement or any provision hereof.

Section 13.8    Severability.  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement, or the application of such provision in jurisdictions or to Persons or circumstances other than those to which it is held invalid, illegal or unenforceable, shall not be affected thereby.

18

Section 13.9   Counterparts.   This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Section 13.10   Non-Waiver.   No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in a written notice given to the party claiming such waiver has occurred; provided that no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

Section 13.11   Notices.   All notices, requests, demands, claims and other communications that are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by confirmed facsimile with a copy sent by another means specified herein; the business day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five business days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

> if to the Company:
>
> c/o Shlomo Rechnitz
> 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.
>
>
> with a copy to:
>
> Leslie Klein
> 14245 Ventura Blvd., Sherman Oaks, CA 91423

and if to a Member, to the Member's address or facsimile number on the books records of the Company, or to such other address with respect to the Company or a Member as the Company or such Member, as applicable, notifies the Company and the other Members in writing as provided above.

<div align="center">

ARTICLE XIV
DEFINITIONS

</div>

Section 14.1   Definitions.

References in this Agreement to an **"Exhibit"** are intended to refer, unless otherwise specified, to an Exhibit attached to this Agreement, and references in this Agreement to an **"Article"** or a **"Section"** are intended to refer, unless otherwise specified, to an Article or a Section of this Agreement.  As used in this Agreement, the following terms shall have the respective meanings set forth below:

<div align="center">19</div>

"**Account Bank**" means PrivateBancorp, Inc.

"**Act**" shall have the meaning specified in the recitals to this Agreement.

"**Affiliate**" means any Person that, directly or indirectly, through one or more intermediaries, is Controlled by one or more Members.  As used in this definition, "Control" means either (a) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting stock of a corporation, or in the case of any Person which is not a corporation, the ownership, directly or indirectly, of at least fifty percent (50%) of the beneficial ownership interests in such Person, or (b) irrespective of stock ownership or other beneficial ownership, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person.

"**Agreement**" means this Limited Liability Company Agreement, as the same may be amended hereafter from time to time as provided herein.

"**Available Cash**" means, at the time of determination, cash generated from revenues from the Company's operations, after provision has been made for (a) all expenditures paid or to be paid by the Company to non-Members and (b) such amounts as the Manager, in his sole discretion, shall deem reasonable in order to provide for any anticipated, contingent or unforeseen expenditures or liabilities of the Company.  Available Cash shall be determined without regard to (i) Capital Contributions and (ii) principal advanced on Company indebtedness.

"**Beneficiary**" means, with respect to the Policy, the legal person or persons designated as the recipients of the Death Benefit for such Policy.

"**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Member by crediting such Member's Capital Contributions, such Member's share of Net Income, and the amount of any Company liabilities that are assumed by such Member (other than liabilities that are secured by any Company property distributed to such Member) and by debiting the amount of cash and the gross fair market value of any Company property distributed to such Member pursuant to any provision of this Agreement (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752), such Member's share of Net Losses, and the amount of any liabilities of such Member that are assumed by the Company (other than liabilities that are secured by any property contributed by such Member to the Company).

"**Capital Contribution**" means, with respect to any Member, the amount of money and the initial gross fair market value of any property contributed (or deemed contributed) from time to time by such Member to the Company (net of any liabilities secured by such property or to which such property is otherwise subject).  The initial gross fair market value of each Policy contributed by Klein shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement.  Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution made

by any predecessor of a Member.  For purposes of this Agreement, a Capital Contribution shall include, without limitation, any Initial Capital Contribution.

"**Certificate**" has the meaning set forth in Section 1.1.

"**Change Forms**" means the forms changing the owner and Beneficiary of the Policy using such form as is required by each of the relevant issuing insurance companies.

"**Code**" means the Internal Revenue Code of 1986, as amended, and as the same may be amended hereafter from time to time.

"**Company**" shall have the meaning specified in the preamble hereto.

"**Consumer Information**" means medical, health, financial and personal information about an Insured, an Original Owner, a Beneficiary under a Policy or a person designated by an Insured to provide periodic information regarding the medical status of the Insured, or any spouse or other individual closely related by blood or law to any such person (each, a "**Consumer**"), including, without, limitation, a Consumer's name, street or mailing address, email address, telephone or other contact information, employer, social security or tax identification number, date of birth, driver's license number, photograph or documentation of identity or residency (whether independently disclosed or contained in any disclosed document such as a Policy, life expectancy evaluation, life insurance application or life settlement application).

