Jeffrey W. Dulberg (State Bar No. 181200)
John W. Lucas (State Bar No. 271038)
Jeffrey P. Nolan (State Bar No.158923)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4003
Tele / Fax: 310-277-6910 / 310-201-0760
E-mail:  jdulberg@pszjlaw.com
        jlucas@pszjlaw.com
        jnolan@pszjlaw.com

*Attorneys for Plaintiff, Bradley D. Sharp, Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re | Case No. 23-01990-NB |
| LESLIE KLEIN, | Chapter 11 |
| Debtor. | Adv Case No.: 2:25-ap-01020-NB |
| BRADLEY D. SHARP, Chapter 11 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>LIFE CAPITAL GROUP, LLC, a limited liability company, SHLOMO Y. RECHNITZ, individually and as a member of LIFE CAPITAL GROUP, LLC, YISROEL ZEV RECHNITZ, an individual, CHAIM MANELA, an individual, JONATHAN POLTER, an individual and as a manager of LIFE CAPITAL GROUP, and SECURITY LIFE OF DENVER LIFE INSURANCE COMPANY,<br><br>Defendants. | **NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF BRADLEY D. SHARP AND JOHN W. LUCAS IN SUPPORT THEREOF**<br><br>Date:  August 12, 2025<br>Time:  2:00 p.m.<br>Place:  Courtroom 1545<br>        255 E. Temple Street<br>        Los Angeles, CA 90012 |

**TO THE HONORABLE NEIL W. BASON, UNITED STATES BANKRUPTCY JUDGE, THE DEFENDANTS AND THEIR ATTORNEYS OF RECORD, THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:**

PLEASE TAKE NOTICE that Plaintiff, Bradley D. Sharp, in his capacity as Chapter 11

Trustee (the "**Trustee**" or "**Plaintiff**") of the bankruptcy estate of Leslie Klein, the debtor herein (the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

"**Debtor**"), will and hereby does move for leave to amend his Complaint (the "**Motion**") pursuant to Federal Rule of Civil Procedure 15(a)(2).

The proposed amended complaint (the "**Amended Complaint**") is attached to the Declaration of Bradley D. Sharp (the "**Sharp Declaration**") as **Exhibit "A"**.  A blacklined comparison of the Amended Complaint to the original Complaint is attached to the Sharp Declaration as **Exhibit "B"**.

**PLEASE TAKE FURTHER NOTICE** that, a hearing to consider the Motion has been scheduled for **August 12, 2025,** at **2:00 p.m. Pacific Time**, or as soon thereafter as counsel may be heard before the Honorable Neil W. Bason, United States Bankruptcy Judge, in Courtroom 1545, 255 East Temple Street, Los Angeles, California 90012.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities and the Declaration of John W. Lucas, Sharp Declaration, each annexed thereto, the record in this chapter 11 case, as well as any other documentary evidence as may be presented to this Court at or before the hearing.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f), if you wish to oppose the Motion, you must file a written response with the Court and serve a copy of it upon the undersigned counsel no later than fourteen (14) days prior to the hearing on the Motion.  The failure to properly file and serve an opposition may be deemed consent to the relief requested in the Motion or a waiver of any right to oppose the Motion.

**WHEREFORE,** the Trustee respectfully requests that this Court enter an order (a) granting the Motion; and (b) granting the Trustee such other and further relief as the Court deems just and proper.

Dated:    July 22, 2025                          PACHULSKI STANG ZIEHL & JONES LLP


                                                 ___/s/ John W. Lucas_____
                                                 John W. Lucas

                                                 Attorneys for Plaintiff, Bradley D. Sharp, Chapter
                                                 11 Trustee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

The Trustee seeks leave to amend his complaint to withdraw, with prejudice, the "Fifth Claim for Relief" (*i.e.*, the breach of contract claim) against Life Capital Group, a limited liability company ("**LCG**"), Shlomo Y. Rechnitz, individually and as a member of LCG ("**Shlomo**"), and Jonathan Polter, an individual and as a manager of LCG ("**Polter**" and together with LCG and Shlomo, the "**Defendants**"). In response to the Defendants' motions to compel arbitration, Trustee undertook a review of the Fifth Claim for Relief to determine whether or not such claim is enforceable. After that review the Trustee determined that the Fifth Claim for Relief is not enforceable as a result of the Debtor's prepetition settlement with the Defendants. Accordingly, the Trustee seeks to amend his complaint to withdraw, with prejudice, the Fifth Claim for Relief thereby bringing finality to such claim both inside and outside this bankruptcy case.

Prior to filing this Motion, Trustee's counsel asked Defendants' counsel to stipulate to the withdrawal of the Fifth Claim for Relief but the Defendants refused. The request to stipulate should not be controversial because (a) the Trustee had a unilateral right to amend his complaint, without Court authorization, pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, had the amendment been made within 21 days after Defendants filed their motions to compel arbitration, (b) nothing other than the motions to compel have transpired in the case since the filing of the complaint, and (c) when court authorization is required to amend, Rule 15(a)(2) of the Federal Rules of Procedure provides that "[t]he court should freely give leave" to a party seeking to amend and such requests should be granted with "extreme liberality."

Defendants will surely argue that the Motion is being filed in bad faith as a means to evade their request to arbitrate the claims asserted by the Trustee before the Rabbinical Counsel of California. As the Trustee has previously argued, all other claims in his complaint are core and as such are clearly non-arbitrable claims because arbitration would conflict with and undermine the purposes of the Bankruptcy Code. While the breach of contract cause of action (*i.e.*, the Fifth Claim for Relief) is claimed to be subject to arbitration, the Trustee believes that such claim is not

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

arbitrable even outside the bankruptcy context because the claim is not enforceable. The Trustee cannot relitigate the Fifth Claim for Relief as a result of the settlement. Prosecution of such cause of action in violation of the terms of the settlement would be contrary to established legal authorities. The Trustee is well within his right to withdraw the claim, with prejudice, as he seeks to do by this Motion.

The purpose of the Trustee's complaint is to enforce the estate's rights arising under the Bankruptcy Code. To that end, the Trustee seeks to avoid the settlement and recover the millions of dollars of value lost by virtue of the Debtor's release thereunder and also avoid and recover the $1,450,000 in preferential transfers. Each of those causes of action are rooted in the Bankruptcy Code and cannot be administered by Rabbinical Counsel of California. Upon the withdrawal of the Fifth Claim for Relief, the Trustee will avoid wasting judicial resources, the limited resources of the estate, and engaging in unnecessary discovery. The Trustee and his counsel are not aware of any authority where a court can require a lawyer to submit evidence on behalf of a plaintiff, when the lawyer considers there is no cause of action or for any reason wishes to dismiss the claim with prejudice at the direction of the client. In the end, the Trustee is the party who brings the claim and is also the party who decides how and when to prosecute the claim. For reasons stated herein, the Trustee respectfully requests the Court to grant the Motion.

## II.

## STATEMENT OF FACTS

### A.    Commencement of Case and Appointment of Trustee

On February 22, 2023 (the "**Petition Date**") [Bankr. Docket No. 1], the Debtor commenced a voluntary chapter 11 case. On May 23, 2023, and in response to the Bankruptcy Judge Sandra Klein's denial of a motion to dismiss the case and ordering the appoint of a chapter 11 trustee on account of the Debtor inability to administer his chapter 11 case, the Office of the United States Trustee (the "UST") filed a *Notice of Appointment of Chapter 11 Trustee* [Docket No. 151]. On May 24, 2023, the UST filed an *Application for Order Approving Appointment of Trustee and Fixing Bond* [Docket No. 154], which was approved by order entered the same day [Docket No. 155]. On

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

that same day, the Trustee accepted his appointment [Docket No. 156], as the chapter 11 trustee of the Debtor's bankruptcy estate.

**B.      Life Capital Group and LLC Agreement**

Life Capital Group, LLC ("**LCG**") is a California limited liability corporation that was formed on or about April 8, 2011.  LCG is governed by a Limited Liability Company Operating Agreement, dated June 1, 2011 (the "**LLC Agreement**"), which is annexed to the Lucas Declaration as **Exhibit "C"**. Per the LLC Agreement, the Debtor's interest in LCG is 50%. *See* LLC Agreement, Sch. A. As reflected therein, the other member of the LCG is Shlomo and no other party has or holds an interest in LCG. *Id.*

The LLC Agreement outlines how LCG operates but also how and when the proceeds from matured life insurance policies are to be distributed among LCG's only two members, the Debtor and Shlomo. In particular, Section 4.3 of the LLC Agreement outlines the terms by which the proceeds from matured insurance policies are distributed by LCG to Shlomo and the Debtor. Other than the scheduled lenders under the LLC Agreement and operating overhead, no other party is entitled to distributions from LCG on account of matured life insurance policies governed by the LLC Agreement.

**C.      The Original Klein Action**

Prior to the Petition Date, on June 7, 2022, the Debtor filed a complaint (the "**Original Klein Complaint**") against LCG, among others, styled as *Klein v. Polter, et. al.*, No. 22STCV18787 (Cal. Super. Ct.) (the "**Original Klein Action**"). A true and correct copy of the Original Klein Complaint is annexed to the Lucas Declaration as **Exhibit "D"**.

By the Original Klein Action, the Debtor asserted a breach of contract cause of action seeking damages arising from LCG and Shlomo's breach of the LLC Agreement caused by their failure to pay the Debtor net income and the proceeds from matured life insurance policies. Original Klein Complaint, Paras. 30-33.

**D.      The LCG Settlement Agreement**

The Original Klein Action was dismissed because the defendants invoked the arbitration provision in the LLC Agreement. Subsequently, the Debtor, LCG, and Shlomo, among others,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

entered into a settlement agreement (the "**LCG Settlement Agreement**") whereby the parties agreed on the terms and conditions concerning the distribution of proceeds from certain matured life insurance policies. A true and correct copy of the LCG Settlement Agreement is annexed to the Lucas Declaration as **Exhibit "E"**. The LCG Settlement Agreement includes a broad release by the Debtor in favor of LCG, Shlomo, and Polter (*i.e.*, the same parties who the Trustee sued). Page 2 of the LCG Agreement outlines the terms of the release and paragraph 3 is the actual release by the Debtor of the other defendants. Notably, the LCG Settlement Agreement does not include a release by the non-debtor counterparties in favor of the Debtor.

**E.** **The Complaint**

On January 23, 2025, the Plaintiff filed a complaint [Adv. Docket No. 1] (the "**Complaint**") the includes twelve claims for relief.

The first claim for relief (the "**First Claim for Relief**") in the Complaint arises under section 548 of the Bankruptcy Code seeking to avoid the LCG Settlement Agreement as a constructively fraudulent transfer. The Trustee alleges that the Debtor was insolvent when he entered into such agreement and did not receive reasonably equivalent value in exchange. LCG, Shlomo, and Polter are parties to the LCG Settlement agreement and subject to this cause of action.

The second claim for relief (the "**Second Claim for Relief**") in the Complaint arises under section 544 of the Bankruptcy Code and sections 3439.04(a)(2) and 3439.05 of California Civil Code seeking to avoid the LCG Settlement Agreement as a constructively fraudulent transfer. The Trustee alleges that the Debtor was insolvent when he entered into such agreement and did not receive reasonably equivalent value in exchange. LCG, Shlomo, and Polter are parties to the LCG Settlement agreement and subject to this cause of action.

The third claim for relief (the "**Third Claim for Relief**") in the Complaint arises under section 550 of the Bankruptcy Code and section 3439.07 of the California Civil Code seeking to recover the value the Debtor lost because of the LCG Settlement Agreement and was entitled under the terms of the LLC Agreement. LCG, Shlomo, and Polter are parties to the LCG Settlement agreement and subject to this cause of action.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The fourth claim for relief (the "**Fourth Claim for Relief**") in the Complaint arises under section 542 of the Bankruptcy Code seeking an accounting from LCG of capital contributions made by Shlomo and the Debtor, the premiums and other costs there were paid for each of the LCG Policies by Shlomo and the Debtor, and Shlomo's and the Debtor's respective entitlements to the proceeds of the LCG Policies, each on a policy-by-policy basis. LCG is subject to this cause of action.

The fifth claim for relief (the "**Fifth Claim for Relief**") in the Complaint is a breach of contract claim, arising under the law of California, alleging that LCG, Shlomo, and Polter breached the terms of the LLC Agreement (which was one of the causes of action in the Original Klein Action) and memorialized such breach by virtue of the LCG Settlement Agreement.  LCG, Shlomo, and Polter are subject to this cause of action.

The sixth claim for relief (the "**Sixth Cause of Action**") in the Complaint seeking an injunction to compel LCG, Shlomo, and Polter to perform their duties and obligations under the LLC Agreement in accordance with the terms thereof.

The seventh claim for relief (the "**Seventh Claim for Relief**") in the Complaint arises under section 547 of the Bankruptcy Code seeking to avoid a preferential transfer that was made with the Debtor's property to satisfy an antecedent debt held by Shlomo when the Debtor was insolvent. Shlomo is subject to this cause of action.

The eighth claim for relief (the "**Eighth Claim for Relief**") in the Complaint arises under section 550 of the Bankruptcy Code seeking to recover the preferential transfer to Shlomo. Shlomo is subject to this cause of action.

The ninth claim for relief (the "**Ninth Claim for Relief**") in the Complaint arises under section 547 of the Bankruptcy Code seeking to avoid a preferential transfer that was made with the Debtor's property to satisfy an antecedent debt held by Yisroel Zev Rechnitz ("**Steve**") when the Debtor was insolvent. Steve is subject to this cause of action.

The tenth claim for relief (the "**Tenth Claim for Relief**") in the Complaint arises under section 550 of the Bankruptcy Code seeking to recover the preferential transfer to Steven. Steve is subject to this cause of action.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The eleventh claim for relief (the "**Eleventh Claim for Relief**") in the Complaint arises under section 547 of the Bankruptcy Code seeking to avoid a preferential transfer that was made with the Debtor's property to satisfy an antecedent debt held by Chaim Manela ("**Manela**") when the Debtor was insolvent. Manela is subject to this cause of action.

The twelfth claim for relief (the "**Twelfth Claim for Relief**") in the Complaint arises under section 550 of the Bankruptcy Code seeking to recover the preferential transfer to Manela. Manela is subject to this cause of action.

The Ninth Claim for Relief, Tenth Claim for Relief, Eleventh Claim for Relief, and Twelfth Claim for Relief) are asserted against Steve and Manela, who are not parties to the LLC Agreement or the LCG Settlement Agreement and have no right to seek to compel arbitration of the causes of action against them.

**F.    The Motion to Compel Arbitration**

On March 10, 2025, LCG and Polter filed a *Motion to Compel Arbitration Before the Rabbinical Council of California and for a Stay* (the "**LCG Motion to Compel**") [Adv. Docket No. 26]. On March 10, 2025, Rechnitz filed a *Motion to Compel Arbitration Before the Rabbinical Council of California and For a Stay, and joinder in LCG's and Polter's Motion to Compel* (the "**Rechnitz Motion to Compel**", and together with the LCG and Polter Motion to Compel, the "**Motions to Compel**") [Adv. Docket No. 28].

On April 8, 2025,  the Plaintiff filed an opposition to the Motions to Compel (the "**Opposition**") [Adv. Docket No. 40]. On April 29, 2025, Rechnitz filed a reply to the Opposition [Adv. Docket No. 42]. On April 29, 2025, LCG and Polter filed a reply to the Opposition [Adv. Docket No. 43].

On May 6, 2025 and June 24, 2025, hearings were held on the Motions to Compel.

On June 27, 2025, the Court entered a Scheduling Order [Adv. Docket No. 57], ordering (a) the Trustee to file a declaration to include a summary of the value provided to the Debtor in exchange for the Debtor's release under the December 2022 settlement (the "**LCG Settlement**") between the Debtor and the Defendants, as well as a summary of the value that the Plaintiff contends the Debtor should have received in exchange for the release under the LCG Settlement; and (b) the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Defendants to file a declaration to include a summary of the value provided to the Debtor in exchange for the Debtor's release under the LCG Settlement.

On July 8, 2025, pursuant to the Scheduling Order, the Trustee filed the *Declaration of Nicholas R. Troszak In Support of the Trustee's Fraudulent Transfer Claims* [Adv. Docket No. 64].

**G.    Plaintiff's Request to Stipulate to the Dismissal of the Breach of Contract Claim**

On July 3, 2025, Jeffrey W. Dulberg, counsel to the Trustee, sent an email to counsel for LCG, Polter, and Shlomo, seeking to stipulate to withdraw, without prejudice, the Fifth Claim for Relief in the Complaint. The Defendants refused the Trustee's request.  Mr. Dulberg followed up revising the offer to stipulate to withdraw the Fifth Claim for Relief but with prejudice. No response was ever received. Attached to the Lucas Declaration at **Exhibit "F"** is a copy of the email exchanges described above.

**III.**

**ARGUMENT**

**A.    Amendments of Complaints Should be Granted with Extreme Liberality**

In the Ninth Circuit, Rule 15(a) of the Federal Rules of Civil Procedure is the proper mechanism for dismissal of some, but not all, claims filed in a complaint. *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1392 (9th Cir. 1988); *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 688 (9th Cir. 2005)

Rule 15(a) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave" to a party seeking to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a). Requests for leave are generally granted with "'extreme liberality.'" *Moss v. United States Secret Serv.,* 572 F.3d 962, 972 (9th Cir. 2009) (quoting *Owens v. Kaiser Found. Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir. 2001)).

Granting a plaintiff leave to amend "is subject to the qualification that the amendment not cause undue prejudice to the defendant, is not sought in bad faith, and is not futile." *Thornton v. McClatchy Newspapers, Inc.,* 261 F.3d 789, 799 (9th Cir. 2001) (internal quotations omitted).  "The party opposing the amendment has the burden of demonstrating why leave to amend should not be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

granted." *Genentech, Inc. v. Abbott Labs.*, 127 F.R.D. 529, 530-31 (N.D. Cal. 1989) (citing *Senza-Gel Corp. v. Seiffhart*, 803 F.2d 661, 667 (Fed. Cir. 1986)).

**B.    The Fifth Claim for Relief is Subject to the Intent of the Parties of the LCG Settlement Agreement to Dismiss Contractual Disputes**

A bankruptcy trustee is the representative of the bankrupt estate, and has the capacity to sue and be sued. 11 U.S.C. § 323. Among the trustee's duties is the obligation to "collect and reduce to money the property of the estate." 11 U.S.C. § 704(1). The "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), including the debtor's "causes of action." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9 (1983) (internal quotation marks and citation omitted). Thus, "under the Bankruptcy Code the trustee stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy." *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002 (9th Cir. 2005) (quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991)).

The Trustee as Plaintiff in this action generally does not have any rights greater or different than the Debtor had immediately before the Petition Date.[1]

Under the doctrine of claim preclusion, "a final judgment on the merits" in a case precludes a successive action between "identical parties or privies" concerning "the same 'claim' or cause of action." *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005) (quoting *Sidhu v. Flecto Co.*, 279 F.3d 896, 900 (9th Cir. 2002)). The claim preclusion analysis is modified in cases where the earlier action was dismissed in the context of a release or other settlement agreement. *Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 689 (9th Cir. 2019).

A judgment based on the parties' stipulation, unlike a judgment imposed at the end of an adversarial proceeding, receives its force and effect from the fact that the parties consented to it. *Id.* (citing *Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1288 (11th Cir. 2004). Because a settlement can limit the scope of the preclusive effect of a dismissal with prejudice by its terms, *U.S.*

---

[1] This, of course, is subject to the qualification that the Trustee, as a representative of the Debtor's estate, acquired rights arising under the Bankruptcy Code (*e.g.*, 11 U.S.C. § 547) that the Debtor did not have prior to the commencement of the bankruptcy case.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 911 (9th Cir. 1998), courts look to the intent of the settling parties to determine the preclusive effect of a dismissal entered in accordance with a settlement agreement, rather than to general principles of claim preclusion. *See F.T.C. v. Garvey*, 383 F.3d 891, 898 n.7 (9th Cir. 2004) ("The basically contractual nature of consent judgments has led to general agreement that preclusive effects should be measured by the intent of the parties.").

By the express and plain terms of the LCG Settlement Agreement, the Debtor stipulated to release and settlement of his breach of contract claim arising under the LLC Agreement. By the breach of contract claim, the Debtor was seeking damages arising from LCG's and Shlomo's failure to follow the terms of the LLC Agreement and distribute to the Debtor his share of the proceeds arising form the matured life insurance policies. *See* LCG Settlement Agreement, p. 2 and Para. 3. While the Plaintiff is seeking to avoid the release and recover the value lost as a result of the LCG Settlement Agreement, he is not seeking to relitigate the breach of contract claim asserted by the Debtor against LCG and Shlomo in the Original Klein Action. The breach of contract claim was settled. In the Life Capital Action, the Trustee is seeking to recover the value Debtor gave up as a result of the LCG Settlement Agreement.

## C.    **The Trustee As Plaintiff Cannot Be Forced to a Prosecute Claim**

In the context of a motion to amend a complaint to <u>withdraw</u> a claim, as opposed to adding a claim or additional facts to support or cure a claim's legal defects, Rule 15(a)(2) of the Federal Rules of Civil Procedure provides a court with discretion to allow a plaintiff to <u>withdraw</u> a claim it no longer wishes to pursue by filing an amended pleading.

Notably, the Sixth Circuit Court of Appeals has held that it "know[s] of no power in the trial judge to require a lawyer to submit evidence on behalf of a plaintiff, when he considers he has no cause of action or for any reason wishes to dismiss his action with prejudice, the client being agreeable." *Smoot v. Fox*, 340 F.2d 301, 303 (6th Cir. 1964); *Shepard v. Egan*, 767 F. Supp. 1158, 1165 (D. Mass 1990) (dismissing and holding that "[I]t is difficult, both practically and logistically, to imagine a court denying a plaintiff's motion to dismiss her own action with prejudice. Could the Court force the plaintiff to continue discovery, or offer evidence?  Can or should the Court require plaintiff to litigate a claim when plaintiff herself has attempted to dismiss it? . . . Suffice it to say that

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Court will not compel plaintiff to pursue a claim that she wishes to dismiss with prejudice.”);

*Saap Energy, Inc. v. Greenwich Ins. Co.*, 2014 U.S. Dist. LEXIS 200421, *12-*15 (W.D. Ky. May

2014) (pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, authorizing plaintiff to

dismiss a single claim (as opposed to the entire action) because a court cannot force a plaintiff to

prosecute a claim that it does not believe is colorable). Moreover, there is long standing precedent

that a plaintiff is the master of his complaint. *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22,

25 (1913) (holding that  and the principle that "[t]he party who brings the suit is master to decide

what law he will rely upon.”); *Loftis v. United Parcel Service, Inc.*, 342 F.3d 509, at 515 (6th Cir.

2003) (same).

As discussed above, Plaintiff does not believe he has a viable cause action under the Fifth

Claim for Relief. At the time the Complaint was filed, the Trustee included the Fifth Claim for

Relief as a precautionary measure to help ensure that any rights the Trustee controls were preserved.

In response to the Motions to Compel, the Trustee has undertaken a more thorough analysis of the

Fifth Claim for Relief and he does not believe that this cause of action is viable or necessary for the

Trustee to obtain the relief necessary to recover the value the Debtor gave up while he was insolvent

in exchange for less than reasonably equivalent value.

Thus, if the Trustee is forced to proceed with the Fifth Claim for Relief, which he believes

has no merit, either in arbitration or this Court, he could be subject to Rule 11 of the Federal Rules of

Civil Procedure, waste the parties’ time and resources, prolong discovery, and ultimately waste the

time of the Court. In the end, the Trustee controls the claims in the Complaint as plaintiff in the Life

Capital Action and he should not be forced to prosecute claims that he has determined have no merit,

especially at the insistence of his adversary.

**D.**    **Defendants Will Not Be Unduly Prejudiced By Amendment Of Complaint**

In the Ninth Circuit, consideration of prejudice to the opposing party carries the greatest

weight when deciding to grant a motion to dismiss a claim or action. *DCD Programs, Ltd. v.*

*Leighton*, 833 F.2d 183,185 (9th Cir. 1987).  Prejudice is the “touchstone of the inquiry under rule

15(a).” *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Lone*

*Star Ladies Inv. Club v. Schlotzsky’s Inc.*, 238 F.3d 363, 368 (5th Cir. 2001)); *see also*, *Howey v.*

*United States*, 481 F.2d 1187, 1190 (9th Cir. 1973) (stating that "the crucial factor is the resulting prejudice to the opposing party").

The amendment to the Complaint will not cause undue prejudice to the Defendants. The Trustee is seeking to <u>withdraw</u> the Fifth Claim for Relief, with prejudice, thereby bringing finality with respect to this claim in this Life Capital Action or any other action for that matter. "[A] dismissal with prejudice has the effect of a final adjudication on the merits favorable to the defendant." *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 80 F.R.D. 103, 105 (S.D.N.Y.1978). Thus, a dismissal with prejudice cannot harm the defendant because the defendant receives all that it would have received had the case been completed in favor of the defendant. *Id.*; *see also*, *Bynum v. County of Kauai*, 2014 U.S. Dist. LEXIS 23142, *7 (D. Haw. Feb. 24, 2014) (holding that when a claim is dismissed with prejudice that the opposing party cannot suffer prejudice because the dismissal results in finality);

The Plaintiff believes that by withdrawing the Fifth Claim for Relief that he is taking steps by way of motion practice for the purpose of simplifying Life Capital Action by bringing finality to a potential claim against LCG, Shlomo, and Polter, and clear the way for this Court to adjudicate the remaining claims, all of which are core and arise by virtue of the Debtor's rights under the Bankruptcy Code. If the Trustee were required to prosecute the Fifth Claim for Relief in this Court he expects that the applicable defendants would file a motion to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim on account of the LCG Settlement Agreement. Similarly, because the breach of contract claim in the Original Klein Complaint was settled, there is also nothing to arbitrate under the LLC Agreement. The Trustee presumes that any arbitration concerning the breach of contract claim would be short and conclude with the recognition that the Debtor or his estate no longer has any rights to enforce regarding the breach of the LLC Agreement insofar as the matured policies that were governed by the settlement and release.

In addition to the above, there is no prejudice because Plaintiff had the automatic right to amend the Complaint within 21 days after the Motions to Compel were filed. The Ninth Circuit has upheld district court orders granting a motion to compel arbitration brought under Rule 12(b)(3). *See, e.g.*, *Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 652 (9th Cir. 2009). Other Circuit Courts

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

have held similarly. *See, e.g., Grasty v. Colorado Tech. Univ.*, 599 F. App'x 596, 597 (7th Cir. 2015) (concluding that "[m]otions to compel arbitration ... are brought properly under Federal Rule of Civil Procedure 12(b)(3)"). Finally, other courts in within the Ninth Circuit have ruled similarly. *Cancer Ctr. Assocs. for Research and Excellence, Inc. v. Phila. Ins. Cos.*, 2015 U.S. Dist. LEXIS 51091, 2015 WL 1766938, at *2 (E.D. Cal. 2015) ("[C]ourts have held that a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction 'is a procedurally sufficient mechanism to enforce [an] [a]rbitration [p]rovision.'"); *Coup v. Scottsdale Plaza Resort, LLC*, 823 F. Supp. 2d 931, 938 (D. Ariz. 2011) (motion to compel arbitration may be properly brought pursuant to Rule 12(b)(1) or 12(b)(6)); *Cedars-Sinai Med. Ctr. v. Global Excel Mgmt., Inc.*, 2010 U.S. Dist. LEXIS 139848, *2 (C.D. Cal. 2010); *Lemberg v. LuLaRoe, LLC*, 2018 U.S. Dist. LEXIS 239291, * 3 (C.D. Cal. 2018).

Because a motion to compel arbitration is considered a responsive pleading to a complaint, Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure provide that a plaintiff has an automatic one-time right to amend without leave from the court. *Lemberg v. LuLaRoe, LLC*, 2018 U.S. Dist. LEXIS 239291, * 3 (C.D. Cal. 2018); *Armendariz v. Ace Cash Express*, 2013 WL 3791438, *1 (D. Or. July 19, 2013) (finding that a motion to compel arbitration "suffices as a 'responsive pleading' to Plaintiff's Complaint or as an unenumerated motion under Rule 12(b), and, therefore, Plaintiff was permitted to file a First Amended Complaint pursuant to Rule 15(a)(1)(B) without first obtaining leave of Court or consent of Defendant.").

While the Trustee's one-time automatic right to amend the Complaint expired 21-days after the Motions to Compel were filed, nothing substantive has transpired in this case other than briefing and argument regarding the enforceability of the arbitration provision in the LLC Agreement. LCG, Shlomo, and Polter have not filed an answer, propounded discovery, made initial disclosures, or filed other dispositive motions. This adversary proceeding is largely at a stand-still because the Court has not made a final determination on whether to deny or grant the Motions to Compel as a result of the Fifth Claim for Relief. Thus, in that context, LCG, Shlomo, and Polter are not in any worse position if Plaintiff is permitted to amend the Complaint, withdrawing the Fifth Claim for Relief (with prejudice), because they no longer have to defend such claim again. In fact, the relief enhances their position because it has the effect of a final adjudication on the merits in their favor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## E.    The Amendment Is not Sought In Bad Faith

The Motion is not filed in bad faith because the Plaintiff is dispensing with a cause of action, with prejudice thereby bringing finality to an issue that was potentially viable at the time the Complaint was filed. Bad faith is more than acting with bad judgment or negligence. The opposing party must demonstrate the "conscious doing of a wrong because of dishonest purpose or moral obliquity." *United States v. Manchester Farming P'ship*, 315 F.3d 1176, 1185 (9th Cir. 2003).

While approximately six months has passed since the Plaintiff filed the Complaint, the length of time that has passed does not show bad faith because this adversary proceeding is still in its early stages. Aside from Defendants' Motions to Compel, nothing else has transpired nor have Defendants filed an answer to the Complaint. *Navarro v. SmileDirectClub, Inc.*, 2022 U.S. Dist. LEXIS 69940, *11 (N.D. Cal. April 15, 2022) (holding that there is no undue delay or bad faith when little other than a motion to compel arbitration has occurred).