"**Covered Person**" shall have the meaning specified in Section 6.5(a).

"**Death Benefit**" means the cash amount of a Policy to be paid upon the death of the applicable Insured under such Policy, which amount will be net of any policy loans made under such Policy (and accrued interest thereon).

"**Disposition**" shall have the meaning specified in Section 10.5(a).

"**Disposition Notice**" shall have the meaning specified in Section 10.5(a).

"**Dissolution Date**" shall have the meaning specified in Section 11.1.

"**Fiscal Period**" means, subject to the provisions of Section 706 of the Code, (i) any Fiscal Year and (ii) any portion of a Fiscal Year for which the Company is required to allocate Net Income, Net Losses or other items of Company income, gain, loss or deduction pursuant to Article IV.

"**Fiscal Year**" shall have the meaning specified in Section 1.7.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Indemnified Liabilities**" shall have the meaning specified in Section 6.12.

21

"**Indemnified Person**" shall have the meaning specified in Section 6.12.

"**Initial Capital Contribution**" means, with respect to each Member, such Member's Initial Capital Contribution set forth on Schedule A.

"**Insured**" means, with respect to a Policy, each person whose life is insured under such Policy.

"**Interest**" means, with respect to any Member, (a) such Member's share of the profits and losses of the Company and a Member's rights to receive distributions from the Company in accordance with the provisions of this Agreement and the Act and (b) such Member's other rights and privileges in respect of the Company as herein provided.

"**Joinder Agreement**" shall have the meaning specified in Section 10.2(a).

"**Klein Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Klein related to such Policy and (y) the Priority Return for Klein on such Policy.

"**Law**" means any law, constitution, statute, ordinance, code, rule, regulation, decision, order, consent, decree, judgment, ordinance, release, license, permit, stipulation or other pronouncement having the effect of law enacted or issued by any Governmental Authority, any foreign country, or domestic or foreign state, country, city or other political subdivision, which includes binding judicial precedent and principles of common law.

"**Lender**" shall mean each lender identified on Schedule C.

"**Majority in Interest**" means Members that at the time in question together hold a Percentage Interest greater than 50% in the aggregate.

"**Manager**" means one or more persons designated as such pursuant to this Agreement.

"**Members**" means, collectively, the members signatory to this Agreement, and any other Persons admitted to the Company as members after the date hereof in accordance with the terms of this Agreement.

"**Net Income**" and "**Net Losses**" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss and each item of income, gain, expense, deduction and loss shall be allocable to the Members in accordance herewith).

"**Non-Payment Policy**" shall have the meaning as specified in Section 8.2.

"**Non-Payment Policy Member**" shall have the meaning as specified in Section 8.2.

22

"**Notice of Intention**" shall have the meaning as specified in Section 10.4(a).

"**Offer Price**" shall have the meaning as specified in Section 10.4(a).

"**Offered Interests**" shall have the meaning specified in Section 10.4(a).

"**Option Period**" shall have the meaning as specified in Section 10.4(b)

"**Original Owner**" means, with respect to a Policy, the Person to which the Policy was initially issued and who was listed as owner on the initial declarations page of such Policy or the policy application, as applicable.

"**Percentage Interest**" means, with respect to any Member as of any date of determination, a fraction (expressed as a percentage) having as its numerator the aggregate number of Interests held by such Member at such time, and having as its denominator the aggregate number of Interests held by all Members at such time. Each Member's Percentage Interest as of the date hereof, and as adjusted from time to time, is set forth on Schedule A.

"**Permitted Transferee**" means (a) with respect to any Member who is an individual, such member's siblings, parents, spouse (former spouse, if any), and children, and trusts solely for the benefit of any of the foregoing, and (b) with respect to any Member that is an entity, an Affiliate of such Member. [**Anyone else?**]

"**Person**" means any individual or any corporation, partnership, limited liability company, limited liability partnership, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other legal entity.