The Trustee acknowledges that withdrawing the Fifth Claim for Relief will have the effect of resolving the Motions to Compel because he will be eliminating the cause of action that was potentially arbitrable. However, the Trustee did not make the determination to withdraw the Fifth Claim for Relief until he was satisfied that the cause of action was not necessary, colorable, or actionable. Thus, the Motion should not be construed as a tactic or as part of some legal gamesmanship. Instead, the Motion and the relief sought herein is incumbent on the Plaintiff because he has a duty to only pursue causes of action that are colorable and have merit.

The facts here are different from the line of cases where courts denied requests for leave to amend a complaint on the basis of bad faith. For example, in *Hernandez v. DMSI Staffing*, LLC., 79 F. Supp. 3d 1054, 1060 (N.D. Cal. 2015), the court denied the plaintiff's request to amend because "Plaintiff timed her motion to amend so that she could have the benefit of previewing Defendants' motion to compel arbitration before deciding whether to abandon the federal case in favor of the parallel state case." In *Oneida Indian Nation v. Cnty. of Oneida*, 199 F.R.D. 61, 80 (N.D.N.Y. 2000), the court denied a motion to amend a complaint seeking to add 20,000 private landowners to the action years after it was commenced because the amendment was sought to gain a tactical advantage in the pending action, which the court found was done in bad faith.

The Trustee's goal for the Life Capital Action is to recover the value the Debtor gave up under the LCG Settlement Agreement while he was insolvent in exchange for reasonably equivalent value and also to avoid and recover the approximate $1,450,000 in preferential transfers. These claims arose under the Bankruptcy Code. They are the heart of the Life Capital Action and the estate stands to gain a substantial recovery to the extent the Trustee prevails on his claims. Unlike *Hernandez*, the Trustee is not waiting for the defendants to file defenses or assert claims so that he can latter chose the better venue and type of claims to assert against his counterparties. The Trustee filed the Complaint with the Bankruptcy Court because the causes of action asserted are core and can only be adjudicated by a bankruptcy judge.

Unlike *Oneida*, the Trustee is not seeking to add new claims to the Complaint. Instead, the Trustee is seeking the Court's authorization to amend the complaint for the purpose of withdrawing the Fifth Claim for Relief. The effect of the withdrawal, with prejudice, will avoid unnecessary litigation, preserve the parties' time and resources, avoid unnecessary discovery, and ultimately help ensure that we use less of the Court's time.

## F.     The Amendment Is Not Futile

A proposed amended pleading adding new claims is futile only if "it appears beyond a doubt" that the claims sought to be added would be dismissed for failure to state a claim. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 188 (9th Cir. 1987) (internal citations omitted); *Miller v. Rykoff-Sexton*, 845 F.2d 209, 214 (9th Cir. 1988) (internal citations omitted). The futility of an amendment is determined by whether the amended complaint could survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Here, the futility element is not applicable because the Trustee is not seeking to amend the Complaint for the purpose of adding a new claim. Instead, the Trustee is seeking to amend the Complaint for the purpose of withdrawing the Fifth Claim for Relief. The Trustee believes that it would be futile to prosecute the Fifth Claim for Relief because that claim was already resolved by the Debtor and the Trustee stands in the Debtor's shoes and does not have any different rights to relitigate what was already resolved.

**G.** **If the Court Grants the Motion the Motions to Compel Should be Denied as Moot**

An "amended complaint supersedes the original, the latter being treated thereafter as non-existent." *Ramirez v. County of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015). Generally, courts deny a motion that targets a complaint that is no longer in effect. *See Lemberg v. Lularoe*, 2018 U.S. Dist. LEXIS 239291, *3 (C.D. Cal. Mar. 1, 2018) (denying the motion to compel arbitration as moot because the motion was targeted at a previous iteration of the complaint and plaintiff's first amended complaint added new plaintiffs and causes of action); *Dog Training Elite Franchising LLC v. Unbound Ventures LLC*, 2025 U.S. Dist. LEXIS 55931, *5 (D. Ariz. Mar. 26, 2025) (same); *Western Air Charter, Inc. v. Sojitz Corp.*, 2019 U.S. Dist. LEXIS 221334, *1 (C.D. Cal. Aug. 1, 2019) (finding that upon plaintiff filing a third amended complaint, defendant's arbitration motion no longer pertained to the operative pleading because the third amended complaint eliminated all reference to the agreement defendants cited as the basis for their arbitration motion).

If the Court grants the Motion, the Motions to Compel should be denied as moot. Upon the filing of the amended complaint, the amendment will supersede the existing Complaint, which includes the Fifth Claim for Relief, and such claim will no longer be in play.

**IV.**

**CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court grant the Motion.

Dated:    July 21, 2025                    **PACHULSKI STANG ZIEHL & JONES LLP**

By      */s/ John W. Lucas*
                    John W. Lucas

Counsel for Plaintiff, Bradley D. Sharp,
Chapter 11 Trustee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## <u>DECLARATION OF BRADLEY D. SHARP</u>

I, Bradley D. Sharp, declare as follows:

1.    I am the duly appointed, authorized and acting chapter 11 trustee of the estate of Leslie Klein, the debtor herein. I make this Declaration in support of the *Motion for Leave to Amend Complaint* (the "**Motion**"),[2] to which this Declaration is annexed.

2.    All matters set forth herein are based on either my personal knowledge, my review of relevant documents and information, including, without limitation, documents and information supplied to me by my professionals, and the record in this case for which judicial notice is sought. All capitalized terms herein which are otherwise not defined herein shall have the same meaning ascribed to them in the Reply.  If called upon to testify, I could and would testify competently to the facts set forth herein.

3.    I have reviewed the LLC Agreement and have a general understanding of the estate's rights thereunder.

4.    I have reviewed the Original Klein Complaint and have a general understanding of the breach of contract claim asserted by the Debtor thereunder.

5.    I have reviewed the LCG Settlement Agreement and interpret such agreement to settle and resolve the breach of contract claim asserted under the Original Klein Complaint.

6.    I do not believe that I, as the authorized representative of the Debtor's Estate, can prosecute the Fifth Claim for Relief under the Complaint in light of the terms of the LCG Settlement.

7.    In my business judgment, I believe that the Fifth Claim for Relief should be withdrawn, with prejudice, because the prosecution of such claim would be contrary to established legal principles and its withdrawal will avoid wasting judicial resources, the limited resources of the Estate, and engaging in unnecessary discovery.

8.    The proposed amended complaint (the "**Amended Complaint**") is annexed hereto as **Exhibit "A"**.  A blacklined comparison of the Amended Complaint to the Complaint is annexed hereto as **Exhibit "B"**

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

---

[2] Capitalized terms not defined herein have the meanings used in the Motion.

9.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22nd day of July, 2025 at Beach Haven, New Jersey.

Bradley D. Sharp, Chapter 11 Trustee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# **EXHIBIT A**

(Amended Complaint)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Jeffrey W. Dulberg (CA Bar No. 181200)
John W. Lucas (CA Bar No. 271038)
Jeffrey P. Nolan (CA Bar No. 158923)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4003
Telephone: 310-277-6910
Facsimile: 310-201-0760
Email: jdulberg@pszjlaw.com
        jlucas@pszjlaw.com
        jnolan@pszjlaw.com

*Attorneys for Bradley D. Sharp, Chapter 11 Trustee*

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>LESLIE KLEIN,<br><br>Debtor. | Case No. 2:23-bk-10990-SK<br><br>Chapter 11 |
| BRADLEY D. SHARP, Chapter 11 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>LIFE CAPITAL GROUP, LLC, a limited liability company, SHLOMO Y. RECHNITZ, individually and as a member of LIFE CAPITAL GROUP, LLC, YISROEL ZEV RECHNITZ, an individual, CHAIM MANELA, an individual, JONATHAN POLTER, an individual and as a manager of LIFE CAPITAL GROUP, and SECURITY LIFE OF DENVER LIFE INSURANCE COMPANY,<br><br>Defendants. | Adv No. 2:24-ap-01020-NB<br><br>**AMENDED COMPLAINT**<br><br>**(1) Constructive Fraudulent Transfer (11 U.S.C. § 548)**<br>**(2) Constructive Fraudulent Transfer (11 U.S.C. § 544)**<br>**(3) Recovery of Constructive Fraudulent Transfers (11 U.S.C. § 550 and Cal. Civil Code § 3439.07)**<br>**(4) Accounting (11 U.S.C. § 542)**<br>**(5) [Omitted]**<br>**(6) Injunction**<br>**(7) Avoidance of Preference – Rechnitz (11 U.S.C. § 547)**<br>**(8) Recovery of Preference -Rechnitz (11 U.S.C. § 550)**<br>**(9) Avoidance of Preference – Y. Rechnitz (11 U.S.C. § 547)**<br>**(10) Recovery of Preference -Y. Rechnitz (11 U.S.C. § 550)**<br>**(11) Avoidance of Preference – Manela (11 U.S.C. § 547)**<br>**(12) Recovery of Preference -Manela (11 U.S.C. § 550)** |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Bradley D. Sharp ("**Plaintiff**" or "**Trustee**"), the duly appointed trustee for the chapter 11

2    estate of Leslie Klein (the "**Debtor**"), in support of his Complaint for Avoidance and Recovery of

3    Fraudulent Transfers and Avoidance and Recovery of Preferential Transfers, alleges as follows:

4    **OVERVIEW OF CLAIMS FOR RELIEF**

5    1.    This is an adversary proceeding brought pursuant to Sections 542, 544, 547, 548 of

6    the Bankruptcy Code and Rules 7001(a), 7001(i), and 7001(g) of the Federal Rules of Bankruptcy

7    Procedure.

8    2.    The Debtor entered into the *Mutual Release of all Claims and Settlement*

9    *Agreement*, dated December 5, 2022 (the "**LCG Settlement Agreement**") by and among Leslie

10   Klein (the "**Debtor**"), Life Capital Group, LLC ("**LCG**"), Shlomo Y. Rechnitz ("**Rechnitz**"), and

11   Jonathan Polter ("**Polter**" and together with LCG and Rechnitz, the "**LCG Defendants**").

12   3.    On or around the same time, the Debtor entered in the *Mutual Release of all Claims*

13   *and Settlement Agreement*, dated December 12, 2022 (the "Security Settlement Agreement" and

14   together with the LCG Settlement Agreement, the "Settlement Agreements") by and among the

15   Debtor, LCG, and Security Life of Denver Insurance Company ("Security Life").[1]

16   4.    By this adversary proceeding, Plaintiff seeks to avoid the release by the Debtor

17   under the LCG Settlement Agreement, as a constructive fraudulent transfer, of his rights and

18   entitlements to distributions from the proceeds of life insurance policies governed by the terms

19   and conditions of that certain *Limited Liability Operating Agreement of Life Capital Group, LLC*,

20   dated June 1, 2011 (the "**LLC Agreement**") and recover the property and/or value therefrom.

21   5.    Plaintiff is seeking to avoid above described fraudulent transfers of the Settlement

22   Agreement and to recover the property, or the value thereof, in accordance with 11 U.S.C. §§ 544

23   (and applicable state law), 548, and 550

24

25   _____

26   [1] It is Plaintiff's understanding that Security Life tendered the insurance proceeds from the Gardner Policies and such
proceeds were used to pay some or all of the other named defendants in this adversary proceeding. Plaintiff's action is

27   directed at LCG, Rechnitz, and Polter, not Security Life. However, Plaintiff files this adversary against Security Life
out of an abundance of caution on account of the release arising from the Security Settlement Agreement. If the relief

28   sought by Plaintiff can be obtained through the sole adjudication of the LCG Settlement Agreement without including
the Security Settlement Agreement, then Plaintiff is willing to withdraw the Complaint as it pertains to Security Life.

6. The Settlement Agreements arose in response to an action commenced by the Debtor in the Los Angeles Superior Court, Case No. Case No. 22STCV18787 (the "**State Court Action**"), against the foregoing parties regarding the Debtor's rights and entitlements to the policy proceeds of the following life insurance policies: (a) policy numbers 1621379 and 1625579 (the "**Gardner Policies**"), (b) policy number 156208510 (the "**Goldstein Policy**"), (c) policy number 60030333 (the "**Holtzman Policy**"), and (d) policy number US0016022L (the "**Berke Klein Policy**" and together with the Gardner Policies and Holtzman Policy, the "**Settled LCG Polices**") that were each transferred to LCG by the Debtor and were each subject to and governed by the LLC Agreement.

7. Plaintiff is seeking an accounting from LCG of LCG's maintenance of the LCG Policies that includes the capital contributions of Rechnitz and the Debtor on a policy-by-policy basis, any loans and the repayment thereof, all costs associated with the LCG Policies on a policy-by-policy basis, and all entitlements of Rechnitz and the Debtor to the proceeds of the Settled LCG Policies and the LCG Policies on a policy-by-policy basis, in accordance with 11 U.S.C. § 542(a).

8. Plaintiff is seeking an injunction, pursuant to Bankruptcy Rule 7001(g), compelling the LCG Defendants to distribute to the Debtor's estate the value of the Settled LCG Policies in accordance with the terms of the LLC Agreement.

9. Plaintiff is seeking to avoid a transfer of not less than $500,000.00 to Shlomo Y. Rechnitz on account of an antecedent debt, in accordance with 11 U.S.C. § 547, and recover such amount in accordance with 11 U.S.C. § 550.

10. Plaintiff is seeking to avoid a transfer of not less than $350,000.00 to Yisroel Zev Rechnitz on account of an antecedent debt, in accordance with 11 U.S.C. § 547, and recover such amount in accordance with 11 U.S.C. § 550.

11. Plaintiff is seeking to avoid a transfer of not less than $600,000.00 to Chaim Manela on account of an antecedent debt, in accordance with 11 U.S.C. § 547, and recover such amount in accordance with 11 U.S.C. § 550.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**THE PARTIES**

12.     Plaintiff brings this action solely in his capacity as the Trustee of the Debtor's bankruptcy estate.

13.     Leslie Klein, the Debtor, is an individual who is a debtor in the above-captioned bankruptcy case and resides in Los Angeles, California.

14.     Plaintiff is informed and believes that defendant Life Capital Group, LLC ("**LCG**") is a California limited liability company that was formed on or about April 8, 2011.

15.     Plaintiff is informed and believes that defendant Shlomo Y. Rechnitz ("**Rechnitz**") is an individual who at all times herein maintained a residence in the Central District of California and is also one of the members of LCG.

16.     Plaintiff is informed and believes that defendant Yisroel Zev Rechnitz ("**Yisroel**") is an individual who at all times herein maintained a residence in the Central District of California.

17.     Plaintiff is informed and believes that defendant Chaim Manela ("**Manela**") is an individual who at all times herein maintained a residence in the Central District of California.

18.     Plaintiff is informed and believes that defendant Jonathan Polter ("**Polter**") is an individual who maintains a residence at 2000 Town Center, Suite 1490, Southfield, Michigan 48075 and serves as manager of LCG.

19.     Plaintiff is informed and believes that Security Life of Denver Insurance Company ("**Security Life**" and together with LCG, Rechnitz, Yisroel, and Polter, each a "**Defendant**" and together, the "**Defendants**") is a corporation organized under the laws of Colorado located at 7535 E. Hampden Ave, Ste. 400, Rm 446, Denver, CO 80231.

**JURISDICTION AND VENUE**

20.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(a) and §1334(b).

21.     Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

22.     This adversary proceeding is commenced pursuant to Rules 7001(a), (i), and (g) of the Federal Rules of Bankruptcy Procedure, 11 U.S.C. §§ 542, 544, 547, 548 and 550, and is a core proceeding under 28 U.S.C. § 157(b)(2)(A) & (H).

## STATEMENT OF FACTS SUPPORTING CLAIMS FOR RELIEF

**A.     Case Background**

23.     On February 22, 2023 (the "**Petition Date**") [Bankr. Docket No. 1], the Debtor commenced a voluntary chapter 11 case in the United States Bankruptcy Court for the Central District of California (Los Angeles Division) Case No. 23-10990-SK (the "**Bankruptcy Case**").

24.     On May 23, 2023, the Office of the United States Trustee (the "**UST**") filed a *Notice of Appointment of Chapter 11 Trustee* [Docket No. 151]. On May 24, 2023, the UST filed an *Application for Order Approving Appointment of Trustee and Fixing Bond* [Docket No. 154], which was approved by order entered the same day [Docket No. 155]. On that same day, the Trustee accepted his appointment [Docket No. 156], as the chapter 11 trustee of the Debtor's bankruptcy estate.

25.     On March 8, 2023, the Debtor filed his schedules of assets and liabilities ("**Schedules**") and statement of financial affairs (the "**SOFAs**") [Bankr. Docket No. 34].

**B.     Formation of Life Capital Group, LLC**

26.     LCG was formed on or about April 8, 2011, by the filing of a certificate of formation with the Secretary of State of California.

27.     On or about June 1, 2011, the Debtor and Rechnitz executed the LLC Agreement, which, among other things, established the rules regarding the management, governance, capitalization, and distributions from LCG to its two sole "Members," the Debtor and Rechnitz.

28.     Polter serves as the "Manager" of LCG.

**C.     Purpose of Life Capital Group, LLC**

29.     In connection with the formation of LCG, Plaintiff is informed and believes that the Debtor transferred or assigned to LCG approximately 22 life insurance policies (the "**LCG Policies**"). The Settled LCG Policies were among the LCG Policies.

30.     Pursuant to the terms of the LLC Agreement, the Debtor's capital contribution into LCG consisted of the LCG Policies and the total amount of premiums payments and other costs the Debtor contributed toward his maintenance of the LCG Policies.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

31.     LCG, through the contributions made by Rechnitz to LCG, maintained the LCG Policies by making the required premium payments due under each of the LCG Policies.

**D.      Debtor's and Rechnitz's Capital Contributions Per the LLC Agreement**

32.     Per the terms of Section 3.1 of the LLC Agreement, the Debtor's initial capital contribution is equal to the sum of the total amount of premiums and other costs associated with maintaining the LCG Policies prior to their transfer to LCG.

33.     Per the terms of Section 3.1 of the LLC Agreement, Rechnitz's initial capital contribution was $3,800,000.00 as allocated among the various LCG Polices and the payment of premiums and respective costs associated with each LCG Policy.

34.     Per the terms of Section 3.2 of the LLC Agreement, Rechnitz was obligated to provide the necessary capital to satisfy the premium payments and other costs associated with maintaining the LCG Policies.

**E.      Payment of LCG Policy Proceeds to the Debtor & Rechnitz Per the LLC Agreement**

35.     Section 4.3 of the LLC Agreement outlines the terms and conditions of the amount and timing of distributing the proceeds of matured LCG Policies to both Rechnitz and the Debtor.

36.     Section 4.3(a) of the LLC Agreement provides that upon the death of an insured covered by a LCG Policy, the proceeds of such LCG Policy are first paid to Rechnitz in an amount equal to the "Rechnitz Amount."

37.     Per the terms of the LLC Agreement, the Rechnitz Amount means "(x) the total amount of Capital Contributions made by Rechnitz related to such [LCG] Policy (y) the Priority Return."

38.     Section 4.3(b) of the LLC Agreement provides that upon the death of an insured covered by a LCG Policy, the proceeds of such LCG Policy are next paid to satisfy any outstanding loans, and then after the loans are paid in full the proceeds of such LCG Policy are next paid to the Debtor in amount equal to the "Klein Amount."

39.     Per the terms of the LLC Agreement, the Klein Amount means "(x) the total amount of Capital Contributions made by Klein related to such Policy and (y) the Priority Return for Klein on such Policy."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

40.     Section 4.3(c) of the LLC Agreement provides that any remaining proceeds from the LCG Policies are divided evenly between the Debtor and Rechnitz.

**F.      The LCG Settlement Agreement**

41.     As set forth in the Exhibit A to the LCG Settlement Agreement, the settlement encompassed the policy proceeds of arising from the Gardner Policies, which equaled $10,316,132.00 and matured upon the date that the second insured died.

42.     The LCG Settlement Agreement also included the settlement of the Debtor's distribution from the Goldstein Policy in the amount of $1,503,945.21, the Holzman Policy in the amount of $8,000.000.00, and the Berke Klein Policy in the amount of $2,929,940.00.

43.     In total, the proceeds from Settled LCG Policies equaled $22,750,017.00 (the "**Settled Policy Proceeds**").

44.     Of the Settled Policy Proceeds, the Debtor purportedly received or was credited with respect to other debts a total approximate amount of $3,697,816.71.

45.     Had LCG distributed the Settled Policy Proceeds in accordance with the terms of the LLC Agreement, the Plaintiff believes that the Debtor was entitled to no less than $8,454,702.00.

46.     Per the terms of the LCG Settlement Agreement, Klein released (the "**Klein Release**") Rechnitz, Polter, and LCG, among others, with respect to any claims "in any way related to the Klein Action [*i.e.*, the State Court Action], the Din Torah, and/or LCG, **including any challenge to any accounting or accounting conventions or calculations stated or implied therein or in Exhibit A hereto, Death Benefits, and Policies**."

47.     Per the terms of the LCG Settlement Agreement, Rechnitz, Polter, and LCG did **not** provide any form of a release to the Debtor.

**G.      The Preferential Payments or Transfers**

48.     Using the LCG Defendants' accounting, Exhibit A to the LCG Settlement Agreement reflects that the Debtor was entitled to $3,697,816.71.

49.     The Debtor did not receive $3,697,816.71.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

50. Instead, the $3,697,816.71 proceeds payable to the Debtor under the LCG Settlement Agreement were allegedly distributed as follows:

    a.     $1,250,000.00 by check to the Debtor.

    b.     $500,000.00 by check to the Debtor in six months after the settlement.

    c.     $500,000.00 by check to Rechnitz on account of a debt.

    d.     $350,000.00 by check to Yisroel on account of a debt.

    e.     $600,000.00 by check to Manela on account of a debt.

    f.     $497,816.71 to a reserve account maintained by LCG per the terms of the LLC Agreement.

51. Of the $3,697,816.71 in proceeds from the LCG Settlement Agreement, $500,000.00 was used to pay an outstanding debt owed to Rechnitz.

52. Of the $3,697,816.71 in proceeds from the LCG Settlement Agreement, $350,000.00 was used to pay an outstanding debt owed to Yisroel.

53. Of the $3,697,816.71 in proceeds from the LCG Settlement Agreement, $600,000.00 was used to pay an outstanding debt owed to Manela; however, the Debtor was entitled to retain every dollar of the $600,000.00 that the Debtor was able to reduce from the debt payable to Manela.

54. The Debtor's Schedules and SOFA did not disclose the LCG Settlement Agreement.

55. The Debtor's Schedules and SOFA did not disclose the three transfers described in Paragraphs 53-55 hereof.

## FIRST CLAIM FOR RELIEF

**(Avoidance of LCG Settlement Agreement as Constructively Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B))**

56. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

57. Per the terms of the LCG Settlement Agreement, the Debtor did not receive consideration and/or did not receive reasonably equivalent value in exchange for the Klein

1    Settlement Payment and the Klein Release in light of the terms and conditions of the Debtor's

2    entitlements under the LCC Agreement.

3    58.    Plaintiff is informed and believes that at the time the Debtor entered into the LCG

4    Settlement Agreement, the Debtor (a) was insolvent on the date the LCG Settlement Agreement

5    became effective or became insolvent as a result of the Debtor's entry into the LCG Settlement

6    Agreement, (b) was engaged or was about to be engaged in a business or transaction for which the

7    remaining assets were unreasonably small in relation to the business or transaction, or (c) intended

8    to incur, or reasonably should have believed that it would incur, debts beyond their ability to pay

9    as they came due.

10    59.    Accordingly, the LCG Settlement Agreement is avoidable, and should be avoided,

11    as fraudulent pursuant to 11 U.S.C. § 548(a)(1(B).

## SECOND CLAIM FOR RELIEF

**(Avoidance of LCG Settlement Agreement as Constructively Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b) and Sections 3439.04(a)(2) and 3439.05 of California Civil Code)**

60.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

61.    Plaintiff is informed and believes, and, based thereon alleges, that there is at least one creditor of the Debtor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code, or that is not allowable only under section 502(e) of the Bankruptcy Code, that may avoid the LCG Settlement Agreement, pursuant to California Code of Civil Procedure §§ 3439.04(2) and 3439.05.

62.    At the time of the Debtor's entry into the LCG Settlement Agreement, the Debtor: (a) was insolvent, or became insolvent as a result of the LCG Settlement Agreement; (b) was engaged in the business or transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (c) intended to incur, or believed that he would incur, debts that would be beyond the Debtor's ability to pay as such debts as they matured.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

63.     The Plaintiff may avoid the LCG Settlement Agreement, pursuant to section 544(b) of the Bankruptcy Code and Sections 3439.04(a)(2) and 3439.05 of California Civil Code.

## THIRD CLAIM FOR RELIEF

### (Recovery of Transfers Pursuant to 11 U.S.C. § 550 and Cal. Civil Code § 3439.07)

64.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

65.     Having avoided the LCG Settlement Agreement, the Plaintiff is entitled to recover from Rechnitz, LCG, and Polter the value the Debtor was entitled per the terms of the LLC Agreement, pursuant to 11 U.S.C. § 550 and/or Cal. Civil Code § 3439.07.

## FOURTH CLAIM FOR RELEIF

### (Accounting of LCG, Including the Debtor's Entitlements Thereunder, Pursuant to 11 U.S.C. § 542(a))

66.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

67.     As forth herein, the LLC Agreement provides for the maintenance of the LCG Policies, which includes the Settled LCG Policies, and terms and conditions under which Rechnitz and the Debtor are entitled to receive the proceeds from such policies.

68.     Pursuant to section 542(a) of the Bankruptcy Code, Plaintiff is seeking an accounting from LCG of the capital contributions made by Rechnitz and the Debtor, the premiums and other costs there were paid for each of the LCG Policies by Rechnitz and the Debtor, and Rechnitz's and the Debtor's respective entitlements to the proceeds of the LCG Policies, each on a policy-by-policy basis.

## FIFTH CLAIM FOR RELIEF

69.     [WITHDRAWN, WITH PREJUDICE.]

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## SIXTH CLAIM FOR RELIEF

**(Injunction, Pursuant to Bankruptcy Rule 7001(g), Compelling Rechnitz, LCG, and Polter to Comply with the Terms of the LLC Agreement)**

70.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

71.     In accordance with the findings relating to the Fourth Claim for Relief (i.e., the accounting), Plaintiff seeks an injunction that compels LCG, Rechnitz, and Polter to comply with the terms of the LLC Agreement, including, but not limited to, turning over any and all amounts that the Debtor's estate are entitled to per the terms of the LLC Agreement.

## SEVENTH CLAIM FOR RELIEF

**(As to Rechnitz For Avoidance of Preferential Transfer Pursuant to 11 U.S.C. § 547)**

72.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

73.     All of the $3,697,816.71 in LCG Settlement Proceeds were not transferred to the Debtor on or after December 5, 2022, in connection with the closing of such settlement.

74.     Instead, $500,000.00 of the $3,697,816.71 (*i.e.*, cash that the Debtor was entitled to) was transferred to Rechnitz.  11 U.S.C. § 547(b)(1).

75.     The LCG Settlement Agreement reflects that the $500,000 transfer to Rechnitz was for or on account of an antecedent debt owed by the Debtor before the $500,000 transfer was made. 11 U.S.C. § 547(b)(2).

76.     The $500,000.00 transfer to Rechnitz was made while the Debtor was insolvent. Plaintiff is entitled to a presumption of insolvency for any transfer made by the Debtor or for his benefit make on or before the 90 days prior to the Petition Date, pursuant to 11 U.S.C. § 547(f). 11 U.S.C. § 547(b)(3).

77.     Debtor filed his voluntary chapter 11 petition on February 22, 2023.  The $500,000.00 transfer to Rechnitz occurred on or after December 5, 2022. The $500,000.00 transfer to Rechnitz at issue, therefore, occurred within 90 days before the Petition Date.  11 U.S.C. § 547(b)(4).

78.    As a result of the $500,000.00 transfer to Rechnitz, Rechnitz received more than he would have received if (i) the Bankruptcy Case was a case under chapter 7; (ii) the $500,000.00 transfer had not been made; and (iii) Rechnitz received payment of his debt under the provisions of the Bankruptcy Code.  Unless set aside, the $500,000.00 transfer to Rechnitz would provide Rechnitz more than he would otherwise be entitled to receive.  11 U.S.C. § 547(b)(5).

79.    In accordance with the foregoing, the $500,000.00 transfer to Rechnitz is avoidable, pursuant to 11 U.S.C. § 547(b), and Plaintiff is entitled to an order and judgment under 11 U.S.C. § 547 that the $500,000.00 transfer to Rechnitz is avoided.

## EIGHTH CLAIM FOR RELIEF

### (As to Rechnitz For Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550)

80.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

81.    Plaintiff is entitled to avoid the $500,000.00 transfer to Rechnitz pursuant to 11 U.S.C. § 547(b).

82.    Rechnitz is the initial transferee of the $500,000.00 transfer.

83.    Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover the $500,000.00 transfer from Rechnitz, plus the costs of this action.

## NINTH CLAIM FOR RELIEF

### (As to Yisroel For Avoidance of Preferential Transfer Pursuant to 11 U.S.C. § 547)

84.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

85.    All of the $3,697,816.71 in LCG Settlement Proceeds were not transferred to the Debtor on or after December 5, 2022, in connection with the closing of such settlement.

86.    Instead, $350,000.00 of the $3,697,816.71 (*i.e.*, cash that the Debtor was entitled to) was transferred to Yisroel.  11 U.S.C. § 547(b)(1).

87.    The LCG Settlement Agreement reflects that the $350,000.00 transfer to Yisroel was for or on account of an antecedent debt owed by the Debtor before $350,000 transfer was made. 11 U.S.C. § 547(b)(2).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

88.     The $350,000.00 transfer to Yisroel was made while the Debtor was insolvent. Plaintiff is entitled to a presumption of insolvency for any transfer made by the Debtor or for his benefit made on or before the 90 days prior to the Petition Date, pursuant to 11 U.S.C. § 547(f). 11 U.S.C. § 547(b)(3).

89.     Debtor filed his voluntary chapter 11 petition on February 22, 2023.  The $350,000.00 transfer to Yisroel occurred on or after December 5, 2022. The $350,000.00 transfer to Rechnitz at issue, therefore, occurred within 90 days before the Petition Date.  11 U.S.C. § 547(b)(4).