"**Policy**" means each of the life insurance policies contributed to the capital of the Company by Klein, as specified in Schedule B hereto.

"**Policy File**" means, with respect to a Policy, the file relating to such Policy which file shall include, without limitation, the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

"**Policy Illustration**" means, with respect to a Policy, a policy illustration from the related issuing insurance company.

"**Polter**" shall have the meaning set forth in Section 6.2.

"**Priority Return**" of a Member with respect to any Policy shall mean an annual rate of return of 12% on the total amount of Capital Contributions made by a Member with respect to such Policy from the date such Capital Contribution were made but computed no earlier than from the date of this Agreement. .

"**Rechnitz Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Rechnitz related to such Policy and (y) the Priority Return for Rechnitz on such Policy.

23

"**Remaining Members**" shall have the meaning specified in Section 10.4(a).

"**Remaining Members Notice**" shall have the meaning specified in Section 10.4(b).

"**Remaining Members Option**" shall have the meaning specified in Section 10.4(b).

"**Reserve Account**" means account number [___] established at Account Bank.

"**Selling Member**" shall have the meaning specified in Section 10.4(a).

"**Third Party**" shall have the meaning as specified in Section 10.4(a).

"**Transfer**" means, as a noun, any voluntary or involuntary, and direct or indirect, assignment, transfer, pledge, syndication, sale, hypothecation, contribution, encumbrance or other disposition or purported disposition, and, as a verb, voluntarily or involuntarily, and directly or indirectly, to assign, transfer, pledge, syndicate, sell, hypothecate, contribute, encumber or otherwise dispose of.

"**Tax Matters Member**" shall have the meaning specified in Section 9.4.

"**Treasury Regulations**" means the Income Tax Regulations promulgated under the Code, as the same may be amended hereafter from time to time.

*[Remainder of Page Intentionally Left Blank]*

24

IN WITNESS WHEREOF, the undersigned have executed this Limited Liability
Company Agreement as of the date first set forth above.

SHLOMO RECHNITZ

LESLIE KLEIN

## SCHEDULE A

| Member | Initial Capital Contributions | Interests | Initial Percentage Interest |
|---|---|---|---|
| Rechnitz | SEE SECTION 3.1 | 50% | 50% |
| Klein | SEE SECTION 3.1 | 50% | 50% |

## SCHEDULE B


## POLICIES

| Insured | Owner | Issuing Insurance Company | Policy Number | Death Benefit |
|---------|-------|---------------------------|---------------|---------------|
|         |       |                           |               |               |

Sch. B-1

## SCHEDULE C

### LENDERS

| Lender | Outstanding Principal Balance |
|---|---|
| Sol Majer | $343,000 |
| Leah Katzsl | $100,000 |
| Ari Majer | $65,328 |
| Simcha Mann | $110,000 |
| Yisroel Rechnitz | $350,000 |
| Chaim Manella | $600,000 |
| Ben Katzsl | $245,000 |
| Shlomo Rechnitz | $500,000 |
| Hirshy Krich | $240,000 |
|  |  |
| **TOTAL** | **$2,553,328** |

## <u>SCHEDULE 7.1(D)(XII)</u>

## POLICIES IN GRACE

# EXHIBIT A

## JOINDER AGREEMENT

[TO COME]

# Exhibit 2



**About**

Learn about

the RCC

**Kosher**

Kosher Services

& Guides

**Beth Din**

Jewish Court

Services

**Financial**

Donations &

Payments

a

# About the RCC

The Rabbinical Council of California (RCC) is the largest body of Orthodox
Rabbis in the Western United States. Its seventy members serve as pulpit
Rabbis ministering to congregations and heads of educational institutions.
These Rabbis directly serve an estimated six thousand families, and network
with a far greater population in both the Orthodox and non-Orthodox Jewish
communities. The RCC's constituency is concentrated in southern California but
services the Bay area as well.

The RCC is a non-profit organization with a dual-purpose mission. Firstly, the
RCC provides the community at large with organized Rabbinic services
including **kosher** food supervision, arbitration and mediation, and assistance
with personal matters such as marriage, divorce, and conversion. Our

members and professional staff are involved in virtually all facets of religious Jewish life on the west coast.