90.     As a result of the $350,000.00 transfer to Yisroel, Yisroel would received more than Yisroel would have received if (i) the Bankruptcy Case was a case under chapter 7; (ii) the $350,000.00 transfer had not been made; and (iii) Yisroel received payment of Yisroel's debt under the provisions of the Bankruptcy Code.  Unless set aside, the $500,000.00 transfer to Yisroel would provide Yisroel more than Yisroel would otherwise be entitled to receive. 11 U.S.C. § 547(b)(5).

91.     In accordance with the foregoing, the $500,000.00 transfer to Yisroel is avoidable, pursuant to 11 U.S.C. § 547(b), and Plaintiff is entitled to an order and judgment under 11 U.S.C. § 547 that the $500,000.00 transfer to Yisroel is avoided.

## **TENTH CLAIM FOR RELIEF**

**(As to Yisroel For Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550)**

92.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

93.     Plaintiff is entitled to avoid the $350,000.00 transfer to Yisroel pursuant to 11 U.S.C. § 547(b).

94.     Yisroel is the initial transferee of the $350,000.00 transfer.

95.     Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover the $350,000.00 transfer from Yisoel, plus the costs of this action.

**ELEVENTH CLAIM FOR RELIEF**

**(As to Manela For Avoidance of Preferential Transfer Pursuant to 11 U.S.C. § 547)**

96.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

97.     All of the $3,697,816.71 in LCG Settlement Proceeds were not transferred to the Debtor on or after December 5, 2022, in connection with the closing of such settlement.

98.     Instead, at least $600,000.00 of the $3,697,816.71 (i.e., cash that the Debtor was entitled to) was transferred to Manela.  11 U.S.C. § 547(b)(1).

99.     The LCG Settlement Agreement reflects that the $600,000.00 transfer to Manela was for or on account of an antecedent debt owed by the Debtor before the $600,000 transfer was made. 11 U.S.C. § 547(b)(2).

100.     The $600,000.00 transfer to Manela was made while the Debtor was insolvent. Plaintiff is entitled to a presumption of insolvency for any transfer made by the Debtor or for his benefit make on or before the 90 days prior to the Petition Date, pursuant to 11 U.S.C. § 547(f). 11 U.S.C. § 547(b)(3).

101.     Debtor filed his voluntary chapter 11 petition on February 22, 2023.  The $600,000.00 transfer to Manela occurred on or after December 5, 2022. The $600,000.00 transfer to Manela at issue, therefore, occurred within 90 days before the Petition Date.  11 U.S.C. § 547(b)(4).

102.     As a result of the $600,000.00 transfer to Manela, Manela received more than he would have received if (i) the Bankruptcy Case was a case under chapter 7; (ii) the $600,000.00 transfer had not been made; and (iii) Manela received payment of his debt under the provisions of the Bankruptcy Code.  Unless set aside, the $600,000.00 transfer to Manela would provide Manela more than he would otherwise be entitled to receive.  11 U.S.C. § 547(b)(5).

103.     In accordance with the foregoing, the $600,000.00 transfer to Manela is avoidable, pursuant to 11 U.S.C. § 547(b), and Plaintiff is entitled to an order and judgment under 11 U.S.C. § 547 that the $600,000.00 transfer to Manela is avoided.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

## TWELFTH CLAIM FOR RELIEF

2

### (As to Manela For Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550)

3    104.    Plaintiff realleges and incorporates herein by reference each and every allegation

4   set forth in the above paragraphs as though fully set forth herein.

5    105.    Plaintiff is entitled to avoid the $600,000.00 transfer to Manela pursuant to 11

6   U.S.C. § 547(b).

7    106.    Manela is the initial transferee of the $600,000.00 transfer.

8    107.    Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover the $600,000.00

9   transfer from Manela, plus the costs of this action.

10   **WHEREFORE**, the Plaintiff prays for judgment as follows:

11   1.    On the First Claim for Relief for the avoidance of a constructive fraudulent transfer of the

12   releases arising under the LCG Settlement Agreement, pursuant to 11 U.S.C. § 548(a)(1)(B).

13   2.    On Second Claim for Relief for the avoidance of a constructive fraudulent transfer of the

14   releases arising under the LCG Settlement Agreement, pursuant to 11 U.S.C. § 544(b) and

15   Sections 3439.04(a)(2) and 3439.05 of California Civil Code.

16   3.    On Third Claim for Relief recovery of the value the Debtor is entitled to recovery by virtue

17   of the avoidance of the constructive fraudulent transfers under the First Claim for Relief and the

18   Second Claim for Relief, pursuant to 11 U.S.C. § 550 and Cal. Civil Code § 3439.07.

19   4.    On Fourth Claim for Relief for an accounting of LCG and the Debtor's entitlements

20   thereunder, pursuant to 11 U.S.C. § 542(a).

21   5.    On Sixth Claim for Relief for an injunction compelling Rechnitz, LCG, and Polter to

22   comply with the terms of the LLC Agreement and turnover any all entitlements payable to the

23   Debtor's estate.

24   6.    On the Seventh Claim for Relief, avoidance of the $500,000.00 transfer to Rechnitz.

25   7.    On the Eighth Claim for Relief, recovery of the $500,000.00 transfer to Rechnitiz.

26   8.    On the Ninth Claim for Relief, avoidance of the $350,000.00 transfer to Yisroel.

27   9.    On the Tenth Claim for Relief, recovery of the $350,000.00 transfer to Yisroel.

28   10.    On the Eleventh Claim for Relief, avoidance of the $600,000.00 transfer to Manela.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    11.    On the Twelfth Claim for Relief, recovery of the $600,000.00 transfer to Manela.

2    12.    For costs of suit incurred herein and pre-judgment interest.

3    13.    For such other and further relief as the Court may deem just and proper.

4    Dated:  August __, 2025                    PACHULSKI STANG ZIEHL & JONES LLP

5

6                                      By _____

7                                           Jeffrey W. Dulberg
                                             John W. Lucas
8                                            Jeffrey P. Nolan

9                                           *Attorneys for Bradley D. Sharp,*
10                                          *Chapter 11 Trustee*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**EXHIBIT B**

(Blacklined Comparison )

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Jeffrey W. Dulberg (CA Bar No. 181200)
John W. Lucas (CA Bar No. 271038)
Jeffrey P. Nolan (CA Bar No. 158923)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4003
Telephone: 310-277-6910
Facsimile: 310-201-0760
Email: jdulberg@pszjlaw.com
       jlucas@pszjlaw.com
       jnolan@pszjlaw.com

*Attorneys for Bradley D. Sharp, Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>LESLIE KLEIN,<br><br>　　　　　Debtor. | Case No. 2:23-bk-10990-SK<br><br>Chapter 11 |
| BRADLEY D. SHARP, Chapter 11 Trustee,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>LIFE CAPITAL GROUP, LLC, a limited liability company, SHLOMO Y. RECHNITZ, individually and as a member of LIFE CAPITAL GROUP, LLC, YISROEL ZEV RECHNITZ, an individual, CHAIM MANELA, an individual, JONATHAN POLTER, an individual and as a manager of LIFE CAPITAL GROUP, and SECURITY LIFE OF DENVER LIFE INSURANCE COMPANY,<br><br>　　　　　Defendants. | Adv No.<br>2:24-ap-～～～～～01020-~~SK~~NB<br><br>**AMENDED** COMPLAINT<br><br>**(1) Constructive Fraudulent Transfer (11 U.S.C. § 548)**<br>**(2) Constructive Fraudulent Transfer (11 U.S.C. § 544)**<br>**(3) Recovery of Constructive Fraudulent Transfers (11 U.S.C. § 550 and Cal. Civil Code § 3439.07)**<br>**(4) Accounting (11 U.S.C. § 542)**<br>**(5)** ~~Breach of Contract~~**[Omitted]**<br>**(6) Injunction**<br>**(7) Avoidance of Preference – Rechnitz (11 U.S.C. § 547)**<br>**(8) Recovery of Preference -Rechnitz (11 U.S.C. § 550)**<br>**(9) Avoidance of Preference – Y. Rechnitz (11 U.S.C. § 547)**<br>**(10)** **Recovery of Preference -Y. Rechnitz (11 U.S.C. § 550)**<br>**(11)** **Avoidance of Preference – Manela (11 U.S.C. § 547)**<br>**(12)** **Recovery of Preference -Manela (11 U.S.C. § 550)** |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Bradley D. Sharp ("**Plaintiff**" or "**Trustee**"), the duly appointed trustee for the chapter 11 estate of Leslie Klein (the "**Debtor**"), in support of his Complaint for Avoidance and Recovery of Fraudulent Transfers and Avoidance and Recovery of Preferential Transfers, ~~and~~ alleges as follows:

## OVERVIEW OF CLAIMS FOR RELIEF

1.     This is an adversary proceeding brought pursuant to Sections 542, 544, 547, 548 of the Bankruptcy Code and Rules 7001(a), 7001(i), and 7001(g) of the Federal Rules of Bankruptcy Procedure.

2.     The Debtor entered into the *Mutual Release of all Claims and Settlement Agreement*, dated December 5, 2022 (the "**LCG Settlement Agreement**") by and among Leslie Klein (the "**Debtor**"), Life Capital Group, LLC ("**LCG**"), Shlomo Y. Rechnitz ("**Rechnitz**"), and Jonathan Polter ("**Polter**" and together with LCG and Rechnitz, the "**LCG Defendants**").

3.     On or around the same time, the Debtor entered in the *Mutual Release of all Claims and Settlement Agreement*, dated December 12, 2022 (the "Security Settlement Agreement" and together with the LCG Settlement Agreement, the "Settlement Agreements") by and among the Debtor, LCG, and Security Life of Denver Insurance Company ("Security Life").[1]

4.     By this adversary proceeding, Plaintiff seeks to avoid the release by the Debtor under the LCG Settlement Agreement, as a constructive fraudulent transfer, of his rights and entitlements to distributions from the proceeds of life insurance policies governed by the terms and conditions of that certain *Limited Liability Operating Agreement of Life Capital Group, LLC*, dated June 1, 2011 (the "**LLC Agreement**") and recover the property and/or value therefrom.

---

[1] It is Plaintiff's understanding that Security Life tendered the insurance proceeds from the Gardner Policies and such proceeds were used to pay some or all of the other named defendants in this adversary proceeding. Plaintiff's action is directed at LCG, Rechnitz, and Polter, not Security Life. However, Plaintiff files this adversary against Security Life out of an abundance of caution on account of the release arising from the Security Settlement Agreement. If the relief sought by Plaintiff can be obtained through the sole adjudication of the LCG Settlement Agreement without including the Security Settlement Agreement, then Plaintiff is willing to withdraw the Complaint as it pertains to Security Life.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5.      Plaintiff is seeking to avoid above described fraudulent transfers of the Settlement Agreement and to recover the property, or the value thereof, in accordance with 11 U.S.C. §§ 544 (and applicable state law), 548, and 550

~~6.      Plaintiff seeks a declaratory judgment that LCG, Rechnitz, and Polter breached the LLC Agreement and the recovery of damages therefrom, each in accordance with applicable law in the state of California.~~

6.      ~~7.~~ The Settlement Agreements arose in response to an action commenced by the Debtor in the Los Angeles Superior Court, Case No. Case No. 22STCV18787 (the "**State Court Action**"), against the foregoing parties regarding the Debtor's rights and entitlements to the policy proceeds of the following life insurance policies: (a) policy numbers 1621379 and 1625579 (the "**Gardner Policies**"), (b) policy number 156208510 (the "**Goldstein Policy**"), (c) policy number 60030333 (the "**Holtzman Policy**"), and (d) policy number US0016022L (the "**Berke Klein Policy**" and together with the Gardner Policies and Holtzman Policy, the "**Settled LCG Polices**") that were each transferred to LCG by the Debtor and were each subject to and governed by the LLC Agreement.

7.      ~~8.~~ Plaintiff is seeking an accounting from LCG of LCG's maintenance of the LCG Policies that includes the capital contributions of Rechnitz and the Debtor on a policy-by-policy basis, any loans and the repayment thereof, all costs associated with the LCG Policies on a policy-by-policy basis, and all entitlements of Rechnitz and the Debtor to the proceeds of the Settled LCG Policies and the LCG Policies on a policy-by-policy basis, in accordance with 11 U.S.C. § 542(a).

~~9.      Plaintiff is seeking a declaratory judgment that the LCG Defendants breached the LLC Agreement and recovery of damages in an amount no less than $8,454,702.00 arising from such breach.~~

8.      ~~10.~~ Plaintiff is seeking an injunction, pursuant to Bankruptcy Rule 7001(g), compelling the LCG Defendants to distribute to the Debtor's estate the value of the Settled LCG Policies in accordance with the terms of the LLC Agreement.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

9.    11. Plaintiff is seeking to avoid a transfer of not less than $500,000.00 to Shlomo Y. Rechnitz on account of an antecedent debt, in accordance with 11 U.S.C. § 547, and recover such amount in accordance with 11 U.S.C. § 550.

10.    12. Plaintiff is seeking to avoid a transfer of not less than $350,000.00 to Yisroel Zev Rechnitz on account of an antecedent debt, in accordance with 11 U.S.C. § 547, and recover such amount in accordance with 11 U.S.C. § 550.

11.    13. Plaintiff is seeking to avoid a transfer of not less than $600,000.00 to Chaim Manela on account of an antecedent debt, in accordance with 11 U.S.C. § 547, and recover such amount in accordance with 11 U.S.C. § 550.

## THE PARTIES

12.    14. Plaintiff brings this action solely in his capacity as the Trustee of the Debtor's bankruptcy estate.

13.    15. Leslie Klein, the Debtor, is an individual who is a debtor in the above-captioned bankruptcy case and resides in Los Angeles, California.

14.    16. Plaintiff is informed and believes that defendant Life Capital Group, LLC ("**LCG**") is a California limited liability company that was formed on or about April 8, 2011.

15.    17. Plaintiff is informed and believes that defendant Shlomo Y. Rechnitz ("**Rechnitz**") is an individual who at all times herein maintained a residence in the Central District of California and is also one of the members of LCG.

16.    18. Plaintiff is informed and believes that defendant Yisroel Zev Rechnitz ("**Yisroel**") is an individual who at all times herein maintained a residence in the Central District of California.

17.    19. Plaintiff is informed and believes that defendant Chaim Manela ("**Manela**") is an individual who at all times herein maintained a residence in the Central District of California.

18.    20. Plaintiff is informed and believes that defendant Jonathan Polter ("**Polter**") is an individual who maintains a residence at 2000 Town Center, Suite 1490, Southfield, Michigan 48075 and serves as manager of LCG.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

19. 21. Plaintiff is informed and believes that Security Life of Denver Insurance Company ("**Security Life**" and together with LCG, Rechnitz, Yisroel, and Polter, each a "**Defendant**" and together, the "**Defendants**") is a corporation organized under the laws of Colorado located at 7535 E. Hampden Ave, Ste. 400, Rm 446, Denver, CO 80231.

**JURISDICTION AND VENUE**

20. 22. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(a) and §1334(b).

21. 23. Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

22. 24. This adversary proceeding is commenced pursuant to Rules 7001(a), (i), and (g) of the Federal Rules of Bankruptcy Procedure, 11 U.S.C. §§ 542, 544, 547, 548 and 550, and is a core proceeding under 28 U.S.C. § 157(b)(2)(A) & (H).

**STATEMENT OF FACTS SUPPORTING CLAIMS FOR RELIEF**

A.    **Case Background**

23. 25. On February 22, 2023 (the "**Petition Date**") [Bankr. Docket No. 1], the Debtor commenced a voluntary chapter 11 case in the United States Bankruptcy Court for the Central District of California (Los Angeles Division) Case No. 23-10990-SK (the "**Bankruptcy Case**").

24. 26. On May 23, 2023, the Office of the United States Trustee (the "**UST**") filed a *Notice of Appointment of Chapter 11 Trustee* [Docket No. 151]. On May 24, 2023, the UST filed an *Application for Order Approving Appointment of Trustee and Fixing Bond* [Docket No. 154], which was approved by order entered the same day [Docket No. 155]. On that same day, the Trustee accepted his appointment [Docket No. 156], as the chapter 11 trustee of the Debtor's bankruptcy estate.

25. 27. On March 8, 2023, the Debtor filed his schedules of assets and liabilities ("**Schedules**") and statement of financial affairs (the "**SOFAs**") [Bankr. Docket No. 34].

B.    **Formation of Life Capital Group, LLC**

26. 28. LCG was formed on or about April 8, 2011, by the filing of a certificate of formation with the Secretary of State of California.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

27. ~~29.~~ On or about June 1, 2011, the Debtor and Rechnitz executed the LLC Agreement, which, among other things, established the rules regarding the management, governance, capitalization, and distributions from LCG to its two sole "Members," the Debtor and Rechnitz.

28. ~~30.~~ Polter serves as the "Manager" of LCG.

**C.    Purpose of Life Capital Group, LLC**

29. ~~31.~~ In connection with the formation of LCG, Plaintiff is informed and believes that the Debtor transferred or assigned to LCG approximately 22 life insurance policies (the "**LCG Policies**"). The Settled LCG Policies were among the LCG Policies.

30. ~~32.~~ Pursuant to the terms of the LLC Agreement, the Debtor's capital contribution into LCG consisted of the LCG Policies and the total amount of premiums payments and other costs the Debtor contributed toward his maintenance of the LCG Policies.

31. ~~33.~~ LCG, through the contributions made by Rechnitz to LCG, maintained the LCG Policies by making the required premium payments due under each of the LCG Policies.

**D.    Debtor's and Rechnitz's Capital Contributions Per the LLC Agreement**

32. ~~34.~~ Per the terms of Section 3.1 of the LLC Agreement, the Debtor's initial capital contribution is equal to the sum of the total amount of premiums and other costs associated with maintaining the LCG Policies prior to their transfer to LCG.

33. ~~35.~~ Per the terms of Section 3.1 of the LLC Agreement, Rechnitz's initial capital contribution was $3,800,000.00 as allocated among the various LCG Polices and the payment of premiums and respective costs associated with each LCG Policy.

34. ~~36.~~ Per the terms of Section 3.2 of the LLC Agreement, Rechnitz was obligated to provide the necessary capital to satisfy the premium payments and other costs associated with maintaining the LCG Policies.

**E.    Payment of LCG Policy Proceeds to the Debtor & Rechnitz Per the LLC Agreement**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

35. ~~37.~~ Section 4.3 of the LLC Agreement outlines the terms and conditions of the amount and timing of distributing the proceeds of matured LCG Policies to both Rechnitz and the Debtor.

36. ~~38.~~ Section 4.3(a) of the LLC Agreement provides that upon the death of an insured covered by a LCG Policy, the proceeds of such LCG Policy are first paid to Rechnitz in an amount equal to the "Rechnitz Amount."

37. ~~39.~~ Per the terms of the LLC Agreement, the Rechnitz Amount means "(x) the total amount of Capital Contributions made by Rechnitz related to such [LCG] Policy (y) the Priority Return."

38. ~~40.~~ Section 4.3(b) of the LLC Agreement provides that upon the death of an insured covered by a LCG Policy, the proceeds of such LCG Policy are next paid to satisfy any outstanding loans, and then after the loans are paid in full the proceeds of such LCG Policy are next paid to the Debtor in amount equal to the "Klein Amount."

39. ~~41.~~ Per the terms of the LLC Agreement, the Klein Amount means "(x) the total amount of Capital Contributions made by Klein related to such Policy and (y) the Priority Return for Klein on such Policy."

40. ~~42.~~ Section 4.3(c) of the LLC Agreement provides that any remaining proceeds from the LCG Policies are divided evenly between the Debtor and Rechnitz.

**F.    The LCG Settlement Agreement**

41. ~~43.~~ As set forth in the Exhibit A to the LCG Settlement Agreement, the settlement encompassed the policy proceeds of arising from the Gardner Policies, which equaled $10,316,132.00 and matured upon the date that the second insured died.

42. ~~44.~~ The LCG Settlement Agreement also included the settlement of the Debtor's distribution from the Goldstein Policy in the amount of $1,503,945.21, the Holzman Policy in the amount of $8,000.000.00, and the Berke Klein Policy in the amount of $2,929,940.00.

43. ~~45.~~ In total, the proceeds from Settled LCG Policies equaled $22,750,017.00 (the "**Settled Policy Proceeds**").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

44. 46. Of the Settled Policy Proceeds, the Debtor purportedly received or was credited with respect to other debts a total approximate amount of $3,697,816.71.

45. 47. Had LCG distributed the Settled Policy Proceeds in accordance with the terms of the LLC Agreement, the Plaintiff believes that the Debtor was entitled to no less than $8,454,702.00.

46. 48. Per the terms of the LCG Settlement Agreement, Klein released (the "**Klein Release**") Rechnitz, Polter, and LCG, among others, with respect to any claims "in any way related to the Klein Action [*i.e.*, the State Court Action], the Din Torah, and/or LCG, **including any challenge to any accounting or accounting conventions or calculations stated or implied therein or in Exhibit A hereto, Death Benefits, and Policies**."

47. 49. Per the terms of the LCG Settlement Agreement, Rechnitz, Polter, and LCG did **not** provide any form of a release to the Debtor.

G.    **The Preferential Payments or Transfers**

48. 50. Using the LCG Defendants' accounting, Exhibit A to the LCG Settlement Agreement reflects that the Debtor was entitled to $3,697,816.71.

49. 51. The Debtor did not receive $3,697,816.71.

50. 52. Instead, the $3,697,816.71 proceeds payable to the Debtor under the LCG Settlement Agreement were allegedly distributed as follows:

      a.    $1,250,000.00 by check to the Debtor.

      b.    $500,000.00 by check to the Debtor in six months after the settlement.

      c.    $500,000.00 by check to Rechnitz on account of a debt.

      d.    $350,000.00 by check to Yisroel on account of a debt.

      e.    $600,000.00 by check to Manela on account of a debt.

      f.    $497,816.71 to a reserve account maintained by LCG per the terms of the LLC Agreement.

51. 53. Of the $3,697,816.71 in proceeds from the LCG Settlement Agreement, $500,000.00 was used to pay an outstanding debt owed to Rechnitz.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52. ~~54.~~ Of the $3,697,816.71 in proceeds from the LCG Settlement Agreement, $350,000.00 was used to pay an outstanding debt owed to Yisroel.

53. ~~55.~~ Of the $3,697,816.71 in proceeds from the LCG Settlement Agreement, $600,000.00 was used to pay an outstanding debt owed to Manela; however, the Debtor was entitled to retain every dollar of the $600,000.00 that the Debtor was able to reduce from the debt payable to Manela.

54. ~~56.~~ The Debtor's Schedules and SOFA did not disclose the LCG Settlement Agreement.

55. ~~57.~~ The Debtor's Schedules and SOFA did not disclose the three transfers described in Paragraphs 53-55 hereof.

## **FIRST CLAIM FOR RELIEF**

**(Avoidance of LCG Settlement Agreement as Constructively Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B))**

56. ~~58.~~ Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

57. ~~59.~~ Per the terms of the LCG Settlement Agreement, the Debtor did not receive consideration and/or did not receive reasonably equivalent value in exchange for the Klein Settlement Payment and the Klein Release in light of the terms and conditions of the Debtor's entitlements under the LCC Agreement.

58. ~~60.~~ Plaintiff is informed and believes that at the time the Debtor entered into the LCG Settlement Agreement, the Debtor (a) was insolvent on the date the LCG Settlement Agreement became effective or became insolvent as a result of the Debtor's entry into the LCG Settlement Agreement, (b) was engaged or was about to be engaged in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction, or (c) intended to incur, or reasonably should have believed that it would incur, debts beyond their ability to pay as they came due.

59. ~~61.~~ Accordingly, the LCG Settlement Agreement is avoidable, and should be avoided, as fraudulent pursuant to 11 U.S.C. § 548(a)(1(B).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**SECOND CLAIM FOR RELIEF**

**(Avoidance of LCG Settlement Agreement as Constructively Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b) and Sections 3439.04(a)(2) and 3439.05 of California Civil Code)**

60. ~~62.~~ Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

61. ~~63.~~ Plaintiff is informed and believes, and, based thereon alleges, that there is at least one creditor of the Debtor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code, or that is not allowable only under section 502(e) of the Bankruptcy Code, that may avoid the LCG Settlement Agreement, pursuant to California Code of Civil Procedure §§ 3439.04(2) and 3439.05.

62. ~~64.~~ At the time of the Debtor's entry into the LCG Settlement Agreement, the Debtor:  (a) was insolvent, or became insolvent as a result of the LCG Settlement Agreement; (b) was engaged in the business or transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (c) intended to incur, or believed that he would incur, debts that would be beyond the Debtor's ability to pay as such debts as they matured.

63. ~~65.~~ The Plaintiff may avoid the LCG Settlement Agreement, pursuant to section 544(b) of the Bankruptcy Code and Sections 3439.04(a)(2) and 3439.05 of California Civil Code.

**THIRD CLAIM FOR RELIEF**

**(Recovery of Transfers Pursuant to 11 U.S.C. § 550 and Cal. Civil Code § 3439.07)**

64. ~~66.~~ Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

65. ~~67.~~ Having avoided the LCG Settlement Agreement, the Plaintiff is entitled to recover from Rechnitz, LCG, and Polter the value the Debtor was entitled per the terms of the LLC Agreement, pursuant to 11 U.S.C. § 550 and/or Cal. Civil Code § 3439.07.

**FOURTH CLAIM FOR RELEIF**

**(Accounting of LCG, Including the Debtor's Entitlements Thereunder, Pursuant to 11 U.S.C. § 542(a))**

1   66.   68. Plaintiff realleges and incorporates herein by reference each and every

2   allegation set forth in the above paragraphs as though fully set forth herein.

3   67.   69. As forth herein, the LLC Agreement provides for the maintenance of the LCG

4   Policies, which includes the Settled LCG Policies, and terms and conditions under which Rechnitz

5   and the Debtor are entitled to receive the proceeds from such policies.

6   68.   70. Pursuant to section 542(a) of the Bankruptcy Code, Plaintiff is seeking an

7   accounting from LCG of the capital contributions made by Rechnitz and the Debtor, the premiums

8   and other costs there were paid for each of the LCG Policies by Rechnitz and the Debtor, and

9   Rechnitz's and the Debtor's respective entitlements to the proceeds of the LCG Policies, each on a

10   policy-by-policy basis.

11   **FIFTH CLAIM FOR RELIEF**

12   **(Breach of Contract of the LLC Agreement, Pursuant to Bankruptcy Rule 7001(a) and (i))**

13   71.   Plaintiff realleges and incorporates herein by reference each and every allegation

14   set forth in the above paragraphs as though fully set forth herein.

15   72.   By reason of the foregoing, Rechnitz, LCG, and Polter each breached the LLC

16   Agreement by failing to distribute the proceeds from the Settled LCG Policies in accordance with

17   the terms and conditions of the LLC Agreement.

18   73.   By reason of the foregoing, Rechnitz, LCG, and Polter have caused damage to the

19   Debtor's estate, in an amount, as nearly as can now be estimated, no less than $8,454,702.00, plus

20   the costs and expenses of initiating and continuing this adversary proceeding.

21   69.   [WITHDRAWN, WITH PREJUDICE.]

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**SIXTH CLAIM FOR RELIEF**

**(Injunction, Pursuant to Bankruptcy Rule 7001(g), Compelling Rechnitz, LCG, and Polter**

**to Comply with the Terms of the LLC Agreement)**

70. ~~74.~~ Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

71. ~~75.~~ In accordance with the findings relating to the Fourth Claim for Relief (i.e., the accounting), Plaintiff seeks an injunction that compels LCG, Rechnitz, and Polter to comply with the terms of the LLC Agreement, including, but not limited to, turning over any and all amounts that the Debtor's estate are entitled to per the terms of the LLC Agreement.

**SEVENTH CLAIM FOR RELIEF**

**(As to Rechnitz For Avoidance of Preferential Transfer Pursuant to 11 U.S.C. § 547)**

72. ~~76.~~ Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

73. ~~77.~~ All of the $3,697,816.71 in LCG Settlement Proceeds were not transferred to the Debtor on or after December 5, 2022, in connection with the closing of such settlement.

74. ~~78.~~ Instead, $500,000.00 of the $3,697,816.71 (*i.e.*, cash that the Debtor was entitled to) was transferred to Rechnitz. 11 U.S.C. § 547(b)(1).

75. ~~79.~~ The LCG Settlement Agreement reflects that the $500,000 transfer to Rechnitz was for or on account of an antecedent debt owed by the Debtor before the $500,000 transfer was made. 11 U.S.C. § 547(b)(2).

76. ~~80.~~ The $500,000.00 transfer to Rechnitz was made while the Debtor was insolvent. Plaintiff is entitled to a presumption of insolvency for any transfer made by the Debtor or for his benefit make on or before the 90 days prior to the Petition Date, pursuant to 11 U.S.C. § 547(f). 11 U.S.C. § 547(b)(3).

77. ~~81.~~ Debtor filed his voluntary chapter 11 petition on February 22, 2023. The $500,000.00 transfer to Rechnitz occurred on or after December 5, 2022. The $500,000.00 transfer

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    to Rechnitz at issue, therefore, occurred within 90 days before the Petition Date.  11 U.S.C. §

2    547(b)(4).

3    78. ~~82.~~ As a result of the $500,000.00 transfer to Rechnitz, Rechnitz received more

4    than he would have received if (i) the Bankruptcy Case was a case under chapter 7; (ii) the

5    $500,000.00 transfer had not been made; and (iii) Rechnitz received payment of his debt under the

6    provisions of the Bankruptcy Code.  Unless set aside, the $500,000.00 transfer to Rechnitz would

7    provide Rechnitz more than he would otherwise be entitled to receive.  11 U.S.C. § 547(b)(5).

8    79. ~~83.~~ In accordance with the foregoing, the $500,000.00 transfer to Rechnitz is

9    avoidable, pursuant to 11 U.S.C. § 547(b), and Plaintiff is entitled to an order and judgment under

10    11 U.S.C. § 547 that the $500,000.00 transfer to Rechnitz is avoided.

## EIGHTH CLAIM FOR RELIEF

### (As to Rechnitz For Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550)

13    80. ~~84.~~ Plaintiff realleges and incorporates herein by reference each and every

14    allegation set forth in the above paragraphs as though fully set forth herein.