Secondly, the RCC is a council of Rabbis which provides professional services to enhance the effectiveness of the Rabbinate. We offer our members programs and tools to assist in community work, and serve as a platform for communication and discussion of current issues and needs.

| | Search |



About
Learn about

the RCC

Kosher
Kosher Services

& Guides

Beth
Din
Jewish Court

Services

Financi
al
Donations &

Payments



# Financial Arbitration & Din Torah

The RCC Beis Din has an established reputation for expertise in arbitrating financial disputes in accordance with Torah law. We adjudicate a wide range of commercial disputes such as employer-employee, landlord-tenant, real property, business interference, breach of contract, breach of fiduciary duty, and unfair competition disputes.  We also hear family law cases involving inheritance and divorce matters. All cases are heard by a panel of three Dayanim (arbitration judges).

RCC judgments are recognized and binding in the civil courts as well. The RCC Beis Din has conducted hearings for cases ranging from several thousand dollars in value up to tens of millions of dollars. Our clientele includes

individuals from a wide range of religious backgrounds as well as corporations who choose Beis Din arbitration over the costly and lengthy alternative of civil litigation.

## DIN TORAH APPLICATION ($10,000 + CLAIMS)

## SMALL CLAIMS APPLICATION ($100 – $10,000)

# Frequently Asked Questions

### Do I need a Lawyer in a Beis Din hearing?                                    ⊖

No. You have the right to have a attorney present if you wish but there is no requirement for you to have one present.  Often a lawyer can assist you in presenting your case or may help you identify what is important to present to the judges. Still, it is your decision whether to hire representation.  Unlike a secular court, the judges in a Beth Din have a much greater freedom to question the parties and make sure each side fully presents their case.

### If I do bring a Lawyer, do I need an attorney with special expertise in Jewish law?    ⊖

No. A lawyer will help ensure that your case is organized, and that you do not neglect any evidence in your favor. The judges are responsible for identifying Jewish law relevant to the case.

### Do the judges follow American law?                                          ⊖

A Beis Din follows Jewish law, which often takes the local law into account. For example, a Beis Din gives great weight to common business practice and interprets contracts according the governing law where they were

4

drawn up.  Corporate Bankruptcy laws are another example of statutes that may be overriding in a Din Torah.

## What are some notable distinctions from secular law? 

Jews are forbidden to charge each other interest on loans so a Beth Din may strike a provision in a contract that calls for interest payments unless there is a a Heter Iska provision. Inheritance rules are sometimes different, particularly in the absence of a will. Punitive damages that are awarded in tort claims and labor disputes in a secular court may not be enforceable in a Din Torah.

## Are the judges bound by precedent? 

Judges in a Din Torah apply their understanding of the Jewish law.  The body of Jewish law is very extensive, and Batei Din in different locales such as Israel and the Diaspora may sometimes rule differently on a specific issue.  Most questions do have a clear resolution that the judges can be expected to follow.

## What happens if the person who is summoned to a Din Torah refuses to come?

Under most circumstances Jewish law forbids the defendant to refuse to appear . Refusal to engage in a Din Torah is a violation of Torah Law, like eating non-kosher food or violating other Jewish laws. If a defendant will not appear, the Beth Din may issue a *Heter Arkaos* which grants permission to the plaintiff to go to a secular court.

| | Search |

בס"ד

# בית דין צדק

**BEIS DIN
RABBINICAL COURT**

ועד הרבנים דקליפארניא

## APPLICATION FOR DIN TORAH

**Issuing a summons** Our Beis Din (Rabbinical Court) issues summons to Din Torah for financial claims which may be valid under Jewish law, as well as family law cases.

**Legal Authority** Dinei Torah are conducted by legally binding arbitration, and California law grants us powers of discovery and subpoena.

**Rabbinic Panel** A three member panel of Rabbis expert in Jewish financial law is convened on all cases.

**Costs** The Beis Din charges five hundred dollars per hearing hour. These are the hours that the Beis Din is in session, either for the actual hearing or for conference on the case. Administrative costs are charged at a rate of two hundred and fifty dollars per hour. Administrative time is billed for office work including but not limited to review of correspondence and procedural issues that come while arranging the Din Torah and the conduct of the case. Halacha requires costs to be split between the two sides except for exceptional cases.