15    81. ~~85.~~ Plaintiff is entitled to avoid the $500,000.00 transfer to Rechnitz pursuant to 11

16    U.S.C. § 547(b).

17    82. ~~86.~~ Rechnitz is the initial transferee of the $500,000.00 transfer.

18    83. ~~87.~~ Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover the $500,000.00

19    transfer from Rechnitz, plus the costs of this action.

## NINTH CLAIM FOR RELIEF

### (As to Yisroel For Avoidance of Preferential Transfer Pursuant to 11 U.S.C. § 547)

22    84. ~~88.~~ Plaintiff realleges and incorporates herein by reference each and every

23    allegation set forth in the above paragraphs as though fully set forth herein.

24    85. ~~89.~~ All of the $3,697,816.71 in LCG Settlement Proceeds were not transferred to

25    the Debtor on or after December 5, 2022, in connection with the closing of such settlement.

26    86. ~~90.~~ Instead, $350,000.00 of the $3,697,816.71 (*i.e.*, cash that the Debtor was

27    entitled to) was transferred to Yisroel.  11 U.S.C. § 547(b)(1).

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

87. 91. The LCG Settlement Agreement reflects that the $350,000.00 transfer to Yisroel was for or on account of an antecedent debt owed by the Debtor before $350,000 transfer was made. 11 U.S.C. § 547(b)(2).

88. 92. The $350,000.00 transfer to Yisroel was made while the Debtor was insolvent. Plaintiff is entitled to a presumption of insolvency for any transfer made by the Debtor or for his benefit made on or before the 90 days prior to the Petition Date, pursuant to 11 U.S.C. § 547(f). 11 U.S.C. § 547(b)(3).

89. 93. Debtor filed his voluntary chapter 11 petition on February 22, 2023.  The $350,000.00 transfer to Yisroel occurred on or after December 5, 2022. The $350,000.00 transfer to Rechnitz at issue, therefore, occurred within 90 days before the Petition Date.  11 U.S.C. § 547(b)(4).

90. 94. As a result of the $350,000.00 transfer to Yisroel, Yisroel would received more than Yisroel would have received if (i) the Bankruptcy Case was a case under chapter 7; (ii) the $350,000.00 transfer had not been made; and (iii) Yisroel received payment of Yisroel's debt under the provisions of the Bankruptcy Code.  Unless set aside, the $500,000.00 transfer to Yisroel would provide Yisroel more than Yisroel would otherwise be entitled to receive.  11 U.S.C. § 547(b)(5).

91. 95. In accordance with the foregoing, the $500,000.00 transfer to Yisroel is avoidable, pursuant to 11 U.S.C. § 547(b), and Plaintiff is entitled to an order and judgment under 11 U.S.C. § 547 that the $500,000.00 transfer to Yisroel is avoided.

**TENTH CLAIM FOR RELIEF**

**(As to Yisroel For Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550)**

92. 96. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

93. 97. Plaintiff is entitled to avoid the $350,000.00 transfer to Yisroel pursuant to 11 U.S.C. § 547(b).

94. 98. Yisroel is the initial transferee of the $350,000.00 transfer.

95. ~~99.~~ Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover the $350,000.00 transfer from Yisoel, plus the costs of this action.

**ELEVENTH CLAIM FOR RELIEF**

**(As to Manela For Avoidance of Preferential Transfer Pursuant to 11 U.S.C. § 547)**

96. ~~100.~~ Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

97. ~~101.~~ All of the $3,697,816.71 in LCG Settlement Proceeds were not transferred to the Debtor on or after December 5, 2022, in connection with the closing of such settlement.

98. ~~102.~~ Instead, at least $600,000.00 of the $3,697,816.71 (i.e., cash that the Debtor was entitled to) was transferred to Manela.  11 U.S.C. § 547(b)(1).

99. ~~103.~~ The LCG Settlement Agreement reflects that the $600,000.00 transfer to Manela was for or on account of an antecedent debt owed by the Debtor before the $600,000 transfer was made. 11 U.S.C. § 547(b)(2).

100. ~~104.~~ The $600,000.00 transfer to Manela was made while the Debtor was insolvent. Plaintiff is entitled to a presumption of insolvency for any transfer made by the Debtor or for his benefit make on or before the 90 days prior to the Petition Date, pursuant to 11 U.S.C. § 547(f). 11 U.S.C. § 547(b)(3).

101. ~~105.~~ Debtor filed his voluntary chapter 11 petition on February 22, 2023.  The $600,000.00 transfer to Manela occurred on or after December 5, 2022. The $600,000.00 transfer to Manela at issue, therefore, occurred within 90 days before the Petition Date.  11 U.S.C. § 547(b)(4).

102. ~~106.~~ As a result of the $600,000.00 transfer to Manela, Manela received more than he would have received if (i) the Bankruptcy Case was a case under chapter 7; (ii) the $600,000.00 transfer had not been made; and (iii) Manela received payment of his debt under the provisions of the Bankruptcy Code.  Unless set aside, the $600,000.00 transfer to Manela would provide Manela more than he would otherwise be entitled to receive.  11 U.S.C. § 547(b)(5).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

103.   ~~107.~~ In accordance with the foregoing, the $600,000.00 transfer to Manela is avoidable, pursuant to 11 U.S.C. § 547(b), and Plaintiff is entitled to an order and judgment under 11 U.S.C. § 547 that the $600,000.00 transfer to Manela is avoided.

**TWELFTH CLAIM FOR RELIEF**

**(As to Manela For Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550)**

104.   ~~108.~~ Plaintiff realleges and incorporates herein by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

105.   ~~109.~~ Plaintiff is entitled to avoid the $600,000.00 transfer to Manela pursuant to 11 U.S.C. § 547(b).

106.   ~~110.~~ Manela is the initial transferee of the $600,000.00 transfer.

107.   ~~111.~~ Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover the $600,000.00 transfer from Manela, plus the costs of this action.

**WHEREFORE**, the Plaintiff prays for judgment as follows:

1.   On the First Claim for Relief for the avoidance of a constructive fraudulent transfer of the releases arising under the LCG Settlement Agreement, pursuant to 11 U.S.C. § 548(a)(1)(B).

2.   On Second Claim for Relief for the avoidance of a constructive fraudulent transfer of the releases arising under the LCG Settlement Agreement, pursuant to 11 U.S.C. § 544(b) and Sections 3439.04(a)(2) and 3439.05 of California Civil Code.

3.   On Third Claim for Relief recovery of the value the Debtor is entitled to recovery by virtue of the avoidance of the constructive fraudulent transfers under the First Claim for Relief and the Second Claim for Relief, pursuant to 11 U.S.C. § 550 and Cal. Civil Code § 3439.07.

4.   On Fourth Claim for Relief for an accounting of LCG and the Debtor's entitlements thereunder, pursuant to 11 U.S.C. § 542(a).

~~5.   On Fifth Claim for Relief a declaration that Rechnitz, LCG, and/or Polter breached the LLC Agreement and damages, expenses, and costs.~~

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   5. 6. On Sixth Claim for Relief for an injunction compelling Rechnitz, LCG, and Polter to

2   comply with the terms of the LLC Agreement and turnover any all entitlements payable to the

3   Debtor's estate.

4   6. 7. On the Seventh Claim for Relief, avoidance of the $500,000.00 transfer to Rechnitz.

5   7. 8. On the Eighth Claim for Relief, recovery of the $500,000.00 transfer to Rechnitiz.

6   8. 9. On the Ninth Claim for Relief, avoidance of the $350,000.00 transfer to Yisroel.

7   9. 10. On the Tenth Claim for Relief, recovery of the $350,000.00 transfer to Yisroel.

8   10. 11. On the Eleventh Claim for Relief, avoidance of the $600,000.00 transfer to Manela.

9   11. 12. On the Twelfth Claim for Relief, recovery of the $600,000.00 transfer to Manela.

10  12. 13. For costs of suit incurred herein and pre-judgment interest.

11  13. 14. For such other and further relief as the Court may deem just and proper.

12  Dated: January 23August    , 2025         PACHULSKI STANG ZIEHL & JONES LLP

13

14                                            By   /s/ John W. Lucas

15                                                 Jeffrey W. Dulberg
                                                   John W. Lucas
16                                                 Jeffrey P. Nolan

17                                                 *Attorneys for Bradley D. Sharp,*
                                                   *Chapter 11 Trustee*

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Document comparison by Workshare Compare on Monday, July 21, 2025
4:25:17 PM

| Input: | |
|---|---|
| Document 1 ID | netdocuments://4891-3096-5481/6 |
| Description | Klein - Complaint Re Fraudulent Transfer (Life Capital) |
| Document 2 ID | netdocuments://4891-3096-5481/7 |
| Description | Klein - Complaint Re Fraudulent Transfer (Life Capital) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 119 |
| Deletions | 129 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 248 |

1

## DECLARATION OF JOHN W. LUCAS

2 I, John W. Lucas, declare and state as follows:

3       1.     I am a partner in the law firm of Pachulski Stang Ziehl & Jones, LLP ("**PSZJ**"),

4 counsel of record to Bradley D. Sharp, the duly appointed, authorized, and acting chapter 11 trustee

5 (the "**Trustee**" or "**Plaintiff**") of the estate of Leslie Klein, the debtor herein (the "**Debtor**").

6       2.     I make this declaration in further support of the Trustee's Motion for Leave to Amend

7 Complaint (the "**Motion**").

8       3.     Except as otherwise indicated, all statements in this declaration are based upon my

9 personal knowledge, my review of certain of the Debtor's books and records, relevant documents,

10 discovery produced by parties in this case, and other information prepared or collected by PSZJ or

11 the Trustee's employees and/or advisors, or my opinion based on my experience serving as counsel

12 to the Trustee in the Debtors' chapter 11 cases. If I were called to testify as a witness in this matter, I

13 could and would competently testify to each of the facts set forth herein based upon my personal

14 knowledge, review of documents, or opinion.

15       4.     Attached hereto as **Exhibit "C"** is a true and correct copy of the LLC Agreement.

16       5.     Attached hereto as **Exhibit "D"** is a true and correct copy of the Original Klein

17 Complaint.

18       6.     Attached hereto as **Exhibit "E"** is a true and correct copy of the LCG Settlement

19 Agreement.

20       7.     Attached hereto as **Exhibit "F"** is a true and correct copy of the emails regarding the

21 proposed stipulation to withdraw the Fifth Claim for Relief.

22       8.     I declare under penalty of perjury under the laws of the United States of America that

23 the foregoing is true and correct.

24       Executed this 22nd day of July, 2025 at San Francisco, California.

25

26                         */s/ John W. Lucas*
                            John W. Lucas

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# **EXHIBIT C**

(LLC Agreement)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## LIFE CAPITAL GROUP, LLC

A California Limited Liability Company

Dated as of June 1, 2011

LCG000001                                                        CONFIDENTIAL

# TABLE OF CONTENTS

## ARTICLE I
## FORMATION AND BUSINESS OF THE COMPANY

Section 1.1    Formation.................................................................................................1
Section 1.2    Name.....................................................................................................1
Section 1.3    Purpose ..................................................................................................1
Section 1.4    Term.......................................................................................................1
Section 1.5    Place of Business ...................................................................................1
Section 1.6    Registered Office and Agency................................................................2
Section 1.7    Fiscal Year .............................................................................................2

## ARTICLE II
## MEMBERS

Section 2.1    Members ..................................................................................................2
Section 2.2    Company Property; Company Interest .....................................................2

## ARTICLE III
## CAPITAL CONTRIBUTIONS

Section 3.1    Initial Capital Contribution of Members, Capital Accounts....................2
Section 3.2    Additional Capital Contributions............................................................2
Section 3.3    Withdrawal and Return of Capital Contributions....................................3
Section 3.4    Interest ....................................................................................................3
Section 3.5    Negative Capital Accounts ......................................................................3

## ARTICLE IV
## DISTRIBUTIONS AND ALLOCATIONS

Section 4.1    Allocation of Net Income and Net Losses................................................3
Section 4.2    Cash Available for Distribution...............................................................4
Section 4.3    Proceeds of Policies................................................................................4
Section 4.4    Constructive Trust ..................................................................................4
Section 4.5    Sale of Policies.......................................................................................4
Section 4.6    Lenders ...................................................................................................4

## ARTICLE V
## COMPANY ACCOUNT

Section 5.1    Establishing a Reserve Account ..............................................................4
Section 5.2    Distribution of Reserve Account .............................................................5

## ARTICLE VI
## MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

Section 6.1    Rights and Powers of Manager................................................................5

i

Section 6.2    Number, Tenure and Qualifications ................................................. 5
Section 6.3    Officers .......................................................................................... 5
Section 6.4    Reliance ......................................................................................... 5
Section 6.5    Indemnification of Manager, Members and Officers. .................. 6
Section 6.6    Exculpation .................................................................................... 7
Section 6.7    No Duties ....................................................................................... 7
Section 6.8    Protection of Insured's Private Information ................................. 7
Section 6.9    Delivery of Policy Files ................................................................ 7
Section 6.10   Change Forms ................................................................................ 7
Section 6.11   Further Assurances ........................................................................ 7
Section 6.12   Indemnification of Rechnitz .......................................................... 8

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Section 7.1    Representations and Warranties of Klein. ..................................... 8
Section 7.2    Representations and Warranties of Rechnitz .............................. 10

## ARTICLE VIII
## ADMISSION OF MEMBERS

Section 8.1    Admission of Members ................................................................ 11
Section 8.2    Admission of Non-Payment Policy Members ............................ 11

## ARTICLE IX
## MAINTENANCE OF BOOKS AND RECORDS; REPORTS TO MEMBERS; TAX RETURNS

Section 9.1    Accounting Method and Records .................................................. 12
Section 9.2    Company Records ......................................................................... 12
Section 9.3    Company Reports ......................................................................... 12
Section 9.4    Designation of Tax Matters Member ........................................... 13
Section 9.5    Tax Treatment and Elections ....................................................... 13

## ARTICLE X
## TRANSFER OF INTERESTS; SPECIAL PROVISIONS

Section 10.1   Transfers and Assignments. ......................................................... 13
Section 10.2   Permitted Transfers. ..................................................................... 13
Section 10.3   Substitute Members ..................................................................... 13
Section 10.4   Right of First Refusal. .................................................................. 14
Section 10.5   Tag-Along Rights and Obligations. ............................................. 15
Section 10.6   Miscellaneous Provisions Affecting Transfer. ............................ 16

## ARTICLE XI
## DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

Section 11.1   Dissolution, etc ........................................................................... 16
Section 11.2   Winding Up. ................................................................................. 16

ii

Section 11.3    Final Distribution.................................................................................17
Section 11.4    Time for Liquidation, etc...................................................................17
Section 11.5    Termination .......................................................................................17
Section 11.6    Return of Contribution Nonrecourse to Other Members.......................17

ARTICLE XII
DISPUTE RESOLUTION

Section 12.1    Rabbinical Counsel.............................................................................17

ARTICLE XIII
MISCELLANEOUS

Section 13.1    Entire Agreement...............................................................................17
Section 13.2    Other Ventures..................................................................................18
Section 13.3    Amendments.....................................................................................18
Section 13.4    Choice of Law ..................................................................................18
Section 13.5    Successors and Assigns; Third Party Beneficiaries.............................18
Section 13.6    Interpretation ...................................................................................18
Section 13.7    Captions............................................................................................18
Section 13.8    Severability.......................................................................................18
Section 13.9    Counterparts......................................................................................19
Section 13.10  Non-Waiver.......................................................................................19
Section 13.11  Notices..............................................................................................19

ARTICLE XIV
DEFINITIONS

Section 14.1    Definitions. ......................................................................................19

iii

LIMITED LIABILITY COMPANY AGREEMENT of LIFE CAPITAL GROUP, LLC (this "**Agreement**"), a California limited liability company (the "**Company**"), dated as of June 1, 2011, among Shlomo Rechnitz, an individual residing in the State of California ("**Rechnitz**"), Leslie Klein, an individual residing in the State of California ("**Klein**"), and the Persons that become Members from time to time after the date hereof in accordance with the terms hereof.

# WITNESSETH:

WHEREAS, the Members desire to operate the Company as a limited liability company under Title 2.5 of the California Corporations Code, as amended from time to time (the "**Act**"), in order to accomplish certain lawful business objectives;

WHEREAS, the Certificate of Formation of Life Capital Group, LLC was filed with the Secretary of State of the State of California on April 8, 2011, in accordance with the provisions of the Act; and

WHEREAS the Members desire to set forth herein the manner in which the Company shall be governed and operated.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

## ARTICLE I
## FORMATION AND BUSINESS OF THE COMPANY

Section 1.1    Formation.  The Company was formed on April 8, 2011 by the filing of a Certificate of Formation (the "**Certificate**") with the Secretary of State of California.  The Members hereby agree to operate the Company as a limited liability company pursuant to the provisions of the Act and upon and subject to the terms and conditions set forth in this Agreement.  Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

Section 1.2    Name.  The name of the Company shall be Life Capital Group, LLC, under which name all business and affairs of the Company shall be conducted.

Section 1.3    Purpose.  The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act.

Section 1.4    Term.  The term of the Company shall continue until terminated in accordance with the provisions of Article XI of this Agreement or otherwise dissolved and wound up pursuant to the Act.

Section 1.5    Place of Business.  The Company shall have its principal place or places of business at such place or places as the Manager may, from time to time, select.

    CONFIDENTIAL

Section 1.6    <u>Registered Office and Agency</u>.  The address of the registered office of the Company in the State of California is 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.  The name and address of the registered agent for service of process on the Company in the State of California is Shlomo Rechnitz, 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.

Section 1.7    <u>Fiscal Year</u>.  The term **"Fiscal Year"** shall mean, subject to the provisions of Section 706 of the Code, each of (a) the period commencing on the date of formation of the Company and ending on December 31, 2011, (b) any subsequent 12-month period commencing on January 1 and ending on December 31 and (c) the period commencing on January 1 and ending on the Dissolution Date.

ARTICLE II
MEMBERS

Section 2.1    <u>Members</u>.  The Company shall consist of the Members executing this Agreement and any substitute or additional Members admitted to the Company in accordance with the terms hereof.  Each initial Member shall be deemed admitted as a Member of the Company at such time as such Member has made its Initial Capital Contribution to the Company.

Section 2.2    <u>Company Property; Company Interest</u>.  No property of the Company shall be deemed to be owned by any Member individually, but all of such property shall be owned by, and title thereto shall be vested solely in, the Company.

ARTICLE III
CAPITAL CONTRIBUTIONS

Section 3.1    <u>Initial Capital Contribution of Members, Capital Accounts</u>.  Each Member has contributed to the capital of the Company, as such Member's Initial Capital Contribution, the amount of cash, or property with a value, set forth on <u>Schedule A</u>.  The Company shall maintain a record of:  (a) the number of Interests held by each Member and (b) the respective Percentage Interest of each Member.  The Manager shall update such <u>Schedule A</u> from time to time to reflect changes in such information.  The Members agree that Klein's Initial Capital Contribution associated with each Policy shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement.  The Members agree that Rechnitz's Initial Capital Contribution associated with the Policies (in the order of each Policy that first generates proceeds) shall be deemed to be $3,800,000. The Company will establish and maintain a Capital Account for each Member throughout the full term of the Company.

Section 3.2    <u>Additional Capital Contributions</u>.    Other than the Initial Capital Contributions made by the Members upon admission to the Company in accordance with <u>Section 3.1</u> and <u>Article VIII</u>, the Members shall not be required to make any additional contributions to the Company; except that Rechnitz shall be obligated to contribute to the Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the Policies which are not Non-Payment Policies after the date of this Agreement and each Non-Payment Policy Member shall be obligated to contribute to the

2

Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the applicable Non-Payment Policy after the date such Non-Payment Policy Member was admitted to the Company as a Member.

Section 3.3    Withdrawal and Return of Capital Contributions.

(a)    No Member shall be entitled to demand a return of such Member's Capital Contribution (including any earnings thereon) or to withdraw any portion of such Member's Capital Account except as expressly provided in this Agreement. Except as expressly provided herein, no Member shall have the right to demand a distribution of property other than cash for its Interest. Each Member hereby waives any right such Member may otherwise have to cause any asset of the Company to be partitioned or to file a complaint or institute any proceeding at law or in equity seeking the partition of any such asset. Except as otherwise provided herein, no Member shall have priority over any other Member, either as to a return of such Member's Capital Contribution or as to Net Income, Net Losses, any other item of Company income, gain, loss or deduction, or Company distributions.

(b)    No Member shall be personally liable for the return of the Capital Contributions of any other Member or any portion thereof, it being expressly understood that any such return shall be made solely from available Company assets, if any.

Section 3.4    Interest.    Interest, if any, earned on funds contributed or held by the Company shall inure to the benefit of the Company. The Members shall not be entitled to receive interest or any other payments from the Company with respect to their Capital Contributions or Capital Accounts, except as otherwise provided for herein.

Section 3.5    Negative Capital Accounts.    Except as may be required by the provisions of the Act or in respect of any negative balance resulting from a withdrawal of capital or distribution in contravention of this Agreement, at no time shall any Member with a negative Capital Account balance have any obligation to the Company or the other Members to restore such negative balance, and such negative balance shall not be treated as an asset of the Company.

ARTICLE IV
DISTRIBUTIONS AND ALLOCATIONS

Section 4.1    Allocation of Net Income and Net Losses.

(a)    Net Income with respect to a Policy for any Fiscal Year shall be allocated (i) first, to Rechnitz to the extent of Rechnitz's Priority Return with respect to such Policy; (ii) second, to Rechnitz until $3,800,000 of Net Income has been allocated to Rechnitz in the aggregate (without regard to allocations of Net Income under subclause (i)); (iii) third, to Klein, to the extent of Klein's Priority Return with respect to such Policy; and (iv) thereafter, to Klein and Rechnitz in proportion to their Percentage Interests.

(b)    Net Losses with respect to a Policy for any Fiscal Year shall be allocated to Klein and Rechnitz in proportion to their Capital Contributions associated with such Policy.

3

CONFIDENTIAL

Section 4.2    Cash Available for Distribution.  Subject to Article XI, the Company shall distribute Available Cash to the Members at such times and in such amounts as determined by Rechnitz in accordance with this Agreement.

Section 4.3    Proceeds of Policies.  If at any time the Company receives any proceeds from any Policy that is not a Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

     (a)    first, to Rechnitz by wire transfer into an account designated by Rechnitz, in an amount up to the Rechnitz Amount for such Policy;

     (b)    second, (A) first, to each of the Lenders, pro-rata, based on the outstanding principal balance owed to such Lender as set forth on Schedule C, until such outstanding principal balance is equal to zero, in an aggregate amount up to the Klein Amount for such Policy and (B) second, any remaining Klein Amount with respect to such Policy to Klein by wire transfer into an account designated by Klein;

     (c)    third, (i) 50% to Rechnitz by wire transfer into an account designated by Rechnitz and (ii) 50% to Klein by wire transfer into an account designated by Klein, provided, however, that if the balance of the Reserve Account is less than $2,500,000, then proceeds distributable to Klein under clause (ii) above shall be deposited in the Reserve Account until such balance is equal to $2,500,000.

Section 4.4    Constructive Trust.  If any Member receives any proceeds in respect of any Policy (following the death of an Insured or otherwise), such Member shall hold such proceeds in a constructive trust for the Company and shall within one (1) Business Day inform the other Members and the Manager and deposit such proceeds in the Reserve Account.

Section 4.5    Sale of Policies.  The Company shall be entitled to sell any Policy to any Person with the prior written consent of each of the Members.  Notwithstanding the immediately preceding sentence, upon Klein's written consent, Rechnitz or his designee shall be entitled to purchase any Policy that is not a Non-Payment Policy from the Company by transferring an amount equal to the Klein Amount for such Policy to the Company, which for administrative convenience shall be subsequently distributed to an account designated by Klein.

Section 4.6    Lenders.  The Members agree that (i) the Company may pay amounts pursuant to Section 4.3(b) directly to the Lenders, and in such event, the payments will be treated as distributions by the Company to Klein and subsequently transferred by Klein to the Lenders, (ii) nothing herein is intended to grant to the Lenders an equity interest in the Company, and (iii) nothing herein is intended to imply that the Company is assuming the obligations owed to the Lenders.

ARTICLE V
RESERVE ACCOUNT

Section 5.1    Establishing a Reserve Account.  As soon as practicable the Company shall establish the Reserve Account with the Account Bank in the name of Company.

4

Section 5.2    <u>Distribution of Reserve Account</u>. Amounts in the Reserve Account shall be distributed to certain Members in certain specified amounts under the following circumstances: (a) if the amount of Net Income allocated to Klein with respect to a Policy under Section 4.1 for a Fiscal Year exceeds the amount of proceeds distributed to Klein with respect to such Policy pursuant to Section 4.3; then 40% of such excess shall be distributed to Klein from the Reserve Account; (b) if upon a disposition of a Policy or the receipt of proceeds from such policy, the Rechnitz Amount with respect to the Policy exceeds the amount of proceeds distributed to Rechnitz with respect to such Policy pursuant to Section 4.3, then the amount of such excess shall be distributed to Rechnitz from the Reserve Account; and (c) if agreed upon by the Members, then the amount agreed upon by the Members shall be distributed to Klein from the Reserve Account.

ARTICLE VI
MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

Section 6.1    <u>Rights and Powers of Manager</u>. The business and affairs of the Company shall be managed by the Manager. The Manager shall direct, manage, and control the business of the Company to the best of the Manager's ability. Except for situations in which the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all acts or activities customary or incident to the management of the Company's business. Nothing contained in this Agreement shall require any person to inquire into the authority of the Manager to execute and deliver any document on behalf of the Company or to bind the Company pursuant to such document.

Section 6.2    <u>Number, Tenure and Qualifications</u>. The Company shall have one Manager, which initially shall be Jonathon Polter ("**Polter**"), an individual residing at 2000 Town Center, Suite 1490, Southfield, Michigan 48075. Polter shall remain as the Manager unless he resigns from such position, is relieved of his duties by (i) if there are two Members or less, a unanimous vote of the Members and (ii) otherwise, an affirmative vote of Members holding a majority of the Interests. Subsequent Managers shall be elected by the affirmative vote of Members holding a majority of the Interests. Managers need not be residents of the State of California.

Section 6.3    <u>Officers</u>. The Manager may delegate the management of the Company's day-to-day business affairs to a Chief Executive Officer and other officers of the Company designated by the Manager and approved by an affirmative vote of Members holding a majority of the Interests and, unless otherwise decided by the Manager, all actions of the Company may be taken by the appropriate duly authorized officers.

Section 6.4    <u>Reliance</u>. The Manager shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any officers, employees, or committees of the Company, or by any other Person as to matters such Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including, without limitation, information, opinions, reports or

5

CONFIDENTIAL

statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

Section 6.5    Indemnification of Manager, Members and Officers.

(a)    General.   The Company shall indemnify any Person (a "**Covered Person**") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including an action by or in the right of the Company) by reason of the fact that he is or was a Manager, Member or officer of the Company, or is or was serving at the request of the Company as a director, manager or officer of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith with no willful misconduct or gross negligence and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.   The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b)    Indemnification in Certain Cases.   To the extent that a Covered Person has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in clause (a) of this Section 6.5, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

(c)    Advances for Expenses.   Expenses (including attorneys' fees) incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be ultimately determined that he is not entitled to be indemnified by the Company as authorized in this Section 6.5.

(d)    Rights Non-Exclusive.   The indemnification and advancement of expenses provided by, or granted pursuant to, the other subparagraphs of this Section 6.5 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, agreement or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

(e)    Insurance.   The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was a Covered Person against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such,

6

whether or not the Company would have the power to indemnify him against such liability under the provisions of this Section 6.5.

(f)  Survival of Rights.  The indemnification and advancement of expenses provided by, or granted pursuant to this Section 6.5 shall continue as to a Person who has ceased to be an officer, Manager or Member and shall inure to the benefit of the heirs, executors and administrators of such Person.

Section 6.6    Exculpation.  No Member, Manager or officer of the Company shall be liable, in damages or otherwise, to the Company or its Members for any act or omission performed or omitted by such Member, Manager or officer pursuant to authority granted by this Agreement except to the extent such Person fails to meet the standard for indemnification set forth in Section 6.5(a).

Section 6.7    No Duties.  Any duties (including fiduciary duties) of a Covered Person to the Company or to any other Covered Person that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, provided, that (i) the foregoing shall not eliminate the obligation of each Member and the Manager to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied covenant of good faith and fair dealing.

Section 6.8    Protection of Insured's Private Information.  Manager and each Member acknowledge that insurance regulations and other applicable Laws are structured to provide confidentiality to policy owners and insureds with respect to Consumer Information in connection with ownership or sale of their policies, and that the Manager and each Member and all of their respective agents and representatives, are obligated to keep Consumer Information confidential in accordance with applicable Laws.  The Manager and each Member agree to comply with all applicable Laws with respect to the confidentiality of Consumer Information; provided, that (i) the Manager and each Member may disclose such information to their internal or external auditors and attorneys and as required or permitted by Law, and (ii) Klein may take all necessary and appropriate actions to transfer ownership of the Policies to the Company.

Section 6.9    Delivery of Policy Files.  Klein shall deliver each Policy File as directed by the Manager within thirty (30) Business Days of the date of this Agreement.

Section 6.10    Change Forms.  On the date of this Agreement, Klein shall execute and deliver Change Forms to the Company or at the Company's direction, changing the owner and Beneficiary of the Policy to the Company or the Company's designee.  In addition, Klein shall execute and deliver any additional instruments of transfer that the Company may reasonably request necessary to evidence the assignment of the Policy and any rights therein to the Company or its designee.

Section 6.11    Further Assurances.  From and after the date hereof, each Member shall execute and deliver such other documents and instruments, and take such further actions, as may be reasonably requested from time to time by another Member to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby.  Without limiting the foregoing, Klein shall cooperate with Rechnitz in causing the Company or its designee to be

7

LCG000011                                                                                                    CONFIDENTIAL

recorded as the owner and beneficiary of each Policy on the books and records of the relevant issuing insurance companies.