**Date of Hearing** Every summons includes a tentative hearing date. This date is not final, and is very likely to change to accommodate the schedules of all parties. When both parties agree to use the RCC Beis Din, we will email or fax a binding arbitration agreement. <u>After</u> the parties sign on binding arbitration, we will finalize the hearing date. You should not plan to attend a hearing until we have finalized.

To request the issuance of a summons, please return this completed application together with a non refundable filing fee of $150, payable to the Rabbinical Council of California (RCC).

To avoid delays in processing your application, please make sure the information below is complete.

### PLAINTIFF:

Name_____

Address_____

Daytime Phone _____Mobile phone _____

Fax_____Email address _____

### DEFENDANT:

Name_____

**Rabbinical Council of California**
3780 Wilshire Blvd., Suite 420, Los Angeles, California 90010  (213) 389-3382  Fax: (213) 234-4558  Email: info@rccvaad.org

<div dir="rtl">

# בית דין צדק

## ועד הרבנים דקליפארניא

</div>

בס"ד

Address_____

Daytime Phone_____Mobile phone_____

Fax_____Email address_____

Briefly describe your claim_____

_____

_____

_____

_____

_____

Estimated value of the claim $_____

For your convenience you may pay RCC fees by credit card.

I, _____, authorize the RCC to charge my credit card

CC #: _____Exp: _____

Security Code: _____

Name On Card: _____

Billing Address: _____

Zip:_____

Signature: _____

# Din Torah Application

## There is a non-refundable application fee of $150

If paying by check please make out the check to "RCC" and mail to:

The Rabbinical Council of California
3780 Wilshire Blvd.
Suite 420
Los Angeles, CA 90010

If paying by credit card (Visa, Mastercard only), please fill out the information below:


CC#_____exp: _____ Security Code:_____

Name on Card:_____

Billing Address:_____Zip code:_____


| Save Application as PDF | Print Application |
|---|---|

You can send this application by email by clicking the button above to save this form as a pdf.  Then attach it in an email addressed to info@RccVaad.org

You can send this form in via fax or mail by clicking the button above to print the form and sending it to:

Rabbinical Council of California
3780 Wilshire Blvd. #420
Los Angeles, CA 91302
Beth Din Fax: 213.234.4558

**Rabbinical Council of California**

3780 Wilshire Blvd Suite 420
Los Angeles, CA. 90010
Phone (213) 389-3382        Fax (213)234-4558
www.rccvaad.org

## AGREEMENT TO SUBMIT TO BINDING ARBITRATION

We, the undersigned, agree to submit to binding arbitration administered by the Beth Din of the Rabbinical Council of California (the "**Beth Din**"), on the terms set out below, all of the claims, counter-claims and defenses arising out of or relating to the following controversy:

_____

_____

We understand that by this Agreement, we are waiving any right to present a claim or defense to a secular court of law and any right to a jury trial.

1.    Selection of Arbitrators; Arbitration Venue.  Upon being advised of the identities of the parties and the nature of the controversy, the Beth Din shall select a panel of three rabbis to serve as arbitrators to hear and determine the controversy (the "**Panel**").  If a designated arbitrator recuses himself or is otherwise unable to fulfill the duties of an arbitrator of the controversy, the Beth Din shall timely appoint his replacement.  The parties waive any right to:

(a)    object to the designation of an arbitrator selected for the Panel by the Beth Din;

(b)    challenge an arbitrator's qualifications or fitness to serve;

(c)    require the arbitrators to be sworn; or

(d)    invoke sections 1281.85-1281.91 of the California Code of Civil Procedure (the "**Code**") regarding ethical standards applicable to neutral arbitrators.

Unless the Panel orders otherwise, the arbitration hearing(s) shall be conducted at the offices of the Rabbinical Council of California, 3780 Wilshire Boulevard, Suite 440, Los Angeles, California.

2.    Right to Representation.  Each party shall have the right to be represented by an attorney or other representative of the party's choice or may elect to proceed without an attorney or other representative.  If a party exercises the right to be represented, the arbitrators may require that only one representative appear in the proceeding on behalf of the party.  A party's lack of legal or other representation shall not require delay or adjournment of the arbitration. Before appearing in any arbitration, your attorney or representative will be required to fill out and sign the Certification attached hereto as **Exhibit "B"**.