Section 6.12    Indemnification of Rechnitz.    Klein shall indemnify and hold harmless (which indemnification shall survive any termination of this Agreement and the dissolution of the Company) Rechnitz and his Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an **"Indemnified Person"**), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and actual expenses incurred (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person, and in connection with or arising out of (i) any breach of any representation, covenant or other obligation of Klein hereunder, (ii) the transactions contemplated hereunder, (iii) any actions or failures to act in connection therewith or (iv) and any and all reasonable legal costs and actual expenses arising out of or incurred in connection with disputes between or among Klein and Rechnitz (collectively, **"Indemnified Liabilities"**); provided, that Klein shall not be liable for any indemnification to an Indemnified Person to the extent that any such Indemnified Liability results from that Indemnified Person's gross negligence or willful misconduct; provided, further, that the aggregate amount of Klein's liability under this Section 6.12 shall be limited to the aggregate of the Rechnitz Amounts for all of the Policies.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Section 7.1    Representations and Warranties of Klein.

(a)    Power and Authority.    Klein has full power, authority and right to execute and deliver this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of its obligations hereunder.

(b)    Binding Obligation.    This Agreement constitutes the legal, valid and binding obligations of Klein enforceable against Klein in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(c)    Consent of Third Parties.    No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by Klein in connection with the execution of this Agreement and the compliance by Klein with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Klein of any other action contemplated hereby.

(d)    Policies.    With respect to each Policy, to the best of Klein's knowledge:

8

LCG000012                                                                                                    CONFIDENTIAL

(i)      at the issuance of such Policy, the related Insured or Original Owner thereof was not a party to any written or oral agreement or arrangement to cause the same or interests therein to be issued, assigned, sold, transferred, or otherwise disposed of in violation of applicable law or public policy;

(ii)     at the issuance of such Policy, the related Insured or Original Owner thereof had the financial capacity to pay the premiums necessary to maintain such Policy in force;

(iii)    at the issuance of such Policy the related Original Owner had an insurable interest in the life of the Insured;

(iv)     the material medical or financial information supplied by or on behalf of the Insured or Original Owner of such Policy in the application and related materials delivered to the applicable issuing insurance company in connection with the issuance of such Policy was not false, incomplete or misleading in any material respect;

(v)      Klein does not possess or control any material documentation or information related to such Policy, or the acquisition or maintenance thereof by Klein, that has not been delivered or disclosed in writing to Rechnitz or his agents;

(vi)     prior to the date of this Agreement and the consummation of the transactions contemplated by [insert transfer agreement title], Klein was trustee of the applicable Original Owner which held sole legal and beneficial title thereto;

(vii)    Klein, in his capacity as trustee of the applicable Original Owner, acquired sole legal and beneficial title thereto and had the power and authority to enter into this Agreement;

(viii)   Immediately prior to its transfer to the Company hereunder, Klein held sole legal and beneficial title thereto;

(ix)     upon the transfer of such Policy, Company or its designee, will hold good and marketable title to and ownership of such Policy free and clear of any liens, charges, rights, encumbrances or other interests;

(x)      such Policy was acquired in a manner in compliance, in all material respects, with the Laws applicable to the purchase of life insurance policies, as then in effect and as then interpreted by the relevant regulators or in case law;

(xi)     except as disclosed to Rechnitz in writing, no previous owner of such Policy has waived, amended or terminated any material provision of, or any material rights in relation to, such Policy;

(xii)    except as disclosed on Schedule 7.1(d)(xii), the premiums for such Policy have been paid such that such Policy will not be in a grace period as of the date of this Agreement and such Policy has not been cancelled as of the date of this Agreement;

9

(xiii)   Klein has disclosed or delivered to Rechnitz and the Company in writing all information received by Klein or any of his agents from the related issuing insurance company related to any change in the terms of such Policy, including with respect to an intent to increase the cost of insurance for such Policy;

(xiv)   there is no current or pending written notice that has been issued to Klein by the related issuing insurance company of such issuing insurance company's intention to cancel, contest, rescind or refuse payment under such Policy;

(xv)   all the information contained in each of the documents in the related Policy File or otherwise delivered by or on behalf of Klein to the Company and Rechnitz in connection with such Policy is true, complete and correct in all material respects;

(xvi)   the related Policy File contains the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

(xvii)   there is not any pending or threatened Proceeding challenging the validity, ownership or enforceability of such Policy or Klein's ownership rights in such Policy;

(xviii)   such Policy was not issued pursuant to or in connection with an agreement whereby the premiums required to be paid on such Policy were paid by any Person pursuant to a recourse or non-recourse premium financing program;

(xix)   Klein has not required any broker to sign an agreement offering Klein or any other Person the "right of last offer" in connection with the purchase of such Policy; and

(xx)   such Policy has been issued by the related issuing insurance company and is in force and any related contestability period and any suicide exclusion period has expired.

Section 7.2    Representations and Warranties of Rechnitz.  Rechnitz hereby represents and warrants that:

(i)   Authority.  Rechnitz has full power, authority and right to execute this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of his obligations hereunder.

(ii)   Binding Obligation.  This Agreement constitutes Rechnitz's legal, valid and binding obligation, enforceable against Rechnitz in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(iii)   Consent of Third Parties.  No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or

10

LCG000014                                                                                                CONFIDENTIAL

Governmental Authority is required by Rechnitz in connection with the execution of this Agreement and the compliance by Rechnitz with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Rechnitz of any other action contemplated hereby.

## ARTICLE VIII
## ADMISSION OF MEMBERS

Section 8.1    Admission of Members.   Subject to Section 8.2, upon the approval of the Members by majority vote, one or more Persons may be admitted to the Company as Members. The Members by majority vote shall determine the number of Interests and the Percentage Interest to be offered to any such Member and the Initial Capital Contribution to be made by any such Member.   Each such Person shall be admitted as a Member at the time such Person (a) executes and delivers a copy of this Agreement to the Manager and (b) if applicable, makes its Initial Capital Contribution to the Company.  The Manager shall update Schedule A to reflect the admission of any such Members.

Section 8.2    Admission of Non-Payment Policy Members.    It is agreed and acknowledged by the Members that Rechnitz's sole obligation with respect to the Company is making Capital Contributions for the payment of premiums on the Policies and the expenses associated with the Policies, in each case after the date of this Agreement.   Rechnitz shall provide the Company and Klein with six (6) months prior written notice if Rechnitz elects to cease paying premiums in respect of any Policy (such Policy, a **"Non-Payment Policy"**).  After delivery of such notice, Rechnitz or Klein shall have the right to introduce any Person to the Company as a potential Member who agrees in writing to assume Rechnitz's obligations for the payment of premiums and other costs and expenses with respect to such Non-Payment Policy, which person shall be admitted as a Member upon the approval of the Members by [majority] vote (such a Member, a **"Non-Payment Policy Member"**).  With respect to any Non-Payment Policy, any payment of premiums and other costs and expenses shall be contributed to the capital of the Company by the applicable Non-Payment Policy Member.  If at any time the Company receives any proceeds from any Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a)    First, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount up to (x) the total amount of Capital Contributions made on such Policy by such Non-Payment Policy Member and (y) the Priority Return of such Non-Payment Policy Member on such Policy computed starting on the date such Non-Payment Policy Member was admitted as a Member;

(b)    Second, by wire transfer into an account designated by Rechnitz, in an amount equal to the Rechnitz Amount for such Policy;

(c)    Third, by wire transfer into an account designated by Klein, in an amount equal to the Klein Amount for such Policy;

11

CONFIDENTIAL

(d)      Fourth, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount equal to fifty percent (50%) of all remaining proceeds from such Policy;

(e)      Fifth, to Rechnitz and Klein by wire transfers into accounts respectively designated by them in proportion to the Capital Contributions made by them with respect to each such Non-Payment Member Policy; provided, however that if Klein introduced the related Non-Payment Policy Member to the Company, then 25% of the amount distributable under this clause (e) to Rechnitz shall be distributed to Klein instead.

Notwithstanding Section 4.1 hereof, Net Income associated with a Non-Payment Policy shall be allocated to each Member to the extent of any Priority Return distributed to such Member with respect to the Non-Payment Policy and to the extent of any distributions made to a Member pursuant to Section 8.2(d) or Section 8.2(e) above with respect to such Non-Payment Policy . Notwithstanding Section 4.1 hereof, Net Losses associated with a Non-Payment Policy shall be allocated to each Member in proportion to the Capital Contributions made by such Member with respect to such Non-Payment Policy.

ARTICLE IX
MAINTENANCE OF BOOKS AND RECORDS;
REPORTS TO MEMBERS; TAX RETURNS

Section 9.1    Accounting Method and Records.    Rechnitz shall determine the accounting method to be used by the Company.  The Company shall maintain such accounting records as shall reflect all Company transactions and as shall be appropriate and adequate for the Company's business.

Section 9.2    Company Records.  The Company shall maintain the following records, within or outside the State of California: (a) a copy of the Company's accounting records and federal, state, local and foreign income tax or information returns and reports, if any, for the five most recent Fiscal Years; and (b) all other records and reports required by the Act or otherwise to be maintained by the Company.  Each Member, and such Member's duly authorized representatives or agents, shall, for any purpose reasonably related to his interest as a Member, have reasonable access to such books and records at such office and shall have the right to inspect and copy such books and records; provided, however, that if a Member was an officer, consultant or employee of the Company received his/her Interest pursuant to a profits interests grant agreement ceases to be an employee, consultant or officer of the Company, such Member shall only have the right to receive books and records that he/she has the right to require the Company to provide to him/her in accordance with applicable law.

Section 9.3    Company Reports.  The Company shall cause to be furnished to each Member and each other Person who was a Member during the period in question (a) such reports and financial statements as may be reasonably required for his financial reporting requirements, including, without limitation, copies of all annual, quarterly and monthly financial statements, and (b) detailed financial statements and information and documents (including Form K-1) necessary or desirable for the preparation or support of such Member's tax returns required in any jurisdiction, as soon as practicable after the end of each Fiscal Year.

12

CONFIDENTIAL

Section 9.4    <u>Designation of Tax Matters Member</u>.  Rechnitz is designated the **"Tax Matters Member"** (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

Section 9.5    <u>Tax Treatment and Elections</u>.    The Company shall be treated as a partnership for federal income tax purposes, the Members shall be treated as partners for federal income tax purposes, and each of the Members agrees to report consistently with such treatment. The Manager shall make all elections necessary to give effect to such treatment.

ARTICLE X
TRANSFER OF INTERESTS; SPECIAL PROVISIONS

Section 10.1    <u>Transfers and Assignments</u>.

(a)    No Member shall be permitted to Transfer any Interest to a Person other than a Permitted Transferee, except in accordance with the provisions set forth in this <u>Article X</u>.

Section 10.2    <u>Permitted Transfers</u>.

(a)    Each Member shall notify the Manager and the other Members of any proposed Transfer to a Permitted Transferee by such Member, or by any of its Affiliates, in the case of an indirect Transfer of an Interest, which notice shall set forth the name and address of the Permitted Transferee and the nature of the relationship between such Member and such Permitted Transferee, at least ten (10) calendar days prior to the proposed date of such Transfer. Each Member shall be responsible for paying all transfer, gains or similar taxes, if any, and all reasonable costs and expenses of the Company, including reasonable attorneys' fees, arising out of any Transfer by such Member of all or a portion of its Interest (or by any of its Affiliates in the case of an indirect Transfer of an Interest) to a Permitted Transferee.  As a condition to any Transfer of all or any portion of an Interest in the Company to a Permitted Transferee shall execute and deliver to the Company a joinder agreement, in form of <u>Exhibit A</u> (a "**Joinder Agreement**").    All of the provisions of this Agreement, including without limitation, the provisions of this <u>Article X</u>, shall be applicable to and binding upon each Permitted Transferee.

(b)    The transfer by a Member of all or any portion of its Interest (including, without limitation, any transfer to a Permitted Transferee) shall not release such Member from any or all of its obligations under this Agreement arising prior to the date of such Transfer.

Section 10.3    <u>Substitute Members</u>. A Permitted Transferee of the Interest of a Member or a transferee of the Interest of a Member pursuant to <u>Sections 10.4</u> and <u>10.5</u> of this Agreement, or any portion thereof, shall become a substitute Member entitled to all the rights, and subject to all of the obligations and restrictions, of the transferor Member if, and only if:

(a)    the transferor assigns the transferee such right;

13

CONFIDENTIAL

(b)      the transferor or transferee pays to the Company all reasonable costs and expenses incurred by the Company in connection with such substitution; and

(c)      the transferee executes and delivers a Joinder Agreement.

Section 10.4    Right of First Refusal.

(a)      Except for Transfers pursuant to or contemplated by Section 10.2, if any Member (a "**Selling Member**") receives a bona fide written offer from an independent third party (a "**Third Party**") to purchase any or all of such Selling Member's Interests for cash and such Selling Member desires to Transfer any or all of such Interests (the "**Offered Interests**") pursuant to such offer, prior to any Transfer it shall give written notice of the proposed Transfer (the "**Notice of Intention**") to the Company and the other Members (the "**Remaining Members**") specifying the number of Offered Interests which such Selling Member wishes to Transfer, the proposed transferee, the proposed purchase price for the Offered Interests (the "**Offer Price**") and the other material terms and conditions of the proposed Transfer.

(b)      For a period of thirty (30) days after receipt of the Notice of Intention (the "**Option Period**"), each of the Remaining Members shall have the irrevocable option to purchase at the Offer Price and on the other terms specified in the Notice of Intention, all of the Offered Interests pro rata based on the Percentage Interest of each Remaining Member; provided, however, that if any Remaining Member does not purchase any or all of its pro rata portion of such Offered Interests, the other Remaining Members shall have the right to purchase such portion, pro rata, until all of such Offered Interests are purchased.  The option of a Remaining Member pursuant to this Section 10.4(b) (the "**Remaining Members Option**") shall be exercisable by delivery of a notice (the "**Remaining Members Notice**") setting forth the maximum number of Offered Interests that such Remaining Member wishes to purchase, including any number which would be allocated to such Remaining Member if any other Remaining Member does not purchase all or any portion of its pro rata portion, to the Selling Member, the Company and the other Remaining Members and shall expire if the Remaining Members Notice is not delivered prior to the expiration of the Option Period.

(c)      If all notices required to be given pursuant to this Section 10.4 have been duly given, and the Remaining Members determine not to exercise their respective options to purchase all of the Offered Interests at the Offer Price and on the other terms specified in the Notice of Intention or determine, with the consent of the Selling Member, to exercise their options to purchase less than all of the Offered Interests, then the Selling Member shall have the right, for a period of ninety (90) days from the earlier of (a) the expiration of the Option Period and (b) the date on which such Selling Member receives notice from the Remaining Members that they will not exercise the option granted pursuant to this Section 10.4, to accept the bona fide offer from the Third Party and enter into an agreement to sell the Offered Interests remaining unsold under this Section 10.4 at a price not less than the Offer Price and on the same terms as set forth in the Notice of Intention; provided that prior to any such Transfer to a Third Party, such Third Party executes and delivers to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby becomes a party to this Agreement.

50028620.3
LCG000018                                                                                                                    CONFIDENTIAL

(d)     The closing of any purchase and sale of any Interests to a Remaining Member pursuant to this Section 10.4 shall take place at the offices of the Company on such date, not later than sixty (60) days after the delivery to the Selling Member of the Remaining Members Notice.  At the closing of such purchase and sale, the Secretary or such other officer of the Company shall record such Transfer in the books of the Company against evidence of such Transfer, delivery of the Offer Price therefor and an executed Joinder Agreement.

(e)     If the Remaining Members Option is not exercised, and the Offered Interests are not sold pursuant to Section 10.4(c) within the ninety (90) day period referred to therein, such sale may not be carried out without complying again with the terms of this Section 10.4.

Section 10.5   Tag-Along Rights and Obligations.

(a)     In the event that after complying with the terms of Section 10.4, the Selling Member desires to sell (the "**Disposition**") the Offered Securities to a Third Person (the "**Acquirer**"), the Selling Member's right to accept such offer to purchase the Offered Securities shall be conditioned on each Remaining Member being offered the right to sell to the Acquirer its pro rata portion of the Offered Securities (based on the Percentage Interest of each Remaining Member) in such Disposition in accordance with this Section 10.5.  The Selling Member shall give notice (the "**Disposition Notice**") to each Remaining Member at least thirty (30) days prior to the consummation of the Disposition specifying the number of Offered Interests which such Selling Member wishes to Transfer in the proposed Disposition, the proposed transferee, the proposed purchase price for the Offered Interests and the other material terms and conditions of the proposed Disposition.

(b)     The election to participate in the Disposition by the Remaining Members pursuant to Section 10.5(a) shall be exercised by notice to the Selling Member given within the time period specified in the Disposition Notice, which time period shall not be less than fifteen (15) days after such Disposition Notice is given.  If any Remaining Member gives notice of its election to sell, it shall be obligated to sell the number of Interests specified in such Remaining Member's notice upon the terms and subject to the conditions specified in Section 10.5(a) to the Acquirer (which shall be the same for the other Remaining Members and the Selling Member), conditional upon the closing of the Disposition.

(c)     The sale or Transfer of Interests to the Acquirer by the Selling Member and by the Remaining Members electing to participate in the Disposition pursuant to this Section 10.5 shall occur simultaneously and be on the same terms and at the same price as the Interests sold by the Selling Member; provided that prior to any such Transfer to an Acquirer, such Acquirer shall execute and deliver to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby become a party to this Agreement.

(d)     If the Acquirer declines to purchase from such Remaining Members their respective proportionate number of Interests calculated in accordance with this Section 10.5, the Selling Member will not sell any Interests to the Acquirer.

50028620.3

LCG000019                                                                          CONFIDENTIAL

Section 10.6    <u>Miscellaneous Provisions Affecting Transfer</u>.

(a)    Upon the Transfer of all or any portion of a Member's Interests as permitted or required under this Agreement, including, without limitation, as provided in this <u>Article X</u>, (i) the income, loss, gain, deduction and credit attributable to the Interests so transferred shall be allocated between the transferor and transferee based upon the number of days during the applicable Fiscal Year that the Interests so transferred was held by each of them, without regard to the results of Company activities during the period in which each was the holder; provided that the Manager shall, at the request and expense of the transferring Member, cause an interim closing of the Company's books as of the effective date of Transfer for purposes of allocating such items between the transferor and transferee; and (ii) the transferor shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods preceding the date of Transfer, and the transferee shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods on and after the date of Transfer based upon the number of days during the applicable Fiscal Year that the Interests so transferred were held by each of them, without regard to the results of Company activities during the period in which each was the holder.

(b)    The Company shall be entitled to treat the record owner of any Interests as the absolute owner thereof, and shall incur no liability for distributions of cash or other property or allocations of income, gain, loss, deduction or credit made in good faith to such owner until such time as a written assignment of such Interests has been received, accepted and recorded on the books of the Company.

## ARTICLE XI
## DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

Section 11.1    <u>Dissolution, etc</u>. The Company shall be dissolved upon the occurrence of any of the following events (the date of such occurrence, the "**Dissolution Date**"):

(a)    As approved by the majority vote of the Members; or

(b)    As otherwise required by applicable law.

Section 11.2    <u>Winding Up</u>.

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company in accordance with this <u>Section 11.2</u>.

(b)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be

16

LCG000020

CONFIDENTIAL

considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(c)     The Members shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

Section 11.3    Final Distribution.  After the application or distribution of the proceeds of the liquidation of the Company's assets in one or more installments to the satisfaction of the liabilities to creditors of the Company, including to the satisfaction of the expenses of the winding-up, liquidation and dissolution of the Company (whether by payment or the making of reasonable provision for payment thereof), the remaining proceeds, if any, plus any remaining assets of the Company shall be distributed to the Members in accordance with Sections 4.3 and 8.2, as applicable.

Section 11.4    Time for Liquidation, etc.  A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Company to seek to minimize potential losses upon such liquidation.  The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of a certificate of cancellation of the certificate with the Secretary of State of the State of California.

Section 11.5    Termination.  Upon completion of the winding up of the Company, the Manager (or any duly elected liquidating trustee or other duly designated representative) shall execute, acknowledge and cause to be filed a certificate of cancellation of the Certificate with the Secretary of State of the State of California.   Upon the cancellation of the Certificate, this Agreement and the Company shall terminate.

Section 11.6   Return of Contribution Nonrecourse to Other Members.   Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution.  If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

ARTICLE XII
DISPUTE RESOLUTION

Section 12.1    Rabbinical Counsel.  If any dispute arises between the Members regarding this Agreement or any provision hereof, that dispute shall be resolved through a binding arbitration proceeding to be conducted in the State of California in accordance with the commercial arbitration rules of the Rabbinical Council of California.

ARTICLE XIII
MISCELLANEOUS

Section 13.1   Entire Agreement.   This Agreement, taken together with the other documents expressly referred to herein, each as amended or supplemented, constitutes the entire

17

agreement among the parties with respect to the subject matter herein or therein and supersedes any prior agreement or understanding among the parties hereto.

Section 13.2    Other Ventures.  The Manager or any Member, and any firm, corporation or association with which the Manager or any Member is in any way interested or connected, may act as attorney for, deal and contract with, and be employed by the Company, and the Manager or any Member may be, in any manner, interested in or connected with any corporation, association or business in which the Company is directly or indirectly interested, all in the same manner and with the same freedom as though not a Manager or a Member, as the case may be, and without accountability for any profit, benefit or compensation received in connection with such actions or relationships, none of which shall be void or voidable.

Section 13.3    Amendments.  This Agreement may be amended only with the written consent of a Majority in Interest; provided that any such amendment that materially adversely affects the rights and privileges of any Member (other than any amendment effected in connection with the making of a Capital Contribution to the Company by, and/or the issuance of additional Interests to, any Member, including, without limitation, any amendment to the rights and privileges of the Interests to reflect dilution resulting from such Capital Contributions or issuance of additional Interests) must be consented to by each of the Members so affected[; provided further, that any amendment to this Agreement shall not be effective without the consent of Rechnitz].

Section 13.4    Choice of Law.  This Agreement shall be construed in accordance with the laws of the State of California, without regard to the choice of laws rules thereof, and the obligations, rights and remedies of the Members hereunder shall be determined in accordance with such laws.

Section 13.5    Successors and Assigns; Third Party Beneficiaries.  This Agreement shall be binding upon, and, subject to Article X, shall inure to the benefit of, the parties and their legal representatives, heirs, administrators, executors, successors and permitted assigns.  Except as otherwise expressly provided herein, none of the provisions of this Agreement shall be for the benefit of or enforceable by any Person not a party hereto.

Section 13.6    Interpretation.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or neuter gender shall include the masculine, the feminine and the neuter.

Section 13.7    Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend or otherwise affect the scope or intent of this Agreement or any provision hereof.

Section 13.8    Severability.  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement, or the application of such provision in jurisdictions or to Persons or circumstances other than those to which it is held invalid, illegal or unenforceable, shall not be affected thereby.

18

CONFIDENTIAL

Section 13.9   Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Section 13.10   Non-Waiver.  No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in a written notice given to the party claiming such waiver has occurred; provided that no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

Section 13.11   Notices.  All notices, requests, demands, claims and other communications that are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by confirmed facsimile with a copy sent by another means specified herein; the business day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five business days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

> if to the Company:
>
> c/o Shlomo Rechnitz
>   5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.
>
>
> with a copy to:
>
> Leslie Klein
> 14245 Ventura Blvd., Sherman Oaks, CA 91423

and if to a Member, to the Member's address or facsimile number on the books records of the Company, or to such other address with respect to the Company or a Member as the Company or such Member, as applicable, notifies the Company and the other Members in writing as provided above.

ARTICLE XIV
DEFINITIONS

Section 14.1   Definitions.

References in this Agreement to an **"Exhibit"** are intended to refer, unless otherwise specified, to an Exhibit attached to this Agreement, and references in this Agreement to an **"Article"** or a **"Section"** are intended to refer, unless otherwise specified, to an Article or a Section of this Agreement.  As used in this Agreement, the following terms shall have the respective meanings set forth below:

19

CONFIDENTIAL

"**Account Bank**" means PrivateBancorp, Inc.

"**Act**" shall have the meaning specified in the recitals to this Agreement.

"**Affiliate**" means any Person that, directly or indirectly, through one or more intermediaries, is Controlled by one or more Members. As used in this definition, "Control" means either (a) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting stock of a corporation, or in the case of any Person which is not a corporation, the ownership, directly or indirectly, of at least fifty percent (50%) of the beneficial ownership interests in such Person, or (b) irrespective of stock ownership or other beneficial ownership, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person.

"**Agreement**" means this Limited Liability Company Agreement, as the same may be amended hereafter from time to time as provided herein.

"**Available Cash**" means, at the time of determination, cash generated from revenues from the Company's operations, after provision has been made for (a) all expenditures paid or to be paid by the Company to non-Members and (b) such amounts as the Manager, in his sole discretion, shall deem reasonable in order to provide for any anticipated, contingent or unforeseen expenditures or liabilities of the Company. Available Cash shall be determined without regard to (i) Capital Contributions and (ii) principal advanced on Company indebtedness.

"**Beneficiary**" means, with respect to the Policy, the legal person or persons designated as the recipients of the Death Benefit for such Policy.

"**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Member by crediting such Member's Capital Contributions, such Member's share of Net Income, and the amount of any Company liabilities that are assumed by such Member (other than liabilities that are secured by any Company property distributed to such Member) and by debiting the amount of cash and the gross fair market value of any Company property distributed to such Member pursuant to any provision of this Agreement (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752), such Member's share of Net Losses, and the amount of any liabilities of such Member that are assumed by the Company (other than liabilities that are secured by any property contributed by such Member to the Company).

"**Capital Contribution**" means, with respect to any Member, the amount of money and the initial gross fair market value of any property contributed (or deemed contributed) from time to time by such Member to the Company (net of any liabilities secured by such property or to which such property is otherwise subject). The initial gross fair market value of each Policy contributed by Klein shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement. Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution made

LCG000024

CONFIDENTIAL

by any predecessor of a Member. For purposes of this Agreement, a Capital Contribution shall include, without limitation, any Initial Capital Contribution.

"**Certificate**" has the meaning set forth in <u>Section 1.1</u>.

"**Change Forms**" means the forms changing the owner and Beneficiary of the Policy using such form as is required by each of the relevant issuing insurance companies.

"**Code**" means the Internal Revenue Code of 1986, as amended, and as the same may be amended hereafter from time to time.

"**Company**" shall have the meaning specified in the preamble hereto.

"**Consumer Information**" means medical, health, financial and personal information about an Insured, an Original Owner, a Beneficiary under a Policy or a person designated by an Insured to provide periodic information regarding the medical status of the Insured, or any spouse or other individual closely related by blood or law to any such person (each, a "**Consumer**"), including, without, limitation, a Consumer's name, street or mailing address, email address, telephone or other contact information, employer, social security or tax identification number, date of birth, driver's license number, photograph or documentation of identity or residency (whether independently disclosed or contained in any disclosed document such as a Policy, life expectancy evaluation, life insurance application or life settlement application).

"**Covered Person**" shall have the meaning specified in <u>Section 6.5(a)</u>.

"**Death Benefit**" means the cash amount of a Policy to be paid upon the death of the applicable Insured under such Policy, which amount will be net of any policy loans made under such Policy (and accrued interest thereon).

"**Disposition**" shall have the meaning specified in <u>Section 10.5(a)</u>.

"**Disposition Notice**" shall have the meaning specified in <u>Section 10.5(a)</u>.

"**Dissolution Date**" shall have the meaning specified in <u>Section 11.1</u>.

"**Fiscal Period**" means, subject to the provisions of Section 706 of the Code, (i) any Fiscal Year and (ii) any portion of a Fiscal Year for which the Company is required to allocate Net Income, Net Losses or other items of Company income, gain, loss or deduction pursuant to <u>Article IV</u>.

"**Fiscal Year**" shall have the meaning specified in <u>Section 1.7</u>.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Indemnified Liabilities**" shall have the meaning specified in <u>Section 6.12</u>.

21

CONFIDENTIAL

"**Indemnified Person**" shall have the meaning specified in Section 6.12.

"**Initial Capital Contribution**" means, with respect to each Member, such Member's Initial Capital Contribution set forth on Schedule A.

"**Insured**" means, with respect to a Policy, each person whose life is insured under such Policy.

"**Interest**" means, with respect to any Member, (a) such Member's share of the profits and losses of the Company and a Member's rights to receive distributions from the Company in accordance with the provisions of this Agreement and the Act and (b) such Member's other rights and privileges in respect of the Company as herein provided.

"**Joinder Agreement**" shall have the meaning specified in Section 10.2(a).

"**Klein Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Klein related to such Policy and (y) the Priority Return for Klein on such Policy.

"**Law**" means any law, constitution, statute, ordinance, code, rule, regulation, decision, order, consent, decree, judgment, ordinance, release, license, permit, stipulation or other pronouncement having the effect of law enacted or issued by any Governmental Authority, any foreign country, or domestic or foreign state, country, city or other political subdivision, which includes binding judicial precedent and principles of common law.

"**Lender**" shall mean each lender identified on Schedule C.

"**Majority in Interest**" means Members that at the time in question together hold a Percentage Interest greater than 50% in the aggregate.

"**Manager**" means one or more persons designated as such pursuant to this Agreement.

"**Members**" means, collectively, the members signatory to this Agreement, and any other Persons admitted to the Company as members after the date hereof in accordance with the terms of this Agreement.

"**Net Income**" and "**Net Losses**" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss and each item of income, gain, expense, deduction and loss shall be allocable to the Members in accordance herewith).

"**Non-Payment Policy**" shall have the meaning as specified in Section 8.2.

"**Non-Payment Policy Member**" shall have the meaning as specified in Section 8.2.

50028620.3

LCG000026

CONFIDENTIAL

"**Notice of Intention**" shall have the meaning as specified in Section 10.4(a).

"**Offer Price**" shall have the meaning as specified in Section 10.4(a).

"**Offered Interests**" shall have the meaning specified in Section 10.4(a).

"**Option Period**" shall have the meaning as specified in Section 10.4(b)

"**Original Owner**" means, with respect to a Policy, the Person to which the Policy was initially issued and who was listed as owner on the initial declarations page of such Policy or the policy application, as applicable.