3.    Discovery.  The arbitrators, in their discretion, may permit discovery and may set limits to and conditions for the conduct of discovery.  In that regard, the arbitrators may (a) order a party to be deposed and to produce documents for inspection and copying and (b) issue orders to non-parties for the taking of their depositions and/or their production of documents for inspection and copying.  The parties waive any right to discovery under the Code, the Federal Rules of Civil Procedure or any other code of civil procedure.

4.      _Absence of a Party_.   The absence of a party who, in the judgment of the arbitrators, has agreed to submit to arbitration and has received proper notice of the proceedings, shall not prevent or delay the arbitration or preclude the rendition of an award.

5.      _Conduct of Arbitration Hearing_.   The arbitrators, in their discretion, shall determine the procedures for the submission of evidence and argument and the conduct of the arbitration hearing, including, without limitation:

(a)     the order and sequence of the proceedings;

(b)     the date and time of the proceedings (which may be held on Sundays and/or on legal holidays);

(c)     the time allotted to any facet of the arbitration;

(d)     whether notice shall be given of any facet of the arbitration and the means of giving any such notice;

(e)     the language(s) in which a proceeding is conducted;

(f)     whether to administer oaths to witnesses;

(g)     whether to permit cross-examination, re-direct or re-cross examination;

(h)     whether to sequester witnesses;

(i)     whether to issue subpoenas for the attendance of non-party witnesses or the production of documents at a hearing;

(j)     whether to admit or exclude evidence; and

(k)     whether to permit any portion of the proceedings to be recorded or transcribed.

The arbitrators may issue interim rulings or orders and may meet with the parties and/or their representatives, together or separately, in order to frame or resolve an issue or to bring about a voluntary resolution of the controversy.

6.      _Rendition of Award_.  Within such time as they see fit following the conclusion of the hearing, the arbitrators shall render their award, which shall be in writing and signed by at least two of them, and the Beth Din shall notify the parties or their designated representatives of the award.  The arbitrators may base their decision on Din Torah, compromise, statutory or common law or any other authority they see fit.  The award need not set out the facts found by the arbitrators or the reasons for their decision and may decree such remedies as the arbitrators determine.

7.      _Scope of Award_.  In addition to a final award, the arbitrators may make other determinations, including interim, interlocutory, or incremental rulings, orders, partial final awards and post-confirmation awards.  In any interim, interlocutory, incremental or partial final award, the arbitrators may assess and apportion the fees, expenses and compensation related to such award as the arbitrators determine is appropriate.  In connection with any further proceedings or actions after any final award prior to the entry of judgment confirming any final award (including, without limitation, in connection with any reconsideration that the arbitrators may be willing to undertake), _and_ after entry of any judgment confirming any final award,

whether or not in violation of the terms of this Agreement or any award or order of the arbitrators (a "**Post Final Award Action**"), the arbitrators may assess and apportion fees, expenses and compensation related to any or all such Post Final Award Actions as the arbitrators determine is appropriate.  The arbitrators may grant any remedy or relief that the arbitrators deem just and equitable and within the scope of the parties' agreement to arbitrate including, without limitation, specific performance of a contract.

8.      Waiver of Objections to Award.  The parties will accept the arbitration award of the Beth Din as binding, final and conclusive.  In this regard, the parties waive:

(a)      any right to challenge, appeal or seek to vacate the arbitration award under section 1286.2 of the Code or otherwise (including without limitation, to take a Post Final Award Action, except with the approval of the arbitrators);

(b)      any right to seek correction of the award under section 1284 of the Code or otherwise;

(c)      any right to challenge the jurisdiction of the arbitrators, whether before or after a final award, including without limitation, before or after entry of judgment confirming any award of the Beth Din, and

(d)      any right to appeal any award of the Beth Din (including without limitation all confirmed awards) to another Beth Din, or to any state or federal court.

Notwithstanding the foregoing, a party may request the correction or a clerical or other non-substantive error in the arbitration award and may request that the award be amplified to include the disposition of an issue that was submitted to the arbitration panel but was not fully dealt with in the arbitration award.  It shall be in the discretion of the arbitrators whether to entertain or grant any such request.