"**Percentage Interest**" means, with respect to any Member as of any date of determination, a fraction (expressed as a percentage) having as its numerator the aggregate number of Interests held by such Member at such time, and having as its denominator the aggregate number of Interests held by all Members at such time. Each Member's Percentage Interest as of the date hereof, and as adjusted from time to time, is set forth on Schedule A.

"**Permitted Transferee**" means (a) with respect to any Member who is an individual, such member's siblings, parents, spouse (former spouse, if any), and children, and trusts solely for the benefit of any of the foregoing, and (b) with respect to any Member that is an entity, an Affiliate of such Member. [**Anyone else?**]

"**Person**" means any individual or any corporation, partnership, limited liability company, limited liability partnership, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other legal entity.

"**Policy**" means each of the life insurance policies contributed to the capital of the Company by Klein, as specified in Schedule B hereto.

"**Policy File**" means, with respect to a Policy, the file relating to such Policy which file shall include, without limitation, the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

"**Policy Illustration**" means, with respect to a Policy, a policy illustration from the related issuing insurance company.

"**Polter**" shall have the meaning set forth in Section 6.2.

"**Priority Return**" of a Member with respect to any Policy shall mean an annual rate of return of 12% on the total amount of Capital Contributions made by a Member with respect to such Policy from the date such Capital Contribution were made but computed no earlier than from the date of this Agreement. .

"**Rechnitz Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Rechnitz related to such Policy and (y) the Priority Return for Rechnitz on such Policy.

23

LCG000027

CONFIDENTIAL

"**Remaining Members**" shall have the meaning specified in Section 10.4(a).

"**Remaining Members Notice**" shall have the meaning specified in Section 10.4(b).

"**Remaining Members Option**" shall have the meaning specified in Section 10.4(b).

"**Reserve Account**" means account number [_____] established at Account Bank.

"**Selling Member**" shall have the meaning specified in Section 10.4(a).

"**Third Party**" shall have the meaning as specified in Section 10.4(a).

"**Transfer**" means, as a noun, any voluntary or involuntary, and direct or indirect, assignment, transfer, pledge, syndication, sale, hypothecation, contribution, encumbrance or other disposition or purported disposition, and, as a verb, voluntarily or involuntarily, and directly or indirectly, to assign, transfer, pledge, syndicate, sell, hypothecate, contribute, encumber or otherwise dispose of.

"**Tax Matters Member**" shall have the meaning specified in Section 9.4.

"**Treasury Regulations**" means the Income Tax Regulations promulgated under the Code, as the same may be amended hereafter from time to time.

*[Remainder of Page Intentionally Left Blank]*

24

LCG000028                                                                                    CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Limited Liability Company Agreement as of the date first set forth above.

SHLOMO RECHNITZ
_____

LESLIE KLEIN
_____

CONFIDENTIAL

## SCHEDULE A

| Member | Initial Capital Contributions | Interests | Initial Percentage Interest |
|---|---|---|---|
| Rechnitz | SEE SECTION 3.1 | 50% | 50% |
| Klein | SEE SECTION 3.1 | 50% | 50% |

Sch. A-1

CONFIDENTIAL

**Portfolio View**

| Last Name | First Name | Name | Policy Number | Face Amount | Carrier | Ownership Status | Age of youngest insured | 2011/12 |
|---|---|---|---|---|---|---|---|---|
| Aaronson | Hugh & Evelyn | Hugh & Evelyn Aaronson | US0007778L | 500,000.00 | American General | Change Complete | 79 | 0.00 |
| Barris | Leo | Barris, Leo | 97520832 | 1,000,000.00 | Phoenix | Change Complete | 86 | 70,752.00 |
| Baum | Marilyn | Baum, Marilyn | 156-219-257 | 1,500,000.00 | AXA | | 72 | 3,876.00 |
| Berke | Ruth | Berke, Ruth | US0016022L | 2,391,200.00 | American General | | 81 | 57,384.00 |
| Brody | Nancy | Brody, Nancy | 97520135 | 1,000,000.00 | Phoenix | Change Complete | 76 | 11,726.00 |
| Chambers | Adele | Chambers, Adele | US0016183L | 1,000,000.00 | American General | Change Complete | 80 | 0.00 |
| Chambers | Leonard & Adele | Chambers, Leonard & Adele | US0006725L | 1,000,000.00 | American General | Change Complete | 79 | 0.00 |
| Deutsch | Simon | Simon Deutsch | US0016020L | 3,736,560.00 | American General | | 82 | 173,412.00 |
| Dorfman | Barbara & Allen | Dorfman, Barbara & Allen | US0007814L | 2,000,000.00 | American General | Change Complete | 74 | 0.00 |
| Elbogin | Evelyn | Elbogin, Evelyn | US0016177L | 3,338,250.00 | American General | | 77 | 90,780.00 |
| Finkel | Ivan & Roberta | Finkel, Ivan & Roberta. | US0007552L | 1,000,000.00 | American General | Change Complete | 78 | 0.00 |
| Friedman | Sheldon & Sandra | Sheldon & Sandra Friedman | US0006795L | 1,000,000.00 | American General | | 77 | 4,284.00 |
| Gardner | Andrew & Yvette | Gardner, Andrew & Yvette | 1621379 | 5,000,000.00 | ING | | 81 | 0.00 |
| Gardner | Andrew & Yvette | Gardner, Andrew & Yvette | 1625579 | 5,000,000.00 | ING | | 81 | 0.00 |
| Gestetner | Sandor & Hajnal | Sandor & Hajnal Gestetner | A10203339L | 2,000,000.00 | American General | Change Complete | 73 | 12,804.00 |
| Glatzer | Fay | Glatzer, Fay | U10042707L | 1,000,000.00 | American General | Change Complete | 74 | 25,000.00 |
| Goldstein | Evelyn | Goldstein, Evelyn | 156-208-510 | 1,000,000.00 | AXA | | 77 | 20,000.00 |

CONFIDENTIAL

| Goldstein/Wiener | Harvey & Irma | Harvey, Goldstein & Irma Wiener | US00113251L | 500,000.00 | American General | Change Complete | 82 | 7,548.00 |
|---|---|---|---|---|---|---|---|---|
| Goodkin | Lewis | Goodkin, Lewis | UME204168L | 5,000,000.00 | American General | | 76 | 184,000.00 |
| Goodkin | Lois | Goodkin, Lois | 97522336 | 1,000,000.00 | Phoenix | Change Complete | 79 | 29,532.00 |
| Grossman | Judith | Grossman, Judith | US0023804L | 1,000,000.00 | American General | Change Complete | 78 | 10,668.00 |
| Herman | Margot | Margot Herman | 60134772 | 1,000,000.00 | Transamerica | | 75 | 9,600.00 |
| Hoffman | Irving & Sandra | Irving & Sandra Hoffman | US0005723L | 1,000,000.00 | American General | Change Complete | 77 | 0.00 |
| Hoffman | Sofie | Hoffman, Sofie | RL3106032X | 5,000,000.00 | ING | | 86 | 17,000.00 |
| Holtzman | Barbara | Holtzman, Barbara | 60030333 | 8,000,000.00 | Allianz | | 79 | 240,000.00 |
| Katz | Sy & Ruth | Katz, Sy & Ruth | US0013793L | 1,000,000.00 | American General | | 77 | 5,484.00 |
| Kirzner | Lillian | Kirzner, Lillian | U10042940L | 3,193,440.00 | American General | | 73 | 42,960.00 |
| Kohn | Eugene | Kohn, Eugene | US0016289L | 3,675,180.00 | American General | | 81 | 183,936.00 |
| Kohn | Siddonia | Kohn, Siddonia | 97519199 | 1,900,000.00 | Phoenix | Change Complete | 83 | 64,404.00 |
| Lowinger | David | Lowinger, David | 97522076 | 1,900,000.00 | Phoenix | Change Complete | 77 | 45,048.00 |
| Parmett | Robert & Suzanne | Parmett | US0007060L | 1,000,000.00 | American General | Change Complete | 76 | 0.00 |
| Rosenblatt | Ila | Rosenblatt, Ila | 97520156 | 1,000,000.00 | Phoenix | Change Complete | 74 | 0.00 |
| Roth | Agnes | Roth, Agnes | US0023724L | 4,529,944.00 | American General | | 79 | 138,852.00 |
| Sears | Ted & Arlene | Sears, Ted & Arlene | US0006796L | 1,000,000.00 | American General | | 77 | 0.00 |
| Smilow | Eva | Smilow, Eva | US0023425L | 2,734,900.00 | American General | | 74 | 22,000.00 |
| Spitzer | Malvine | Spitzer, Malvine | US0023546L | 5,702,550.00 | American General | | 81 | 79,000.00 |
| Sternhell | Bella | Sternhell, Bella | 97519200 | 1,000,000.00 | Phoenix | Change Complete | 82 | 29,256.00 |
| Tsunemoto | Jean | Tsunemoto, | 97520736 | 1,000,000.00 | Phoenix | Change Complete | 82 | 25,512.00 |

CONFIDENTIAL

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wiese | Fay | Jean<br>Wiese, Fay | 156219549 | 1,000,000.00 | AXA | | 72 | 9,000.00 |
| Windham | Ida May | Windham, Ida May | 97520428 | 1,000,000.00 | Phoenix | Change Complete | 77 | 17,580.00 |
| Yorkshire | Stuart | Yorkshire, Stuart | 60136698 | 1,000,000.00 | Transamerica | | 89 | 84,000.00 |
| Zimmerman | Pearl Rozy | Zimmerman, Pearl Rozy | US0023738L | 9,910,800.00 | American General | | 76 | 102,648.00 |
| Zucker | Mitzie | Zucker, Mitzie | 97520786 | 2,000,000.00 | Phoenix | Change Complete | 77 | 15,180.00 |
| | | | | 100512824.00 | | | | 1833226.00 |

LCG000033

CONFIDENTIAL

## SCHEDULE B

## POLICIES

| Insured | Owner | Issuing Insurance Company | Policy Number | Death Benefit |
|---------|-------|---------------------------|---------------|---------------|
|         |       |                           |               |               |

Sch. B-1

LCG000034                                                                CONFIDENTIAL

## SCHEDULE C

### LENDERS

| Lender | Outstanding Principal Balance |
|---|---|
| Sol Majer | $343,000 |
| Leah Katzsl | $100,000 |
| Ari Majer | $65,328 |
| Simcha Mann | $110,000 |
| Yisroel Rechnitz | $350,000 |
| Chaim Manella | $600,000 |
| Ben Katzsl | $245,000 |
| Shlomo Rechnitz | $500,000 |
| Hirshy Krich | $240,000 |
|  |  |
| **TOTAL** | **$2,553,328** |

Sch. C-1

CONFIDENTIAL

## <u>SCHEDULE 7.1(D)(XII)</u>

### POLICIES IN GRACE

LCG000036                                                              CONFIDENTIAL

## **EXHIBIT A**

### **JOINDER AGREEMENT**

[TO COME]

CONFIDENTIAL

# **EXHIBIT D**

(Original Klein Complaint)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Electronically FILED by Superior Court of California, County of Los Angeles on 05/07/2022 09:55 PM Sherri R. Carter, Executive Officer/Clerk of Court, by S. Ruiz,Deputy Clerk
Case 2:25-ap-01020-NB    Doc 65    Filed 07/22/25    Entered 07/22/25 13:50:50    Desc
Main Document    Page 96 of 147
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Stephanie Bowick

1  JEFFREY A. SLOTT, ESQ. (SBN 103807)
2  LAW OFFICES OF JEFFREY A. SLOTT
   A Professional Corporation
3  15760 Ventura Boulevard, Suite 1600
   Encino, California  91436
4  Telephone: (818) 995-1955
   Facsimile: (818) 995-0955
5  Email: jslott@aol.com

6  Attorney for Plaintiff LESLIE KLEIN

7

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10         FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

11

12  LESLIE KLEIN, individually and ) CASE NO: 22STCV18787
    as a Member of the EKLK        )
13  FOUNDATION, and derivatively   )
    on behalf of LIFE CAPITAL      )
14  GROUP, LLC, a limited          ) **VERIFIED COMPLAINT OF LESLIE**
    liability company,             ) **KLEIN, INDIVIDUALLY AND AS A**
15                                 ) **MEMBER OF THE EKLK FOUNDATION,**
            Plaintiffs,            ) **AND DERIVATIVELY ON BEHALF OF**
16                                 ) **LIFE CAPITAL GROUP, LLC, A**
         vs.                       ) **LIMITED LIABILITY COMPANY FOR:**
17                                 )
    JONATHON POLTER, an            )
18  individual; SHLOMO RECHNITZ,   ) **1. ENFORCEMENT OF RIGHT OF**
    individually and as a Member   )    **INSPECTION;**
19  of the TRSR FOUNDATION, LIFE   ) **2. BREACH OF FIDUCIARY**
    CAPITAL GROUP, LLC, a limited  )    **DUTY;**
20  liability company, VOYA        ) **3. ACCOUNTING;**
    FINANCIAL, INC., a corporation ) **4. BREACH OF CONTRACT;**
21  and DOES 1-30, inclusive.      ) **5. INJUNCTIVE RELIEF, INCLUDING**
                                   )    **APPOINTMENT OF RECEIVER;**
22          Defendants.            ) **6. BREACH OF IMPLIED COVENANT**
                                   )    **OF GOOD FAITH AND FAIR**
23  _____  )    **DEALING;**
24                                   **7. DECLARATORY RELIEF**

25

26                                   **[DEMAND FOR JURY TRIAL]**

27  / / /

28

                          1

1   Plaintiff, LESLIE KLEIN, hereby complains and alleges

2   against Defendants, and each of them, as follows:

3   COMES NOW LESLIE KLEIN, in his individual capacity

4   asserting claims on his own behalf and derivatively on behalf of

5   LIFE CAPITAL GROUP, LLC, a limited liability Company, and hereby

6   complains and alleges against Defendants, and each of them, as

7   follows:

8

9   **GENERAL ALLEGATIONS**

10   1.   At all times herein mentioned, Plaintiff was and now

11   is, an individual residing in the County of Los Angeles, State

12   of California.  At all times herein mentioned, Plaintiff was and

13   now is a Member of the EKLK Foundation, on whose behalf

14   Plaintiff is pursuing claims against Defendants, and each of

15   them.  At all times herein mentioned, Plaintiff is pursuing

16   claims derivatively on behalf of Life Capital Group, LLC, a

17

18   limited liability company.

19   2.   At all times herein mentioned, Defendants SCHLOMO

20   RECHNITZ and DOES 1 through 10, inclusive, and each of them,

21   (collectively "RECHNITZ") and JONATHAN POLTER and DOES 11

22   through 20, inclusive, and each of them (collectively "POLTER")

23

24   were and now are individuals. At all times herein mentioned,

25   RECHNITZ is a resident of the County of Los Angeles, State of

26   California.  Plaintiff is informed and believes and based upon

27   such information and belief, alleges that at all times herein

28

2

mentioned, POLTER was and now is a resident of the State of

Michigan from which he conducts business in the State of

California in his own name, as an employee of various California

business entities, and individually utilizing the names of

various California business entities.  At all times herein

mentioned, Defendant RECHNITZ was and now is a Member of the

TRSR Foundation, against whom Plaintiff is seeking damages.

3.    At all times herein mentioned, LIFE CAPITAL GROUP,

LLC, a limited liability Company and DOES 21 through 30,

inclusive, and each of them (collectively "LCG"), were and now

are California Limited Liability Companies authorized, licensed

and conducting business in the State of California with their

principal place of business located at 7223 Beverly Boulevard,

Suite 205, Los Angeles, California 90356.

4.    At all times herein mentioned, Plaintiff and RECHNITZ

were and now are the sole members and owners of LCG, each owning

a 50% membership interest therein.

5.    At all times herein mentioned, and until approximately

June 14, 2021, POLTER was a manager of LCG.

6.    At all times herein mentioned, and effective as of

June 14, POLTER resigned as sole manager of LCG whereupon

Plaintiff and RECHNITZ became the equal managing members of LCG.

7.    At all times herein mentioned, POLTER and RECHNITZ

failed and refused to notify Plaintiff of POLTER's resignation

as sole manager of LCG, whereupon RECHNITZ, without the

3

knowledge, authorization or consent of Plaintiff designated himself as sole managing member of LCG by filing applicable forms with the California Secretary of State with such unilateral and unauthorized designation.

8.    At all times herein mentioned, Defendant VOYA FINANCIAL, INC., a corporation ("VOYA") is named as a defendant herein, solely and exclusively as a nominal defendant, against whom Plaintiff seeks no damages and no affirmative relief, other than to impose injunctive relief upon said defendant to preclude it from inadvertently or intentionally jeopardizing or prejudicing the rights of Plaintiff and/or LCG by making distributions of large sums of life insurance proceeds to RECHNITZ or LCG as hereinafter described and alleged.

9.    Plaintiff is informed and believes and based upon such information and belief alleges that at all times herein mentioned, defendant VOYA FINANCIAL, INC was and now is a corporation, licensed, authorized and conducting business in the State of California, with its principle place of business located in Atlanta, Georgia.

10.   At all times herein mentioned, Plaintiff requested of RECHNITZ and POLTER that the claims asserted by Plaintiff herein derivatively on behalf of LCG, be honored or satisfied prior to the filing of this Complaint.  The foregoing request was ignored or overtly rejected and denied by each of said Defendants prior to the filing of this Complaint.  Such request was in fact

4

1   futile given the hostility, fraudulent conduct and intentional

2   disregard for the rights of Plaintiff demonstrated by Defendants

3   RECHNITZ and POLTER.  Prior to the filing of this Compliant,

4   Plaintiff informed RECHNITZ and POLTER in writing of the

5   ultimate facts of each cause of action asserted against each

6   said Defendant herein.  Such requests by Plaintiff directed to

7   said Defendants included but are not limited to Plaintiff's

8
9   requests that he be acknowledged as a 50% owner and member of

10   LCG, that he be permitted to inspect the books and records of

11   LCG, that he be included in the management, decision-making and

12   control of money of LCG and that LCG conduct its operations and

13   maintain its financial dealings and record-keeping separate and

14   distinct from the individual financial dealings of RECHNITZ and

15   POLTER.  Based on the foregoing and at all times herein

16   mentioned, the rights of LCG are therefore being derivatively

17   pursued hereunder by Plaintiff.

18
19        11.  At all times herein mentioned, Defendants, and each of

20   them, with the exception of Defendant VOYA FINANCIAL, INC., were

21   and now are the agents, servants, employees, representatives,

22   joint tortfeasors, co-conspirators, members, officers,

23   directors, owners and managers of each of the other Defendants

24   named herein and in doing the things hereinafter alleged, were

25   acting within their individual capacities and/or in such

26   representative capacities.

27
28   / / /

5

12. Plaintiff is unaware of the true name and capacities of DOES 1-30, inclusive, and each of them, who therefore sues said Defendants under such fictitious names. Plaintiff will seek leave of Court to amend this Complaint accordingly when the identities of said DOE defendants have been ascertained.

13. On or about June 1, 2011, Plaintiff and RECHNITZ entered into an Operating Agreement concerning their joint and equal ownership in LCG. The Operating Agreement is titled "Limited Liability Company Agreement of Life Capital Group, LLC" dated as of June 1, 2011 ("The Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit "A" and is incorporated herein by this reference.

14. LCG is a life insurance policy holding company pursuant to which it has, for at least the past ten years, engaged in the ownership, management and maintenance of life insurance policies contributed to it by Plaintiff as prior owner of each such policy. As prior owner of each such life insurance policy, Plaintiff paid the premiums on such policies, from approximately 2007 through approximately 2011 when the policies were then contributed to LCG by Plaintiff. Under the terms of the Agreement, Plaintiff was and is entitled to receive interest on the premiums he paid on the aforesaid life insurance policies from 2007 through 2011. Under the terms of the Agreement, upon contribution of the aforesaid life insurance policies to LCG, LCG was to assume and undertake payment of all life insurance

6

policy premiums from and after 2011, through the present. Under the terms of the Agreement, funding for LCG to enable it to pay the premiums on the aforesaid life insurance policies was to be contributed to LCG solely by RECHNITZ. Under the terms of the Agreement, RECHNITZ was and is entitled to receive interest at the rate of thirteen percent (13%) per annum on all of the money he contributed to LCG for payment of life insurance policy premiums. In forming LCG, it was contemplated by its members that the company would hold the life insurance policies, manage and maintain them, and pay the premiums on the life insurance policies until such time as the insureds of such life insurance policies died. Upon the death of the insureds under the aforesaid life insurance policies, LCG would profit from receipt of the life insurance proceeds from each policy, theoretically in an amount greater than the amount paid for the policies and for the premium payments. Over the years of its existence, some insureds died and LCG received the proceeds of their life insurance policies, other policies lapsed or otherwise became worthless and were replaced with other valuable life insurance policies as contributed to LCG by Plaintiff from time-to-time. One such policy involved insured Barbara Holtzman, deceased. Without the knowledge, permission or consent of Plaintiff, Defendant RECHNITZ assigned and transferred the life insurance policy of Barbara Holtzman to a charitable organization known as Torah Umesorah for the purpose of defrauding LCG and Plaintiff.

7

Upon the death of Barbara Holtzman, Torah Umesorah paid Defendant RECHNITZ all of the proceeds of her life insurance policy in the approximate sum of Eight Million Dollars ($8,000,000.00) without the knowledge, consent or participation of LCG or Plaintiff. On another life insurance policy owned by LCG, Mr. and Mrs. Bernstein passed away and their life insurance company paid LCG the sum of $1,500,000.00, all of which was taken by RECHNITZ without the knowledge or consent of Mr. Klein. Similarly, the life insurance policy of Ruth Berke was paid to LCG in the sum of $3,500,000.00 and not a dime was paid to Mr. Klein. Finally, Andrew Gardner and Yvette Gardner passed away recently, and their life insurance carrier, Voya Financial, Inc. fka Security Life of Denver Insurance Company is about to pay LCG the sum of $10,000,000.00 and Mr. Klein has no control over those proceeds as RECHNITZ and POLTER have essentially locked him out of LCG. Defendant RECHNITZ absconded with such life insurance proceeds and has never accounted for same, all of which occurred within four years last passed. Under the terms of the Agreement, upon the death of insureds under policies owned by LCG, the life insurance proceeds would be paid to LCG and its members would then split the net profits therefrom, after deducting from the gross life insurance proceeds all interest due Plaintiff and said Defendant on the premiums paid by each of them as heretofore alleged.

/ / /

8

15. At all times herein mentioned, Plaintiff and RECHNITZ had and continue to have equal voting rights in regard to all business matters undertaken and engaged in by LCG, including the appointment of managers for the company. At some point in time RECHNITZ unilaterally appointed POLTER as manager of LCG. On or about June 14, 2021, RECHNITZ appointed himself as sole member and manager of LCG without the knowledge, authorization or consent of Plaintiff. Prior to and after June 14, 2021, on numerous occasions, verbally and in writing, Plaintiff has demanded copies of the LCG books and records, K-1 tax forms to be issued to the members of LCG each year, tax returns prepared and filed on behalf of LCG and a full accounting of all business conducted by LCG.

16. At all times herein mentioned, LCG was required under the terms of The Agreement and California law, to prepare, maintain, distribute to its members and otherwise properly manage all of the LCG books and records, including without limitation the above-described financial documents, banking records, etc. Despite Plaintiff's multiple demands that copies of such documents be provided to Plaintiff, RECHNITZ and POLTER have failed and refused and continue to fail and refuse to provide same to Plaintiff. Plaintiff is informed and believes and based upon such information and belief, alleges that RECHNITZ and POLTER have never prepared or filed any tax returns for LCG, have never kept its books and records in a manner

9

consistent with state and federal laws, have never maintained

bank accounts for the company and yet have collected in excess

of Thirteen Million Dollars ($13,000,000.00) from life insurance

proceeds on the death of various insureds, all to the exclusion

of Plaintiff, without accounting for same.

### FIRST CAUSE OF ACTION

**(Enforcement of Right of Inspection**

**[Corp. Code Sections 17701 and 17704.10]**

**As Against Defendants RECHNITZ, POLTER and LCG)**

17.   Plaintiff refers to the allegations set forth in Paragraphs 1 through 16 above, and incorporates same herein by this reference.

18.   Plaintiff has made multiple demands of Defendants RECHNITZ, POLTER and LCG for copies of the federal, state and local income tax returns and reports for the six most recent fiscal years. Plaintiff has made multiple demands of said Defendants for the right to inspect the books and records of LCG for the past four fiscal years.  Said Defendants, and each of them, have failed and refused and continue to fail and refuse to comply with such demands, notwithstanding Plaintiff's status as a 50% member of LCG.

19.   Under the terms of the Agreement, Plaintiff is entitled to a full accounting of all business conducted by LCG.

/ / /

/ / /

10

Despite Plaintiff's multiple demands for such full accounting, said Defendants, and each of them, have failed and refused to provide it.

20. As a direct and proximate result of said Defendants' impeding Plaintiff's right to inspect the books, records, finances and financial documents, including tax returns, of LCG, Plaintiff has been damaged in a certain but unascertained amount. Plaintiff will seek leave of court to amend this Complaint accordingly when the exact nature and extent of all such damages have been ascertained.

21. As a direct and proximate result of the aforesaid wrongful conduct and violation of Plaintiff's right to inspection and to receive documents from LCG, Plaintiff is entitled to and hereby seeks an Order form the Court enforcing his right as a member of LCG to inspect its books and records and to obtain the requested documents, along with a full accounting of all financial transactions involving LCG during the past six years.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty as Against

### Defendants RECHNITZ and POLTER)

22. Plaintiff refers to the allegations as set forth in Paragraphs 1 through 16, 18 and 19 above and incorporates same herein by this reference

/ / /

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

23.   At all times herein mentioned, POLTER was a manager of LCG, and RECHNITZ is and was a member manager of LCG.   As such, POLTER and RECHNITZ owed and owe fiduciary duties under the California Corporations Code and common law to Plaintiff as a member of LCG.   In addition, at all times herein mentioned, said Defendants have owed and continue to owe Plaintiff fiduciary duties under the Agreement.

24.   From in or about 2018 and continuing through the present, Defendants RECHNITZ and POLTER have breached their fiduciary duties owed to LCG and Plaintiff by, among other things, excluding Plaintiff from participation in the business of LCG, by failing and refusing to account to Plaintiff for financial transactions involving LCG, by diverting funds belonging to LCG and Plaintiff to their own personal use and benefit without the knowledge, authorization or consent of Plaintiff, by mismanaging CLG to such extent that it can no longer operate or remain solvent, and by refusing to acknowledge Plaintiff's 50% ownership in LCG, all in breach of said Defendants' fiduciary duties of good faith, undivided loyalty and disclosure owed to Plaintiff.

25.   As a direct and proximate result of said Defendants' aforesaid breaches of fiduciary duties to LCG and Plaintiff, LCG and Plaintiff have been damaged in a certain, but presently unascertained sum in excess of the minimum jurisdictional limits of this Court.   As a further direct and proximate result of the

12

aforesaid breaches of fiduciary duties by said Defendants, and each of them, Plaintiff and LCG are entitled to disgorgement of profits and an accounting.  Plaintiff also seeks the appointment of a receiver to assume full control of LCG for the purpose of managing the business and eventually winding down its affairs and dissolving it.

26.  The aforesaid conduct on the part of said Defendants, and each of them, was undertaken with malice, fraud and oppression, and in disregard of the rights of Plaintiff and LCG. Plaintiff is therefore entitled to and hereby seeks an award of exemplary and punitive damages in a sum to be determined according to proof.

## THIRD CAUSE OF ACTION

**(Accounting As Against Defendants RECHNITZ, POLTER and LCG)**

27.  Plaintiff refers to the allegations set forth in paragraphs 1 through 16, 18, 19, 23 and 24 above and incorporates same herein by this reference.

28.  Plaintiff is informed and believes and thereon alleges that Defendants RECHNITZ, POLTER and LCG have maintained a pattern and practice of converting LCG assets, including life insurance proceeds to their own personal benefit and use, to the exclusion of Plaintiff.  Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, said Defendants have failed to maintain proper books and records of business conducted by LCG, have co-mingled their personal assets

13

with those of LCG, have failed to file tax returns for LCG from
and after 2018 and continuing through the present, and at all
times herein mentioned have concealed the assets and the nature
and extent of business operations of LCG from Plaintiff

29. As a direct and proximate result of the aforesaid
unauthorized and wrongful actions of said Defendants, and each
of them, Plaintiff seeks and is entitled to an accounting of the
LCG business and financial affairs, including but not limited to
a full accounting of all financial transactions involving LCG
and/or the life insurance policies it owns.

## FOURTH CAUSE OF ACTION

**(Breach of Contract as Against Defendants RECHNITZ and LCG)**

30. Plaintiff refers to the allegations set forth in
paragraphs 1 through 16, 18, 19, 23 and 24 above and
incorporates same herein by this reference.

31. The Agreement provides for the payment of net income
to the members of LCG, as well as distribution of life insurance
proceeds to Plaintiff. The Agreement also requires maintenance
of the LCG books and records, filing of tax returns and
disclosure of same to members of LCG.

32. From at least January 1, 2018 through the present,
Defendants RECHNITZ and LCG have breached the Agreement by
virtue of all of their aforesaid wrongful conduct

/ / /

/ / /

14

33.  As a direct and proximate result of the aforesaid breaches of the Agreement by said Defendants, and each of them, Plaintiff has been damaged in a certain, but presently unascertained sum in excess of $40,000,000.  Plaintiff is entitled to compensatory and consequential damages as a direct and proximate result of the aforesaid wrongful conduct on the part of said Defendants, and each of them.  Plaintiff will seek leave of Court to amend this Complaint accordingly when the exact nature and extent of all such damages have been ascertained.

## FIFTH CAUSE OF ACTION

### (Injunctive Relief and Appointment of Receiver

### As Against All Defendants)

34.  Plaintiff refers to the allegations set forth in paragraphs 1 through 16, 18, 19, 23, 24, 31 and 32 above and incorporates same herein by this reference.

35.  Plaintiff is informed and believes and thereon alleges that insurance policies issued by ING and Security Life of Denver Insurance Company, the successor of which is Defendant VOYA, on the lives of Andrew and Evette Gardner, Policy Nos. 1621379 and 1625579.  Andrew and Evette Gardner passed away in in or around early 2022 and VOYA will be paying the sum of $5,000,000 for each of the aforesaid insurance policies on their lives to LCG.