9.      Enforcement of Award.  The parties shall take all steps necessary or appropriate to comply with and effectuate the arbitration award, including the execution of any documents ordered by the arbitrators.  The arbitrators will be deemed to retain jurisdiction of the controversy pursuant to this Agreement to the extent necessary to interpret, implement or enforce the award and any entry of judgment confirming, reversing, altering or ordering a rehearing of any award of the Beth Din.  Any party may obtain a judgment confirming the award by filing a petition in a court of competent jurisdiction in the County of Los Angeles and any other jurisdiction permitted by the arbitrators.

10.      Award of Costs and Attorneys' Fees.  Absent a contrary disposition by the arbitrators in their award, the costs of the arbitration shall be shared equally by the parties.  In this regard, persons or entities that constitute a unified entity for purposes of the arbitration, such as partners who are co-petitioners or co-respondents, shall be treated as a single party.  In their discretion, the arbitrators may award to a prevailing party costs and attorneys' fees incurred in the arbitration.  The arbitrators may also require any party to pay the costs and attorneys' fees incurred by another party as a result of the former's:

(a)      failing or refusing to honor any of the terms of this Agreement;

(b)      failing or refusing to honor the interim rulings or award of the arbitrators;

(c)      taking any Post Final Award Action, or

(d)     causing unreasonable delay or expense in the completion of the arbitration.

The arbitrators will be deemed to have retained jurisdiction of the controversy after rendition of their award for purposes of considering and rendering any such relief.

11.     <u>Exoneration of Arbitrators</u>.  No arbitrator or other person assisting in the arbitration on behalf of the Beth Din shall be held liable for any decision or other conduct in connection with the arbitration.  A party shall not threaten or assert any such claim.  No arbitrator or other person assisting in the arbitration on behalf of the Beth Din shall be called upon to explain or justify the arbitration award or to communicate, confer or testify about the arbitration.

12.     <u>Voluntary Execution of Agreement; Representations</u>.  Each party represents and acknowledges that the party has read and understands this Agreement, that the party has had the opportunity to consult with counsel of the party's choice in deciding whether to enter into the Agreement and that the party has signed the Agreement voluntarily, without coercion or duress and without any representation, inducement or promise other than the covenants contained in the Agreement.  **Each party hereby further certifies to the matters set forth on <u>Exhibit "A"</u> attached hereto, which such party has completed and signed in connection with the execution of this Agreement.**

13.     <u>Amendment</u>.  This Agreement may be amended only by a writing signed by all parties, but then only with the prior written consent of the arbitrators.

14.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute a single agreement with the same effect as if all Parties had signed the same signature page. Delivery of executed counterparts of this Agreement by email or fax shall be effective to form a binding agreement.  Any signature page from any counterpart of this Agreement, signed only by one Party, may be detached from such counterpart and re-attached to any other counterpart of this Agreement that has a signature page signed only by the other Party.

15.     <u>Choice of Law</u>.  The Federal Arbitration Act ("<u>FAA</u>") and related federal law shall govern the interpretation, implementation and enforcement of this Agreement to the fullest extent possible, to the exclusion of all otherwise potentially applicable state law, regardless of the location of the arbitration proceedings or the nature of the disputes or controversies between the parties to this Agreement.

**AGREED BY PETITIONER:**                    **AGREED BY RESPONDENT:**


_____            _____
Petitioner                    Date           Respondent                   Date


Address For Notices and Service:             Address For Notices and Service:


_____            _____

_____            _____

_____            _____

Exhibit "A"

Certification of Party

The undersigned hereby certifies to the Rabbinical Council of Los Angeles, under penalty of perjury, as follows (Check only the circles that are true):

o    The undersigned's name is: _____

o    The undersigned has, during the five (5) year period prior to the date of this Certification, never appeared as a party before the Rabbinical Council of Los Angeles in a prior or pending in a non-collective bargaining case.

o    The undersigned has, during the five (5) year period prior to the date of this Certification, appeared as a party before the Rabbinical Council of Los Angeles in one or more prior or pending non-collective bargaining case(s). As to each such case, the undersigned certifies as follows:

The Date of the Case:
        Case 1: _____

        Case 2: _____

        Case 3: _____

The names of the parties:
        Case 1: _____

        Case 2: _____

        Case 3: _____

The names of the arbitrators:
        Case 1: _____

        Case 2: _____

        Case 3: _____

The results of each case arbitrated to conclusion, including the date of the arbitration award, identification of the prevailing party, the names of the parties' attorneys and the amount of monetary damages awarded if any.
        Case 1: _____
                _____
                _____

        Case 2: _____
                _____
                _____

        Case 3: _____
                _____
                _____

Signature of Party: _____
Date: _____

Exhibit "B"

<u>Certification of Attorney or Other Representative for a Party</u>

The undersigned hereby certifies to the Rabbinical Council of Los Angeles and to each of the Parties to the attached Agreement, under penalty of perjury, as follows (Check only the circles that are true):

o    The undersigned's name is: _____

o    The undersigned has, during the five (5) year period prior to the date of this Certification, never appeared as a lawyer or other representative for a party before the Rabbinical Council of Los Angeles in a prior or pending non-collective bargaining case.

o    The undersigned has, during the five (5) year period prior to the date of this Certification, appeared as a lawyer or other representative for a party before the Rabbinical Council of Los Angeles in one or more prior or pending non-collective bargaining case(s).  As to each such case, the undersigned certifies as follows (**PLEASE NOTE THAT IN ORDER TO PRESERVE CONFIDENTIALITY, IT SHALL BE SUFFICIENT TO GIVE THE NAME OF ANY PARTY NOT A PARTY TO THE PENDING ARBITRATION AS "CLAIMANT" OR "RESPONDENT" IF THE PARTY IS AN INDIVIDUAL AND NOT A BUSINESS OR CORPORATE ENTITY) (PLEASE NOTE ALSO THAT IF THERE ARE MORE CASES OR YOU NEED MORE ROOM, PLEASE FEEL FREE TO ADD ADDENDA TO THIS CERTIFICATION)**:

The Date of the Case:

   Case 1: _____

   Case 2: _____

   Case 3: _____

The names of the parties:

   Case 1: _____

   Case 2: _____

   Case 3: _____

The names of the arbitrators:

   Case 1: _____

   Case 2: _____

   Case 3: _____

The results of each case arbitrated to conclusion, including (a) the date of the arbitration award, (b) identification of the prevailing party, (c) the names of the parties' attorneys and (d) the amount of monetary damages awarded if any:

   Case 1: _____
           _____
           _____

   Case 2: _____
           _____
           _____

Case 3: _____
_____
_____

Signature of the lawyer or other representative for a Party:

_____
Type Name:

Date: _____

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
2818 La Cienega Avenue, Los Angeles, California 90034

A true and correct copy of the foregoing document entitled (*specify*): **DEFENDANTS LIFE CAPITAL GROUP, LLC AND JONATHAN POLTER'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION BEFORE THE RABBINICAL COUNCIL OF CALIFORNIA AND FOR A STAY; DECLARATION OF JONATHAN POLTER, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **_March 10, 2025_**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Michael G D'Alba    mgd@lnbyg.com**
- **Jeffrey W Dulberg    jdulberg@pszjlaw.com**
- **Matthew A Lesnick    matt@lesnickprince.com, matt@ecf.inforuptcy.com;jmack@lesnickprince.com**
- **John W Lucas    jlucas@pszjlaw.com, ocarpio@pszjlaw.com**
- **Matthew D. Resnik    matt@rhmfirm.com, roksana@rhmfirm.com;sloan@rhmfirm.com;nina@rhmfirm.com;david@rhmfirm.com;priscilla@rhmfirm.com;gabriela@rhmfirm.com;rosario@rhmfirm.com;rebeca@rhmfirm.com;LA@rhmfirm.com**
- **Bradley D. Sharp (TR)    bsharp@dsi.biz**
- **Nikko Salvatore Stevens    nikko@cym.law, eService@cym.law,karen@cym.law**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Beth Ann R. Young    bry@lnbyg.com, bry@lnbyb.com**

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) **_March 10, 2025_**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **_March 10, 2025_**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 10, 2025 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                   **F 9013-3.1.PROOF.SERVICE**