/ / /

15

36.   At all times herein mentioned, Defendants RECHNITZ and LCG have concealed the fact that the Gardners are deceased in an attempt to collect $10,000,000 from VOYA on the Gardners' life insurance policies to the exclusion of Plaintiff.  On or about May 10, 2022, counsel for Plaintiff wrote and delivered a letter to VOYA (directed to Security Life of Denver Insurance Company) demanding that the proceeds of the Gardner life insurance policies be withheld and not distributed to LCG or RECHNITZ.  To date, VOYA has not responded to the aforesaid written correspondence.

37.   Plaintiff is informed and believes and thereon alleges that unless restrained and enjoined, Defendants, and each of them, will wrongfully distribute and disburse the Gardner life insurance proceeds to LCG and/or to RECHNITZ, to the exclusion of Plaintiff, thereby causing great and irreparable injury to LCG and Plaintiff.  For the reasons heretofore stated, Plaintiff has no adequate legal remedy in that once the funds are distributed to LCG and/or RECHNITZ, RECHNITZ will abscond with same to the permanent exclusion of Plaintiff, notwithstanding Plaintiff's right to share in such proceeds.  In addition, RECHNITZ will undertake the same conduct and divisive action to defraud Plaintiff and LCG and abscond with other insurance proceeds if RECHNITZ is permitted to remain in sole control of LCG and is not restrained.

/ / /

16

38.   Plaintiff is therefore entitled to and hereby seeks a temporary restraining order, preliminary injunction and permanent injunction enjoining Defendants, and each of them, and their agents, servants, and employees and all persons acting under and in concert with or for them, from further managing the business of LCG, from disbursing the Gardner life insurance proceeds to LCG or RECHNITZ until such time as a receiver has been appointed to control such disbursements and funds and further to restrain said Defendants against further exclusion of Plaintiff from the business of LCG.  Plaintiff is entitled to and further seeks a mandatory injunction compelling LCG, RECHNITZ and POLTER to account for all financial transactions involving LCG since January 1, 2018 through the present.

## SIXTH CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith**

**and Fair Dealing as Against Defendants**

**RECHNITZ, POLGER and LCG)**

39.   Plaintiff refers to the allegations set forth in paragraphs 1 through 16, 18, 19, 23 and 24 above and incorporates same herein by this reference.

40.   At all times herein mentioned, there existed and exists a covenant among Plaintiff and Defendants RECHNITZ, LCG and POLTER pursuant to which each owes the other an obligation to conduct business with each other in good faith and with

/ / /

17

1
2

fairness to all.  Implied in the Agreement is a covenant of good
faith and fair dealing among Plaintiff and Defendants.

3
4
5
6
7
8
9

41.  Plaintiff is informed and believes and thereon alleges
that Defendants RECHNITZ, POLTER and LCG breached and/or
assisted in or ratified the breach of the aforesaid implied
covenant of good faith and fair dealing in the Agreement by
undertaking the foregoing wrongful conduct as against Plaintiff,
as heretofore alleged.

10
11
12
13
14
15

42.  As a direct and proximate result of the aforesaid
breaches of the implied covenant of good faith and fair dealing
as alleged herein, Plaintiff has been damaged in a certain but
presently unascertained sum.  Plaintiff will seek leave of Court
to amend this Complaint accordingly when the exact nature and
extent of all such damages has been ascertained.

16
17
18
19
20
21

43.  The aforesaid conduct by Defendants, and each of them,
was undertaken with malice, fraud, and oppression, and in
conscious disregard of the rights of Plaintiff.  Plaintiff is
therefore entitled to and hereby seeks an award of exemplary and
punitive damages in a sum to be determined according to proof.

22

### SEVENTH CAUSE OF ACTION

23

### (Declaratory Relief as Against All Defendants)

24
25
26
27

44.  Plaintiff refers to the allegations set forth in
paragraphs 1 through 16, 18, 19, 23, 24, 31, 32, 35, 36 and 37
above and incorporates same herein by this reference.

28

/ / /

18

45. An actual controversy has arisen between Plaintiff and Defendants, and each of them, wherein Defendants RECHNITZ and POLTER, on their own individual behalf and on behalf of LCG, have excluded Plaintiff from the business of LCG, have diverted funds from the business of LCG, have failed and refused to account for financial transactions of LCG and are planning to abscond with the Gardner life insurance policy proceeds. An actual controversy has arisen between Plaintiff and VOYA to the extent VOYA has not agreed to withhold distribution of the Gardner life insurance policy proceeds.

46. Plaintiff accordingly seeks a declaration of the rights and duties of the parties with respect to the Agreement, management of LCG, disposition of the Gardner life insurance policy proceeds and accounting for all financial transactions involving LCG as heretofore described

WHEREFORE, Plaintiff prays for Judgment against Defendants, and each of them, as follows:

1. For a temporary restraining order, preliminary injunction and a permanent injunction, enjoining Defendants, and each of them, and their agents, servants and employees, and all persons acting under and in concert with or for them, from disbursing or paying out the Gardner life insurance policy proceeds pending further order of the Court, refusing to permit Plaintiff to participate in the business of LCG, mandating that Defendants RECHNITZ, POLTER and LCG provide Plaintiff with a full

19

accounting of all financial transactions involving LCG and against interfering with the appointment of a receiver to control LCG and operate its business;

2.    For the appointment of a receiver to fully control and operate LCG to the exclusion of RECHNITZ and POLTER.

3.    For general damages according to proof;

4.    For special damages for out-of-pocket expenses incurred by Plaintiff in the pursuit of Plaintiff's rights of inspection, and copies of the books and records of LCG;

5.    For disgorgement of profits and benefits unjustly retained by LCG and/or RECHNITZ;

6.    For an accounting;

7.    For a declaration of the rights and duties with respect to the agreement and operation of the business of LCG;

8.    For pre-judgment interest as permitted by law;

9.    For attorney's fees according to proof;

10.   For costs of suit incurred herein; and

11.   For such other and further relief as the Court deems just and proper.


Dated:   June 6, 2022        LAW OFFICES OF JEFFREY A. SLOTT
                             A Professional Corporation



                             BY:_____
                                JEFFREY A. SLOTT, ESQ.
                                Attorney for Plaintiff LESLIE KLEIN,

20

**VERIFICATION**

STATE OF CALIFORNIA )
                    ) ss.
COUNTY OF LOS ANGELES )

I, LESLIE KLEIN, am the Complainant in this action.  I have
read the allegations contained in the attached COMPLAINT and
know the contents thereof.  The allegations contained in the
Complaint are true of my own knowledge except as to those
matters which are stated therein on information and belief, and
as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct.

Executed this 6th day of June, 2022, at Encino, California.

_____
LESLIE KLEIN,

21

# EXHIBIT A

LIMITED LIABILITY COMPANY AGREEMENT of LIFE CAPITAL GROUP, LLC (this "**Agreement**"), a California limited liability company (the "**Company**"), dated as of June 1, 2011, among Shlomo Rechnitz, an individual residing in the State of California ("**Rechnitz**"), Leslie Klein, an individual residing in the State of California ("**Klein**"), and the Persons that become Members from time to time after the date hereof in accordance with the terms hereof.

## WITNESSETH:

WHEREAS, the Members desire to operate the Company as a limited liability company under Title 2.5 of the California Corporations Code, as amended from time to time (the "**Act**"), in order to accomplish certain lawful business objectives;

WHEREAS, the Certificate of Formation of Life Capital Group, LLC was filed with the Secretary of State of the State of California on April 8, 2011, in accordance with the provisions of the Act; and

WHEREAS the Members desire to set forth herein the manner in which the Company shall be governed and operated.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

## ARTICLE I
### FORMATION AND BUSINESS OF THE COMPANY

Section 1.1    Formation. The Company was formed on April 8, 2011 by the filing of a Certificate of Formation (the "**Certificate**") with the Secretary of State of California. The Members hereby agree to operate the Company as a limited liability company pursuant to the provisions of the Act and upon and subject to the terms and conditions set forth in this Agreement. Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

Section 1.2    Name. The name of the Company shall be Life Capital Group, LLC, under which name all business and affairs of the Company shall be conducted.

Section 1.3    Purpose. The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act.

Section 1.4    Term. The term of the Company shall continue until terminated in accordance with the provisions of Article XI of this Agreement or otherwise dissolved and wound up pursuant to the Act.

Section 1.5    Place of Business. The Company shall have its principal place or places of business at such place or places as the Manager may, from time to time, select.

Section 1.6    Registered Office and Agency. The address of the registered office of the Company in the State of California is 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036. The name and address of the registered agent for service of process on the Company in the State of California is Shlomo Rechnitz, 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.

Section 1.7    Fiscal Year. The term **"Fiscal Year"** shall mean, subject to the provisions of Section 706 of the Code, each of (a) the period commencing on the date of formation of the Company and ending on December 31, 2011, (b) any subsequent 12-month period commencing on January 1 and ending on December 31 and (c) the period commencing on January 1 and ending on the Dissolution Date.

## ARTICLE II
## MEMBERS

Section 2.1    Members. The Company shall consist of the Members executing this Agreement and any substitute or additional Members admitted to the Company in accordance with the terms hereof. Each initial Member shall be deemed admitted as a Member of the Company at such time as such Member has made its Initial Capital Contribution to the Company.

Section 2.2    Company Property; Company Interest. No property of the Company shall be deemed to be owned by any Member individually, but all of such property shall be owned by, and title thereto shall be vested solely in, the Company.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

Section 3.1    Initial Capital Contribution of Members, Capital Accounts. Each Member has contributed to the capital of the Company, as such Member's Initial Capital Contribution, the amount of cash, or property with a value, set forth on Schedule A. The Company shall maintain a record of: (a) the number of Interests held by each Member and (b) the respective Percentage Interest of each Member. The Manager shall update such Schedule A from time to time to reflect changes in such information. The Members agree that Klein's Initial Capital Contribution associated with each Policy shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement. The Members agree that Rechnitz's Initial Capital Contribution associated with the Policies (in the order of each Policy that first generates proceeds) shall be deemed to be $3,800,000. The Company will establish and maintain a Capital Account for each Member throughout the full term of the Company.

Section 3.2    Additional Capital Contributions.    Other than the Initial Capital Contributions made by the Members upon admission to the Company in accordance with Section 3.1 and Article VIII, the Members shall not be required to make any additional contributions to the Company; except that Rechnitz shall be obligated to contribute to the Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the Policies which are not Non-Payment Policies after the date of this Agreement and each Non-Payment Policy Member shall be obligated to contribute to the

2

Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the applicable Non-Payment Policy after the date such Non-Payment Policy Member was admitted to the Company as a Member.

      Section 3.3    Withdrawal and Return of Capital Contributions.

      (a)    No Member shall be entitled to demand a return of such Member's Capital Contribution (including any earnings thereon) or to withdraw any portion of such Member's Capital Account except as expressly provided in this Agreement. Except as expressly provided herein, no Member shall have the right to demand a distribution of property other than cash for its Interest. Each Member hereby waives any right such Member may otherwise have to cause any asset of the Company to be partitioned or to file a complaint or institute any proceeding at law or in equity seeking the partition of any such asset. Except as otherwise provided herein, no Member shall have priority over any other Member, either as to a return of such Member's Capital Contribution or as to Net Income, Net Losses, any other item of Company income, gain, loss or deduction, or Company distributions.

      (b)    No Member shall be personally liable for the return of the Capital Contributions of any other Member or any portion thereof, it being expressly understood that any such return shall be made solely from available Company assets, if any.

      Section 3.4    Interest. Interest, if any, earned on funds contributed or held by the Company shall inure to the benefit of the Company. The Members shall not be entitled to receive interest or any other payments from the Company with respect to their Capital Contributions or Capital Accounts, except as otherwise provided for herein.

      Section 3.5    Negative Capital Accounts. Except as may be required by the provisions of the Act or in respect of any negative balance resulting from a withdrawal of capital or distribution in contravention of this Agreement, at no time shall any Member with a negative Capital Account balance have any obligation to the Company or the other Members to restore such negative balance, and such negative balance shall not be treated as an asset of the Company.

### ARTICLE IV
### DISTRIBUTIONS AND ALLOCATIONS

      Section 4.1    Allocation of Net Income and Net Losses.

      (a)    Net Income with respect to a Policy for any Fiscal Year shall be allocated (i) first, to Rechnitz to the extent of Rechnitz's Priority Return with respect to such Policy; (ii) second, to Rechnitz until $3,800,000 of Net Income has been allocated to Rechnitz in the aggregate (without regard to allocations of Net Income under subclause (i)); (iii) third, to Klein, to the extent of Klein's Priority Return with respect to such Policy; and (iv) thereafter, to Klein and Rechnitz in proportion to their Percentage Interests.

      (b)    Net Losses with respect to a Policy for any Fiscal Year shall be allocated to Klein and Rechnitz in proportion to their Capital Contributions associated with such Policy.

3

Section 4.2     Cash Available for Distribution. Subject to Article XI, the Company shall distribute Available Cash to the Members at such times and in such amounts as determined by Rechnitz in accordance with this Agreement.

Section 4.3     Proceeds of Policies. If at any time the Company receives any proceeds from any Policy that is not a Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a)     first, to Rechnitz by wire transfer into an account designated by Rechnitz, in an amount up to the Rechnitz Amount for such Policy;

(b)     second, (A) first, to each of the Lenders, pro-rata, based on the outstanding principal balance owed to such Lender as set forth on Schedule C, until such outstanding principal balance is equal to zero, in an aggregate amount up to the Klein Amount for such Policy and (B) second, any remaining Klein Amount with respect to such Policy to Klein by wire transfer into an account designated by Klein;

(c)     third, (i) 50% to Rechnitz by wire transfer into an account designated by Rechnitz and (ii) 50% to Klein by wire transfer into an account designated by Klein, provided, however, that if the balance of the Reserve Account is less than $2,500,000, then proceeds distributable to Klein under clause (ii) above shall be deposited in the Reserve Account until such balance is equal to $2,500,000.

Section 4.4     Constructive Trust. If any Member receives any proceeds in respect of any Policy (following the death of an Insured or otherwise), such Member shall hold such proceeds in a constructive trust for the Company and shall within one (1) Business Day inform the other Members and the Manager and deposit such proceeds in the Reserve Account.

Section 4.5     Sale of Policies. The Company shall be entitled to sell any Policy to any Person with the prior written consent of each of the Members. Notwithstanding the immediately preceding sentence, upon Klein's written consent, Rechnitz or his designee shall be entitled to purchase any Policy that is not a Non-Payment Policy from the Company by transferring an amount equal to the Klein Amount for such Policy to the Company, which for administrative convenience shall be subsequently distributed to an account designated by Klein.

Section 4.6     Lenders. The Members agree that (i) the Company may pay amounts pursuant to Section 4.3(b) directly to the Lenders, and in such event, the payments will be treated as distributions by the Company to Klein and subsequently transferred by Klein to the Lenders, (ii) nothing herein is intended to grant to the Lenders an equity interest in the Company, and (iii) nothing herein is intended to imply that the Company is assuming the obligations owed to the Lenders.

## ARTICLE V
## RESERVE ACCOUNT

Section 5.1     Establishing a Reserve Account. As soon as practicable the Company shall establish the Reserve Account with the Account Bank in the name of Company.

4

Section 5.2   Distribution of Reserve Account. Amounts in the Reserve Account shall be distributed to certain Members in certain specified amounts under the following circumstances: (a) if the amount of Net Income allocated to Klein with respect to a Policy under Section 4.1 for a Fiscal Year exceeds the amount of proceeds distributed to Klein with respect to such Policy pursuant to Section 4.3; then 40% of such excess shall be distributed to Klein from the Reserve Account; (b) if upon a disposition of a Policy or the receipt of proceeds from such policy, the Rechnitz Amount with respect to the Policy exceeds the amount of proceeds distributed to Rechnitz with respect to such Policy pursuant to Section 4.3, then the amount of such excess shall be distributed to Rechnitz from the Reserve Account; and (c) if agreed upon by the Members, then the amount agreed upon by the Members shall be distributed to Klein from the Reserve Account.

## ARTICLE VI

## MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

Section 6.1   Rights and Powers of Manager. The business and affairs of the Company shall be managed by the Manager. The Manager shall direct, manage, and control the business of the Company to the best of the Manager's ability. Except for situations in which the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all acts or activities customary or incident to the management of the Company's business. Nothing contained in this Agreement shall require any person to inquire into the authority of the Manager to execute and deliver any document on behalf of the Company or to bind the Company pursuant to such document.

Section 6.2   Number, Tenure and Qualifications. The Company shall have one Manager, which initially shall be Jonathon Polter ("**Polter**"), an individual residing at 2000 Town Center, Suite 1490, Southfield, Michigan 48075. Polter shall remain as the Manager unless he resigns from such position, is relieved of his duties by (i) if there are two Members or less, a unanimous vote of the Members and (ii) otherwise, an affirmative vote of Members holding a majority of the Interests. Subsequent Managers shall be elected by the affirmative vote of Members holding a majority of the Interests. Managers need not be residents of the State of California.

Section 6.3   Officers. The Manager may delegate the management of the Company's day-to-day business affairs to a Chief Executive Officer and other officers of the Company designated by the Manager and approved by an affirmative vote of Members holding a majority of the Interests and, unless otherwise decided by the Manager, all actions of the Company may be taken by the appropriate duly authorized officers.

Section 6.4   Reliance. The Manager shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any officers, employees, or committees of the Company, or by any other Person as to matters such Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including, without limitation, information, opinions, reports or

5

statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

        Section 6.5     <u>Indemnification of Manager, Members and Officers</u>.

        (a)     <u>General</u>.     The Company shall indemnify any Person (a "**Covered Person**") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including an action by or in the right of the Company) by reason of the fact that he is or was a Manager, Member or officer of the Company, or is or was serving at the request of the Company as a director, manager or officer of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith with no willful misconduct or gross negligence and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.     The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of <u>nolo</u> <u>contendere</u> or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

        (b)     <u>Indemnification in Certain Cases</u>.  To the extent that a Covered Person has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in clause (a) of this <u>Section 6.5</u>, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

        (c)     <u>Advances for Expenses</u>.  Expenses (including attorneys' fees) incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be ultimately determined that he is not entitled to be indemnified by the Company as authorized in this <u>Section 6.5</u>.

        (d)     <u>Rights Non-Exclusive</u>.  The indemnification and advancement of expenses provided by, or granted pursuant to, the other subparagraphs of this <u>Section 6.5</u> shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, agreement or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

        (e)     <u>Insurance</u>.  The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was a Covered Person against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such,

6

whether or not the Company would have the power to indemnify him against such liability under the provisions of this <u>Section 6.5</u>.

(f) <u>Survival of Rights</u>. The indemnification and advancement of expenses provided by, or granted pursuant to this <u>Section 6.5</u> shall continue as to a Person who has ceased to be an officer, Manager or Member and shall inure to the benefit of the heirs, executors and administrators of such Person.

Section 6.6   <u>Exculpation</u>. No Member, Manager or officer of the Company shall be liable, in damages or otherwise, to the Company or its Members for any act or omission performed or omitted by such Member, Manager or officer pursuant to authority granted by this Agreement except to the extent such Person fails to meet the standard for indemnification set forth in <u>Section 6.5(a)</u>.

Section 6.7   <u>No Duties</u>. Any duties (including fiduciary duties) of a Covered Person to the Company or to any other Covered Person that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, <u>provided</u>, that (i) the foregoing shall not eliminate the obligation of each Member and the Manager to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied covenant of good faith and fair dealing.

Section 6.8   <u>Protection of Insured's Private Information</u>. Manager and each Member acknowledge that insurance regulations and other applicable Laws are structured to provide confidentiality to policy owners and insureds with respect to Consumer Information in connection with ownership or sale of their policies, and that the Manager and each Member and all of their respective agents and representatives, are obligated to keep Consumer Information confidential in accordance with applicable Laws. The Manager and each Member agree to comply with all applicable Laws with respect to the confidentiality of Consumer Information; <u>provided</u>, that (i) the Manager and each Member may disclose such information to their internal or external auditors and attorneys and as required or permitted by Law, and (ii) Klein may take all necessary and appropriate actions to transfer ownership of the Policies to the Company.

Section 6.9   <u>Delivery of Policy Files</u>. Klein shall deliver each Policy File as directed by the Manager within thirty (30) Business Days of the date of this Agreement.

Section 6.10   <u>Change Forms</u>. On the date of this Agreement, Klein shall execute and deliver Change Forms to the Company or at the Company's direction, changing the owner and Beneficiary of the Policy to the Company or the Company's designee. In addition, Klein shall execute and deliver any additional instruments of transfer that the Company may reasonably request necessary to evidence the assignment of the Policy and any rights therein to the Company or its designee.

Section 6.11   <u>Further Assurances.</u> From and after the date hereof, each Member shall execute and deliver such other documents and instruments, and take such further actions, as may be reasonably requested from time to time by another Member to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby. Without limiting the foregoing, Klein shall cooperate with Rechnitz in causing the Company or its designee to be

7

recorded as the owner and beneficiary of each Policy on the books and records of the relevant issuing insurance companies.

Section 6.12   Indemnification of Rechnitz.   Klein shall indemnify and hold harmless (which indemnification shall survive any termination of this Agreement and the dissolution of the Company) Rechnitz and his Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an **"Indemnified Person"**), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and actual expenses incurred (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person, and in connection with or arising out of (i) any breach of any representation, covenant or other obligation of Klein hereunder, (ii) the transactions contemplated hereunder, (iii) any actions or failures to act in connection therewith or (iv) and any and all reasonable legal costs and actual expenses arising out of or incurred in connection with disputes between or among Klein and Rechnitz (collectively, **"Indemnified Liabilities"**); provided, that Klein shall not be liable for any indemnification to an Indemnified Person to the extent that any such Indemnified Liability results from that Indemnified Person's gross negligence or willful misconduct; provided, further, that the aggregate amount of Klein's liability under this Section 6.12 shall be limited to the aggregate of the Rechnitz Amounts for all of the Policies.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Section 7.1   Representations and Warranties of Klein.

(a)   Power and Authority.   Klein has full power, authority and right to execute and deliver this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of its obligations hereunder.

(b)   Binding Obligation.   This Agreement constitutes the legal, valid and binding obligations of Klein enforceable against Klein in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(c)   Consent of Third Parties.   No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by Klein in connection with the execution of this Agreement and the compliance by Klein with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Klein of any other action contemplated hereby.

(d)   Policies.   With respect to each Policy, to the best of Klein's knowledge:

8

(i)      at the issuance of such Policy, the related Insured or Original Owner thereof was not a party to any written or oral agreement or arrangement to cause the same or interests therein to be issued, assigned, sold, transferred, or otherwise disposed of in violation of applicable law or public policy;

(ii)     at the issuance of such Policy, the related Insured or Original Owner thereof had the financial capacity to pay the premiums necessary to maintain such Policy in force;

(iii)    at the issuance of such Policy the related Original Owner had an insurable interest in the life of the Insured;

(iv)    the material medical or financial information supplied by or on behalf of the Insured or Original Owner of such Policy in the application and related materials delivered to the applicable issuing insurance company in connection with the issuance of such Policy was not false, incomplete or misleading in any material respect;

(v)     Klein does not possess or control any material documentation or information related to such Policy, or the acquisition or maintenance thereof by Klein, that has not been delivered or disclosed in writing to Rechnitz or his agents;

(vi)    prior to the date of this Agreement and the consummation of the transactions contemplated by [insert transfer agreement title], Klein was trustee of the applicable Original Owner which held sole legal and beneficial title thereto;

(vii)   Klein, in his capacity as trustee of the applicable Original Owner, acquired sole legal and beneficial title thereto and had the power and authority to enter into this Agreement;

(viii)  Immediately prior to its transfer to the Company hereunder, Klein held sole legal and beneficial title thereto;

(ix)    upon the transfer of such Policy, Company or its designee, will hold good and marketable title to and ownership of such Policy free and clear of any liens, charges, rights, encumbrances or other interests;

(x)     such Policy was acquired in a manner in compliance, in all material respects, with the Laws applicable to the purchase of life insurance policies, as then in effect and as then interpreted by the relevant regulators or in case law;

(xi)    except as disclosed to Rechnitz in writing, no previous owner of such Policy has waived, amended or terminated any material provision of, or any material rights in relation to, such Policy;

(xii)   except as disclosed on Schedule 7.1(d)(xii), the premiums for such Policy have been paid such that such Policy will not be in a grace period as of the date of this Agreement and such Policy has not been cancelled as of the date of this Agreement;

9

(xiii)   Klein has disclosed or delivered to Rechnitz and the Company in writing all information received by Klein or any of his agents from the related issuing insurance company related to any change in the terms of such Policy, including with respect to an intent to increase the cost of insurance for such Policy;

(xiv)   there is no current or pending written notice that has been issued to Klein by the related issuing insurance company of such issuing insurance company's intention to cancel, contest, rescind or refuse payment under such Policy;

(xv)   all the information contained in each of the documents in the related Policy File or otherwise delivered by or on behalf of Klein to the Company and Rechnitz in connection with such Policy is true, complete and correct in all material respects;

(xvi)   the related Policy File contains the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

(xvii)   there is not any pending or threatened Proceeding challenging the validity, ownership or enforceability of such Policy or Klein's ownership rights in such Policy;

(xviii)   such Policy was not issued pursuant to or in connection with an agreement whereby the premiums required to be paid on such Policy were paid by any Person pursuant to a recourse or non-recourse premium financing program;

(xix)   Klein has not required any broker to sign an agreement offering Klein or any other Person the "right of last offer" in connection with the purchase of such Policy; and

(xx)   such Policy has been issued by the related issuing insurance company and is in force and any related contestability period and any suicide exclusion period has expired.

Section 7.2    Representations and Warranties of Rechnitz.  Rechnitz hereby represents and warrants that:

(i)    Authority.  Rechnitz has full power, authority and right to execute this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of his obligations hereunder.

(ii)    Binding Obligation.  This Agreement constitutes Rechnitz's legal, valid and binding obligation, enforceable against Rechnitz in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(iii)    Consent of Third Parties.  No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or

10

Governmental Authority is required by Rechnitz in connection with the execution of this Agreement and the compliance by Rechnitz with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Rechnitz of any other action contemplated hereby.

ARTICLE VIII
ADMISSION OF MEMBERS

Section 8.1    Admission of Members.  Subject to Section 8.2, upon the approval of the Members by majority vote, one or more Persons may be admitted to the Company as Members. The Members by majority vote shall determine the number of Interests and the Percentage Interest to be offered to any such Member and the Initial Capital Contribution to be made by any such Member.  Each such Person shall be admitted as a Member at the time such Person (a) executes and delivers a copy of this Agreement to the Manager and (b) if applicable, makes its Initial Capital Contribution to the Company.  The Manager shall update Schedule A to reflect the admission of any such Members.

Section 8.2    Admission of Non-Payment Policy Members.    It is agreed and acknowledged by the Members that Rechnitz's sole obligation with respect to the Company is making Capital Contributions for the payment of premiums on the Policies and the expenses associated with the Policies, in each case after the date of this Agreement.  Rechnitz shall provide the Company and Klein with six (6) months prior written notice if Rechnitz elects to cease paying premiums in respect of any Policy (such Policy, a "**Non-Payment Policy**").  After delivery of such notice, Rechnitz or Klein shall have the right to introduce any Person to the Company as a potential Member who agrees in writing to assume Rechnitz's obligations for the payment of premiums and other costs and expenses with respect to such Non-Payment Policy, which person shall be admitted as a Member upon the approval of the Members by [majority] vote (such a Member, a "**Non-Payment Policy Member**").  With respect to any Non-Payment Policy, any payment of premiums and other costs and expenses shall be contributed to the capital of the Company by the applicable Non-Payment Policy Member.  If at any time the Company receives any proceeds from any Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a)    First, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount up to (x) the total amount of Capital Contributions made on such Policy by such Non-Payment Policy Member and (y) the Priority Return of such Non-Payment Policy Member on such Policy computed starting on the date such Non-Payment Policy Member was admitted as a Member;

(b)    Second, by wire transfer into an account designated by Rechnitz, in an amount equal to the Rechnitz Amount for such Policy;

(c)    Third, by wire transfer into an account designated by Klein, in an amount equal to the Klein Amount for such Policy;

11

(d)     Fourth, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount equal to fifty percent (50%) of all remaining proceeds from such Policy;

(e)     Fifth, to Rechnitz and Klein by wire transfers into accounts respectively designated by them in proportion to the Capital Contributions made by them with respect to each such Non-Payment Member Policy; provided, however that if Klein introduced the related Non-Payment Policy Member to the Company, then 25% of the amount distributable under this clause (e) to Rechnitz shall be distributed to Klein instead.

Notwithstanding Section 4.1 hereof, Net Income associated with a Non-Payment Policy shall be allocated to each Member to the extent of any Priority Return distributed to such Member with respect to the Non-Payment Policy and to the extent of any distributions made to a Member pursuant to Section 8.2(d) or Section 8.2(e) above with respect to such Non-Payment Policy . Notwithstanding Section 4.1 hereof, Net Losses associated with a Non-Payment Policy shall be allocated to each Member in proportion to the Capital Contributions made by such Member with respect to such Non-Payment Policy.

ARTICLE IX
MAINTENANCE OF BOOKS AND RECORDS;
REPORTS TO MEMBERS; TAX RETURNS

Section 9.1     Accounting Method and Records.     Rechnitz shall determine the accounting method to be used by the Company. The Company shall maintain such accounting records as shall reflect all Company transactions and as shall be appropriate and adequate for the Company's business.

Section 9.2     Company Records. The Company shall maintain the following records, within or outside the State of California: (a) a copy of the Company's accounting records and federal, state, local and foreign income tax or information returns and reports, if any, for the five most recent Fiscal Years; and (b) all other records and reports required by the Act or otherwise to be maintained by the Company.     Each Member, and such Member's duly authorized representatives or agents, shall, for any purpose reasonably related to his interest as a Member, have reasonable access to such books and records at such office and shall have the right to inspect and copy such books and records; provided, however, that if a Member was an officer, consultant or employee of the Company received his/her Interest pursuant to a profits interests grant agreement ceases to be an employee, consultant or officer of the Company, such Member shall only have the right to receive books and records that he/she has the right to require the Company to provide to him/her in accordance with applicable law.

Section 9.3     Company Reports. The Company shall cause to be furnished to each Member and each other Person who was a Member during the period in question (a) such reports and financial statements as may be reasonably required for his financial reporting requirements, including, without limitation, copies of all annual, quarterly and monthly financial statements, and (b) detailed financial statements and information and documents (including Form K-1) necessary or desirable for the preparation or support of such Member's tax returns required in any jurisdiction, as soon as practicable after the end of each Fiscal Year.

12

Section 9.4      Designation of Tax Matters Member.  Rechnitz is designated the "**Tax Matters Member**" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

Section 9.5      Tax Treatment and Elections.   The Company shall be treated as a partnership for federal income tax purposes, the Members shall be treated as partners for federal income tax purposes, and each of the Members agrees to report consistently with such treatment. The Manager shall make all elections necessary to give effect to such treatment.

## ARTICLE X
## TRANSFER OF INTERESTS; SPECIAL PROVISIONS

Section 10.1    Transfers and Assignments.

(a)      No Member shall be permitted to Transfer any Interest to a Person other than a Permitted Transferee, except in accordance with the provisions set forth in this Article X.

Section 10.2    Permitted Transfers.

(a)      Each Member shall notify the Manager and the other Members of any proposed Transfer to a Permitted Transferee by such Member, or by any of its Affiliates, in the case of an indirect Transfer of an Interest, which notice shall set forth the name and address of the Permitted Transferee and the nature of the relationship between such Member and such Permitted Transferee, at least ten (10) calendar days prior to the proposed date of such Transfer. Each Member shall be responsible for paying all transfer, gains or similar taxes, if any, and all reasonable costs and expenses of the Company, including reasonable attorneys' fees, arising out of any Transfer by such Member of all or a portion of its Interest (or by any of its Affiliates in the case of an indirect Transfer of an Interest) to a Permitted Transferee.  As a condition to any Transfer of all or any portion of an Interest in the Company to a Permitted Transferee shall execute and deliver to the Company a joinder agreement, in form of Exhibit A (a "**Joinder Agreement**").   All of the provisions of this Agreement, including without limitation, the provisions of this Article X, shall be applicable to and binding upon each Permitted Transferee.

(b)      The transfer by a Member of all or any portion of its Interest (including, without limitation, any transfer to a Permitted Transferee) shall not release such Member from any or all of its obligations under this Agreement arising prior to the date of such Transfer.

Section 10.3    Substitute Members.  A Permitted Transferee of the Interest of a Member or a transferee of the Interest of a Member pursuant to Sections 10.4 and 10.5 of this Agreement, or any portion thereof, shall become a substitute Member entitled to all the rights, and subject to all of the obligations and restrictions, of the transferor Member if, and only if:

(a)      the transferor assigns the transferee such right;

13

(b)      the transferor or transferee pays to the Company all reasonable costs and expenses incurred by the Company in connection with such substitution; and

(c)      the transferee executes and delivers a Joinder Agreement.

Section 10.4    Right of First Refusal.

(a)      Except for Transfers pursuant to or contemplated by Section 10.2, if any Member (a "**Selling Member**") receives a bona fide written offer from an independent third party (a "**Third Party**") to purchase any or all of such Selling Member's Interests for cash and such Selling Member desires to Transfer any or all of such Interests (the "**Offered Interests**") pursuant to such offer, prior to any Transfer it shall give written notice of the proposed Transfer (the "**Notice of Intention**") to the Company and the other Members (the "**Remaining Members**") specifying the number of Offered Interests which such Selling Member wishes to Transfer, the proposed transferee, the proposed purchase price for the Offered Interests (the "**Offer Price**") and the other material terms and conditions of the proposed Transfer.

(b)      For a period of thirty (30) days after receipt of the Notice of Intention (the "**Option Period**"), each of the Remaining Members shall have the irrevocable option to purchase at the Offer Price and on the other terms specified in the Notice of Intention, all of the Offered Interests pro rata based on the Percentage Interest of each Remaining Member; provided, however, that if any Remaining Member does not purchase any or all of its pro rata portion of such Offered Interests, the other Remaining Members shall have the right to purchase such portion, pro rata, until all of such Offered Interests are purchased. The option of a Remaining Member pursuant to this Section 10.4(b) (the "**Remaining Members Option**") shall be exercisable by delivery of a notice (the "**Remaining Members Notice**") setting forth the maximum number of Offered Interests that such Remaining Member wishes to purchase, including any number which would be allocated to such Remaining Member if any other Remaining Member does not purchase all or any portion of its pro rata portion, to the Selling Member, the Company and the other Remaining Members and shall expire if the Remaining Members Notice is not delivered prior to the expiration of the Option Period.

(c)      If all notices required to be given pursuant to this Section 10.4 have been duly given, and the Remaining Members determine not to exercise their respective options to purchase all of the Offered Interests at the Offer Price and on the other terms specified in the Notice of Intention or determine, with the consent of the Selling Member, to exercise their options to purchase less than all of the Offered Interests, then the Selling Member shall have the right, for a period of ninety (90) days from the earlier of (a) the expiration of the Option Period and (b) the date on which such Selling Member receives notice from the Remaining Members that they will not exercise the option granted pursuant to this Section 10.4, to accept the bona fide offer from the Third Party and enter into an agreement to sell the Offered Interests remaining unsold under this Section 10.4 at a price not less than the Offer Price and on the same terms as set forth in the Notice of Intention; provided that prior to any such Transfer to a Third Party, such Third Party executes and delivers to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby becomes a party to this Agreement.

14

(d)     The closing of any purchase and sale of any Interests to a Remaining Member pursuant to this Section 10.4 shall take place at the offices of the Company on such date, not later than sixty (60) days after the delivery to the Selling Member of the Remaining Members Notice. At the closing of such purchase and sale, the Secretary or such other officer of the Company shall record such Transfer in the books of the Company against evidence of such Transfer, delivery of the Offer Price therefor and an executed Joinder Agreement.

(e)     If the Remaining Members Option is not exercised, and the Offered Interests are not sold pursuant to Section 10.4(c) within the ninety (90) day period referred to therein, such sale may not be carried out without complying again with the terms of this Section 10.4.

Section 10.5   Tag-Along Rights and Obligations.

(a)     In the event that after complying with the terms of Section 10.4, the Selling Member desires to sell (the "**Disposition**") the Offered Securities to a Third Person (the "**Acquirer**"), the Selling Member's right to accept such offer to purchase the Offered Securities shall be conditioned on each Remaining Member being offered the right to sell to the Acquirer its pro rata portion of the Offered Securities (based on the Percentage Interest of each Remaining Member) in such Disposition in accordance with this Section 10.5. The Selling Member shall give notice (the "**Disposition Notice**") to each Remaining Member at least thirty (30) days prior to the consummation of the Disposition specifying the number of Offered Interests which such Selling Member wishes to Transfer in the proposed Disposition, the proposed transferee, the proposed purchase price for the Offered Interests and the other material terms and conditions of the proposed Disposition.

(b)     The election to participate in the Disposition by the Remaining Members pursuant to Section 10.5(a) shall be exercised by notice to the Selling Member given within the time period specified in the Disposition Notice, which time period shall not be less than fifteen (15) days after such Disposition Notice is given. If any Remaining Member gives notice of its election to sell, it shall be obligated to sell the number of Interests specified in such Remaining Member's notice upon the terms and subject to the conditions specified in Section 10.5(a) to the Acquirer (which shall be the same for the other Remaining Members and the Selling Member), conditional upon the closing of the Disposition.

(c)     The sale or Transfer of Interests to the Acquirer by the Selling Member and by the Remaining Members electing to participate in the Disposition pursuant to this Section 10.5 shall occur simultaneously and be on the same terms and at the same price as the Interests sold by the Selling Member; provided that prior to any such Transfer to an Acquirer, such Acquirer shall execute and deliver to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby become a party to this Agreement.

(d)     If the Acquirer declines to purchase from such Remaining Members their respective proportionate number of Interests calculated in accordance with this Section 10.5, the Selling Member will not sell any Interests to the Acquirer.

15

Section 10.6   <u>Miscellaneous Provisions Affecting Transfer</u>.

(a)    Upon the Transfer of all or any portion of a Member's Interests as permitted or required under this Agreement, including, without limitation, as provided in this <u>Article X</u>, (i) the income, loss, gain, deduction and credit attributable to the Interests so transferred shall be allocated between the transferor and transferee based upon the number of days during the applicable Fiscal Year that the Interests so transferred was held by each of them, without regard to the results of Company activities during the period in which each was the holder; provided that the Manager shall, at the request and expense of the transferring Member, cause an interim closing of the Company's books as of the effective date of Transfer for purposes of allocating such items between the transferor and transferee; and (ii) the transferor shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods preceding the date of Transfer, and the transferee shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods on and after the date of Transfer based upon the number of days during the applicable Fiscal Year that the Interests so transferred were held by each of them, without regard to the results of Company activities during the period in which each was the holder.

(b)    The Company shall be entitled to treat the record owner of any Interests as the absolute owner thereof, and shall incur no liability for distributions of cash or other property or allocations of income, gain, loss, deduction or credit made in good faith to such owner until such time as a written assignment of such Interests has been received, accepted and recorded on the books of the Company.

## ARTICLE XI
## DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

Section 11.1   <u>Dissolution, etc</u>. The Company shall be dissolved upon the occurrence of any of the following events (the date of such occurrence, the "**Dissolution Date**"):

(a)    As approved by the majority vote of the Members; or

(b)    As otherwise required by applicable law.

Section 11.2   <u>Winding Up</u>.

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company in accordance with this <u>Section 11.2</u>.

(b)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be

16

considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(c)      The Members shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

Section 11.3   Final Distribution.   After the application or distribution of the proceeds of the liquidation of the Company's assets in one or more installments to the satisfaction of the liabilities to creditors of the Company, including to the satisfaction of the expenses of the winding-up, liquidation and dissolution of the Company (whether by payment or the making of reasonable provision for payment thereof), the remaining proceeds, if any, plus any remaining assets of the Company shall be distributed to the Members in accordance with Sections 4.3 and 8.2, as applicable.

Section 11.4   Time for Liquidation, etc.   A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Company to seek to minimize potential losses upon such liquidation. The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of a certificate of cancellation of the certificate with the Secretary of State of the State of California.

Section 11.5   Termination.   Upon completion of the winding up of the Company, the Manager (or any duly elected liquidating trustee or other duly designated representative) shall execute, acknowledge and cause to be filed a certificate of cancellation of the Certificate with the Secretary of State of the State of California.   Upon the cancellation of the Certificate, this Agreement and the Company shall terminate.

Section 11.6   Return of Contribution Nonrecourse to Other Members.   Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

## ARTICLE XII
## DISPUTE RESOLUTION

Section 12.1   Rabbinical Counsel.   If any dispute arises between the Members regarding this Agreement or any provision hereof, that dispute shall be resolved through a binding arbitration proceeding to be conducted in the State of California in accordance with the commercial arbitration rules of the Rabbinical Council of California.

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1   Entire Agreement.   This Agreement, taken together with the other documents expressly referred to herein, each as amended or supplemented, constitutes the entire

17

agreement among the parties with respect to the subject matter herein or therein and supersedes any prior agreement or understanding among the parties hereto.

Section 13.2   Other Ventures.  The Manager or any Member, and any firm, corporation or association with which the Manager or any Member is in any way interested or connected, may act as attorney for, deal and contract with, and be employed by the Company, and the Manager or any Member may be, in any manner, interested in or connected with any corporation, association or business in which the Company is directly or indirectly interested, all in the same manner and with the same freedom as though not a Manager or a Member, as the case may be, and without accountability for any profit, benefit or compensation received in connection with such actions or relationships, none of which shall be void or voidable.

Section 13.3   Amendments.  This Agreement may be amended only with the written consent of a Majority in Interest; provided that any such amendment that materially adversely affects the rights and privileges of any Member (other than any amendment effected in connection with the making of a Capital Contribution to the Company by, and/or the issuance of additional Interests to, any Member, including, without limitation, any amendment to the rights and privileges of the Interests to reflect dilution resulting from such Capital Contributions or issuance of additional Interests) must be consented to by each of the Members so affected[; provided further, that any amendment to this Agreement shall not be effective without the consent of Rechnitz].

Section 13.4   Choice of Law.  This Agreement shall be construed in accordance with the laws of the State of California, without regard to the choice of laws rules thereof, and the obligations, rights and remedies of the Members hereunder shall be determined in accordance with such laws.

Section 13.5   Successors and Assigns; Third Party Beneficiaries.  This Agreement shall be binding upon, and, subject to Article X, shall inure to the benefit of, the parties and their legal representatives, heirs, administrators, executors, successors and permitted assigns.  Except as otherwise expressly provided herein, none of the provisions of this Agreement shall be for the benefit of or enforceable by any Person not a party hereto.

Section 13.6   Interpretation.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or neuter gender shall include the masculine, the feminine and the neuter.

Section 13.7   Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend or otherwise affect the scope or intent of this Agreement or any provision hereof.

Section 13.8   Severability.  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement, or the application of such provision in jurisdictions or to Persons or circumstances other than those to which it is held invalid, illegal or unenforceable, shall not be affected thereby.

18

Section 13.9   Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Section 13.10  Non-Waiver.  No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in a written notice given to the party claiming such waiver has occurred; provided that no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

Section 13.11  Notices.  All notices, requests, demands, claims and other communications that are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by confirmed facsimile with a copy sent by another means specified herein; the business day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five business days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

> if to the Company:
>
> c/o Shlomo Rechnitz
>> 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.
>
> with a copy to:
>
> Leslie Klein
> 14245 Ventura Blvd., Sherman Oaks, CA 91423

and if to a Member, to the Member's address or facsimile number on the books records of the Company, or to such other address with respect to the Company or a Member as the Company or such Member, as applicable, notifies the Company and the other Members in writing as provided above.

## ARTICLE XIV
## DEFINITIONS

Section 14.1   Definitions.

References in this Agreement to an **"Exhibit"** are intended to refer, unless otherwise specified, to an Exhibit attached to this Agreement, and references in this Agreement to an **"Article"** or a **"Section"** are intended to refer, unless otherwise specified, to an Article or a Section of this Agreement.  As used in this Agreement, the following terms shall have the respective meanings set forth below:

19

"**Account Bank**" means PrivateBancorp, Inc.

"**Act**" shall have the meaning specified in the recitals to this Agreement.

"**Affiliate**" means any Person that, directly or indirectly, through one or more intermediaries, is Controlled by one or more Members. As used in this definition, "Control" means either (a) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting stock of a corporation, or in the case of any Person which is not a corporation, the ownership, directly or indirectly, of at least fifty percent (50%) of the beneficial ownership interests in such Person, or (b) irrespective of stock ownership or other beneficial ownership, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person.

"**Agreement**" means this Limited Liability Company Agreement, as the same may be amended hereafter from time to time as provided herein.

"**Available Cash**" means, at the time of determination, cash generated from revenues from the Company's operations, after provision has been made for (a) all expenditures paid or to be paid by the Company to non-Members and (b) such amounts as the Manager, in his sole discretion, shall deem reasonable in order to provide for any anticipated, contingent or unforeseen expenditures or liabilities of the Company. Available Cash shall be determined without regard to (i) Capital Contributions and (ii) principal advanced on Company indebtedness.

"**Beneficiary**" means, with respect to the Policy, the legal person or persons designated as the recipients of the Death Benefit for such Policy.

"**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Member by crediting such Member's Capital Contributions, such Member's share of Net Income, and the amount of any Company liabilities that are assumed by such Member (other than liabilities that are secured by any Company property distributed to such Member) and by debiting the amount of cash and the gross fair market value of any Company property distributed to such Member pursuant to any provision of this Agreement (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752), such Member's share of Net Losses, and the amount of any liabilities of such Member that are assumed by the Company (other than liabilities that are secured by any property contributed by such Member to the Company).

"**Capital Contribution**" means, with respect to any Member, the amount of money and the initial gross fair market value of any property contributed (or deemed contributed) from time to time by such Member to the Company (net of any liabilities secured by such property or to which such property is otherwise subject). The initial gross fair market value of each Policy contributed by Klein shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement. Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution made

20

by any predecessor of a Member. For purposes of this Agreement, a Capital Contribution shall include, without limitation, any Initial Capital Contribution.

"**Certificate**" has the meaning set forth in <u>Section 1.1</u>.

"**Change Forms**" means the forms changing the owner and Beneficiary of the Policy using such form as is required by each of the relevant issuing insurance companies.

"**Code**" means the Internal Revenue Code of 1986, as amended, and as the same may be amended hereafter from time to time.

"**Company**" shall have the meaning specified in the preamble hereto.

"**Consumer Information**" means medical, health, financial and personal information about an Insured, an Original Owner, a Beneficiary under a Policy or a person designated by an Insured to provide periodic information regarding the medical status of the Insured, or any spouse or other individual closely related by blood or law to any such person (each, a "**Consumer**"), including, without, limitation, a Consumer's name, street or mailing address, email address, telephone or other contact information, employer, social security or tax identification number, date of birth, driver's license number, photograph or documentation of identity or residency (whether independently disclosed or contained in any disclosed document such as a Policy, life expectancy evaluation, life insurance application or life settlement application).

"**Covered Person**" shall have the meaning specified in <u>Section 6.5(a)</u>.

"**Death Benefit**" means the cash amount of a Policy to be paid upon the death of the applicable Insured under such Policy, which amount will be net of any policy loans made under such Policy (and accrued interest thereon).

"**Disposition**" shall have the meaning specified in <u>Section 10.5(a)</u>.

"**Disposition Notice**" shall have the meaning specified in <u>Section 10.5(a)</u>.

"**Dissolution Date**" shall have the meaning specified in <u>Section 11.1</u>.

"**Fiscal Period**" means, subject to the provisions of Section 706 of the Code, (i) any Fiscal Year and (ii) any portion of a Fiscal Year for which the Company is required to allocate Net Income, Net Losses or other items of Company income, gain, loss or deduction pursuant to <u>Article IV</u>.

"**Fiscal Year**" shall have the meaning specified in <u>Section 1.7</u>.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Indemnified Liabilities**" shall have the meaning specified in <u>Section 6.12</u>.

21

"**Indemnified Person**" shall have the meaning specified in <u>Section 6.12</u>.

"**Initial Capital Contribution**" means, with respect to each Member, such Member's Initial Capital Contribution set forth on <u>Schedule A</u>.

"**Insured**" means, with respect to a Policy, each person whose life is insured under such Policy.

"**Interest**" means, with respect to any Member, (a) such Member's share of the profits and losses of the Company and a Member's rights to receive distributions from the Company in accordance with the provisions of this Agreement and the Act and (b) such Member's other rights and privileges in respect of the Company as herein provided.

"**Joinder Agreement**" shall have the meaning specified in <u>Section 10.2(a)</u>.

"**Klein Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Klein related to such Policy and (y) the Priority Return for Klein on such Policy.

"**Law**" means any law, constitution, statute, ordinance, code, rule, regulation, decision, order, consent, decree, judgment, ordinance, release, license, permit, stipulation or other pronouncement having the effect of law enacted or issued by any Governmental Authority, any foreign country, or domestic or foreign state, country, city or other political subdivision, which includes binding judicial precedent and principles of common law.

"**Lender**" shall mean each lender identified on <u>Schedule C</u>.

"**Majority in Interest**" means Members that at the time in question together hold a Percentage Interest greater than 50% in the aggregate.

"**Manager**" means one or more persons designated as such pursuant to this Agreement.

"**Members**" means, collectively, the members signatory to this Agreement, and any other Persons admitted to the Company as members after the date hereof in accordance with the terms of this Agreement.

"**Net Income**" and "**Net Losses**" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss and each item of income, gain, expense, deduction and loss shall be allocable to the Members in accordance herewith).

"**Non-Payment Policy**" shall have the meaning as specified in <u>Section 8.2</u>.

"**Non-Payment Policy Member**" shall have the meaning as specified in <u>Section 8.2</u>.

22

"**Notice of Intention**" shall have the meaning as specified in <u>Section 10.4(a)</u>.

"**Offer Price**" shall have the meaning as specified in <u>Section 10.4(a)</u>.

"**Offered Interests**" shall have the meaning specified in <u>Section 10.4(a)</u>.

"**Option Period**" shall have the meaning as specified in <u>Section 10.4(b)</u>

"**Original Owner**" means, with respect to a Policy, the Person to which the Policy was initially issued and who was listed as owner on the initial declarations page of such Policy or the policy application, as applicable.

"**Percentage Interest**" means, with respect to any Member as of any date of determination, a fraction (expressed as a percentage) having as its numerator the aggregate number of Interests held by such Member at such time, and having as its denominator the aggregate number of Interests held by all Members at such time. Each Member's Percentage Interest as of the date hereof, and as adjusted from time to time, is set forth on <u>Schedule A</u>.

"**Permitted Transferee**" means (a) with respect to any Member who is an individual, such member's siblings, parents, spouse (former spouse, if any), and children, and trusts solely for the benefit of any of the foregoing, and (b) with respect to any Member that is an entity, an Affiliate of such Member. [**Anyone else?**]

"**Person**" means any individual or any corporation, partnership, limited liability company, limited liability partnership, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other legal entity.

"**Policy**" means each of the life insurance policies contributed to the capital of the Company by Klein, as specified in <u>Schedule B</u> hereto.

"**Policy File**" means, with respect to a Policy, the file relating to such Policy which file shall include, without limitation, the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

"**Policy Illustration**" means, with respect to a Policy, a policy illustration from the related issuing insurance company.

"**Polter**" shall have the meaning set forth in <u>Section 6.2</u>.

"**Priority Return**" of a Member with respect to any Policy shall mean an annual rate of return of 12% on the total amount of Capital Contributions made by a Member with respect to such Policy from the date such Capital Contribution were made but computed no earlier than from the date of this Agreement. .

"**Rechnitz Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Rechnitz related to such Policy and (y) the Priority Return for Rechnitz on such Policy.

**"Remaining Members"** shall have the meaning specified in <u>Section 10.4(a)</u>.

**"Remaining Members Notice"** shall have the meaning specified in <u>Section 10.4(b)</u>.

**"Remaining Members Option"** shall have the meaning specified in <u>Section 10.4(b)</u>.

**"Reserve Account"** means account number [___] established at Account Bank.

**"Selling Member"** shall have the meaning specified in <u>Section 10.4(a)</u>.

**"Third Party"** shall have the meaning as specified in <u>Section 10.4(a)</u>.

**"Transfer"** means, as a noun, any voluntary or involuntary, and direct or indirect, assignment, transfer, pledge, syndication, sale, hypothecation, contribution, encumbrance or other disposition or purported disposition, and, as a verb, voluntarily or involuntarily, and directly or indirectly, to assign, transfer, pledge, syndicate, sell, hypothecate, contribute, encumber or otherwise dispose of.

**"Tax Matters Member"** shall have the meaning specified in <u>Section 9.4.</u>

**"Treasury Regulations"** means the Income Tax Regulations promulgated under the Code, as the same may be amended hereafter from time to time.

*[Remainder of Page Intentionally Left Blank]*

24

LESLIE KLEIN, INDIVIDUALLY AND AS A MEMBER OF THE EKLK FOUNDATION, AND DERIVATIVELY ON BEHALF
OF LIFE CAPITAL

# General Information

| | |
|---|---|
| **Case Name** | LESLIE KLEIN, INDIVIDUALLY AND AS A MEMBER OF THE EKLK FOUNDATION, AND DERIVATIVELY ON BEHALF OF LIFE CAPITAL GROUP, LLC, A vs. JONATHON POLTER, ET AL. |
| **Court** | California Superior Court |
| **Date Filed** | Tue Jun 07 00:00:00 EDT 2022 |
| **Docket Number** | 22STCV18787 |
| **Parties** | BURNITE JOHN T.; WAGNER AVRAHAM; KLEIN LESLIE; RECHNITZ SHLOMO; POLTER JONATHON; SLOTT JEFFREY A.; VOYA FINANCIAL ADVISORS INC.; TABIBKHOEI FARAH; SECURITY LIFE OF DENVER INSURANCE COMPANY |

© 2025 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

**<u>EXHIBIT E</u>**

(LCG Settlement Agreement)

# FILED UNDER SEAL

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# **EXHIBIT F**

(Emails)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | |
|---|---|
| **From:** | Jeffrey Dulberg |
| **Sent:** | Monday, July 7, 2025 1:15 PM |
| **To:** | Matt Lesnick; Beth R. Young; Michael G. D'Alba |
| **Cc:** | John W. Lucas; Jeffrey P. Nolan |
| **Subject:** | RE: Klein / LCG |

Thank you both.  We proposed this stipulation to streamline the litigation and get to the heart of the matter which are the remaining claims.  I can't say I recall seeing defendants refuse to agree to drop a count against them, but it is what it is.  Beth's reference to Smith v. Spizzirri is missing the point – "are we dealing with any arbitrable claims in the first instance" is the proper question.  If you would consider stipulating on the condition that we dismiss with prejudice, we should discuss that but unless I am missing something, given Beth's unequivocal take that you share, there doesn't seem to be any reason to conduct a discussion. We will make our filings.

**Jeffrey Dulberg**
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jdulberg@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Matt Lesnick <matt@lesnickprince.com>
**Sent:** Monday, July 7, 2025 11:40 AM
**To:** Beth R. Young <bry@lnbyg.com>; Jeffrey Dulberg <jdulberg@pszjlaw.com>; Michael G. D'Alba <mgd@lnbyg.com>
**Cc:** John W. Lucas <jlucas@pszjlaw.com>; Jeffrey P. Nolan <jnolan@pszjlaw.com>
**Subject:** Re: Klein / LCG

Jeff —

For the sake of clarity, my clients are in complete agreement with Beth's email. I also am available this week if you would like to discuss.

Best,
Matt

lesnick  prince  pappas  alverson

**Matthew A. Lesnick**
Lesnick Prince Pappas & Alverson LLP
315 West Ninth Street, Suite 705
Los Angeles, CA  90015
office    310.396.0964
cell    310.717.0238

matt@lesnickprince.com
www.lesnickprince.com

**From:** Beth R. Young <bry@lnbyg.com>
**Date:** Thursday, July 3, 2025 at 9:05 PM
**To:** 'Jeffrey Dulberg' <jdulberg@pszjlaw.com>, Matt Lesnick <matt@lesnickprince.com>, Michael G. D'Alba <mgd@lnbyg.com>
**Cc:** John W. Lucas <jlucas@pszjlaw.com>, Jeffrey P. Nolan <jnolan@pszjlaw.com>
**Subject:** RE: Klein / LCG

Hi Jeff:
We are confused by your belated request which appears to run afoul of the Federal Arbitration Act ("**FAA**") and appears to be designed to circumvent the clear mandate of the FAA that the contract claims are subject to arbitration. We find it remarkable that after approximately 6 months litigating the motion to compel arbitration, and on the eve of the Trustee's obligation to file and serve an accounting of the amount that the "Trustee contends was owed to Klein" at the time of the settlement with LCG that the Trustee advises of his intention to dismiss the breach of contract claim.
In order to further consider the Trustee's request, please explain why the Trustee wants to dismiss the breach of contract claim but maintain all other claims.  What impact, if any, do you contend this proposed dismissal has on (1) the litigation and the pending motion to compel arbitration; and (2) the Trustee's obligation to provide the accounting of the amount that the Trustee contends was owed to Klein at the time of the settlement with LCG pursuant to the Court's recent Order? As you note, the Trustee cannot unilaterally dismiss certain claims from the existing pleading and to do so requires either our consent or leave of court for the requested relief.  Moreover, the nature of dismissal sought is inconsistent with the Court's supervisory role under the FAA, which requires staying rather than dismissing claims subject to the FAA. Specifically, *Smith v. Spizzirri,* 601 U.S. 472 (2024) and its progeny hold that when parties seek to compel arbitration and request a stay of litigation, as moving parties have in their pending motion to compel arbitration, the court must stay the proceedings rather than dismiss them. Indeed the stay facilitates the arbitration that the Trustee seeks to evade. If you contend otherwise, kindly explain. It does seem, particularly in light of your professed interest in the dismissal being "without prejudice" that the Trustee is charting a course inconsistent with the FAA despite conceding the FAA's application in the Trustee's briefing on the motion to compel arbitration.
In any event, given the pendency of the Court's order on our motion to compel arbitration, as well as the obligation of the Trustee to provide the accounting that we have been asking for since the inception of this adversary proceeding, dismissal of the breach of contract claim would not and could not moot the Court's Order which requires the Trustee's production of the accounting.
For at least the above reasons (which are not intended to be exhaustive), we will not stipulate.
I am happy to discuss these matters further with you next week at a mutually convenient time.
Best regards
Beth
**BETH ANN R. YOUNG,** Esq.
**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK  L.L.P.**
2818 La Cienega Avenue  **|**  Los Angeles, CA   90034
Main  310 229 1234   **|**   Direct  310 229 3352   **|**  Mobile  310 409 6708
bry@lnbyg.com   **|**   **www.lnbyg.com**

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Golubchik L.L.P.'s
email policies which can be found at http://www.lnbyg.com/disclaimers.htm.

 Please consider the environment before printing this email

**From:** Jeffrey Dulberg <jdulberg@pszjlaw.com>
**Sent:** Thursday, July 3, 2025 1:04 PM
**To:** Beth R. Young <bry@lnbyg.com>; Matt Lesnick <matt@lesnickprince.com>; Michael G. D'Alba <mgd@lnbyg.com>
**Cc:** John W. Lucas <jlucas@pszjlaw.com>; Jeffrey P. Nolan <jnolan@pszjlaw.com>
**Subject:** Klein / LCG

Beth, Michael, Matt –

The Trustee has determined to withdraw, without prejudice, the breach of contract claim (i.e., the Fifth Claim for Relief in the complaint) against all three of Shlomo, LCG and Polter.  While perhaps the Trustee can do this as of right at this juncture, our preference is to stipulate with you to accomplish this rather than file a motion.

Please let me know if your respective clients will agree and we will prepare the stipulation.

Best,
**Jeffrey Dulberg**
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jdulberg@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco